# EXHIBIT 1

## COMMONWEALTH OF MASSACHUSETTS

**Suffolk, ss.**

| | |
|---|---|
| JANE DOE, <br><br>     For herself and the Class, <br><br> v. <br><br> ATRIUS HEALTH, INC. <br><br>     Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION** <br><br> CIVIL ACTION NO. _____ <br><br> **JURY TRIAL DEMANDED** |

### COMPLAINT

Plaintiff Jane Doe[1] ("Plaintiff"), on behalf of herself and the proposed Class (defined below), alleges as follows:

### Preliminary Statement

1.    Plaintiff brings this action to remedy the secret interception of the contents of internet communications between healthcare consumers and the defendant, Atrius Health, Inc. ("Atrius"). Specifically, Atrius aided in the interception of communications between Plaintiff and other Class Members (defined below) and a website maintained by Atrius (the "Atrius Website"). Atrius assisted in the interception of these communications by Google, Facebook (now known as "Meta," but referred to in this complaint as "Facebook"), and other companies that provide so-called "tracking technology." The Plaintiff's and Class Members' wire communications with Atrius were secretly and contemporaneously intercepted, recorded, and transmitted to these third parties without their knowledge or consent whenever they visited any page of the Atrius Website.

---

[1] "Jane Doe" is a pseudonym used to protect the privacy of the Plaintiff, given that this case involves private health information of Jane Doe. Ms. Doe's identity will be disclosed to counsel for the Defendant when agreements or court orders are in place that protect the privacy of Plaintiff and her children.

2.    Atrius actively aided the secret interceptions of healthcare consumers' communications with their website by injecting hidden code into the website. During the loading of webpages on the Atrius Website, Atrius assists Google, Facebook, and others to intercept communications surreptitiously.

3.    Atrius did not disclose to healthcare consumers that it helps third parties such as Google and Facebook to intercept the contents of their communications with the Atrius Website, nor did Atrius seek or obtain their consent for such interception. On the contrary, Atrius deceptively tells healthcare consumers that they disclose consumers' information to third parties only in limited circumstances, not including sharing such information with technology or social media companies such as Google or Facebook.

4.    The Massachusetts Wiretap Act (M.G.L. c. 272 § 99) makes it unlawful to "secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication." "Wire" communications include communications over the internet between websites and website users. The Massachusetts Wiretap Act's prohibitions apply even when one of the parties to the communications knows about the interception if that party secretly records or intercepts the communication or aids another in recording or intercepting the communication without the knowledge or consent of the other party. It is not necessary for a violation of the Massachusetts Wiretap Act that the entirety of the contents of any communication be intercepted; instead, an unlawful interception occurs when

    a.   the identity of the parties to the communication;

    b.   the existence of the communication; **or**

    c.   any part of the contents, substance, purport, or meaning of the communication is intercepted or recorded.

5.    The Massachusetts Legislature enacted the Massachusetts Wiretap Act to counter "the uncontrolled development and unrestricted use of modern electronic surveillance devices," which it

found "pose grave dangers to the privacy of all citizens of the commonwealth." M.G.L. c. 272 § 99(A) (preamble). Internet communications fall comfortably within the Act's express terms. The purposes for which the Massachusetts legislature enacted the Massachusetts Wiretap Act are highly significant in today's world, as technology companies continually chip away at the privacy of individuals, contrary to the public policies that animate the Massachusetts Wiretap Act.

6.     Although this case concerns the interception of communications that disclose healthcare consumers' private health information, Plaintiff's claim under the Massachusetts Wiretap Act does not depend on whether the intercepted communications reveal an individual's private health information or any other sensitive information. The Massachusetts Wiretap Act applies to all interceptions, regardless of the communication's substance.

7.     Moreover, although this case concerns communications between healthcare consumers and healthcare providers, the Massachusetts Wiretap Act claim of the Plaintiff and the Members of the Class does not depend on the nature of the relationship between Plaintiff and the Members of the Class and Atrius. The Massachusetts Wiretap Act applies to all interceptions, regardless of relationship, if any, among the parties to the communication.

8.     The Massachusetts Wiretap Act provides a private remedy for the secret interception of wire communications, enforceable against both the intercepting party **and** any party that aids such an interception.

9.     Atrius aided interceptions by Google, Facebook, and other third parties of healthcare consumers' communications with Atrius through the Atrius Website. Plaintiff seeks statutory remedies under the Massachusetts Wiretap Act both on her own behalf and on behalf of all other Massachusetts residents who accessed the Atrius Website.

## PARTIES

10.     Plaintiff is a resident of Burlington, Massachusetts. Plaintiff is a patient of Atrius. Plaintiff regularly uses the Atrius Website to (i) search for and obtain information about Atrius doctors (including their credentials and backgrounds); (ii) search for information on particular symptoms, conditions, and medical procedures; and (iii) obtain and review medical records through the website's patient portal.

11.     Defendant Atrius Health, Inc. is a corporation that operates in Boston, Massachusetts. Atrius provides medical services and care to patients in Massachusetts, focusing primarily on primary care and specialty medical services. Atrius currently has approximately 614 primary care and specialty physicians. Atrius Health currently serves approximately 689,000 adult and pediatric patients across eastern Massachusetts with approximately 1.9 million visits annually.

## JURISDICTION

12.     The exercise of personal jurisdiction over Atrius is proper according to M.G.L. c. 223 § 3 because, among other things, Atrius is located in and conducts business in Massachusetts, and Plaintiff's claim arises out of Atrius's activities and conduct in the Commonwealth of Massachusetts.

## FACTUAL ALLEGATIONS

### Atrius and Its Website

13.     Atrius operates dozens of healthcare facilities throughout Massachusetts. Atrius offers care to Massachusetts residents across various specialties, including heart and vascular care, orthopedics, gastroenterology, diabetes, surgery, obstetrics and gynecology, and neurology.

14.     Atrius maintains the Atrius Website for its medical practices, found at https://www.atriushealth.org/. Through its website, healthcare consumers can obtain information about the services Atrius provides, including information about doctors, services, and treatments provided by Atrius for particular medical conditions.

15.     The Atrius Website is designed for communications with healthcare consumers. The website includes the following functions:

(a)     The Atrius Website provides general information about Atrius.

(b)     The Atrius Website provides information about healthcare services provided at Atrius, communicated through service-specific pages for a range of services such as "Obstetrics/Gynecology," "Neurology," "Psychiatry and Behavioral Health," and "Pediatrics," among many others.

(c)     The Atrius Website provides substantive information about specific health conditions, including symptoms and causes of those conditions, diagnoses and treatments, and programs and services offered by Atrius.

(d)     The Atrius Website permits healthcare consumers to use a "Find a Doctor" function to search for doctors by condition, specialty, gender, language, and location.

(e)     The Atrius Website permits healthcare consumers to book an appointment online through the website.

(f)     The Atrius Website permits healthcare consumers to renew their medications online through the website.

(g)     The Atrius Website permits healthcare consumers to access and pay bills online.

(h)     The Atrius Website lets healthcare consumers access their private medical information online through the MyHealth Online patient portal.

16.     Because the Atrius Website provides an interactive experience through which a healthcare consumer can obtain information about particular medical conditions, doctors, specialties, and the website user's own healthcare condition and needs, a website user's interaction with the website reveals information about the website user that the user would expect to remain private.

**Reasonable Expectations of Users of the Atrius Website**

17.     Healthcare consumers in Massachusetts have an interest in preserving the confidentiality of communications with healthcare providers. Among the ways healthcare consumers communicate with healthcare providers is through those providers' websites, such as the Atrius Website.

18.     Users of healthcare-related websites such as the Atrius Website have a legitimate expectation and understanding that their communications with Atrius through the website will be private. They also have a legitimate expectation that healthcare providers such as Atrius will not share with third parties their communications with Atrius without their consent.

19.     The expectations and understandings of website users are supported by state law, which prohibits healthcare providers such as Atrius from using or disclosing individuals' "communications" with healthcare providers without valid authorization from the individual. *See* M.G.L. c. 111 § 70E.

20.     Healthcare consumers would **<u>not</u>** anticipate or expect that their communications with healthcare providers, including Atrius, which reveal information about that individual's personal health conditions, will be intercepted and secretly shared with third parties such as Google and Facebook for marketing purposes.

21.     The expectations and understanding of users of the Atrius Website are informed by what Atrius tells them and does not tell them about how it handles their personal information.

22.     The Atrius website features no pop-up or other prominent notification communicating to visitors of the website that Atrius is using any tracking technologies or otherwise facilitating the interception of communications between healthcare consumers and Atrius.

23.     The Atrius Website does contain a small, inconspicuous link at the bottom of each page to what it describes as a "Web Privacy Statement," but that statement contains no disclosure that Atrius is using any tracking technologies or otherwise facilitating the interception of communications between healthcare consumers and Atrius. The Web Privacy Statement, in fact, says nothing about privacy, focusing instead on other issues such as indicating that Atrius does not "practice medicine" through the website, and that material on the website is protected by copyright.

24.     The Atrius Website also contains a "Medical Information Privacy Notice," but that notice contains no disclosure that Atrius uses any tracking technologies or otherwise facilitates the interception of communications between healthcare consumers and Atrius. It does not focus on the Atrius Website itself but instead discusses Atrius's practices in protecting patient medical information more generally. Although the notice contains disclosures about when Atrius may share "health information" with third parties, such as "for law enforcement purposes" and "for reporting victims of abuse," the notice does not disclose that Atrius shares any information with third-party technology and social media companies such as Google or Facebook or that those third parties may use such information for their own commercial purposes. (To repeat, *see* ¶¶ 6, 7, *supra*, Plaintiff's claim is not limited to the interception of "health information" but concerns all intercepted communications made through the Atrius Website, whether or not those communications relate to health information.)

25.     In short, healthcare consumers expect that their communications with healthcare-related websites will not be shared with third parties without their consent—an understanding reinforced by Atrius's deceptive statements on the Atrius Website. The interceptions of website users' communications with Atrius were, therefore, truly secret and made without any consent from Plaintiff or the other class member website users.

### Third-Parties Offering Tracking Technologies

26.     Plaintiff describes in this complaint various tracking technologies implemented on the Atrius Website that cause the secret interception, recording, and transmission of the contents of Class Members' internet communications with Atrius. The next section presents a basic overview of how the technologies work. This section provides a brief overview of the third parties that intercept and record the contents of Class Members' internet communications with Atrius and the purposes for which interceptions are made.

27.     Meta Platforms, Inc., referred to in this complaint by its former and more familiar name, "Facebook,"[2] is a multinational technology conglomerate based in Menlo Park, California. It owns and operates social media platforms, including Facebook and Instagram, as well as various other software and technology products and services.

28.     Facebook maintains detailed profiles on individuals that include the users' real names, locations, email addresses, friends, and communications that Facebook associates with personal identifiers, including IP addresses and device identifiers.

29.     Facebook derives most of its revenues from selling targeted advertising to users of its platforms, including Facebook and Instagram. Facebook tailors advertising toward particular individuals by building extensive behavioral profiles about each individual. These profiles are based not only on those individuals' use of Facebook products, such as Facebook and Instagram, but also on the activities of those individuals on other websites that Facebook does not own.

30.     Among the ways Facebook tracks users on websites not owned by Facebook to supplement its detailed individual profiles is by offering websites with the tracking technology known as Meta Pixel, formerly known as Facebook Pixel. Facebook advertises that Meta Pixel allows website owners to track users across their website and to optimize Facebook advertising based on how they use the websites.

31.     Facebook explains on its own website: "The Meta Pixel is a snippet of JavaScript code that allows [companies] to track visitor activity on your website."

32.     Facebook explains further: "Once you've set up the Meta Pixel, the Pixel will log when someone takes an action on your website…. The Meta Pixel receives these actions, or events, which you can view on your Meta Pixel page in Events Manager."

---

[2] Facebook rebranded its parent company as "Meta" in October 2021.

33.     Therefore, the Meta "pixel allows Facebook to be a **silent third-party watching whatever you're doing**."[3]

34.     Google LLC is a multinational technology conglomerate and a wholly owned subsidiary of Alphabet Inc. Google LLC is referred to in this complaint as simply "Google." Google owns and operates various software services, including the popular Gmail email service, Google's search platform, and numerous other internet software services. It also manufactures technology products, including cell phones, smart home devices, and computers.

35.     Google maintains detailed profiles on individuals that include information such as their real names, dates of birth, email addresses, phone numbers, and details on interactions such individuals have with Google's services, such as Gmail. Google maintains detailed profiles on individuals, whether or not they have a Google account.

36.     Google derives a substantial portion of its revenues through individually targeted advertising. Specifically, Google uses the information it collects on individuals to tailor advertising specifically to the individual, making Google's advertising more valuable than other forms of advertising that are not customized to the individual.

37.     One way Google collects information to build its detailed profiles on individuals is through the tracking technology known as Google Analytics. Google incentivizes websites to use Google Analytics by offering it as a free tool for websites to track the behavior of users on its website. The tracking information recorded through Google Analytics and accessible by the website owner provides the website owner with insights about how users use the website, which the owner can use to improve the website. Although Google provides Google Analytics to website owners for "free,"

---

[3] *Facebook spies on us but not by recording our calls. Here's how the social network knows everything,* Jefferson Graham, USA Today, https://www.usatoday.com/story/tech/2020/03/04/facebook-not-recording-our-calls-but-has-other-ways-snoop/4795519002/(last visited Aug. 11, 2022) (emphasis added).

Google benefits and profits from Google Analytics by using the data collected through Google Analytics for its own commercial purposes, including using that data to build individuals' profiles further. Google can then use this information to serve such individuals with better-targeted individualized advertisements.

**Website Tracking Technologies on the Atrius Website**

38.    Atrius injects hidden code into the Atrius Website that permits third parties to contemporaneously intercept healthcare consumers' communications with Atrius. The tracking technologies permit third parties such as Google and Facebook to associate a website user's browsing activity with particular individuals known to Google and Facebook. This includes, for example, associating the content of the communications between the website user and Atrius with the website user's Facebook profile.

39.    These tracking technologies transmit to Google, Facebook, and other companies, contemporaneously with the website communications between Class Members and Atrius, the contents of those communications and identifying information about the Class Members. The contents intercepted include private health information, including the individual's medical conditions, doctors they may be seeing, medical searches the individual performs on the website, and personal medical information the user enters into forms on the website.

40.    Atrius uses or has used several tracking technologies on its website, including Google Analytics and Meta Pixel. The tracking technologies are implemented through similar means.

41.    Before describing how such technologies work, it is important to first define some basic technological terms.

42.    A **"browser"** or **"web browser"** is software on a computer or other device (such as a tablet or cell phone) that permits a website user to view a webpage. Examples include Google Chrome, Safari, and Firefox.

43.    An **"IP address"** is a unique combination of four numbers, each between 0 and 255, that serves as a particular device's address on the internet. Both websites and website users have IP addresses. For example, the IP address for the Atrius Website, as of the time of this complaint, is 198.168.31.233. When they connect to the internet, particular individuals also have their own unique IP addresses. Companies such as Google and Facebook associate particular individuals with IP addresses to help track them across the internet for commercial purposes.

44.    A **"URL"** is another form of an address specifically for websites (or a webpage on a website) that a web browser can translate into an IP address to load the website. A URL is the familiar address often preceded by "http://." For example, the URL for the main landing page for the Atrius Website is https://www.atriushealth.org/. Numerous URLs also point to specific pages on that website; often, a URL will contain information about the particular webpage itself. For example, the Atrius Website has a page specifically about Atrius's obstetrics and gynecology practice; that page's URL is https://www.atriushealth.org/specialties-and-services/obstetrics-gynecology/.

45.    A **"cookie"** is a file saved on a website user's device that helps track the user across different web pages or websites. As described below, Google Analytics and Meta Pixel are not themselves cookies but are instead implemented by JavaScript code. Both technologies, however, sometimes use cookies in addition to other means to help a third-party such as Google or Facebook confirm the real-world identity of a person browsing a website. Notably, both Google Analytics and Meta Pixel continue to intercept communications even if a user has set their browser settings to turn off cookies.

46.    **"JavaScript"** is a type of computer code that can be included on a website. A website user's browser downloads and "runs" the code within the browser. The JavaScript code can perform various functions, including causing the browser to load components of the website, providing interactive functionality in the website, transmitting information from the browser to servers on the

internet, or performing other functions in the background. Unlike many other components of a website, such as text and images, which are visible to the website user, the JavaScript code itself is not visible. The execution of JavaScript code may or may not result in the presentation of visible components of the website.

47.     With those basic terms in mind, the tracking technologies described in this complaint—in particular, Google Analytics and Meta Pixel—work as follows. In general terms, a website owner (here, Atrius) inserts into its website code that causes an individual's web browser, when loading the website, to also load a JavaScript file from a third-party server (such as Google or Facebook). That JavaScript code is then executed automatically within the individual's web browser.

48.     The execution of the JavaScript code causes the individual's web browser to retrieve a very small file from the third-party's website, such as a transparent single-pixel image file from Facebook's server (hence the origin of the phrase "Meta Pixel" or "Facebook Pixel" to describe the tracking technology).

49.     When the JavaScript code causes the user's web browser to retrieve a file from the third-party's website, the JavaScript code also causes the browser to communicate certain information to the third-party website. That information can include: (i) the URL of the website the user is visiting (that is, the website address, such as https://www.atriushealth.org/); (ii) the title of the particular webpage being visited; (iii) metadata from the website, including information describing the content of the website; (iv) information the user has submitted to the website, such as search terms or any other information inputted into a form (even if the user has not yet "submitted" the form); (v) whether and to what degree the user has scrolled through the website; (vi) if a user has made a selection on any drop-down menu on the website, the content of that selection; and (vii) prior pages the website user has visited before viewing the current page.

50.    When the JavaScript code causes the browser to communicate the information described in the paragraph above to third-party servers such as Google or Facebook, the code also causes the browser to reveal the website user's IP address to the third-party website. This disclosure permits the third party, such as Google or Facebook, to associate the information it has received about the individual's communications with the website to the identity of a particular individual known to Google and Facebook. A third-party such as Google and Facebook can then add the content of the user's communications with Atrius to its collection of information it already has about the individual, which it can then use for advertising purposes. For example, when Meta Pixel's JavaScript code causes a "pixel" to be loaded from Facebook's servers, Facebook records and associates the content of the communications it has intercepted with an individual's Facebook and Instagram profiles, which includes the individual's real name and other information about them.

51.    The code for tracking technologies is invisible to a website user. By design, the tracking technologies work so that no visible evidence of the technology is shown to the user. For example, even though some technologies may load a small single-pixel image or another file, that image is not displayed as part of the website; instead, it is loaded in the background solely for the purpose of transmitting the content of the user's communications and the user's identity to the third party such as Google or Facebook. The tracking technologies are detectible only by using specialized tools that divulge the code underlying a webpage and the network traffic the website components generate.

52.    The tracking technologies described in this complaint intercept and transmit to third parties the contents of communications between healthcare consumers and Atrius contemporaneously with those communications. The tracking technologies intercept and transmit the contents of those communications to third parties before the webpage has even completed loading.

53.    The use of tracking technologies became an important news story in June 2022 following a report by the online magazine The Markup reporting that "Facebook Is Receiving

Sensitive Medical Information from Hospital Websites."[4] (the "Markup Article"). That article detailed how many of the nation's top hospitals had Meta Pixel code on their websites, which caused the unauthorized disclosure of individuals' communications and other personal information to Facebook. The Markup Article has triggered Congressional investigations and increased scrutiny of hospitals' data practices.[5] In reaction to the Markup Article, some healthcare providers removed Meta Pixel code from their websites completely or severely limited its use.

54.     Atrius appears to be among these healthcare providers that removed Meta Pixel in reaction to the Markup Article. Due to changes Atrius made in mid-2021 as to how it injected the Meta Pixel code onto its website, Plaintiffs cannot identify the precise date that Atrius removed the Meta Pixel code, although the evidence does confirm that Atrius used Meta Pixel during a substantial portion of the class period. Atrius, however, continues, to the present, to secretly inject Google Analytics and several other third-party tracking technologies onto its website. These tracking technologies are each substantially similar to the now-removed Meta Pixel code, both in their surreptitious deployment on the website and their contemporaneous interception of website users' communications with Atrius.

**Atrius's Use of Tracking Technologies on the Atrius Website**

55.     Atrius uses various tracking technologies across the Atrius Website. Several of those tracking technologies are injected into the code of all, or almost all, of the pages within the Atrius Website. For example, on nearly every page of the Atrius Website, Atrius injects hidden code that

---

[4]  *See* "Facebook Is Receiving Sensitive Medical Information from Hospital Websites," https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.
[5]  *See* "Meta Faces Mounting Questions from Congress on Health Data Privacy As Hospitals Remove Facebook Tracker," https://www.healthcareitnews.com/news/senator-questions-zuckerberg-over-metas-healthcare-data-collection-policies.

loads Google Analytics. It also appears Meta Pixel was injected onto many pages on the Atrius Website before Atrius removed Meta Pixel in late September 2022.

56.     The code for tracking technologies such as Meta Pixel and Google Analytics is invisible to website users but becomes visible only when using special "developer" software such as Google's "Developer Mode," a tool designed for web developers. Google's Developer Mode displays hidden components of websites and records the content of network traffic generated by website components (including the loading and execution of JavaScript code and the text that the JavaScript code causes to be transmitted to third-party web servers when it loads a small file or image).

57.     Below is an image of the main landing page for the Atrius Website:



58.     When a user loads the main landing page for the Atrius Website, the webpage causes the user's web browser to download from Google's servers a file called "analytics.js," which contains the JavaScript code for Google Analytics ("analytics" refers to "Google Analytics," and "js" standards for JavaScript). The website then causes the user's web browser to execute the JavaScript code

contained in the "analytics.js" file. That code, in turn, causes the user's web browser to connect to Google's servers again to load a small file. When the user's web browser loads this small file, the Google Analytics JavaScript code causes the user's web browser to intercept and transmit certain information to Google.

59.     The image below depicts the landing page for the Atrius Website on the left-hand-side, and to the right of it, Google Developer Mode, which inspects the components of the website and the network traffic those components generate:



60.     A closer view of Google Developer Mode, focusing specifically on the contents of the communication intercepted and transmitted to Google, is presented below (with highlighting added). The "Payload" is a technological term that refers to information transmitted from a user's web browser to a web server when the browser retrieves a file from that web server. In this case, the "Payload" reflects the information that the Google Analytics JavaScript code causes the user's web browser to intercept and transmit to Google when a small file is loaded from Google's servers:



61.    Among the information transmitted to Google's servers contemporaneously with the communications between the website user and the Atrius Website are:

(a)    The URL of the webpage visited (the text after the letters "dl," which includes the text "https://www.atriushealth.org"); and

(b)    The title of the webpage (after the letters "dt," which includes "Atrius Health | Care. About. You. Welcoming New Patients").

62.    The other information Google intercepts includes data about the user's web browser configuration (including screen resolution, device information, and browser settings); a unique

identifier for the particular user visiting the website, which Google retrieves through a cookie set in the website user's browser (which enables Google to track that individual across the website); and identification codes used to connect the browsing activity with a Google Analytics account held by the website (here, Atrius).

63.     Notably, when the website user's web browser intercepts the contents of communications between the website user and the Atrius Website and contemporaneously transmits those contents to Google, the connection established between the user's web browser and Google's servers reveals the user's IP address to Google. Google then uses that IP address to associate the user's communications with the website with particular individuals known to Google, including those individuals' Google accounts and real-world identities (whether or not the individual has a Google account). After Google associates the website user's communications with Atrius with the identity of particular individuals known to Google, Google can use that information for its own commercial purposes, including serving personalized advertisements upon that individual on other websites owned by Google or any other third parties that use Google's advertising platforms (many do).

64.     Google can further confirm the identity of the user communicating with Atrius through the Atrius Website through a "cookie" file saved on the user's computer, which the Google Analytics code retrieves. The cookie further confirms the website user's identity, enabling Google to associate the user's communications with a particular individual known to Google (including the individual's real-world identity).

65.     Moreover, by communicating information about the website user's browser configuration and device (such as screen resolution and other browser configuration settings), Google can confirm the user's identity through a technique known as "browser fingerprinting." In short, browser fingerprinting associates particular individuals with unique combinations of web browser

settings. This permits Google to confirm further that a specific individual using Google's services (for example, a person with a Gmail account) and an individual visiting the Atrius Website are the same.

66.     As noted, Atrius recently removed Meta Pixel from its website, likely in response to press coverage and Congressional scrutiny following the Markup Article. An archived version of the main page of the Atrius website, saved before Atrius removed Meta Pixel, confirms that Atrius used Meta Pixel code on the main landing page of its website during the class period.

67.     When Atrius used Meta Pixel, the Atrius Website would load a JavaScript file called "fbevents.js." That JavaScript code, in turn, caused the website user's browser to secretly and contemporaneously intercept and transmit to Facebook the website user's communications with the Atrius Website. Below is an example of the contents of the communication between the website user and Atrius, which the hidden Meta Pixel would intercept and transmit to Facebook:

| ✕ | Headers | Payload | Preview | Response | Initiator | Timing | Cookies |

▼ **Query String Parameters**      view source      view URL-encoded

id: 110459582760837

ev: Microdata

dl: https://www.atriushealth.org/

rl:

if: false

ts: 1586697697627

cd[DataLayer]: []

cd[Meta]: {"title":"\n\tAtrius Health | Care. About You. | Welcoming New Patie
nts\n","meta:description":"Atrius Health provides primary and specialty care
to more than 745,000 adult and pediatric patients at 31 medical practice loca
tions in eastern Massachusetts. Find a doctor today."}

cd[OpenGraph]: {"og:description":"Atrius Health provides primary and specialty
care to more than 745,000 adult and pediatric patients at 31 medical practice
locations in eastern Massachusetts. Find a doctor today.","og:image":"http://
www.atriushealth.org/app_media/24da6292bbd749e28f3ebf65f805c507.ashx","og:tit
le":"Atrius Health | Care. About You. | Welcoming New Patients"}

cd[Schema.org]: []

cd[JSON-LD]: [{"@context":"https://web.archive.org/web/20200412132127/http://s
chema.org","@type":"WebSite","url":"https://web.archive.org/web/2020041213212
7/https://www.atriushealth.org","potentialAction":{"@type":"SearchAction","ta
rget":"https://web.archive.org/web/20200412132127/https://www.atriushealth.or
g/search/site-search?q={search_term_string}","query-input":"required name=sea
rch_term_string"}}]

sw: 1920

sh: 1080

v: 2.9.15

r: stable

ec: 1

o: 30

fbp: fb.0.1586697697114.1669629872

68.     Similar to Google Analytics, Meta Pixel caused the user's web browser to intercept and transmit to Facebook the contents of the communications between the website user and the Atrius Website, including the URL of the webpage visited, the title of the webpage, and descriptions of contents of the webpage. The interception and transmission to Facebook also included information

about the user's browser configuration and various codes to associate the communications with Atrius's advertising account with Facebook.

69.    Also, the JavaScript code for Meta Pixel caused the user's web browser to reveal the user's IP address to Facebook. This identifier permitted Facebook to associate the content of the website user's communications with the website to the user's Facebook profile (or the profile of other websites owned by Facebook, such as Instagram). With that information, Facebook could then use the contents of communications between the website user and Atrius to serve personalized advertising to the website user in the future.

70.    Moreover, the transmission to Facebook of the user's browser configuration permitted Facebook to confirm the user's identity through browser fingerprinting (that is, comparing the unique combination of browser settings revealed to Facebook via the Meta Pixel Code to Facebook's own records of the same browser configuration when the same individual visits Facebook, Instagram, and other Facebook-owned websites).

71.    The text fields communicated to Facebook by the Meta Pixel code also included a persistent identifier for each particular user, which permitted Facebook to track that individual across the Atrius Website and further confirm that individual's real-world identity.

72.    As reflected in the screenshots depicted above, the landing page included a button inviting new patients to make an appointment by clicking the "Book Now" button. By clicking on that button, the website user communicates an intention to receive medical care from Atrius. When a website user clicks that button, hidden Google Analytics code contemporaneously intercepts that communication and transmits its contents to Google. The screenshot below shows the contents of the communication intercepted and transmitted to Google (with highlighting added):



That is, hidden Google Analytics code intercepted and transmitted to Google that the user made an "Outbound Link Click" to an Atrius Health "scheduling" page. (Google knows the more detailed contents of that destination page—that it is designed to permit an individual to make an appointment—through Google's scraping of website data for purposes of its Google search platform.)

73.    On the Atrius landing page, existing patients were also presented with an option to access Atrius's "MyHealth Online" patient portal by clicking on the "MyHealth Online" button shown on that page (a button that is available on nearly every page on the website). When a user clicks that button, the user is communicating the fact that the user is an existing patient of Atrius. When a user clicks the button, hidden Google Analytics code intercepts and transmits to Google the content of that communication. The screenshot below reflects the information intercepted by and transmitted to Google (with highlighting added):

That is, hidden Google Analytics code intercepts that the user has made an "Outbound Link Click" to the Artius MyHealth Online patient portal.

74.    Before Atrius removed Meta Pixel from the Atrius Website, hidden Meta Pixel code intercepted the same communication when a user clicked on the "MyHealth Online" button to log into Atrius's patient portal. The content of the communication intercepted via Meta Pixel's hidden code is shown below (with highlighting added):



That is, the hidden Meta Pixel could would intercept a "ButtonClick" event, that the user specifically clicked in a "login" button to connect to "MYHEALTH ONLINE."

75.  Atrius configured its website to intercept and retransmit to Google, Facebook, and other third parties specific information about the webpages a healthcare consumer visits within the website, which in turn may reveal personal information about the healthcare consumer. The further examples presented below do not reflect webpages Plaintiff personally visited but are presented for illustrative purposes.

76.  The Atrius Website contains dozens of subpages for specific "Specialties & Services." For example, the Atrius Website contains a page entitled "Obstetrics/Gynecology," designed to inform the website user about OB/GYN services Atrius offers. By visiting that webpage, a user reveals to Atrius that the user has some interest in OB/GYN services (for example, the user may be pregnant or know someone who is). When the user communicates with Atrius by visiting this particular webpage, Atrius causes the secret interception and transmission of that communication to Google and other third parties. Below is a screenshot of the Atrius Obstetrics/Gynecology webpage:



77.     The graphic below presents the contents of the communication between the website user and Atrius that are secretly intercepted and transmitted to Google when the above page loads as a result of the Google Analytics JavaScript code that Atrius secretly injects into the website (with highlighting added):

78.     As reflected in the above screenshot, the code injected into the Atrius Website causes the user's browser to contemporaneously intercept and transmit to Google the fact that the website user is visiting an "Obstetrics and Gynecology" webpage on the Atrius Website—information that Google retains and can use for its own commercial purposes, and because Google retains it, can be accessible by third parties by subpoena or otherwise.[6]

---

[6] *See, e.g.,* "How data from period-tracking and pregnancy apps could be used to prosecute pregnant people," https://www.latimes.com/business/story/2022-08-17/privacy-reproductive-health-apps.

79.     Before Atrius removed Meta Pixel code from the Atrius Website, the same webpage contained hidden code that intercepted the user's communication with the website and retransmitted that same information to Facebook. Atrius caused the secret interception and transmission to Facebook of the contents of the communication between the website user and Atrius, including that the user is visiting an Obstetrics & Gynecology webpage, information that Facebook retained and can use for commercial purposes.

80.     The Atrius Website contains dozens of similar pages on particular medical specialties and practices that Atrius offers. By visiting those other pages that concern specific specialties and practices, website users communicate to Atrius information about themselves, including conditions they may have or services in which they may be interested. For each such page, the Atrius Website aids or aided Google and Facebook's secret interception of the contents of communications with Atrius, similar to the above Obstetrics/Gynecology department example.

81.     The Atrius Website also includes a search function that permits an individual to search for medical or other information relevant to them. Healthcare consumers often enter search terms that reveal private health information about them, for example, when an individual uses the search function for particular symptoms, conditions, or medical specialties offered by Atrius. When an individual uses the search function, Atrius aids in the secret interception of the contents of that search and transmission of those contents to Google and other third parties. Below, for example, is the search results page for "pregnant."



82.     When a user performs this search on the Atrius Website, and the results page then loads, the Google Analytics code is activated, causing the individual's web browser to intercept the user's search terms and transmit them to Google. Below is the portion of the communication that the Google Analytics code causes to be transmitted to Google (with highlighting added):

As reflected in the above screenshot, the hidden Google Analytics code causes the precise search terms entered by the user to be intercepted and transmitted to Google, which Google can then use for its own commercial purposes, including associating those search terms with the individual's real-world identity for targeted advertising purposes.

83.    Upon information and belief, before Atrius removed Meta Pixel from the Atrius Website, healthcare consumers' searches on the Atrius Website were similarly intercepted and transmitted to Facebook through the hidden Meta Pixel code.

84.    The Atrius Website also includes a "Find A Doctor" feature that permits healthcare consumers to search for doctors using filtering criteria, such as specialties, location, doctor gender, and language. For example, the screenshot below depicts the search results page when a user indicates she is looking for a female doctor in "Obstetrics & Gynecology" within five miles of Boston zip code 02210:



85.    Depicted below are the contents of the user's communication with the Atrius website

that are intercepted and transmitted to Google via hidden Google Analytics Code (with highlighting

added):



86.    The above screenshot reflects that when an individual enters a search on the Atrius

"Find a Doctor" page and chooses other filtering criteria, Google Analytics intercepts the contents of

the search and transmits them to Google, including the other filtering criteria the user has selected,

including a location near 02210 and a "specialization" of "obstetrics" and "gynecology." Google retains all this information and may use it for its own commercial purposes, including associating find-a-doctor search criteria with the individual's real-world identity for targeted advertising purposes.

87.     Before Atrius removed Meta Pixel from the Atrius Website, Atrius also injected hidden Meta Pixel code that intercepted communications on the Find-A-Doctor page of the Atrius Website, permitting Facebook to associate those communications with the individual's accounts held by Facebook-owned platforms (including Facebook and Instagram).

88.     The Atrius Website includes an "Online Bill Pay" feature that permits patients to pay their Atrius medical bills online. By accessing that portion of the website, the website user communicates that the user is a patient of Atrius. A screen capture of the main "Online Bill Pay" page is shown below:



89.     When a user visits the Atrius Website's Online Bill Pay page, hidden Google Analytics code that Atrius has injected onto the webpage intercepts the user's communication with Atrius and sends the communication to Google and other third parties. The contents of the communication intercepted and sent to Google are depicted below (with highlighting added), reflecting that the user's communication with Atrius through which the user accesses the "Bill Pay" portion of the website is intercepted and sent to Google[7]:



---

[7] The prefixes preceding the text fields for this example (and the next one) are different than the other Google Analytics examples (for example, "utmdt," and "utmp") , because this particular page used a different version of Google Analytics code.

90.     The Atrius Website also features an online form that patients may fill out to obtain a prescription refill. By accessing this part of the website, a website user communicates to Atrius that the user is a patient needing medicine. The online "Prescription Refill" form is shown below:



91.     When the website user initiates this communication, hidden Google Analytics code that Atrius has injected into its website causes the website user's communication with Atrius to be intercepted and contemporaneously transmitted to Google. The contents of the interception, including that the user is seeking "Prescriptions/RxRefills" from "Atrius Health," are depicted below (with highlighting added):



92.    In addition to Google and Facebook, Atrius enables or has enabled the communications between healthcare consumers and Atrius to be intercepted and transmitted to various other companies without the consumer's knowledge or consent. These additional third parties include:

(a)    **Doubleclick.** Google Doubleclick is an internet advertising platform. Like Google Analytics and Meta Pixel, Atrius has inserted code into their website that causes communications between the user and the website to be intercepted and transmitted to Google. The contents intercepted include the URL and title of each website visited and the user's IP address. Google can then monetize that information through advertisements.

(b)    **Sharethis**. Sharethis is a company that tracks the behavior of users of websites. Similar to Google Analytics and Meta Pixel, Atrius inserts code on its website that causes the contents of the user's communications with the website, including pages viewed, the contents of searches, and other information, to be sent to the sharethis.com server. The code also causes the user's IP address to be revealed to Sharethis.

(c)    **New Relic**. New Relic offers a "Browser Monitoring" analytics service that is similar to Google Analytics. Similar to Google Analytics and Meta Pixel, Atrius, during the class period, inserted code into their website that caused communications between the user and Atrius to be intercepted by and transmitted to New Relic at bam.nr-data.net. The contents intercepted include the URL of each webpage visited and the user's IP address, among other things.

(d)    **Twitter Pixel.** When Atrius previously used it during the class period, Twitter Pixel operated much the same way as Meta Pixel. It used hidden JavaSript code that caused the user's web browser to intercept contents of the user's communication with the Atrius Website and transmit those contents to Twitter. Through the use of IP addresses and other identifiers, Twitter could associate a particular website user's intercepted communications with individuals known to Twitter (such as individuals with Twitter accounts).

### The Secret Use of Website Tracking Technologies Such as Meta Pixel and Google Analytics Is Not Necessary

93.    The secret use of tracking technologies such as Meta Pixel and Google Analytics is not necessary for the Atrius Website's operation. The Atrius Website can and would operate just the same from the perspective of healthcare consumers without the secret use of tracking technologies described in this complaint.

94.    Tracking technologies such as Google Analytics and Meta Pixel are distinct from and are not necessary to feature Google or Facebook-associated functionality on the website. For example, a website can contain links to its Facebook profile or invite website users to interact with Atrius via Facebook without using Meta Pixel. Meta Pixel is an entirely distinct feature from a Facebook button or a link to a Facebook profile; any website can have one without the other.

95.    Moreover, even if Atrius wanted to use tracking technologies to optimize its website or its marketing for a website, there is no legitimate or lawful reason for Atrius (i) to keep secret from its website users the use of these tracking technologies; (ii) to falsely and deceptively claim that Atrius

does not share the communications with others when it does; or (iii) to claim that Atrius maintains the privacy of those communications when it does not.

### Class Action Allegations

96.     Plaintiff brings this action under Mass. R. Civ. Proc. 23 on behalf of herself and the Class, which includes:

> All Massachusetts residents who, while in the Commonwealth of Massachusetts, accessed any portion of the website at www.atriushealth.org within three years prior to the date of the filing of this initial complaint in this action.

97.     This action is properly maintainable as a class action.

98.     The Class Members are so numerous that joinder of all members in a single lawsuit is impractical.

99.     Common questions of law and fact exist for all Class Members, and those questions predominate over any questions solely affecting individual members of the Class. Among the predominant questions of law and fact common to the Class are:

(a)     Whether communications between Class Members and Atrius, through the Atrius Website, were wire communications under the Massachusetts Wiretap Act;

(b)     Whether Atrius inserted tracking technologies into the hidden code of the Atrius Website, including Google Analytics and Meta Pixel;

(c)     Whether the tracking technologies inserted into the hidden code of the Atrius Website are "intercepting devices" as defined in the Massachusetts Wiretap Act, M.G.L. c. 272 § 99(B)(3);

(d)     Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between Atrius and users of the Atrius Website;

(e)     Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others disclosed to third parties such as Google, Facebook, and others the identity of the parties to the communication, the existence of the communication, and the communications' content, substance, purport, and meaning;

(f)     Whether by inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, Atrius installed an intercepting device on their website with the

intent to aid Google, Facebook, and other companies to hear and record communications between the Class Members and Atrius;

(g)   If Plaintiff prevails on the merits of her Massachusetts Wiretap Act claim, the remedies afforded under the Massachusetts Wiretap Act to Class Members, including statutory remedies, attorneys' fees, and litigation disbursements.

100.   Plaintiff's claims are typical of Class Members' claims because, like Plaintiff, each Class Member accessed the Atrius Website and had their communications with that website secretly intercepted and transmitted to third parties without their knowledge or consent.

101.   Plaintiff will fairly and adequately protect the interests of the Class Members and has retained counsel who have extensive experience prosecuting consumer class actions and who, with Plaintiff, are fully capable of, and intent upon, vigorously pursuing this action. Plaintiff has no interest adverse to the Class.

102.   A class action is superior to all other available methods for this controversy's fair and efficient adjudication. Furthermore, any individual Class member's damages are not likely substantial enough to justify the expense and burden of individual litigation. Hence, it would be impracticable for all Class Members to redress the wrongs done to them individually. There will be no difficulty in managing this action as a class action.

103.   Atrius has acted on grounds generally applicable to the Class, making appropriate the relief Plaintiff seeks for the Class as a whole.

## COUNT I

**(Violation of the Massachusetts Wiretap Act, M.G.L. c. 272 § 99, on behalf of the Class)**

104.   Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

105.   The Massachusetts Wiretap Act, M.G.L. c. 272 § 99, makes it an unlawful act to "secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any

wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." *Id.* ¶ (B)(4), (C). The Act provides a private remedy to any "person whose oral or wire communications were intercepted." *Id* ¶ (C).

106.    An individual's communications with a website constitute "wire communications" as defined in the Massachusetts Wiretap Act, M.G.L. c. 272 § 99(B)(1). The communications between Plaintiff and other Class Members and Atrius, through the Atrius Website, were wire communications under the Massachusetts Wiretap Act.

107.    The tracking technologies inserted into the hidden code of the Atrius Website, including Google Analytics and Meta Pixel, are "intercepting devices" as defined in the Massachusetts Wiretap Act, M.G.L. c. 272 § 99(B)(3). "Intercepting devices" also include (i) any devices Class Members used to access the Atrius Website; (ii) Class Members' web browsers used to access the Atrius Website; (iii) Atrius's own computer servers; and (iv) the computer servers of third-parties such as Google and Facebook which intercepted Class Members' communications with the Atrius Website.

108.    The computer code for tracking technologies such as Google Analytics, Meta Pixel, and others enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between Atrius and users of the Atrius Website, including, but not limited to, the identity of the parties to the communication, the existence of the communication, and the communication's content, substance, purport, and meaning, including but not limited to (i) the identity of webpages the user visited; (ii) the precise text of search queries; (iii) the search criteria individuals used to find doctors; and (iv) the precise contents of information the individuals inputted onto forms on the website.

109.    By inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, Atrius installed an intercepting device on their website with the intent to aid Google,

Facebook, and other companies to secretly hear and record communications between the Class Members and Atrius.

110.    Class Members' communications between the Class Members and Atrius were intercepted, disclosed to Google, Facebook, and other third parties, and used without their knowledge or consent. Moreover, their privacy interests were violated by the interception.

111.    Pursuant to the Massachusetts Wiretap Act, Plaintiff seeks for herself and each Class Member statutory damages of $100 for each day of Atrius's violation of the Massachusetts Wiretap Act for Plaintiff and each Class Member or $1,000 with respect to the Plaintiff and each Class Member, whichever is higher, plus reasonable attorneys' fees and other litigation disbursements that her counsel has incurred and will reasonably incur in prosecuting this action.

## Prayers for Relief

WHEREFORE, Plaintiff prays for relief in the form of an order as follows:

a.    Certifying this action as a class action under Massachusetts Rule of Civil Procedure 23, and appointing Plaintiff as class representative and her attorneys as class counsel;

b.    Awarding damages (including statutory damages) to Plaintiff and Class Members;

c.    Awarding attorneys' fees, expenses, and the costs of this suit, together with prejudgment and post-judgment interest at the maximum rate allowed by law; and

d.    Awarding such other and further relief which the Court finds just and proper.

## **Jury Demand**

Plaintiff demands a trial by jury on all claims so triable.

Dated: March 10, 2023                    Respectfully submitted,


_/s/ Michelle H. Blauner_
SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com