COMMONWEALTH OF MASSACHUSETTS
SUFFOLK COUNTY CIVIL
Docket Report

**2384CV00597 Doe, For Herself And The Class, Jane vs. Atrius Health, Inc.**

| | | | |
|---|---|---|---|
| **CASE TYPE:** | Business Litigation | **FILE DATE:** | 03/10/2023 |
| **ACTION CODE:** | BE1 | **CASE TRACK:** | B - Special Track (BLS) |
| **DESCRIPTION:** | Fraud, Business Torts, etc. | | |
| **CASE DISPOSITION DATE:** | 01/09/2025 | **CASE STATUS:** | Closed |
| **CASE DISPOSITION:** | Transferred to another Court | **STATUS DATE:** | 01/09/2025 |
| **CASE JUDGE:** | | **CASE SESSION:** | Business Litigation 1 |

**PARTIES**

| | |
|---|---|
| **Plaintiff**<br>Doe, For Herself And The Class, Jane | **Attorney** **549049**<br>Michelle H Blauner<br>Shapiro Haber and Urmy LLP<br>Shapiro Haber and Urmy LLP<br>One Boston Place<br>Boston, MA 02108<br>Work Phone (617) 208-4713<br>Added Date: 03/10/2023<br><br>**Attorney** **663866**<br>Patrick Vallely<br>Shapiro Haber and Urmy LLP<br>Shapiro Haber and Urmy LLP<br>One Boston Place<br>Suite 2600<br>Boston, MA 02108<br>Work Phone (617) 439-3939<br>Added Date: 10/30/2023 |

**COMMONWEALTH OF MASSACHUSETTS**
**SUFFOLK COUNTY CIVIL**
**Docket Report**

| | |
|---|---|
| **Defendant**<br>Atrius Health, Inc.<br>265 Grove St.<br>Suite 3-300<br>Newton, MA 02466 | **Attorney** **633246**<br>Anthony E Fuller<br>Hogan Lovells LLP<br>Hogan Lovells LLP<br>125 High St<br>20th Floor<br>Boston, MA 02110<br>Work Phone (617) 371-1000<br>Added Date: 05/01/2023<br><br>**Attorney** **558906**<br>Maria R Durant<br>Hogan Lovells US LLP<br>Hogan Lovells US LLP<br>125 High St<br>Suite 2010<br>Boston, MA 02110<br>Work Phone (617) 371-1024<br>Added Date: 05/11/2023<br><br>**Attorney** **679637**<br>Adam Cooke<br>Hogan Lovells US LLP<br>Hogan Lovells US LLP<br>555 Thirteenth St NW<br>Columbia Square<br>Washington, DC 20004<br>Work Phone (202) 637-5479<br>Added Date: 10/30/2023<br><br>**Attorney** **709197**<br>Kayla H Ghantous<br>Hogan Lovells US LLP<br>Hogan Lovells US LLP<br>125 High St<br>Suite 2010<br>Boston, MA 02110<br>Work Phone (617) 702-7749<br>Added Date: 05/11/2023 |

**COMMONWEALTH OF MASSACHUSETTS**
**SUFFOLK COUNTY CIVIL**
**Docket Report**

**FINANCIAL DETAILS**

| Date | Fees/Fines/Costs/Charge | Assessed | Paid | Dismissed | Balance |
|---|---|---|---|---|---|
| 03/10/2023 | Civil Filing Fee (per Plaintiff) Receipt: 38819 Date: 03/10/2023 | 240.00 | 240.00 | 0.00 | 0.00 |
| 03/10/2023 | Civil Security Fee (G.L. c. 262, § 4A) Receipt: 38819 Date: 03/10/2023 | 20.00 | 20.00 | 0.00 | 0.00 |
| 03/10/2023 | Civil Surcharge (G.L. c. 262, § 4C) Receipt: 38819 Date: 03/10/2023 | 15.00 | 15.00 | 0.00 | 0.00 |
| 03/10/2023 | Civil Filing Fee (per Plaintiff) Receipt: 38819 Date: 03/10/2023 | 240.00 | 240.00 | 0.00 | 0.00 |
| 03/10/2023 | Fee for Blank Summons or Writ (except Writ of Habeas Corpus) MGL 262 sec 4b Receipt: 38819 Date: 03/10/2023 | 5.00 | 5.00 | 0.00 | 0.00 |
| | **Total** | **520.00** | **520.00** | **0.00** | **0.00** |

**COMMONWEALTH OF MASSACHUSETTS**
**SUFFOLK COUNTY CIVIL**
**Docket Report**

**INFORMATIONAL DOCKET ENTRIES**

| Date | Ref | Description | Judge |
|---|---|---|---|
| 03/10/2023 | 1 | Complaint electronically filed. | |
| 03/10/2023 | 2 | Civil action cover sheet filed. | |
| 03/10/2023 | 3 | Plaintiff Jane Doe, For Herself And The Class's Motion to proceed in pseudonym | |
| 03/10/2023 | 4 | Affidavit of Attorney Michelle H. Blauner in Support of Plaintiff's Motion to Proceed in Pseudonym | |
| 03/13/2023 | 5 | General correspondence regarding Notice of Acceptance into Business Litigation Session<br>It has been assigned to BLS1.<br>(3/14/23) (Notice sent 3/24/23) | Salinger |
| 03/21/2023 | | Endorsement on Motion to Proceed in Pseudonym (#3.0): ALLOWED<br>After review, Allowed. Plaintiff shall file a notice with the court disclosing Plaintiff's true name and address. The notice shall be impounded in the interest of justice until the completion of this case or further order of the court, and the notice shall be served on Defendant with the complaint (or provided to defense counsel if the complaint has already been served.<br>(3/21/23) (Notice sent 3/24/23) | Krupp |
| 03/28/2023 | 6 | Plaintiff Jane Doe, For Herself And The Class's Notice of Plaintiff's True Identity | |
| 03/31/2023 | 7 | Party(s) file Stipulation<br>Regarding Acceptance of Service and Defendant's Time to Respond to the Complaint<br><br>Applies To: Doe, For Herself And The Class, Jane (Plaintiff); Atrius Health, Inc. (Defendant) | |
| 04/27/2023 | 8 | Defendant Atrius Health, Inc.'s Notice of filing removal (US Dist.# 23-cv-10923) | |
| 04/27/2023 | | Exhibits/Appendix | |
| 05/01/2023 | | Attorney appearance<br>On this date Anthony E Fuller, Esq. added for Defendant Atrius Health, Inc. | |
| 05/09/2023 | | REMOVED to the U.S. District Court of Massachusetts | |
| 05/09/2023 | | Case transferred to another court. | |
| 05/11/2023 | | Attorney appearance<br>On this date Maria R Durant, Esq. added for Defendant Atrius Health, Inc. | |
| 05/11/2023 | | Attorney appearance<br>On this date Kayla H Ghantous, Esq. added for Defendant Atrius Health, Inc. | |
| 10/30/2023 | | Remanded to the Superior Court from the U.S. District Court.<br><br>ACTION RETURN TO COURT ACCORDINGLY<br><br>See P#20 Notice Sent 10/30/2023 | |

COMMONWEALTH OF MASSACHUSETTS
SUFFOLK COUNTY CIVIL
Docket Report

| | | |
|---|---|---|
| 10/30/2023 | 9 | Defendant Atrius Health, Inc.'s Notice of Removal |
| 10/30/2023 | 10 | Corporate Disclosure Statement filed<br><br>Applies To: Atrius Health, Inc. (Defendant) |
| 10/30/2023 | | Defendant Atrius Health, Inc.'s Notice of Appearance<br><br>Applies To: Fuller, Esq., Anthony E (Attorney) on behalf of Atrius Health, Inc. (Defendant) |
| 10/30/2023 | | Defendant Atrius Health, Inc.'s Notice of Appearance<br><br>Applies To: Durant, Esq., Maria R (Attorney) on behalf of Atrius Health, Inc. (Defendant) |
| 10/30/2023 | | Defendant Atrius Health, Inc.'s Notice of Appearance<br><br>Applies To: Durant, Esq., Maria R (Attorney) on behalf of Atrius Health, Inc. (Defendant) |
| 10/30/2023 | | Defendant Atrius Health, Inc.'s Notice of Appearance<br><br>Applies To: Cooke, Esq., Adam (Attorney) on behalf of Atrius Health, Inc. (Defendant) |
| 10/30/2023 | 11 | Defendant Atrius Health, Inc.'s Assented to Motion to Extend Time |
| 10/30/2023 | 12 | Defendant Atrius Health, Inc.'s Motion for Admission Pro Hac Vice Of Allison Holt Ryan<br>ELECTRONIC ORDER entered granting Motion. (Saylor, J. USD) entered 5/8/2023 |
| 10/30/2023 | | Attorney appearance<br>On this date Patrick Vallely, Esq. added for Plaintiff Jane Doe, For Herself And The Class |
| 10/30/2023 | 13 | Plaintiff Jane Doe, For Herself And The Class's Motion to Remand<br><br>Endorsement: For the foregoing reasons, the court finds that it lacks subject matter jurisdiction over this matter, and the matter is not removable under 28 U.S.C section 1442(a)(1). Plaintiffs' Motion To Remand is therefore GRANTED. (Saylor, J. USD) entered 10/25/2023 |
| 10/30/2023 | 14 | Jane Doe, For Herself And The Class's Memorandum in support of Motion To Remand |

COMMONWEALTH OF MASSACHUSETTS
SUFFOLK COUNTY CIVIL
Docket Report

| | | | |
|---|---|---|---|
| 10/30/2023 | 15 | Defendant Atrius Health, Inc.'s Assented to Motion to Extend Time<br><br>Endorsement: ELECTRONIC ORDER entered granting Assented To MOTION for Extension Of Time To File response /Reply as to Motion To Remand Until June 23, 2023 (McKillop, Matthew) (Entered: 06/08/2023) (Saylor, J. USD) | |
| 10/30/2023 | 16 | Opposition to Plaintiff's Motion To Remand filed by Atrius Health, Inc. | |
| 10/30/2023 | 17 | Plaintiff Jane Doe, For Herself And The Class's Assented to Motion for Leave To File Reply Memorandum On Motion To Remand<br><br>Endorsement: ELECTRONIC ORDER entered granting Assented To Motion for Leave To File Reply Memorandum on Motion to Remand. (McKillop, Matthew) (Entered (9/11/2023) (Saylor, J. USD) | |
| 10/30/2023 | 18 | Reply/Sur-reply<br><br>Memorandum In Support Of Her Motion To Remand<br><br>Applies To: Doe, For Herself And The Class, Jane (Plaintiff) | |
| 10/30/2023 | 19 | Plaintiff Jane Doe, For Herself And The Class's Memorandum and Order On Motion To Remand<br><br>Endorsement: For the foregoing reasons, the court finds that it lacks subject matter jurisdiction over this matter, and the matter is not removable under 28 U.S.C section 1442(a)(1). Plaintiffs' Motion To Remand is therefore GRANTED. (Saylor, J. USD) entered 10/25/2023 | |
| 10/30/2023 | 20 | General correspondence regarding Certified Order Of Remand | |
| 10/30/2023 | 21 | General correspondence regarding Certified Docket Entries Received | |
| 11/16/2023 | 22 | Defendant Atrius Health, Inc.'s Assented to Motion to Stay Deadline to Respond to Complaint | |
| 11/29/2023 | | Endorsement on Motion to Stay Deadline to Respond to Complaint (#22.0): ALLOWED<br>(Dated 11/20/2023) Notice sent 11/30/2023. | Kazanjian |
| 01/22/2024 | 23 | Defendant Atrius Health, Inc.'s Assented to Motion to Stay Proceedings Pending Completion of Interlocutory Appeals and Consolidation | |
| 01/24/2024 | | Endorsement on Motion to stay proceedings pending completion of interlocutory appeals and consolidation (#23.0): ALLOWED<br>After review, Allowed. Proceedings in this case are stayed pending a decision in the appeals of Vita v. Beth Israel Deaconess and Vita v. New England Baptist (together, "the Vita appeals"). Within 14 days of the decision in the Vita Appeals, the parties shall notify the court and propose three alternative dates in the following 60 days when all parties could attend a Rule 16 conference in this matter.<br>(Dated 1/23/24) Notice Sent 1/24/24 | Krupp |
| 12/05/2024 | 24 | Amended: amended complaint filed by Jane Doe, For Herself And The Class | |

COMMONWEALTH OF MASSACHUSETTS
SUFFOLK COUNTY CIVIL
Docket Report

| | | |
|---|---|---|
| 12/05/2024 | 25 | Plaintiff, Defendant Jane Doe, For Herself And The Class, Atrius Health, Inc.'s Joint Notice of<br>Supreme Judicial Court Decision in Vita v. New England Baptist Hospital |
| 01/03/2025 | 26 | Defendant Atrius Health, Inc.'s Notice of Removal<br><br>(U.S. Dist.#24-cv-10020) |
| 01/03/2025 | | Exhibits/Appendix |
| 01/06/2025 | | The following form was generated:<br><br>Notice to Appear - BLS was generated and sent to:<br>Plaintiff: Michelle H Blauner, Esq. mblauner@shulaw.com<br>Plaintiff: Patrick Vallely, Esq. pvallely@shulaw.com<br>Defendant: Anthony E Fuller, Esq. anthony.fuller@hoganlovells.com<br>Defendant: Maria R Durant, Esq. maria.durant@hoganlovells.com<br>Defendant: Kayla H Ghantous, Esq. kayla.ghantous@hoganlovells.com<br>Defendant: Adam Cooke, Esq. adam.a.cooke@hoganlovells.com<br>Sent On: 01/06/2025 12:33:42 |
| 01/09/2025 | | REMOVED to the U.S. District Court<br>Of Massachusetts |
| 01/09/2025 | | Case transferred to another court. |

I HEREBY ATTEST AND CERTIFY ON January 9, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: [signature]
Asst. Clerk

COMMONWEALTH OF MASSACHUSETTS

**Suffolk, ss.**

| | |
|---|---|
| JANE DOE,<br>For herself and the Class,<br>v.<br>ATRIUS HEALTH, INC.<br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**<br>CIVIL ACTION NO. 23-597<br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Jane Doe[1] ("Plaintiff"), on behalf of herself and the proposed Class (defined below), alleges as follows:

### Preliminary Statement

1. Plaintiff brings this action to remedy the secret interception of the contents of internet communications between healthcare consumers and the defendant, Atrius Health, Inc. ("Atrius"). Specifically, Atrius aided in the interception of communications between Plaintiff and other Class Members (defined below) and a website maintained by Atrius (the "Atrius Website"). Atrius assisted in the interception of these communications by Google, Facebook (now known as "Meta," but referred to in this complaint as "Facebook"), and other companies that provide so-called "tracking technology." The Plaintiff's and Class Members' wire communications with Atrius were secretly and contemporaneously intercepted, recorded, and transmitted to these third parties without their knowledge or consent whenever they visited any page of the Atrius Website.

[1] "Jane Doe" is a pseudonym used to protect the privacy of the Plaintiff, given that this case involves private health information of Jane Doe. Ms. Doe's identity will be disclosed to counsel for the Defendant when agreements or court orders are in place that protect the privacy of Plaintiff and her children.

2. Atrius actively aided the secret interceptions of healthcare consumers' communications with their website by injecting hidden code into the website. During the loading of webpages on the Atrius Website, Atrius assists Google, Facebook, and others to intercept communications surreptitiously.

3. Atrius did not disclose to healthcare consumers that it helps third parties such as Google and Facebook to intercept the contents of their communications with the Atrius Website, nor did Atrius seek or obtain their consent for such interception. On the contrary, Atrius deceptively tells healthcare consumers that they disclose consumers' information to third parties only in limited circumstances, not including sharing such information with technology or social media companies such as Google or Facebook.

4. The Massachusetts Wiretap Act (M.G.L. c. 272 § 99) makes it unlawful to "secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication." "Wire" communications include communications over the internet between websites and website users. The Massachusetts Wiretap Act's prohibitions apply even when one of the parties to the communications knows about the interception if that party secretly records or intercepts the communication or aids another in recording or intercepting the communication without the knowledge or consent of the other party. It is not necessary for a violation of the Massachusetts Wiretap Act that the entirety of the contents of any communication be intercepted; instead, an unlawful interception occurs when

a. the identity of the parties to the communication;

b. the existence of the communication; **or**

c. any part of the contents, substance, purport, or meaning of the communication is intercepted or recorded.

5. The Massachusetts Legislature enacted the Massachusetts Wiretap Act to counter "the uncontrolled development and unrestricted use of modern electronic surveillance devices," which it

found "pose grave dangers to the privacy of all citizens of the commonwealth." M.G.L. c. 272 § 99(A) (preamble). Internet communications fall comfortably within the Act's express terms. The purposes for which the Massachusetts legislature enacted the Massachusetts Wiretap Act are highly significant in today's world, as technology companies continually chip away at the privacy of individuals, contrary to the public policies that animate the Massachusetts Wiretap Act.

6. Although this case concerns the interception of communications that disclose healthcare consumers' private health information, Plaintiff's claim under the Massachusetts Wiretap Act does not depend on whether the intercepted communications reveal an individual's private health information or any other sensitive information. The Massachusetts Wiretap Act applies to all interceptions, regardless of the communication's substance.

7. Moreover, although this case concerns communications between healthcare consumers and healthcare providers, the Massachusetts Wiretap Act claim of the Plaintiff and the Members of the Class does not depend on the nature of the relationship between Plaintiff and the Members of the Class and Atrius. The Massachusetts Wiretap Act applies to all interceptions, regardless of relationship, if any, among the parties to the communication.

8. The Massachusetts Wiretap Act provides a private remedy for the secret interception of wire communications, enforceable against both the intercepting party **and** any party that aids such an interception.

9. Atrius aided interceptions by Google, Facebook, and other third parties of healthcare consumers' communications with Atrius through the Atrius Website. Plaintiff seeks statutory remedies under the Massachusetts Wiretap Act both on her own behalf and on behalf of all other Massachusetts residents who accessed the Atrius Website.

## PARTIES

10. Plaintiff is a resident of Burlington, Massachusetts. Plaintiff is a patient of Atrius. Plaintiff regularly uses the Atrius Website to (i) search for and obtain information about Atrius doctors (including their credentials and backgrounds); (ii) search for information on particular symptoms, conditions, and medical procedures; and (iii) obtain and review medical records through the website's patient portal.

11. Defendant Atrius Health, Inc. is a corporation that operates in Boston, Massachusetts. Atrius provides medical services and care to patients in Massachusetts, focusing primarily on primary care and specialty medical services. Atrius currently has approximately 614 primary care and specialty physicians. Atrius Health currently serves approximately 689,000 adult and pediatric patients across eastern Massachusetts with approximately 1.9 million visits annually.

## JURISDICTION

12. The exercise of personal jurisdiction over Atrius is proper according to M.G.L. c. 223 § 3 because, among other things, Atrius is located in and conducts business in Massachusetts, and Plaintiff's claim arises out of Atrius's activities and conduct in the Commonwealth of Massachusetts.

## FACTUAL ALLEGATIONS

### Atrius and Its Website

13. Atrius operates dozens of healthcare facilities throughout Massachusetts. Atrius offers care to Massachusetts residents across various specialties, including heart and vascular care, orthopedics, gastroenterology, diabetes, surgery, obstetrics and gynecology, and neurology.

14. Atrius maintains the Atrius Website for its medical practices, found at https://www.atriushealth.org/. Through its website, healthcare consumers can obtain information about the services Atrius provides, including information about doctors, services, and treatments provided by Atrius for particular medical conditions.

15. The Atrius Website is designed for communications with healthcare consumers. The website includes the following functions:

(a) The Atrius Website provides general information about Atrius.

(b) The Atrius Website provides information about healthcare services provided at Atrius, communicated through service-specific pages for a range of services such as "Obstetrics/Gynecology," "Neurology," "Psychiatry and Behavioral Health," and "Pediatrics," among many others.

(c) The Atrius Website provides substantive information about specific health conditions, including symptoms and causes of those conditions, diagnoses and treatments, and programs and services offered by Atrius.

(d) The Atrius Website permits healthcare consumers to use a "Find a Doctor" function to search for doctors by condition, specialty, gender, language, and location.

(e) The Atrius Website permits healthcare consumers to book an appointment online through the website.

(f) The Atrius Website permits healthcare consumers to renew their medications online through the website.

(g) The Atrius Website permits healthcare consumers to access and pay bills online.

(h) The Atrius Website lets healthcare consumers access their private medical information online through the MyHealth Online patient portal.

16. Because the Atrius Website provides an interactive experience through which a healthcare consumer can obtain information about particular medical conditions, doctors, specialties, and the website user's own healthcare condition and needs, a website user's interaction with the website reveals information about the website user that the user would expect to remain private.

<u>**Reasonable Expectations of Users of the Atrius Website**</u>

17. Healthcare consumers in Massachusetts have an interest in preserving the confidentiality of communications with healthcare providers. Among the ways healthcare consumers communicate with healthcare providers is through those providers' websites, such as the Atrius Website.

18. Users of healthcare-related websites such as the Atrius Website have a legitimate expectation and understanding that their communications with Atrius through the website will be private. They also have a legitimate expectation that healthcare providers such as Atrius will not share with third parties their communications with Atrius without their consent.

19. The expectations and understandings of website users are supported by state law, which prohibits healthcare providers such as Atrius from using or disclosing individuals' "communications" with healthcare providers without valid authorization from the individual. *See* M.G.L. c. 111 § 70E.

20. Healthcare consumers would **not** anticipate or expect that their communications with healthcare providers, including Atrius, which reveal information about that individual's personal health conditions, will be intercepted and secretly shared with third parties such as Google and Facebook for marketing purposes.

21. The expectations and understanding of users of the Atrius Website are informed by what Atrius tells them and does not tell them about how it handles their personal information.

22. The Atrius website features no pop-up or other prominent notification communicating to visitors of the website that Atrius is using any tracking technologies or otherwise facilitating the interception of communications between healthcare consumers and Atrius.

23. The Atrius Website does contain a small, inconspicuous link at the bottom of each page to what it describes as a "Web Privacy Statement," but that statement contains no disclosure that Atrius is using any tracking technologies or otherwise facilitating the interception of communications between healthcare consumers and Atrius. The Web Privacy Statement, in fact, says nothing about privacy, focusing instead on other issues such as indicating that Atrius does not "practice medicine" through the website, and that material on the website is protected by copyright.

24. The Atrius Website also contains a "Medical Information Privacy Notice," but that notice contains no disclosure that Atrius uses any tracking technologies or otherwise facilitates the interception of communications between healthcare consumers and Atrius. It does not focus on the Atrius Website itself but instead discusses Atrius's practices in protecting patient medical information more generally. Although the notice contains disclosures about when Atrius may share "health information" with third parties, such as "for law enforcement purposes" and "for reporting victims of abuse," the notice does not disclose that Atrius shares any information with third-party technology and social media companies such as Google or Facebook or that those third parties may use such information for their own commercial purposes. (To repeat, *see* ¶¶ 6, 7, *supra*, Plaintiff's claim is not limited to the interception of "health information" but concerns all intercepted communications made through the Atrius Website, whether or not those communications relate to health information.)

25. In short, healthcare consumers expect that their communications with healthcare-related websites will not be shared with third parties without their consent—an understanding reinforced by Atrius's deceptive statements on the Atrius Website. The interceptions of website users' communications with Atrius were, therefore, truly secret and made without any consent from Plaintiff or the other class member website users.

**<u>Third-Parties Offering Tracking Technologies</u>**

26. Plaintiff describes in this complaint various tracking technologies implemented on the Atrius Website that cause the secret interception, recording, and transmission of the contents of Class Members' internet communications with Atrius. The next section presents a basic overview of how the technologies work. This section provides a brief overview of the third parties that intercept and record the contents of Class Members' internet communications with Atrius and the purposes for which interceptions are made.

27. Meta Platforms, Inc., referred to in this complaint by its former and more familiar name, "Facebook,"[2] is a multinational technology conglomerate based in Menlo Park, California. It owns and operates social media platforms, including Facebook and Instagram, as well as various other software and technology products and services.

28. Facebook maintains detailed profiles on individuals that include the users' real names, locations, email addresses, friends, and communications that Facebook associates with personal identifiers, including IP addresses and device identifiers.

29. Facebook derives most of its revenues from selling targeted advertising to users of its platforms, including Facebook and Instagram. Facebook tailors advertising toward particular individuals by building extensive behavioral profiles about each individual. These profiles are based not only on those individuals' use of Facebook products, such as Facebook and Instagram, but also on the activities of those individuals on other websites that Facebook does not own.

30. Among the ways Facebook tracks users on websites not owned by Facebook to supplement its detailed individual profiles is by offering websites with the tracking technology known as Meta Pixel, formerly known as Facebook Pixel. Facebook advertises that Meta Pixel allows website owners to track users across their website and to optimize Facebook advertising based on how they use the websites.

31. Facebook explains on its own website: "The Meta Pixel is a snippet of JavaScript code that allows [companies] to track visitor activity on your website."

32. Facebook explains further: "Once you've set up the Meta Pixel, the Pixel will log when someone takes an action on your website.... The Meta Pixel receives these actions, or events, which you can view on your Meta Pixel page in Events Manager."

[2] Facebook rebranded its parent company as "Meta" in October 2021.

33. Therefore, the Meta "pixel allows Facebook to be a **silent third-party watching whatever you're doing**."[3]

34. Google LLC is a multinational technology conglomerate and a wholly owned subsidiary of Alphabet Inc. Google LLC is referred to in this complaint as simply "Google." Google owns and operates various software services, including the popular Gmail email service, Google's search platform, and numerous other internet software services. It also manufactures technology products, including cell phones, smart home devices, and computers.

35. Google maintains detailed profiles on individuals that include information such as their real names, dates of birth, email addresses, phone numbers, and details on interactions such individuals have with Google's services, such as Gmail. Google maintains detailed profiles on individuals, whether or not they have a Google account.

36. Google derives a substantial portion of its revenues through individually targeted advertising. Specifically, Google uses the information it collects on individuals to tailor advertising specifically to the individual, making Google's advertising more valuable than other forms of advertising that are not customized to the individual.

37. One way Google collects information to build its detailed profiles on individuals is through the tracking technology known as Google Analytics. Google incentivizes websites to use Google Analytics by offering it as a free tool for websites to track the behavior of users on its website. The tracking information recorded through Google Analytics and accessible by the website owner provides the website owner with insights about how users use the website, which the owner can use to improve the website. Although Google provides Google Analytics to website owners for "free,"

[3] *Facebook spies on us but not by recording our calls. Here's how the social network knows everything*, Jefferson Graham, USA Today, https://www.usatoday.com/story/tech/2020/03/04/facebook-not-recording-our-calls-but-has-other-ways-snoop/4795519002/(last visited Aug. 11, 2022) (emphasis added).

Google benefits and profits from Google Analytics by using the data collected through Google Analytics for its own commercial purposes, including using that data to build individuals' profiles further. Google can then use this information to serve such individuals with better-targeted individualized advertisements.

Website Tracking Technologies on the Atrius Website

38. Atrius injects hidden code into the Atrius Website that permits third parties to contemporaneously intercept healthcare consumers' communications with Atrius. The tracking technologies permit third parties such as Google and Facebook to associate a website user's browsing activity with particular individuals known to Google and Facebook. This includes, for example, associating the content of the communications between the website user and Atrius with the website user's Facebook profile.

39. These tracking technologies transmit to Google, Facebook, and other companies, contemporaneously with the website communications between Class Members and Atrius, the contents of those communications and identifying information about the Class Members. The contents intercepted include private health information, including the individual's medical conditions, doctors they may be seeing, medical searches the individual performs on the website, and personal medical information the user enters into forms on the website.

40. Atrius uses or has used several tracking technologies on its website, including Google Analytics and Meta Pixel. The tracking technologies are implemented through similar means.

41. Before describing how such technologies work, it is important to first define some basic technological terms.

42. A **"browser"** or **"web browser"** is software on a computer or other device (such as a tablet or cell phone) that permits a website user to view a webpage. Examples include Google Chrome, Safari, and Firefox.

43. An **"IP address"** is a unique combination of four numbers, each between 0 and 255, that serves as a particular device's address on the internet. Both websites and website users have IP addresses. For example, the IP address for the Atrius Website, as of the time of this complaint, is 198.168.31.233. When they connect to the internet, particular individuals also have their own unique IP addresses. Companies such as Google and Facebook associate particular individuals with IP addresses to help track them across the internet for commercial purposes.

44. A **"URL"** is another form of an address specifically for websites (or a webpage on a website) that a web browser can translate into an IP address to load the website. A URL is the familiar address often preceded by "http://." For example, the URL for the main landing page for the Atrius Website is https://www.atriushealth.org/. Numerous URLs also point to specific pages on that website; often, a URL will contain information about the particular webpage itself. For example, the Atrius Website has a page specifically about Atrius's obstetrics and gynecology practice; that page's URL is https://www.atriushealth.org/specialties-and-services/obstetrics-gynecology/.

45. A **"cookie"** is a file saved on a website user's device that helps track the user across different web pages or websites. As described below, Google Analytics and Meta Pixel are not themselves cookies but are instead implemented by JavaScript code. Both technologies, however, sometimes use cookies in addition to other means to help a third-party such as Google or Facebook confirm the real-world identity of a person browsing a website. Notably, both Google Analytics and Meta Pixel continue to intercept communications even if a user has set their browser settings to turn off cookies.

46. **"JavaScript"** is a type of computer code that can be included on a website. A website user's browser downloads and "runs" the code within the browser. The JavaScript code can perform various functions, including causing the browser to load components of the website, providing interactive functionality in the website, transmitting information from the browser to servers on the

internet, or performing other functions in the background. Unlike many other components of a website, such as text and images, which are visible to the website user, the JavaScript code itself is not visible. The execution of JavaScript code may or may not result in the presentation of visible components of the website.

47. With those basic terms in mind, the tracking technologies described in this complaint—in particular, Google Analytics and Meta Pixel—work as follows. In general terms, a website owner (here, Atrius) inserts into its website code that causes an individual's web browser, when loading the website, to also load a JavaScript file from a third-party server (such as Google or Facebook). That JavaScript code is then executed automatically within the individual's web browser.

48. The execution of the JavaScript code causes the individual's web browser to retrieve a very small file from the third-party's website, such as a transparent single-pixel image file from Facebook's server (hence the origin of the phrase "Meta Pixel" or "Facebook Pixel" to describe the tracking technology).

49. When the JavaScript code causes the user's web browser to retrieve a file from the third-party's website, the JavaScript code also causes the browser to communicate certain information to the third-party website. That information can include: (i) the URL of the website the user is visiting (that is, the website address, such as https://www.atriushealth.org/); (ii) the title of the particular webpage being visited; (iii) metadata from the website, including information describing the content of the website; (iv) information the user has submitted to the website, such as search terms or any other information inputted into a form (even if the user has not yet "submitted" the form); (v) whether and to what degree the user has scrolled through the website; (vi) if a user has made a selection on any drop-down menu on the website, the content of that selection; and (vii) prior pages the website user has visited before viewing the current page.

50. When the JavaScript code causes the browser to communicate the information described in the paragraph above to third-party servers such as Google or Facebook, the code also causes the browser to reveal the website user's IP address to the third-party website. This disclosure permits the third party, such as Google or Facebook, to associate the information it has received about the individual's communications with the website to the identity of a particular individual known to Google and Facebook. A third-party such as Google and Facebook can then add the content of the user's communications with Atrius to its collection of information it already has about the individual, which it can then use for advertising purposes. For example, when Meta Pixel's JavaScript code causes a "pixel" to be loaded from Facebook's servers, Facebook records and associates the content of the communications it has intercepted with an individual's Facebook and Instagram profiles, which includes the individual's real name and other information about them.

51. The code for tracking technologies is invisible to a website user. By design, the tracking technologies work so that no visible evidence of the technology is shown to the user. For example, even though some technologies may load a small single-pixel image or another file, that image is not displayed as part of the website; instead, it is loaded in the background solely for the purpose of transmitting the content of the user's communications and the user's identity to the third party such as Google or Facebook. The tracking technologies are detectible only by using specialized tools that divulge the code underlying a webpage and the network traffic the website components generate.

52. The tracking technologies described in this complaint intercept and transmit to third parties the contents of communications between healthcare consumers and Atrius contemporaneously with those communications. The tracking technologies intercept and transmit the contents of those communications to third parties before the webpage has even completed loading.

53. The use of tracking technologies became an important news story in June 2022 following a report by the online magazine The Markup reporting that "Facebook Is Receiving

Sensitive Medical Information from Hospital Websites."[4] (the "Markup Article"). That article detailed how many of the nation's top hospitals had Meta Pixel code on their websites, which caused the unauthorized disclosure of individuals' communications and other personal information to Facebook. The Markup Article has triggered Congressional investigations and increased scrutiny of hospitals' data practices.[5] In reaction to the Markup Article, some healthcare providers removed Meta Pixel code from their websites completely or severely limited its use.

54. Atrius appears to be among these healthcare providers that removed Meta Pixel in reaction to the Markup Article. Due to changes Atrius made in mid-2021 as to how it injected the Meta Pixel code onto its website, Plaintiffs cannot identify the precise date that Atrius removed the Meta Pixel code, although the evidence does confirm that Atrius used Meta Pixel during a substantial portion of the class period. Atrius, however, continues, to the present, to secretly inject Google Analytics and several other third-party tracking technologies onto its website. These tracking technologies are each substantially similar to the now-removed Meta Pixel code, both in their surreptitious deployment on the website and their contemporaneous interception of website users' communications with Atrius.

**<u>Atrius's Use of Tracking Technologies on the Atrius Website</u>**

55. Atrius uses various tracking technologies across the Atrius Website. Several of those tracking technologies are injected into the code of all, or almost all, of the pages within the Atrius Website. For example, on nearly every page of the Atrius Website, Atrius injects hidden code that

[4] *See* "Facebook Is Receiving Sensitive Medical Information from Hospital Websites," https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.
[5] *See* "Meta Faces Mounting Questions from Congress on Health Data Privacy As Hospitals Remove Facebook Tracker," https://www.healthcareitnews.com/news/senator-questions-zuckerberg-over-metas-healthcare-data-collection-policies.

loads Google Analytics. It also appears Meta Pixel was injected onto many pages on the Atrius Website before Atrius removed Meta Pixel in late September 2022.

56. The code for tracking technologies such as Meta Pixel and Google Analytics is invisible to website users but becomes visible only when using special "developer" software such as Google's "Developer Mode," a tool designed for web developers. Google's Developer Mode displays hidden components of websites and records the content of network traffic generated by website components (including the loading and execution of JavaScript code and the text that the JavaScript code causes to be transmitted to third-party web servers when it loads a small file or image).

57. Below is an image of the main landing page for the Atrius Website:




58. When a user loads the main landing page for the Atrius Website, the webpage causes the user's web browser to download from Google's servers a file called "analytics.js," which contains the JavaScript code for Google Analytics ("analytics" refers to "Google Analytics," and "js" standards for JavaScript). The website then causes the user's web browser to execute the JavaScript code

contained in the "analytics.js" file. That code, in turn, causes the user's web browser to connect to Google's servers again to load a small file. When the user's web browser loads this small file, the Google Analytics JavaScript code causes the user's web browser to intercept and transmit certain information to Google.

59. The image below depicts the landing page for the Atrius Website on the left-hand-side, and to the right of it, Google Developer Mode, which inspects the components of the website and the network traffic those components generate:




60. A closer view of Google Developer Mode, focusing specifically on the contents of the communication intercepted and transmitted to Google, is presented below (with highlighting added). The "Payload" is a technological term that refers to information transmitted from a user's web browser to a web server when the browser retrieves a file from that web server. In this case, the "Payload" reflects the information that the Google Analytics JavaScript code causes the user's web browser to intercept and transmit to Google when a small file is loaded from Google's servers:




61. Among the information transmitted to Google's servers contemporaneously with the communications between the website user and the Atrius Website are:

(a) The URL of the webpage visited (the text after the letters "dl," which includes the text "https://www.atriushealth.org"); and

(b) The title of the webpage (after the letters "dt," which includes "Atrius Health | Care. About. You. Welcoming New Patients").

62. The other information Google intercepts includes data about the user's web browser configuration (including screen resolution, device information, and browser settings); a unique

identifier for the particular user visiting the website, which Google retrieves through a cookie set in the website user's browser (which enables Google to track that individual across the website); and identification codes used to connect the browsing activity with a Google Analytics account held by the website (here, Atrius).

63. Notably, when the website user's web browser intercepts the contents of communications between the website user and the Atrius Website and contemporaneously transmits those contents to Google, the connection established between the user's web browser and Google's servers reveals the user's IP address to Google. Google then uses that IP address to associate the user's communications with the website with particular individuals known to Google, including those individuals' Google accounts and real-world identities (whether or not the individual has a Google account). After Google associates the website user's communications with Atrius with the identity of particular individuals known to Google, Google can use that information for its own commercial purposes, including serving personalized advertisements upon that individual on other websites owned by Google or any other third parties that use Google's advertising platforms (many do).

64. Google can further confirm the identity of the user communicating with Atrius through the Atrius Website through a "cookie" file saved on the user's computer, which the Google Analytics code retrieves. The cookie further confirms the website user's identity, enabling Google to associate the user's communications with a particular individual known to Google (including the individual's real-world identity).

65. Moreover, by communicating information about the website user's browser configuration and device (such as screen resolution and other browser configuration settings), Google can confirm the user's identity through a technique known as "browser fingerprinting." In short, browser fingerprinting associates particular individuals with unique combinations of web browser

settings. This permits Google to confirm further that a specific individual using Google's services (for example, a person with a Gmail account) and an individual visiting the Atrius Website are the same.

66. As noted, Atrius recently removed Meta Pixel from its website, likely in response to press coverage and Congressional scrutiny following the Markup Article. An archived version of the main page of the Atrius website, saved before Atrius removed Meta Pixel, confirms that Atrius used Meta Pixel code on the main landing page of its website during the class period.

67. When Atrius used Meta Pixel, the Atrius Website would load a JavaScript file called "fbevents.js." That JavaScript code, in turn, caused the website user's browser to secretly and contemporaneously intercept and transmit to Facebook the website user's communications with the Atrius Website. Below is an example of the contents of the communication between the website user and Atrius, which the hidden Meta Pixel would intercept and transmit to Facebook:

× Headers Payload Preview Response Initiator Timing Cookies

▾ **Query String Parameters** view source view URL-encoded

id: 110459582760837

ev: Microdata

dl: https://www.atriushealth.org/

rl:

if: false

ts: 1586697697627

cd[DataLayer]: []

cd[Meta]: {"title":"\n\tAtrius Health | Care. About You. | Welcoming New Patients\n","meta:description":"Atrius Health provides primary and specialty care to more than 745,000 adult and pediatric patients at 31 medical practice locations in eastern Massachusetts. Find a doctor today."}

cd[OpenGraph]: {"og:description":"Atrius Health provides primary and specialty care to more than 745,000 adult and pediatric patients at 31 medical practice locations in eastern Massachusetts. Find a doctor today.","og:image":"http://www.atriushealth.org/app_media/24da6292bbd749e28f3ebf65f805c507.ashx","og:title":"Atrius Health | Care. About You. | Welcoming New Patients"}

cd[Schema.org]: []

cd[JSON-LD]: [{"@context":"https://web.archive.org/web/20200412132127/http://schema.org","@type":"WebSite","url":"https://web.archive.org/web/20200412132127/https://www.atriushealth.org","potentialAction":{"@type":"SearchAction","target":"https://web.archive.org/web/20200412132127/https://www.atriushealth.org/search/site-search?q={search_term_string}","query-input":"required name=search_term_string"}}]

sw: 1920

sh: 1080

v: 2.9.15

r: stable

ec: 1

o: 30

fbp: fb.0.1586697697114.1669629872

68. Similar to Google Analytics, Meta Pixel caused the user's web browser to intercept and transmit to Facebook the contents of the communications between the website user and the Atrius Website, including the URL of the webpage visited, the title of the webpage, and descriptions of contents of the webpage. The interception and transmission to Facebook also included information

about the user's browser configuration and various codes to associate the communications with Atrius's advertising account with Facebook.

69. Also, the JavaScript code for Meta Pixel caused the user's web browser to reveal the user's IP address to Facebook. This identifier permitted Facebook to associate the content of the website user's communications with the website to the user's Facebook profile (or the profile of other websites owned by Facebook, such as Instagram). With that information, Facebook could then use the contents of communications between the website user and Atrius to serve personalized advertising to the website user in the future.

70. Moreover, the transmission to Facebook of the user's browser configuration permitted Facebook to confirm the user's identity through browser fingerprinting (that is, comparing the unique combination of browser settings revealed to Facebook via the Meta Pixel Code to Facebook's own records of the same browser configuration when the same individual visits Facebook, Instagram, and other Facebook-owned websites).

71. The text fields communicated to Facebook by the Meta Pixel code also included a persistent identifier for each particular user, which permitted Facebook to track that individual across the Atrius Website and further confirm that individual's real-world identity.

72. As reflected in the screenshots depicted above, the landing page included a button inviting new patients to make an appointment by clicking the "Book Now" button. By clicking on that button, the website user communicates an intention to receive medical care from Atrius. When a website user clicks that button, hidden Google Analytics code contemporaneously intercepts that communication and transmits its contents to Google. The screenshot below shows the contents of the communication intercepted and transmitted to Google (with highlighting added):

× Headers Payload Preview Response Initiator Timing

▾ **Query String Parameters** view source view URL-encoded

v: 2
tid: G-WXKQ94QWHT
gtm: 45je3310
_p: 744539169
_gaz: 1
cid: 1529696143.1678056936
ul: en-us
sr: 1920x1080
uaa: x86
uab: 64
uafvl: Chromium;110.0.5481.178|Not%20A(Brand;24.0.0.0|Googl
e%20Chrome;110.0.5481.178
uamb: 0
uam:
uap: Windows
uapv: 10.0.0
uaw: 0
_s: 3
sid: 1678056936
sct: 1
seg: 1
dl: https://www.atriushealth.org/
dt: Atrius Health | Care. About You. | Welcoming New Patien
ts
en: Outbound Link Click
ep.link_url: https://bit.ly/atrius-health-open-scheduling-her
o
_et: 69

That is, hidden Google Analytics code intercepted and transmitted to Google that the user made an "Outbound Link Click" to an Atrius Health "scheduling" page. (Google knows the more detailed contents of that destination page—that it is designed to permit an individual to make an appointment—through Google's scraping of website data for purposes of its Google search platform.)

73. On the Atrius landing page, existing patients were also presented with an option to access Atrius's "MyHealth Online" patient portal by clicking on the "MyHealth Online" button shown on that page (a button that is available on nearly every page on the website). When a user clicks that button, the user is communicating the fact that the user is an existing patient of Atrius. When a user clicks the button, hidden Google Analytics code intercepts and transmits to Google the content of that communication. The screenshot below reflects the information intercepted by and transmitted to Google (with highlighting added):

× Headers Payload Preview Response Initiator Timing

▾ Query String Parameters view source view URL-encoded

v: 2
tid: G-WXXQ94QWHT
gtm: 45je3310
_p: 744539169
_gaz: 1
cid: 1529696143.1678056936
ul: en-us
sr: 1920x1080
uaa: x86
uab: 64
uafvl: Chromium;110.0.5481.178|Not%20A(Brand;24.0.0.0|Googl
e%20Chrome;110.0.5481.178
uamb: 0
uam:
uap: Windows
uapv: 10.0.0
uaw: 0
_s: 5
sid: 1678056936
sct: 1
seg: 1
dl: https://www.atriushealth.org/
dt: Atrius Health | Care. About You. | Welcoming New Patier
ts
en: Outbound Link Click
ep.link_url: https://myhealth.atriushealth.org/
_et: 1665

That is, hidden Google Analytics code intercepts that the user has made an "Outbound Link Click" to the Artius MyHealth Online patient portal.

74. Before Atrius removed Meta Pixel from the Atrius Website, hidden Meta Pixel code intercepted the same communication when a user clicked on the "MyHealth Online" button to log into Atrius's patient portal. The content of the communication intercepted via Meta Pixel's hidden code is shown below (with highlighting added):

X Headers Payload Preview Response Initiator »

▾ Query String Parameters view source view URL-encoded

id: 110459582760837
ev: SubscribedButtonClick
dl: https://www.atriushealth.org/
rl:
if: false
ts: 1586697715652
cd[buttonFeatures]: {"classList":"login-btn","destination":"https://myhealth.atriushealth.org/","id":"","imageUrl":"","innerText":"MYHEALTH ONLINE","numChildButtons":0,"tag":"a","name":""}
cd[buttonText]: MYHEALTH ONLINE
cd[formFeatures]: []
cd[pageFeatures]: {"title":"\n\tAtrius Health | Care. About You. | Welcoming New Patients\n"}
cd[parameters]: []
sw: 1920
sh: 1080
v: 2.9.15
r: stable
ec: 2
o: 30
fbp: fb.0.1586697700469.1669629872
it: 1586697697583
coo: false
es: automatic
tm: 3
rqm: GET

That is, the hidden Meta Pixel could would intercept a "ButtonClick" event, that the user specifically clicked in a "login" button to connect to "MYHEALTH ONLINE."

75. Atrius configured its website to intercept and retransmit to Google, Facebook, and other third parties specific information about the webpages a healthcare consumer visits within the website, which in turn may reveal personal information about the healthcare consumer. The further examples presented below do not reflect webpages Plaintiff personally visited but are presented for illustrative purposes.

76. The Atrius Website contains dozens of subpages for specific "Specialties & Services." For example, the Atrius Website contains a page entitled "Obstetrics/Gynecology," designed to inform the website user about OB/GYN services Atrius offers. By visiting that webpage, a user reveals to Atrius that the user has some interest in OB/GYN services (for example, the user may be pregnant or know someone who is). When the user communicates with Atrius by visiting this particular webpage, Atrius causes the secret interception and transmission of that communication to Google and other third parties. Below is a screenshot of the Atrius Obstetrics/Gynecology webpage:




77. The graphic below presents the contents of the communication between the website user and Atrius that are secretly intercepted and transmitted to Google when the above page loads as a result of the Google Analytics JavaScript code that Atrius secretly injects into the website (with highlighting added):

× Headers Payload Preview Response Initiator Timing

▾ **Query String Parameters** view source view URL-encoded

v: 2
tid: G-WXKQ94QWHT
gtm: 45je3310
_p: 1496954154
cid: 1529696143.1678056936
ul: en-us
sr: 1920x1080
uaa: x86
uab: 64
uafvl: Chromium;110.0.5481.178|Not%20A(Brand;24.0.0.0|Google%20Chrome;110.0.5481.178
uamb: 0
uam:
uap: Windows
uapv: 10.0.0
uaw: 0
_s: 1
sid: 1678056936
sct: 1
seg: 1
dl: https://www.atriushealth.org/specialties-and-services/obstetrics-gynecology
dr: https://www.atriushealth.org/specialties-and-services
dt: Obstetrics and Gynecology | Atrius Health
en: page_view

78. As reflected in the above screenshot, the code injected into the Atrius Website causes the user's browser to contemporaneously intercept and transmit to Google the fact that the website user is visiting an "Obstetrics and Gynecology" webpage on the Atrius Website—information that Google retains and can use for its own commercial purposes, and because Google retains it, can be accessible by third parties by subpoena or otherwise.[6]

---

[6] *See, e.g.,* "How data from period-tracking and pregnancy apps could be used to prosecute pregnant people," https://www.latimes.com/business/story/2022-08-17/privacy-reproductive-health-apps.

79. Before Atrius removed Meta Pixel code from the Atrius Website, the same webpage contained hidden code that intercepted the user's communication with the website and retransmitted that same information to Facebook. Atrius caused the secret interception and transmission to Facebook of the contents of the communication between the website user and Atrius, including that the user is visiting an Obstetrics & Gynecology webpage, information that Facebook retained and can use for commercial purposes.

80. The Atrius Website contains dozens of similar pages on particular medical specialties and practices that Atrius offers. By visiting those other pages that concern specific specialties and practices, website users communicate to Atrius information about themselves, including conditions they may have or services in which they may be interested. For each such page, the Atrius Website aids or aided Google and Facebook's secret interception of the contents of communications with Atrius, similar to the above Obstetrics/Gynecology department example.

81. The Atrius Website also includes a search function that permits an individual to search for medical or other information relevant to them. Healthcare consumers often enter search terms that reveal private health information about them, for example, when an individual uses the search function for particular symptoms, conditions, or medical specialties offered by Atrius. When an individual uses the search function, Atrius aids in the secret interception of the contents of that search and transmission of those contents to Google and other third parties. Below, for example, is the search results page for "pregnant."




82. When a user performs this search on the Atrius Website, and the results page then loads, the Google Analytics code is activated, causing the individual's web browser to intercept the user's search terms and transmit them to Google. Below is the portion of the communication that the Google Analytics code causes to be transmitted to Google (with highlighting added):

× Headers **Payload** Preview Response »

▾ **Query String Parameters** view source view decoded

v: 2
tid: G-WXKQ94QWHT
gtm: 45je3360
_p: 1509835185
cid: 1903265724.1678313469
ul: en-us
sr: 1920x1080
uaa: x86
uab: 64
uafvl: Chromium%3B110.0.5481.178%7CNot%2520A(Brand%3B24.0.0.0%7CGoogle%2520Chrome%3B110.0.5481.178
uamb: 0
uam:
uap: Windows
uapv: 10.0.0
uaw: 0
sid: 1678313469
sct: 1
seg: 1
dl: https%3A%2F%2Fwww.atriushealth.org%2Fsearch%2Fsite-search%3Fq%3Dpregnant
dr: https%3A%2F%2Fwww.atriushealth.org%2F
dt: Site%20Search%20Results
_s: 1

▾ **Request Payload**

en=page_view
en=view_search_results&ep.search_term=pregnant

As reflected in the above screenshot, the hidden Google Analytics code causes the precise search terms entered by the user to be intercepted and transmitted to Google, which Google can then use for its own commercial purposes, including associating those search terms with the individual's real-world identity for targeted advertising purposes.

83. Upon information and belief, before Atrius removed Meta Pixel from the Atrius Website, healthcare consumers' searches on the Atrius Website were similarly intercepted and transmitted to Facebook through the hidden Meta Pixel code.

84. The Atrius Website also includes a "Find A Doctor" feature that permits healthcare consumers to search for doctors using filtering criteria, such as specialties, location, doctor gender, and language. For example, the screenshot below depicts the search results page when a user indicates she is looking for a female doctor in "Obstetrics & Gynecology" within five miles of Boston zip code 02210:



85. Depicted below are the contents of the user's communication with the Atrius website that are intercepted and transmitted to Google via hidden Google Analytics Code (with highlighting added):

× Headers **Payload** Preview Response Initiator »

▾ **Query String Parameters** view source view URL-encoded

v: 2
tid: G-WXKQ94QWHT
gtm: 45je3360
_p: 1301291835
cid: 1903265724.1678313469
ul: en-us
sr: 1920x1080
uaa: x86
uab: 64
uafvl: Chromium;110.0.5481.178|Not%20A(Brand;24.0.0.0|Google%20Chrome;110.0.5481.178
uamb: 0
uam:
uap: Windows
uapv: 10.0.0
uaw: 0
_s: 1
sid: 1678313469
sct: 1
seg: 1
dl: https://www.atriushealth.org/search/clinician-specialist-results-page?specializations=obstetrics%2Fgynecology&locations=&cityandzip=02210
dr: https://www.atriushealth.org/find-a-doctor
dt: New Clinician Specialist Results Page
en: page_view

86. The above screenshot reflects that when an individual enters a search on the Atrius "Find a Doctor" page and chooses other filtering criteria, Google Analytics intercepts the contents of the search and transmits them to Google, including the other filtering criteria the user has selected,

including a location near 02210 and a "specialization" of "obstetrics" and "gynecology." Google retains all this information and may use it for its own commercial purposes, including associating find-a-doctor search criteria with the individual's real-world identity for targeted advertising purposes.

87. Before Atrius removed Meta Pixel from the Atrius Website, Atrius also injected hidden Meta Pixel code that intercepted communications on the Find-A-Doctor page of the Atrius Website, permitting Facebook to associate those communications with the individual's accounts held by Facebook-owned platforms (including Facebook and Instagram).

88. The Atrius Website includes an "Online Bill Pay" feature that permits patients to pay their Atrius medical bills online. By accessing that portion of the website, the website user communicates that the user is a patient of Atrius. A screen capture of the main "Online Bill Pay" page is shown below:



89. When a user visits the Atrius Website's Online Bill Pay page, hidden Google Analytics code that Atrius has injected onto the webpage intercepts the user's communication with Atrius and sends the communication to Google and other third parties. The contents of the communication intercepted and sent to Google are depicted below (with highlighting added), reflecting that the user's communication with Atrius through which the user accesses the "Bill Pay" portion of the website is intercepted and sent to Google[7]:

× Headers Payload Preview Response Initiator Timing

▾ Query String Parameters view source view URL-encoded

```
utmwv: 5.7.2
utms: 1
utmn: 1295267102
utmhn: apps.atriushealth.org
utmcs: UTF-8
utmsr: 1920x1080
utmvp: 1324x979
utmsc: 24-bit
utmul: en-us
utmje: 0
utmfl: -
utmdt: Atrius Health Bill Pay
utmhid: 531370889
utmr: https://www.atriushealth.org/
utmp: /BillPay/Account.aspx
utmht: 1678314557801
utmac: UA-24614374-1
utmcc: __utma=44105332.1903265724.1678313469.1678314558.
1678314558.1;+__utmz=44105332.1678314558.1.1.utmcsr=atri
ushealth.org|utmccn=(referral)|utmcmd=referral|utmcct
=/;
utmjid: 1571695935
utmredir: 1
utmu: qAAAAAAAAAAAAAAAAAABAAAE~
```

[7] The prefixes preceding the text fields for this example (and the next one) are different than the other Google Analytics examples (for example, "utmdt," and "utmp") , because this particular page used a different version of Google Analytics code.

90. The Atrius Website also features an online form that patients may fill out to obtain a prescription refill. By accessing this part of the website, a website user communicates to Atrius that the user is a patient needing medicine. The online "Prescription Refill" form is shown below:



Atrius Health

About Us | Careers | Donate | Innovation & Academics | SEARCH SITE | URGENT CARE

Patient Information | Online Services | Specialties & Services | Locations | Health & Wellness | MYHEALTH ONLINE | FIND A DOCTOR

HOME PRESCRIPTION REFILL

# PRESCRIPTION REFILL

## PATIENT INFORMATION

Please Note: This form is to refill prescriptions through the pharmacies at Atrius Health. Please contact your clinician's office if you need a prescription refilled at a pharmacy other than an Atrius Health pharmacy.

* indicates a required field

Patient Name *:
Birth Date *:
E-Mail:
(Used to send you a confirmation e-mail when your request is received. We will not share it or use it for any other purpose.)

IF WE NEED TO CONTACT YOU ABOUT YOUR PRESCRIPTION

Telephone *:
Best Time To Call:

ORDER LOCATION

Pharmacy Location *:

Would you like to sign up for auto-refills *? ○ Yes ○ No

Do you want this order mailed or in-person pickup *? ○ Mail this order only

91. When the website user initiates this communication, hidden Google Analytics code that Atrius has injected into its website causes the website user's communication with Atrius to be intercepted and contemporaneously transmitted to Google. The contents of the interception, including that the user is seeking "Prescriptions/RxRefills" from "Atrius Health," are depicted below (with highlighting added):

× Headers **Payload** Preview Response Initiator »

▾ **Query String Parameters** view source view URL-encodec

utmwv: 5.7.2
utms: 1
utmn: 656374756
utmhn: apps.atriushealth.org
utmcs: UTF-8
utmsr: 1920x1080
utmvp: 1351x979
utmsc: 24-bit
utmul: en-us
utmje: 0
utmfl: -
utmdt: Atrius Health
utmhid: 661813939
utmr: https://www.atriushealth.org/
utmp: /Prescriptions/RxRefills.aspx
utmht: 1678390532390
utmac: UA-24614374-1
utmcc: __utma=44105332.915625968.1678381612.167838161
6.1678390532.2;+__utmz=44105332.1678390532.2.2.utmcsr
=atriushealth.org|utmccn=(referral)|utmcmd=referral|u
tmcct=/;
utmjid: 1920884704
utmredir: 1
utmu: qAAAAAAAAAAAAAAAAAAAAAAE~

92. In addition to Google and Facebook, Atrius enables or has enabled the communications between healthcare consumers and Atrius to be intercepted and transmitted to various other companies without the consumer's knowledge or consent. These additional third parties include:

(a) **Doubleclick.** Google Doubleclick is an internet advertising platform. Like Google Analytics and Meta Pixel, Atrius has inserted code into their website that causes communications between the user and the website to be intercepted and transmitted to Google. The contents intercepted include the URL and title of each website visited and the user's IP address. Google can then monetize that information through advertisements.

(b) **Sharethis**. Sharethis is a company that tracks the behavior of users of websites. Similar to Google Analytics and Meta Pixel, Atrius inserts code on its website that causes the contents of the user's communications with the website, including pages viewed, the contents of searches, and other information, to be sent to the sharethis.com server. The code also causes the user's IP address to be revealed to Sharethis.

(c) **New Relic**. New Relic offers a "Browser Monitoring" analytics service that is similar to Google Analytics. Similar to Google Analytics and Meta Pixel, Atrius, during the class period, inserted hidden code into their website that caused communications between the user and Atrius to be intercepted by and transmitted to New Relic at bam.nr-data.net. The contents intercepted include the URL of each webpage visited and the user's IP address, among other things.

(d) **Twitter Pixel.** When Atrius previously used it during the class period, Twitter Pixel operated much the same way as Meta Pixel. It used hidden JavaSript code that caused the user's web browser to intercept contents of the user's communication with the Atrius Website and transmit those contents to Twitter. Through the use of IP addresses and other identifiers, Twitter could associate a particular website user's intercepted communications with individuals known to Twitter (such as individuals with Twitter accounts).

**The Secret Use of Website Tracking Technologies Such as Meta Pixel and Google Analytics Is Not Necessary**

93. The secret use of tracking technologies such as Meta Pixel and Google Analytics is not necessary for the Atrius Website's operation. The Atrius Website can and would operate just the same from the perspective of healthcare consumers without the secret use of tracking technologies described in this complaint.

94. Tracking technologies such as Google Analytics and Meta Pixel are distinct from and are not necessary to feature Google or Facebook-associated functionality on the website. For example, a website can contain links to its Facebook profile or invite website users to interact with Atrius via Facebook without using Meta Pixel. Meta Pixel is an entirely distinct feature from a Facebook button or a link to a Facebook profile; any website can have one without the other.

95. Moreover, even if Atrius wanted to use tracking technologies to optimize its website or its marketing for a website, there is no legitimate or lawful reason for Atrius (i) to keep secret from its website users the use of these tracking technologies; (ii) to falsely and deceptively claim that Atrius

does not share the communications with others when it does; or (iii) to claim that Atrius maintains the privacy of those communications when it does not.

## Class Action Allegations

96. Plaintiff brings this action under Mass. R. Civ. Proc. 23 on behalf of herself and the Class, which includes:

> All Massachusetts residents who, while in the Commonwealth of Massachusetts, accessed any portion of the website at www.atriushealth.org within three years prior to the date of the filing of this initial complaint in this action.

97. This action is properly maintainable as a class action.

98. The Class Members are so numerous that joinder of all members in a single lawsuit is impractical.

99. Common questions of law and fact exist for all Class Members, and those questions predominate over any questions solely affecting individual members of the Class. Among the predominant questions of law and fact common to the Class are:

(a) Whether communications between Class Members and Atrius, through the Atrius Website, were wire communications under the Massachusetts Wiretap Act;

(b) Whether Atrius inserted tracking technologies into the hidden code of the Atrius Website, including Google Analytics and Meta Pixel;

(c) Whether the tracking technologies inserted into the hidden code of the Atrius Website are "intercepting devices" as defined in the Massachusetts Wiretap Act, M.G.L. c. 272 § 99(B)(3);

(d) Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between Atrius and users of the Atrius Website;

(e) Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others disclosed to third parties such as Google, Facebook, and others the identity of the parties to the communication, the existence of the communication, and the communications' content, substance, purport, and meaning;

(f) Whether by inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, Atrius installed an intercepting device on their website with the

intent to aid Google, Facebook, and other companies to hear and record communications between the Class Members and Atrius;

(g) If Plaintiff prevails on the merits of her Massachusetts Wiretap Act claim, the remedies afforded under the Massachusetts Wiretap Act to Class Members, including statutory remedies, attorneys' fees, and litigation disbursements.

100. Plaintiff's claims are typical of Class Members' claims because, like Plaintiff, each Class Member accessed the Atrius Website and had their communications with that website secretly intercepted and transmitted to third parties without their knowledge or consent.

101. Plaintiff will fairly and adequately protect the interests of the Class Members and has retained counsel who have extensive experience prosecuting consumer class actions and who, with Plaintiff, are fully capable of, and intent upon, vigorously pursuing this action. Plaintiff has no interest adverse to the Class.

102. A class action is superior to all other available methods for this controversy's fair and efficient adjudication. Furthermore, any individual Class member's damages are not likely substantial enough to justify the expense and burden of individual litigation. Hence, it would be impracticable for all Class Members to redress the wrongs done to them individually. There will be no difficulty in managing this action as a class action.

103. Atrius has acted on grounds generally applicable to the Class, making appropriate the relief Plaintiff seeks for the Class as a whole.

## COUNT I

**(Violation of the Massachusetts Wiretap Act, M.G.L. c. 272 § 99, on behalf of the Class)**

104. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

105. The Massachusetts Wiretap Act, M.G.L. c. 272 § 99, makes it an unlawful act to "secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any

wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." *Id.* ¶ (B)(4), (C). The Act provides a private remedy to any "person whose oral or wire communications were intercepted." *Id* ¶ (C).

106. An individual's communications with a website constitute "wire communications" as defined in the Massachusetts Wiretap Act, M.G.L. c. 272 § 99(B)(1). The communications between Plaintiff and other Class Members and Atrius, through the Atrius Website, were wire communications under the Massachusetts Wiretap Act.

107. The tracking technologies inserted into the hidden code of the Atrius Website, including Google Analytics and Meta Pixel, are "intercepting devices" as defined in the Massachusetts Wiretap Act, M.G.L. c. 272 § 99(B)(3). "Intercepting devices" also include (i) any devices Class Members used to access the Atrius Website; (ii) Class Members' web browsers used to access the Atrius Website; (iii) Atrius's own computer servers; and (iv) the computer servers of third-parties such as Google and Facebook which intercepted Class Members' communications with the Atrius Website.

108. The computer code for tracking technologies such as Google Analytics, Meta Pixel, and others enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between Atrius and users of the Atrius Website, including, but not limited to, the identity of the parties to the communication, the existence of the communication, and the communication's content, substance, purport, and meaning, including but not limited to (i) the identity of webpages the user visited; (ii) the precise text of search queries; (iii) the search criteria individuals used to find doctors; and (iv) the precise contents of information the individuals inputted onto forms on the website.

109. By inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, Atrius installed an intercepting device on their website with the intent to aid Google,

Facebook, and other companies to secretly hear and record communications between the Class Members and Atrius.

110. Class Members' communications between the Class Members and Atrius were intercepted, disclosed to Google, Facebook, and other third parties, and used without their knowledge or consent. Moreover, their privacy interests were violated by the interception.

111. Pursuant to the Massachusetts Wiretap Act, Plaintiff seeks for herself and each Class Member statutory damages of $100 for each day of Atrius's violation of the Massachusetts Wiretap Act for Plaintiff and each Class Member or $1,000 with respect to the Plaintiff and each Class Member, whichever is higher, plus reasonable attorneys' fees and other litigation disbursements that her counsel has incurred and will reasonably incur in prosecuting this action.

## Prayers for Relief

WHEREFORE, Plaintiff prays for relief in the form of an order as follows:

a. Certifying this action as a class action under Massachusetts Rule of Civil Procedure 23, and appointing Plaintiff as class representative and her attorneys as class counsel;

b. Awarding damages (including statutory damages) to Plaintiff and Class Members;

c. Awarding attorneys' fees, expenses, and the costs of this suit, together with prejudgment and post-judgment interest at the maximum rate allowed by law; and

d. Awarding such other and further relief which the Court finds just and proper.

## Jury Demand

Plaintiff demands a trial by jury on all claims so triable.

Dated: March 10, 2023

Respectfully submitted,

*/s/ Michelle H. Blauner*

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

Date Filed 3/10/2023 3:23 PM
Superior Court - Suffolk
Docket Number

2

| CIVIL ACTION COVER SHEET | DOCKET NO(S) B.L.S. 23-597 | Trial Court Of Massachusetts Superior Court Department County: SUFFOLK |
|---|---|---|
| PLAINTIFF(S)<br>Jane Doe | | DEFENDANT(S)<br>Atrius Health, Inc. |
| ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE Board of Bar Overseers number<br>Michelle Blauner (BBO #549049)<br>Shapiro Haber & Urmy LLP<br>One Boston Place, Suite 2600<br>Boston, MA 02108 | | ATTORNEY (if known) |

Origin Code Original Complaint

TYPE OF ACTION AND TRACK DESIGNATION (See reverse side) CODE NO. TYPE OF ACTION (specify) TRACK IS THIS A JURY CASE? * ________ ____________________ (B) ☑ Yes ☐ No

BK 1 - consumer matters involving complex issues

The following is a full and detailed statement of the facts on which plaintiff relies to determine eligibility in to The Business Litigation Session.

Plaintiff brings this class action to remedy the secret interception of the contents of internet communications between healthcare consumers and certain healthcare providers. Specifically, the defendants aided in the interception of communications between Plaintiff and other Class Members and a website maintained by Atrius Health, Inc.. These communications were intercepted by Google, Facebook (now known as "Meta"), and other companies that provide so-called "tracking software." Class Members' communications with the Atrius Health Website were secretly and contemporaneously monitored, recorded, and retransmitted to these third parties without their knowledge or consent whenever Plaintiff or other Class Members visited the Atrius Health Website or any page within that website.

Defendants actively aided this secret interception of healthcare consumers' communications with their website. Defendants aided the interceptions by injecting hidden code into their websites to permit Google, Facebook, and others to intercept the communications.

The Massachusetts Wiretap Act (M.G.L. c. 272 § 99) makes it unlawful to "secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication." The Massachusetts Wiretap Act provides a private remedy for the secret interception of wire communications, enforceable against both the intercepting party and any party that aids such an interception. Atrius Health, Inc. aided interceptions completed by Google, Facebook, and other third parties of healthcare consumers' communications with the Atrius Health Website. Plaintiff seeks statutory remedies under the Massachusetts Wiretap Act both on her own behalf and on behalf of all other Massachusetts residents who accessed the Atrius Health Website.

* A Special Tracking Order shall be created by the Presiding Justice of the Business Litigation Session at the Rule 16 Conference.

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT.

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods." Signature of Attorney of Record /s/ Michelle H. Blauner
DATE: 03-10-2023

I HEREBY ATTEST AND CERTIFY ON January 9, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

Date Filed 3/10/2023 3:23 PM
Superior Court - Suffolk
Docket Number

3/21

3

NOTIFY

COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.

| | |
|---|---|
| JANE DOE,<br><br>for herself and the class,<br><br>v.<br><br>ATRIUS HEALTH, INC.,<br><br>Defendant. | SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION<br><br>CIVIL ACTION NO. 23-0597<br><br>JURY TRIAL DEMANDED |

NOTICE SENT 03.24.23 (6) (MAT)

**PLAINTIFF'S MOTION TO PROCEED IN PSEUDONYM**

Plaintiff respectfully moves, *ex parte*, to proceed in this action under the pseudonym Jane Doe, and to permit the impoundment of her name and/or other identifying information about herself for the pendency of this case pursuant to Massachusetts Uniform Rules on Impoundment Procedure ("URIP") Rule 2.[1]

The material sought to be precluded from public disclosure (both through proceeding in pseudonym and by impoundment for future court filings) are names of Plaintiff and/or other identifying information concerning Plaintiff.[2] The impoundment is necessary because the facts of the underlying action relate directly and specifically to sensitive medical information for Plaintiff. Specifically, the claim arises from the Defendant's systematic violation of the privacy rights of healthcare consumers who accessed its website, exposing sensitive personal information to third parties without those consumers' knowledge or consent. The information revealed during this litigation may include medical conditions experienced and procedures obtained by Plaintiff.

[1] URIP Rule 2 provides: "The motion shall describe with particularity (i) the material sought to be impounded, (ii) the duration for which impoundment is sought, (iii) the reasons impoundment is necessary, and (iv) the reasons other alternatives to impoundment will not afford adequate protection."

[2] This could include social media handles, IP addresses, etc.

3/21/23 After review, ALLOWED. Plaintiff shall file a notice with the court disclosing plaintiff's true name and address. The notice shall be impounded in the interest of justice until the completion of this case or further order of the court, and the notice shall be served on defendant with the complaint (or provided to defense counsel if the complaint has already been served.

Therefore, to protect the medical information that will necessarily be disclosed as part of the factual allegations and discovery in this matter, it is necessary to file this Complaint and proceed with the use of a pseudonym.

Alternatives to impoundment would not serve the same function and would not adequately protect Plaintiff, as Defendant has already mishandled her personal medical information. Plaintiff recognizes that Massachusetts adheres to a presumption of openness, but this presumption is offset by the equally if not more important premise that the citizens of Massachusetts have a right to the privacy and confidentiality of their medical information, a right which is protected by statute, including G.L. c. 272, § 99 (Interception of Wire and Oral Communications), G.L. c.214, § 1B (Right to Privacy), and G.L. c. 111, § 70E (Patients' and Residents' Rights).

Perhaps as importantly, proceeding with the Plaintiff's full name would have the unwelcome effect of making impoundment a more laborious, tedious, and inefficient task. For each piece of discovery regarding the Plaintiffs' medical information, Plaintiffs would have to seek impoundment of those materials. It would impact the ability to move forward efficiently in both written and oral discovery. An impoundment order (attached at Exhibit B) would serve both purposes of protecting the Plaintiffs' private medical information and also allowing efficient prosecution of this case.

WHEREFORE, Plaintiff respectfully requests this court ALLOW her Motion for Proceed in Pseudonym, including permitting Plaintiff to refer to herself by the pseudonym "Jane Doe" in her Complaint and future court filings and to redact any documents filed in the future that contain personal identifying information for Plaintiff. Because Plaintiff files this motion at the time of the complaint filing (as directed by the Court clerk) and before service, Plaintiff agrees that any order will be subject to modification for good cause upon motion by any party.

Dated: March 10, 2023

Respectfully submitted,

*/s/ Michelle H. Blauner*

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

I HEREBY ATTEST AND CERTIFY ON January 9, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: [signature]
Asst. Clerk

4

COMMONWEALTH OF MASSACHUSETTS

**Suffolk, ss.**

| | |
|---|---|
| JANE DOE,<br><br>Plaintiff, on behalf of herself and others similarly situated,<br><br>v.<br><br>ATRIUS HEALTH, INC.,<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**<br><br>CIVIL ACTION NO. 23-597<br><br>**JURY TRIAL DEMANDED** |

**AFFIDAVIT OF ATTORNEY MICHELLE H. BLAUNER IN SUPPORT OF PLAINTIFF'S MOTION TO PROCEED IN PSEUDONYM**

I, Michelle H. Blauner, hereby state and depose:

1. I am counsel for the Plaintiff in the above-captioned case.

2. Plaintiff is an individual, the identity of whom is known to me and my firm.

3. The allegations in Plaintiff's Complaint in this action, to the extent they relate to Plaintiff, reflect information Plaintiff has provided to my firm to prosecute this action.

4. The claims Plaintiff asserts relate to personal information that Defendants inappropriately assisted third parties to intercept. That personal information is highly sensitive, personal, and confidential.

5. To protect the privacy interests of the Plaintiff, it is necessary to proceed under a pseudonym so as not to cause further harm by additional, repeated disclosure of highly confidential medical information throughout this litigation.

6. Allowing the plaintiffs to file under a pseudonym also allows for the most efficient disclosure of documents and discovery while protecting the legitimate privacy interests of Plaintiff.

Signed under the pains and penalties of perjury this 10th day of March 2023.

*/s/ Michelle H. Blauner*
SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

I HEREBY ATTEST AND CERTIFY ON January 9, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: [signature]
Asst. Clerk

# CIVIL ACTION COVER SHEET
# INSTRUCTIONS

## SELECT CATEGORY THAT BEST DESCRIBES YOUR CASE

BA.1 claims relating to the governance and conduct of internal of entities
BA2. claims relating to employment agreements
BA3. claims relating to liability of shareholders, directors, officers, partners etc.

BB.1 shareholder derivative claims
BB.2 claims relating to or arising out of securities transactions

BC.1 claims involving mergers, consolidation, sales of assets, issuance of debt, equity and like interests

BD.1 claims to determine the use or status of, or claims involving, intellectual property
BD.2 claims to determine the use or status of, or claims involving, confidential, property or trade secret information
BD.3 claims to determine the use or status, or claims involving restrictive covenants

BE.1 claims involving breaches of contract or fiduciary, fraud, mis-representation business torts or other violations involving business relationships

BF.1 claims under the U.C.C. involving complex issues
BG.1 claims arising from transactions with banks, investment bankers

BH.1 claims for violation of antitrust or other trade regulation laws
BH.2 claims of unfair trade practices involving complex issues

BL.1 malpractice claims by business enterprises against professionals

BJ.1 claims by or against a business enterprise to which a government entity is a party

BK.1 other commercial claims, including insurance, construction, real estate and consumer matters involving complex issues

TRANSFER YOUR SELECTION TO THE FACE SHEET

EXAMPLE:

| CODE NO. | TYPE OF ACTION (SPECIFY) | TRACK | IS THIS A JURY CASE? |
|---|---|---|---|
| | | * | |
| BD3 | Restrictive covenants | (B) | Yes No |

DUTY OF THE PLAINTIFF. The plaintiff, or plaintiff's counsel, shall set forth, in the face sheet a statement specifying in full detail the facts upon which the plaintiff then relies for "presumptive" entry into the Business Litigation Session. A copy of the civil action cover sheet shall be served on all defendants, together with the complaint.

DUTY OF THE DEFENDANT. Should the defendant contest the entry into the Business Litigation Session, the defendant shall file with the answer (or dispositive motion) a statement specifying why the action does not belong in the Business Litigation Session. Such Statement shall be served with the answer (or dispositive motion).

A CIVIL ACTION COVER SHEET MUST BE FILED WITH EACH COMPLAINT.

FAILURE TO COMPLETE THIS COVER SHEET THOROUGHLY AND ACCU-RATELY MAY RESULT IN THE TRANSFER OF THIS ACTION FROM THE BUSINESS LITIGATION SESSION TO ANOTHER APPROPRIATE SESSION OF THE SUPERIOR COURT.

* A special tracking order shall be created by the presiding justice of the Business Litigation Session at the Initial Rule 16 Conference.

\ 3|21

NOTIFY

5

**Commonwealth of Massachusetts**
**County of Suffolk**
**The Superior Court – Business Litigation Session**

CIVIL DOCKET#: **2384CV00597-BLS1**

Case: Doe v. Atrius Health, Inc.

**NOTICE OF ACCEPTANCE INTO BUSINESS LITIGATION SESSION**

This matter has been accepted into the Suffolk Business Litigation Session. It has been assigned to **BLS1**.

Hereafter, as shown above, all parties must include the initials "**BLS1**" at the end of the docket number on all filings.

Counsel for the plaintiff(s) is hereby advised that within seven (7) days of the filing of an appearance, answer, motion or other response to the complaint by or on behalf of the defendant(s) which has been served with process within the time limitation of Mass. R. Civ. P. 4(j), or such other time as may be modified by the Court, he or she shall send notice thereof to the appropriate BLS Session Clerk at Suffolk Superior Court, Three Pemberton Square, Boston, MA 02108.

Upon receipt of such notice, the Court will issue a Notice of Initial Rule 16 Conference for purposes of meeting with all counsel. Before the Rule 16 Conference, counsel shall discuss with their clients and with opposing counsel whether the parties will participate in the BLS Project on Discovery (counsel are directed to www.mass.gov/superior-court-business-litigation-session for description of the Project). Counsel may indicate their respective client's participation by completing, filing, and serving the attached form. If by the date of the initial Rule 16 Conference, not all parties have given notice of their participation, counsel shall be prepared to discuss at that conference whether their clients will participate in the Project.

The Court requests that plaintiff's counsel serve on opposing parties a copy of this notice and the attached form.

Dated: March 13, 2023

NOTICE SENT
03 . 24 . 23
(LAT)

(3) I HEREBY ATTEST AND CERTIFY ON January 9, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Asst. Clerk

/s/ Kenneth W. Salinger

Kenneth W. Salinger
Justice of the Superior Court &
Administrative Justice of the Business Litigation Session

Date Filed 3/31/2023 9:38 AM
Superior Court - Suffolk
Docket Number 2384CV00597
LW



COMMONWEALTH OF MASSACHUSETTS

**Suffolk, ss.**

| | |
|---|---|
| JANE DOE,<br>For herself and the Class,<br>v.<br>ATRIUS HEALTH, INC.<br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**<br><br>CIVIL ACTION NO. 2384CV00597-BLS1 |

## JOINT STIPULATION REGARDING ACCEPTANCE OF SERVICE AND DEFENDANT'S TIME TO RESPOND TO THE COMPLAINT

Plaintiff Jane Doe ("Plaintiff") and Defendant Atrius Health, Inc. hereby stipulate to acceptance of service of process for Atrius Health Inc. and a schedule for Defendant to respond to Plaintiff's Complaint.

On March 10, 2023, Plaintiff filed the Complaint in this action, in which Atrius Health, Inc. was named as a defendant. The parties have met and conferred, and the undersigned counsel for Defendant hereby stipulates to sufficient service of process upon Atrius Health, Inc. as of March 28, 2023. Subject to the Court's approval, Defendant and Plaintiff also stipulate that Defendant shall have until May 29, 2023, to answer or otherwise respond to the Complaint.

Respectfully submitted this 31st day of March 2023:

*/s/ Michelle H. Blauner*
SHAPIRO HABER & URMY LLP
Michelle H. Blauner (BBO #549049)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
mblauner@shulaw.com

*Counsel for Plaintiff and the Proposed Class*

*/s/ Anthony Fuller (e-signed with permission)*
HOGAN LOVELLS US LLP
Anthony Fuller (BBO #633246)
125 High Street, 20th Floor
Boston, MA 02110
(617) 371-1000 – Telephone
(617) 371-1037 – Facsimile
anthony.fuller@hoganlovells.com

*Counsel for Defendant Atrius Health, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon Defendant's counsel, by email, on March 31, 2023.

*/s/ Michelle H. Blauner*
Michelle H. Blauner

I HEREBY ATTEST AND CERTIFY ON January 9, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: [signature]
Asst. Clerk

8

**COMMONWEALTH OF MASSACHUSETTS**

**Suffolk, S.S.**

| | |
|---|---|
| JANE DOE,<br>For herself and the Class,<br>Plaintiff,<br>v.<br>ATRIUS HEALTH, INC.<br>Defendant. | **Superior Court Department**<br>**Of the Trial Court**<br>**Business Litigation Session**<br><br>Civil Action No. 2384CV00597-BLS1 |

**NOTICE OF FILING OF NOTICE OF REMOVAL**

PLEASE TAKE NOTICE THAT on April 27, 2023, Defendant Atrius Health, Inc. ("Atrius") removed this action to federal court by filing a Notice of Removal pursuant to 28 U.S.C. § 1442(a)(1) in the United States District Court for the District of Massachusetts. A true and correct copy of the Notice of Removal is attached hereto as Exhibit A.

PLEASE TAKE FURTHER NOTICE that, upon the filing of the Notice of Removal with the United States District Court for the District of Massachusetts, and filing copies thereof with the Clerk at the Norfolk County Superior Court, Atrius Health has effected removal and the Superior Court shall proceed no further in this action unless the action is remanded pursuant to 28 U.S.C. § 1446(d).

Dated: April 27, 2023

Respectfully submitted,

By its attorneys,

/s/ Anthony E. Fuller
Anthony E. Fuller (BBO # 633246)

I HEREBY ATTEST AND CERTIFY ON January 9, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: [signature]
Asst. Clerk

Maria R. Durant (BBO # 558906)
Kayla H. Ghantous (BBO # 709197)
125 High Street, Suite 2010
Boston, MA 02110
Telephone: (617) 371-1000
Facsimile: (617) 371-1037
anthony.fuller@hoganlovells.com
maria.durant@hoganlovells.com
kayla.ghantous@hoganlovells.com

Allison Holt Ryan*
Adam A. Cooke (BBO # 679637)
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
allison.holt-ryan@hoganlovells.com
adam.a.cooke@hoganlovells.com

*Pro hac vice application forthcoming*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 27, 2023, copies of the foregoing Notice of Filing of Notice of Removal were sent via electronic mail and overnight delivery to the addresses listed below:

Shapiro Haber & Urmy LLP
Edward F. Haber
Michelle H. Blauner
Patrick J. Vallely
One Boston Place
Suite 2600
Boston, MA 02108
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Counsel for Plaintiff Jane Doe, For herself and the Class*

/s/ Anthony E. Fuller
*Counsel for Defendant Atrius Health, Inc.*

9

23-597BLS1 Suffolk Superior Court

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
OCT 30 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JANE DOE,<br>For herself and the class,<br><br>Plaintiff,<br><br>v.<br><br>ATRIUS HEALTH, INC.<br><br>Defendant. | Civil Action No. ______________<br><br>[Superior Court Department of the Trial Court Business Litigation Session Case No. 2384CV00597-BLS1]<br><br>**DEFENDANT'S NOTICE OF REMOVAL UNDER 28 U.S.C. § 1442(a)(1)** |

**NOTICE OF REMOVAL**

For more than fifteen years, the federal government has engaged non-governmental entities to help construct a nationwide health information technology infrastructure designed to improve patient engagement and access to care. Since 2011, Atrius Health, Inc. ("Atrius" or "Defendant") has served as one of those entities. Plaintiff Jane Doe now challenges Defendant's efforts to implement the federal government's directives and promote patient engagement and access to care. Atrius removes this case pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1), and sets forth below a "short and plain statement of the grounds for removal," 28 U.S.C. § 1446(a).

**NATURE OF THE REMOVED ACTION**

1. On March 10, 2023, Plaintiff filed a Class Action Complaint ("Complaint") against Atrius in the Business Litigation Session of Suffolk County Superior Court, Case No. 2384CV00597-BLS1. Atrius accepted service on March 28, 2023. *See* Ex. A, Stipulation of Service.

2. Atrius is a non-profit multi-specialty, multi-site medical group practice in Eastern Massachusetts. An early adopter of electronic health records ("EHR") and data analytics, Atrius

delivers a system of connected care for adult and pediatric patients. Atrius maintains a website, https://atriushealth.org/ (the "Atrius Website"), which Plaintiff alleges enables "healthcare consumers [to] obtain information about the services Atrius provides, including information about doctors, services, and treatments provided by Atrius for particular medical conditions." Compl. ¶ 14; *see also id.* ¶¶ 15-16.

3. Plaintiff further alleges that Defendant deployed analytics tools on the Atrius Website offered by technology and social media companies such as Google or Facebook.[1] *See* Compl. ¶¶ 1-2, 24, 92(a)-92(d). One of the tools Atrius has allegedly used is known as "Google Analytics," a "free" website analytics technology. *Id.* ¶ 37. According to the Complaint, "information recorded through Google Analytics and accessible by the website owner provides the website owner with insights about how users use the website, which the owner can use to improve the website." *Id.* Another tool Atrius allegedly used but then removed is Facebook's "Meta Pixel," *id.* ¶¶ 30, 54, a "'snippet of JavaScript code,'" that enables logging of "visitor activity" on a website," *id.* ¶¶ 31.

4. Federal and state governments as well as organizations across the country use website analytics technologies such as Google Analytics and the Meta Pixel to improve their website functions and user experience. For example, the Privacy Policy on the website Medicare.gov states: "We use third-party web services to conduct outreach and education through the use of digital advertising for Medicare.gov. These third-party services may collect information through the use of web beacons (also called pixels) that are located on our pages. A web beacon . . . in combination with a cookie, allows us to collect information regarding the use of the web page that contains the web beacon." Ex. B, Medicare.gov, *Privacy Policy* at 5; *see also* Ex.

[1] The Complaint refers to the technology companies Google LLC and Meta Platforms, Inc. as "Google" and "Facebook," respectively. *See* Compl. ¶¶ 27, 34. This Notice of Removal does the same.

C, CMS.gov, *Privacy Policy* at 4 (same disclosure in privacy policy). Similarly, the Privacy Policy for Mass.gov, which includes websites for various courts in the Commonwealth, states: "The use of cookies is standard practice among Internet websites. Mass.gov uses cookies and tools for data collection and analytics to learn more about how visitors to Mass.gov find and interact with the pages they visit. We may use this information to improve our service offerings and better tailor individual user experience." *See* Ex. D, Mass.gov, *Privacy Policy* at 2-3.

5. Here, Plaintiff alleges that analytics technologies installed on the Atrius Website caused a user's browser to execute embedded JavaScript code, which in turn caused "the user's web browser to retrieve a file from [a] third-party website" and then subsequently "communicate certain information to the third-party website." Compl. ¶¶ 47-49. That information could include the Uniform Resource Locator ("URL") of the webpage visited as well as other information about the webpage and user interaction with the webpage. *Id.* ¶ 49. The Complaint does not allege that these technologies communicated social security numbers, medical insurance numbers, birth dates, or medical test results to third-party websites.

6. Plaintiff alleges that she is a patient of Atrius and "regularly uses the Atrius Website." *Id.* ¶ 10. She purportedly uses the Atrius Website to "(i) search for and obtain information about Atrius doctors (including their credentials and backgrounds); (ii) search for information on particular symptoms, conditions, and medical procedures; and (iii) obtain and review medical records through the website's patient portal." *Id.* She does not allege whether she has or had a Facebook or Google account, or an account with any of the other technology or social media companies referenced in the Complaint. She also does not allege when and where she accessed the Atrius Website or what specific pages of the Atrius Website she visited. Nor does she allege what browser she used to access the Atrius Website or how it was configured.

7. Based on these allegations, Plaintiff alleges that Atrius "aided" so-called "interceptions" by Google, Facebook, and other third parties of user communications with the Atrius Website. Plaintiff asserts a single claim against Defendant on behalf of herself and a putative class of Massachusetts residents under the state wiretap statute, Mass. Gen. Laws Ann. ch. 272 § 99. Compl. ¶¶ 104-11; *see id.* ¶ 96 (defining the putative class).

**BASIS FOR REMOVAL**

8. Pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a), Atrius removes this case to federal court. The statute authorizes the removal of state court cases against "any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office." *Id.* § 1442(a)(1).

9. There is no presumption against federal officer removal, *Massachusetts v. Exxon Mobil Corp.*, 462 F. Supp. 3d 31, 38-39 (D. Mass. 2020), and under binding Supreme Court precedent, the federal officer removal statute must be "liberally construed." *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 147 (2007). Private defendants routinely remove state court actions under this statute when acting under color of federal office. *See, e.g.*, *Moore v. Elec. Boat Corp.*, 25 F.4th 30, 32 (1st Cir. 2022).

10. To meet the low bar for removal, the defendant must show (1) it is a "person" under the statute and was "acting under a federal officer's authority," (2) that "the charged conduct was carried out 'for or relating to' the asserted official authority," and (3) that the defendant "will assert a colorable federal defense." *Moore*, 25 F.4th at 34 (citation omitted).

11. Atrius meets each of these requirements. First, companies qualify as "person[s]" under the statute, so Atrius clearly meets this threshold element. In addition, Atrius acted under federal officer authority because it developed its website and patient portal in conjunction with a

series of federal programs that sought to create a nationwide health information technology infrastructure. Second, the alleged conduct at issue in the Complaint was carried out "for or relating to" federal incentive and interoperability initiatives centered on Medicare and Medicaid, including the Meaningful Use program, Merit-based Incentive Payment System (MIPS), and the Primary Care First program. Through these initiatives, the federal government provides monetary incentives and guidance to providers, including Atrius, to enhance patient engagement and expand online access to their EHR. Under federal direction, Atrius has gathered data demonstrating expanded patient access and improved patient engagement. Third, Atrius intends to assert multiple colorable federal defenses to Plaintiff's claim for relief.

12. Courts across the country have upheld federal officer removal in similar privacy class actions against healthcare defendants related to their websites. *See Doe v. UPMC*, 2020 WL 4381675, *7 (W.D. Pa. Jul. 31, 2020), *appeal denied*, 2020 WL 5742685 (W.D. Pa. Sept. 25, 2020) ("UPMC has shown that by its participation in the Meaningful Use [p]rogram, it was 'acting under' DHHS when it engaged in the conduct that is at issue in the Complaint."); *Doe v. ProMedica Health Sys., Inc.*, 2020 WL 7705627, *3 (N.D. Ohio Oct. 30, 2020), *appeal denied*, 2020 WL 7705713 (N.D. Ohio Dec. 14, 2020) ("Because Defendant's participation assisted the federal government in achieving that goal [creating an interoperable system of patient EHR], Defendant has satisfied the 'acting under' prong.").[2] Removal is proper here as well.

[2] Other district courts have reached different conclusions, including Judge Stearns in a margin order issued in *Doe v. Cape Cod Healthcare, Inc.*, No. 23-cv-10080, (D. Mass. Jan. 25, 2023), ECF No. 10, *appeal filed*, No. 23-1149 (1st Cir. Feb. 2, 2023). Atrius respectfully disagrees with these decisions, which overlook the extent to which the federal government is obligated to facilitate construction of infrastructure to support interoperable health information technology, fail to acknowledge the contractual obligations entities like Atrius undertook when they agreed to participate in federal incentive programs, and ignore the significant guidance the federal government provided to private entities regarding implementation of this infrastructure.

***Background on Federal Programs***

13. For a period of nearly twenty years, the federal government has endeavored to spur the creation of infrastructure sufficient to support the implementation of interoperable health information technology across the country. This project began in 2004 when President George W. Bush signed an Executive Order calling for the establishment of the Office of the National Coordinator for Health Information Technology ("ONC") within the Department of Health and Human Services ("HHS"). *See* Exec. Order No. 13,335, 69 Fed. Reg. 24,059 (Apr. 27, 2004). President Bush directed the ONC to "develop, maintain, and direct the implementation of a strategic plan to guide the nationwide implementation of interoperable health information technology." *Id.*

14. In the Health Information Technology for Economic and Clinical Health Act of 2009, Congress followed up on that executive action, *see* American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115, 230 (2009), codified as 42 U.S.C. § 300jj *et seq*, and directed billions of dollars of federal funds to the Centers of Medicare and Medicaid Services ("CMS") within HHS to "invest in the infrastructure necessary to allow for and promote the electronic exchange and use of health information for each individual in the United States consistent with the goals outlined in the strategic plan developed by the [ONC]." 42 U.S.C. § 300jj-31(a).

15. Following that mandate, the ONC enlisted private healthcare providers, including Atrius, to help build the nationwide infrastructure. In doing so, the ONC recognized that private healthcare providers are essential to the development of the Congressionally-directed infrastructure precisely because they have direct access to patients. The government has therefore tried to augment "a provider's ability to influence patient engagement by providing a wider range

of technologies and methods for a patient's use." Medicare and Medicaid Programs; Electronic Health Record Incentive Program-Stage 3 and Modifications to Meaningful Use in 2015 Through 2017, 80 Fed. Reg. 62,761, 62,848 (Dec. 15, 2015).

16. To achieve these goals, the ONC issues guidance to private providers in the form of strategic plans. For instance, in the 2015–2020 plan, the ONC required "federal agencies" to "collaborate with . . . private stakeholders to . . . [b]uild a culture of electronic health information access and use." Ex. E, ONC, *Federal Health IT Strategic Plan 2015-2020* at 7. The 2020–2025 plan underscores the collaboration that has already occurred: "Federal, state, and local governments, along with the private sector, have worked together to help digitize health information and healthcare." Ex. F, ONC, *Federal Health IT Strategic Plan 2020-2025* at 2.

17. Medicare and Medicaid EHR incentive and interoperability initiatives have been at the center of these federal efforts. For instance, CMS established the Meaningful Use program in 2011, which has been followed by various other initiatives and programs. *See* 42 C.F.R. §§ 495.2–495.370. The goal of these initiatives has been to increase patients' "meaningful use" and engagement with their EHR. *See* Ex. G, CMS, *Promoting Interoperability Programs* at 1.

18. Since 2011, federal EHR interoperability initiatives, including the Meaningful Use program, MIPS, and the Primary Care First program, have offered incentive payments to Medicare and Medicaid providers when they provide program reports and meet specific criteria for increasing patient engagement. *See id.* (noting history of interoperability programs); *see also* Ex. H, CMS, *Traditional MIPS Overview* at 1-3 (describing promoting interoperability component); Ex. I, CMS, *2021 Promoting Interoperability: Traditional MIPS* at 1-2 (describing 2021 MIPS requirements for Promoting Interoperability component).

19. The program requirements for increasing patient engagement include implementing certified EHR technology based on federal standards and technical specifications to facilitate patients viewing their medical records. *See* 45 C.F.R. § 170.315. Once ONC certifies that a particular technology complies with federal standards, the developer can market the product to healthcare providers. To meet the numerous federal requirements, CMS recommends that providers create patient "portals" to facilitate access to providers and EHR. CMS has explained that the portals "must be engaging and user-friendly," and to make that happen, providers should "actively promote and facilitate portal use." Ex. J, ONC, *How to Optimize Patient Portals for Patient Engagement and Meet Meaningful Use Requirements* at 1 (2013).

20. HHS requires program participants to show patients' increased engagement over time. Those providers that meet the specified engagement criteria, qualify for higher federal payments. *See* 42 U.S.C. § 1395w-4.

21. For instance, one objective of the Meaningful Use program was to "[p]rovide patients the ability to view online, download, and transmit their health information within 4 business days of the information being available to the [provider]." 42 C.F.R. § 495.22(e)(8)(i). To meet that objective, providers had to show that more than fifty percent of Medicaid patients received access to view, download, and transmit their health information to a third party—a percentage that went up over time. *Compare id.* § 495.22(e)(8) (fifty percent in 2015), *with id.* § 495.24(d)(5)(i)(B) (eighty percent in 2019).

22. In addition to the Meaningful Use program and MIPS initiatives promoting interoperability, CMS created another program, the Primary Care First program, that incentivizes physicians who may not participate in the other initiatives. Under the Primary Care First program, CMS enters into participant agreements with certain providers to, among other things, further

incentivize patient access and EHR interoperability. *See, e.g.*, Ex. K, Primary Care First Program Participation Agreement. For instance, participants must ensure that patients receive access to their EHR within one business day and that their EHR technology enables a patient to "[i]dentify, record, and access information directly and electronically shared by a patient." 45 C.F.R. § 170.315(e)(3).

23. Aside from incentive programs, CMS also provided an example of how to engage with beneficiaries: it created its own portal and promoted patient engagement through the use of third-party services on its websites. By working with over two dozen third-parties, CMS is able to "collect basic information about visits to Medicare.gov." *See* Ex. B at 4. CMS "use[s] third-party web services to conduct outreach and education through the use of digital advertising for Medicare.gov." *Id.* at 5. These services include "the use of web beacons (also called pixels)," which CMS uses "to better target Medicare advertisements." *Id.*

24. CMS also engaged Facebook to "place[] a cookie or pixel . . . for conversion tracking on certain pages of a CMS website. [This] allows Facebook Ads to measure the performance of CMS advertisements based on consumer activity and to report the ad performance to CMS." Ex. L, HHS, *Third Party Websites and Applications Privacy Impact Assessment – Facebook Ads* at 2 (Sept. 4, 2018).

***Atrius is a "person"***

25. Federal officer removal can be effectuated by "any person acting under" a federal officer. 28 U.S.C. § 1442(a)(1).

26. Courts have repeatedly held that corporations qualify as "person[s]" under the statute. *See, e.g.*, *Moore*, 25 F.4th at 34–38; *see also Genereux v. Am. Beryllia Corp.*, 577 F.3d 350, 357 & n.9 (1st Cir. 2009).

27. Atrius is a Massachusetts non-profit corporation, Compl. ¶ 11, and thus qualifies as a "person."

***Atrius is "acting under" Federal Authority***

28. The "acting under" element for federal officer removal must be "'broad[ly]'" and "'liberally construed.'" *See Moore*, 25 F.4th at 34 n.3 (citation omitted). This element involves "an effort to *assist,* or to help *carry out,* the duties or tasks of the federal superior." *Watson*, 551 U.S. at 152 (emphasis in original).

29. Atrius readily meets this requirement. First, on behalf of itself and its providers, Atrius has been a longstanding participant in Medicare and Medicaid EHR incentive programs and initiatives, including the Meaningful Use program, MIPS, and the Primary Care First program. Atrius has assisted and continues to assist the federal government in carrying out its goal of creating a nationwide healthcare information technology infrastructure through its participation in these programs. *See* Ex. F at 23-39. This work has included development of its patient portal to meet interoperability standards and efforts to increase patient access and engagement as well as filing hundreds of reports attesting to this work. *See* Ex. M, Monsen Decl. ¶¶ 6-7.[3]

30. Second, the government has modeled how to best enhance patient engagement. That includes development of a patient portal and analyzing patient engagement, including with digital marketing tools. Furthermore, the federal government has shown participants how to enhance patient engagement on its own websites by using third-party services to analyze users'

[3] Dr. Craig Monsen is Atrius' Chief Medical Information Officer and Associate Chief Information Officer. *See* Ex. M ¶ 2. In those roles, he has "provide[d] guidance to internal teams developing Atrius' electronic patient portal" and has gained familiarity with Atrius' "participation in and involvement with federal incentive and interoperability initiatives, including the Meaningful Use program, Merit-based Incentive Payment System (MIPS), and the Primary Care First program." *Id.* ¶¶ 4-5.

engagement with those websites, including on the CMS website and the HHS website. *See* Ex. C at 3-4; Ex. N, HHS.gov, *HHS Privacy Policy Notice* at 8-11.

31. Third, the federal government has created an office devoted to promoting patient engagement with health records and closely monitors private providers' work to achieve that goal. In exchange for carrying out the work of improving patient access and engagement, Atrius and other private providers have received payments and direction through various federal programs and initiatives, including the Meaningful Use program, MIPS, and the Primary Care First program. *See* Ex. M ¶ 8. Such exchanges are akin to a government-contractor relationship. *See Moore*, 25 F.4th at 34 n.3.

32. Finally, the Primary Care First program includes promoting interoperability and patient access to records as an element of improving patient care. As part of this program, Atrius has entered into Primary Care First participation agreements for almost all of its clinical facilities, ensuring that it attains the interoperability benchmarks that are part of the federal government's efforts to improve primary care and interoperability. *See* Ex. K at 82-83; Ex. M ¶ 9.

33. Atrius developed its website to promote patient engagement and access to EHR, including through its portal, while at the same time raising awareness and usability of its website and portal. Ex. M ¶ 10. These efforts enabled Atrius to meet the objectives set forth in the government's incentive initiatives. *Id.* The federal government would not be able to "carry out" these important federal healthcare initiatives without the assistance of providers like Atrius. *Watson*, 551 U.S. at 152.

*Atrius' Conduct Taken "for or relating to" the Asserted Federal Authority*

34. The "for or relating to" element means that the Plaintiff's claim must be "related to" the activity Atrius took while "acting under" the federal officer. *See Moore*, 25 F.4th at 35–

36. "No causal link is required," and the required nexus "is not to be understood as anything more than a 'related to' nexus." *Id.* at 35. The Supreme Court has stated "that the ordinary meaning of the phrase 'relating to' is 'a broad one,' holding that it normally means in 'association with or connection with.'" *Id.* at 35 n.4 (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383–84 (1992)).

35. The Complaint centers on Defendant's alleged use of commonplace website analytics tools, such as Google Analytics and the Meta Pixel. *See, e.g.*, Compl. ¶¶ 55-92. As Plaintiff alleges, and the government's own use of such tools shows, these technologies enable a website owner to review user activity and engagement and assess website functionality. *See*, *e.g.*, *id.* ¶¶ 30-32, 37. Plaintiff thus challenges development of Atrius' website, which was designed to help promote patient engagement. Indeed, in support of her claim that Atrius violated the Massachusetts wiretap statute, *see id.* ¶¶ 104-111, Plaintiff points to a button on the "Atrius landing page" that enables users to access Atrius' "MyHealth Online" portal, which is "available on nearly every page on the website." *Id.* ¶ 73. According to the Complaint, when a user clicks the button, information about the fact of that click is transmitted to third parties like Google. *Id.* Facilitating access to the portal, including by providing multiple links on the Atrius Website, was one way Atrius implemented requirements for interoperability and engagement. *See* Ex. M ¶¶ 6-10. Plaintiff's claim clearly "relat[es] to" Defendant's role in carrying out the federal government's goal of creating a national healthcare information technology infrastructure.

36. In a similar case, *UPMC*, the plaintiffs there also asserted state law claims against a defendant healthcare provider based on alleged disclosure of personally identifiable information to third parties for marketing purposes and without the plaintiffs' knowledge or authorization. *UPMC*, 2020 WL 4381675, at *1. The district court found that as a Meaningful Use participant,

"UMPC must, among other things, raise awareness and increase usability of the UPMC website and [its] portal." *Id.* at *6. The court concluded that challenging transmission of information to third parties, such as Facebook, "plainly" established "a connection or association between UPMC's website management and marketing strategies and the Meaningful Use program, particularly the incentives that are tied to patient participation and usability." *Id.* The same is true of Plaintiff's claim here.

***Atrius' Colorable Federal Defenses***

37. The final element for removal under Section 1442 merely requires that the defendant assert a "colorable federal defense." *See Mesa v. California*, 489 U.S. 121, 129-30 (1989) (colorable federal defense is "defensive" and "based in federal law"). A federal defense is "colorable" as long as it is not "wholly insubstantial and frivolous," even if it is not "clearly sustainable." *Moore*, 25 F.4th at 37 (citations omitted).

38. Atrius intends to argue that Plaintiff's state law claim is preempted in whole or in part under *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001), which instructs that federal preemption applies where the relationship between defendant and the government is "inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law." *Id.* at 347. Such arguments are best resolved by the federal courts, as their resolution turns on the interpretation of federal law. *See id.* at 353 (finding that the plaintiffs' state-law claims were preempted where "the existence of [ ] federal enactments" formed "a critical element in [the plaintiffs'] case").

39. Here, Atrius followed the directives of the federal government to develop and maintain a website designed with the purpose of facilitating and promoting patient access to her and engagement. Thus, the relationship between Defendant and the federal government is

"inherently federal in character." *Id.* at 347. Other courts have reached this conclusion. *See UPMC*, 2020 WL 4381675, at *7 ("Having already found that UPMC was 'acting under' DHHS when it engaged in the complained-of conduct, it follows that the relationship between UPMC and DHHS is 'inherently federal' in nature, such that the issue of whether Plaintiffs' state-law claims are preempted under the principles articulated in *Buckman* should be decided by a federal court.").

40. In addition, Atrius has a colorable federal defense to Plaintiff's claim for relief under the dormant Commerce Clause, which "prohibits state laws that unduly restrict interstate commerce." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2459 (2019). Put another way, "a state law that has the 'practical effect' of regulating commerce occurring wholly outside that State's borders is invalid under the Commerce Clause." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 332 (1989) (citation omitted). A state law that imposes a "burden" on interstate commerce that is clearly excessive in relation to the putative local benefits also violates the dormant Commerce Clause. *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 346 (2007). The regulation of internet-based commerce will often implicate the dormant Commerce Clause, as "it is difficult, if not impossible, for a state to regulate internet activities without 'project[ing] its legislation into other States.'" *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 103 (2d Cir. 2003) (quoting *Healy*, 491 U.S. at 334).

41. That is exactly what Plaintiff's interpretation of the Massachusetts wiretap statute would do. While Plaintiff purports to limit the putative class to Massachusetts residents who accessed the Atrius Website while inside the Commonwealth, Compl. ¶ 96, Plaintiff's interpretation of Massachusetts law would impact commercial activity far beyond the borders of the Commonwealth. Countless organizations across the country with websites that contain analytic tools would face liability under Plaintiff's reading of the Massachusetts wiretap statute,

even if just one person accessed the website while in the Commonwealth. Massachusetts law would therefore regulate commerce outside of the Commonwealth, forcing organizations to conform their websites regardless of any nexus to Massachusetts. There is at least a colorable argument that such an extension of Massachusetts law would run afoul of the dormant Commerce Clause. *See UPMC*, 2020 WL 4381675, at *7 (finding a colorable federal defense based on the dormant Commerce Clause where the provider's "website and patient portal 'provide[d] an easily accessible, interstate (and international) platform").

42. Atrius may identify additional defenses that involve federal law as it continues to review the Complaint.

## PROCEDURAL REQUIREMENTS

43. All the procedural requirements for removal under 28 U.S.C. § 1446 are satisfied.

44. Atrius is filing this Notice of Removal within thirty days of "formal" acceptance of service of the Complaint, which occurred on March 28, 2023. 28 U.S.C. § 1446(b); *see also Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 347–48 (1999) (noting that "formal service" is required to start the thirty day period pursuant to § 1446(b)).

45. This Court is the corresponding federal court for the Business Litigation Session of Suffolk County Superior Court of the Commonwealth of Massachusetts, where the suit was originally filed. Venue is therefore proper under 28 U.S.C. §§ 101 and 1441(a).

46. Atrius has attached a copy of the Complaint and all other publicly available filings from the state court docket as Exhibits A, O-T.

47. Upon filing this Notice, Atrius will promptly "give written notice thereof to all adverse parties," and will "file a copy of the notice with the clerk" of the Business Litigation Session of Suffolk County Superior Court. 28 U.S.C. § 1446(d).

**WHEREFORE,** Notice is given that this action is removed from the Business Litigation Session of Suffolk County Superior Court of the Commonwealth of Massachusetts to the United States District Court for the District of Massachusetts.

Dated: April 27, 2023

Respectfully submitted,

By: /s/ Anthony E. Fuller

Anthony E. Fuller (BBO #663246)
Maria R. Durant (BBO # 558906)
Kayla H. Ghantous (BBO # 709197)
HOGAN LOVELLS US LLP
125 High Street, Suite 2010
Boston, MA 02110
Telephone: (617) 371-100
Facsimile: (617) 371-1037
anthony.fuller@hoganlovells.com
maria.durant@hoganlovells.com
kayla.ghantous@hoganlovells.com

Allison Holt Ryan (*admitted pro hac vice*)
Adam A. Cooke (BBO # 679637)
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
allison.holt-ryan@hoganlovells.com
adam.a.cooke@hoganlovells.com

*Counsel for Defendant*

I HEREBY ATTEST AND CERTIFY ON January 9, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: [signature]
Asst. Clerk

**CERTIFICATE OF SERVICE**

I hereby certify that on April 27, 2023, copies of the foregoing Notice of Removal and accompanying exhibits were sent via electronic mail and overnight delivery to:

Edward F. Haber
Michelle H. Blauner
Patrick J. Vallely
SHAPIRO HABER
& URMY LLP
One Boston Place
Suite 2600
Boston, MA 02108
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Counsel for Plaintiff Jane Doe, For herself and the Class*

/s/ *Anthony E. Fuller*
Anthony E. Fuller

*Counsel for Defendant*

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Jane Doe, For herself and the Class

(b) County of Residence of First Listed Plaintiff: Middlesex
*(EXCEPT IN U.S. PLAINTIFF CASES)*

(c) Attorneys *(Firm Name, Address, and Telephone Number)*
Edward F. Haber, Michelle H. Blauner, and Patrick J. Vallely, Shapiro Haber & Urmy LLP, Address: One Boston Place, Suite 2600, Boston, MA 02108, Tele:

## DEFENDANTS

Atrius Health, Inc.

County of Residence of First Listed Defendant: Middlesex
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*
Anthony E. Fuller, Maria R. Durant, and Kayla H. Ghantous, Address: 125 High Street, Suite 2010, Boston, MA 02110, Tele: (617) 371-1000; Adam A. Cooke, Allison Holt Ryan

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

Other:
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark
- ☐ 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit (15 USC 1681 or 1692)
- ☐ 485 Telephone Consumer Protection Act
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☒ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☐ 1 Original Proceeding
- ☒ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C.§ 1442

Brief description of cause:
Removal pursuant to federal officer removal statute

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE F. Dennis Saylor, IV DOCKET NUMBER 1:22-cv-12196

DATE: April 27, 2023

SIGNATURE OF ATTORNEY OF RECORD: /s/ Anthony E. Fuller

FOR OFFICE USE ONLY

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only) Jane Doe, For herself and the Class v. Atrius Health, Inc.

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

☐ I. 160, 400, 410, 441, 535, 830*, 835*, 850, 880, 891, 893, R.23, REGARDLESS OF NATURE OF SUIT.

☐ II. 110, 130, 190, 196, 370, 375, 376, 440, 442, 443, 445, 446, 448, 470, 751, 820*, 840*, 895, 896, 899.

☑ III. 120, 140, 150, 151, 152, 153, 195, 210, 220, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 367, 368, 371, 380, 385, 422, 423, 430, 450, 460, 462, 463, 465, 480, 485, 490, 510, 530, 540, 550, 555, 560, 625, 690, 710, 720, 740, 790, 791, 861-865, 870, 871, 890, 950.

*Also complete AO 120 or AO 121. for patent, trademark or copyright cases.

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

John Doe and Jane Doe, Individually and on behalf of those similarly situated v. Atrius Health, Inc., 1:22-cv-12196

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

YES ☐ NO ☑

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC §2403)

YES ☐ NO ☑

If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

YES ☐ NO ☑

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

YES ☐ NO ☑

7. Do all of the parties in this action, excluding governmental agencies of the United States and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

YES ☑ NO ☐

A. If yes, in which division do all of the non-governmental parties reside?

Eastern Division ☑ Central Division ☐ Western Division ☐

B. If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

Eastern Division ☐ Central Division ☐ Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

YES ☐ NO ☑

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME Anthony E. Fuller

ADDRESS 125 High Street, Suite 2010, Boston MA 02110

TELEPHONE NO. (617) 371-1000

10

23-597BLS1 Suffolk Superior Court

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JANE DOE,<br>For herself and the Class,<br>Plaintiff,<br>v.<br>ATRIUS HEALTH, INC.<br>Defendant. | Civil Action No. 1:23-CV-10923 |

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
OCT 30 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

## DEFENDANT ATRIUS HEALTH, INC.'S CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 7.1(a), Defendant Atrius Health, Inc. ("Atrius") states that it is a non-profit corporation and does not have any parent corporation. As a non-profit corporation, Atrius does not have stockholders, and thus no publicly held corporation owns 10% or more of its stock.

Date: April 27, 2023

/s/ Anthony E. Fuller
Anthony E. Fuller (BBO # 633246)
Maria R. Durant (BBO # 558906)
Kayla H. Ghantous (BBO # 709197)
125 High Street, Suite 2010
Boston, MA 02110
Telephone: (617) 371-1000
Facsimile: (617) 371-1037
anthony.fuller@hoganlovells.com
maria.durant@hoganlovells.com
kayla.ghantous@hoganlovells.com

Allison Holt Ryan*
Adam A. Cooke (BBO # 679637)
Columbia Square
555 Thirteenth Street, NW

I HEREBY ATTEST AND CERTIFY ON January 9, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Asst. Clerk

Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
allison.holt-ryan@hoganlovells.com
adam.a.cooke@hoganlovells.com

**Pro hac vice application forthcoming*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 27, 2023, copies of the foregoing corporate disclosure statement were sent via electronic mail and overnight delivery to the addresses listed below:

Shapiro Haber & Urmy LLP
Edward F. Haber
Michelle H. Blauner
Patrick J. Vallely
One Boston Place
Suite 2600
Boston, MA 02108
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Counsel for Plaintiff Jane Doe, For herself and the Class*

*/s/ Anthony E. Fuller*
*Counsel for Defendant Atrius Health, Inc.*

11

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JANE DOE,
For herself and the Class,
Plaintiff,

v.

ATRIUS HEALTH, INC.
Defendant.

Civil Action No. 1:23-cv-10923

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
OCT 30 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

**DEFENDANT'S ASSENTED-TO MOTION TO EXTEND TIME**

Defendant Atrius Health, Inc. ("Defendant"), by and through undersigned counsel, moves to extend the deadline to respond to Plaintiff Jane Doe's ("Plaintiff") Motion to Remand ("Remand Motion") by fourteen (14) days to June 23, 2023.

Plaintiff filed the Class Action Complaint on March 10, 2023 in the Business Litigation Session of the Suffolk County Superior Court, Case No. 2384CV00597. *See* ECF 1-13 (Complaint). Defendant accepted service on March 28, 2023, and removed the action to this Court on April 27, 2023.[1] *See* ECF 1 (Notice of Removal); ECF 1-1 (Acceptance of Service). Plaintiff filed the Remand Motion approximately one month later, on May 26, 2023. *See* ECF 19; ECF 20. Defendant's response to the Remand Motion is currently due on June 9, 2023. *See* Local Rule 7.1(b)(2).

With Plaintiff's assent and pursuant to Fed. R. Civ. P. 6(b)(1)(A), Defendant respectfully requests that its deadline to respond to the Remand Motion be extended by fourteen (14) days to

[1] On May 8, 2023, Defendant moved with Plaintiff's assent to extend the deadline to respond to the Complaint until thirty days after the Court resolved Plaintiff's then-forthcoming motion. *See* ECF 11. The Court granted Defendant's motion the same day. *See* ECF 12.

June 23, 2023. This is Defendant's first such request; the additional time sought will not alter any other deadlines set in this case; and this request is not made for undue delay.

WHEREFORE, Defendant respectfully requests that the Court extend the deadline for Defendant to respond to the Remand Motion by fourteen (14) days, until June 23, 2023.

Dated: June 1, 2023

Respectfully submitted,

/s/Anthony E. Fuller

Anthony E. Fuller (BBO #633246)
Maria R. Durant (BBO # 558906)
Kayla H. Ghantous (BBO # 709197)
125 High Street, Suite 2010
Boston, MA 02110
Telephone: (617) 371-1000
Facsimile: (617) 371-1037
anthony.fuller@hoganlovells.com
maria.durant@hoganlovells.com
kayla.ghantous@hoganlovells.com

Allison Holt Ryan (*admitted pro hac vice*)
Adam A. Cooke (BBO # 679637)
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
allison.holt-ryan@hoganlovells.com
adam.a.cooke@hoganlovells.com

*Counsel for Defendant*

I HEREBY ATTEST AND CERTIFY ON January 9, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: [signature]
Asst. Clerk

**CERTIFICATE PURSUANT TO LOCAL RULE 7.1(a)(2)**

Counsel for Defendant certify that they have conferred with Plaintiff's counsel of record on this motion and that Plaintiff's counsel assents to the motion.

Dated: June 1, 2023

Respectfully submitted,

*/s/ Anthony E. Fuller*

Anthony E. Fuller (BBO #633246)
Maria R. Durant (BBO # 558906)
Kayla H. Ghantous (BBO # 709197)
125 High Street, Suite 2010
Boston, MA 02110
Telephone: (617) 371-1000
Facsimile: (617) 371-1037
anthony.fuller@hoganlovells.com
maria.durant@hoganlovells.com
kayla.ghantous@hoganlovells.com

Allison Holt-Ryan (*admitted pro hac vice*)
Adam A. Cooke (BBO # 679637)
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
allison.holt-ryan@hoganlovells.com
adam.a.cooke@hoganlovells.com

*Counsel for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 1, 2023, copies of the foregoing Defendant's Assented-To Motion to Extend Time were served via electronic filing through the Court's ECF system to:

Edward F. Haber
Michelle H. Blauner
Patrick J. Vallely
SHAPIRO HABER
& URMY LLP
One Boston Place
Suite 2600
Boston, MA 02108
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Counsel for Plaintiff Jane Doe, For herself and the Class*

*/s/ Anthony E. Fuller*
*Counsel for Defendant*

12

Suffolk Superior Court

23-597

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JANE DOE,<br>For herself and the Class,<br>Plaintiff,<br>v.<br>ATRIUS HEALTH, INC.<br>Defendant. | Civil Action No. 1:23-cv-10923 |

**MOTION FOR ADMISSION PRO HAC VICE OF ALLISON HOLT RYAN**

Pursuant to Local Rule 83.5.3, Kayla H. Ghantous, a member of the bar of this Court and attorney for Defendant Atrius Health, Inc., in the above-referenced matter, moves to admit attorney Allison Holt Ryan to the bar of this Court *pro hac vice*.

In support of this motion, the movant relies on the Certification of Allison Holt Ryan (attached as Exhibit A), which states the following:

1. She is a member of the bar in good standing in every jurisdiction in which she has been admitted to practice;
2. She is not the subject of disciplinary proceedings pending in any jurisdiction in which she is a member of the bar;
3. She has not previously had a *pro hac vice* admission to this Court (or other admission for a limited purpose under this rule) revoked for misconduct; and
4. She has read and agrees to comply with the Local Rules of the United States District Court for the District of Massachusetts.

WHEREFORE, movant Kayla H. Ghantous, counsel for Atrius Health, Inc., respectfully requests this Court grant this motion to admit attorney Allison Holt Ryan to practice before this Court *pro hac vice*.

**LOCAL RULE 7.1(a)(2) CERTIFICATION**

Pursuant to Rule 7.1(a)(2), undersigned counsel hereby certifies that counsel for Atrius Health, Inc. conferred with counsel for Plaintiffs, who have consented to this motion.

Dated: May 8, 2023

Respectfully Submitted,

By: */s/ Kayla H. Ghantous*

Kayla H. Ghantous (BBO # 709197)
HOGAN LOVELLS US LLP
125 High Street, Suite 2010
Boston, MA 02110
Telephone: (617) 371-1000
Fascimile: (617) 371-1037
kayla.ghantous@hoganlovells.com

*Counsel for Defendant Atrius Health, Inc.*

I HEREBY ATTEST AND CERTIFY ON January 9, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: [signature]
Asst. Clerk

## CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2023, copies of the foregoing Motion for Admission *Pro Hac Vice* were sent via electronic mail, as indicated below, to:

Edward F. Haber
Michelle H. Blauner
Patrick J. Vallely
SHAPIRO HABER
& URMY LLP
One Boston Place
Suite 2600
Boston, MA 02108
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Counsel for Plaintiff Jane Doe, For herself and the Class*

*/s/ Kayla H. Ghantous*
*Counsel for Defendant Atrius Health, Inc.*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JANE DOE<br>For herself and the Class,<br>Plaintiff,<br><br>v.<br><br>ATRIUS HEALTH, INC.<br>Defendant. | Civil Action No. 1:23-cv-10923 |

**CERTIFICATION OF ALLISON HOLT RYAN**
**IN SUPPORT OF MOTION TO ADMIT ATTORNEY *PRO HAC VICE***

I, Allison Holt Ryan, Esq., pursuant to 28 U.S.C. § 1746, hereby certify as follows:

1. I am submitting this affidavit in support of a motion to appear *pro hac vice* ("Motion") on behalf of Defendant Atrius Health, Inc. in the above captioned matter.
2. I am a partner in the law firm of Hogan Lovells US LLP, located at 555 Thirteenth Street, NW, Washington, DC 20004.
3. I am a member in good standing in the bar of the District of Columbia and the Supreme Court of Tennessee.
4. There are no disciplinary proceedings pending against me as a member of the bar in any jurisdiction.
5. I have not previously had a *pro hac vice* admission to this Court (or other admission for a limited purpose under this rule) revoked for misconduct.
6. I have read and agree to comply with the Local Rules of the United States District Court for the District of Massachusetts.

Subscribed and sworn on this 8th day of May, 2023.

Respectfully submitted,

*/s/ Allison Holt Ryan*

13

Suffolk Superior Court

23-597BLS1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JANE DOE, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ATRIUS HEALTH, INC., *et al.*,<br><br>Defendant. | Case No.: 1:23-cv-10923-FDS |

**PLAINTIFF'S MOTION TO REMAND**

Pursuant to 28 U.S.C. § 1447(c), Plaintiff respectfully moves this Court to remand this action to the Massachusetts Superior Court, for the reasons stated in the accompanying Memorandum of Law in Support of Plaintiff's Motion to Remand.

Dated: May 26, 2023

*/s/ Patrick J. Vallely*

Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
**SHAPIRO HABER & URMY LLP**
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

***Attorneys for Plaintiff***

I HEREBY ATTEST AND CERTIFY ON January 9, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: [signature]
Asst. Clerk

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading was filed electronically through the Court's electronic filing system and that notice of this filing will be sent to all counsel of record in this matter by operation of the Court's ECF system.

Dated: May 26, 2023

*/s/ Patrick J. Vallely*
Patrick J. Vallely

16

23-5978LS1 Suffolk Superior Court

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JANE DOE, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ATRIUS HEALTH, INC.<br><br>Defendant. | Civil Action No. 1:23-cv-10923<br><br>**DEFENDANT ATRIUS HEALTH, INC.'S OPPOSITION TO PLAINTIFF'S MOTION TO REMAND** |

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
OCT 30 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ........................................ 1

II. BACKGROUND ........................................ 2

III. ARGUMENT ........................................ 8

A. Atrius "acted under" Federal Authority ........................................ 9

B. Atrius' Alleged Conduct "relates to" its Work on Behalf of CMS and ONC ....... 13

C. Atrius Presents a Colorable Federal Defense to Plaintiff's Allegations ............... 16

IV. CONCLUSION ........................................ 20

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ades v. Omni Hotels Mgmt. Corp.*,
46 F. Supp. 3d 999 (C.D. Cal. 2014) ....................20

*Am. Beverage Ass'n v. Snyder*,
735 F.3d 362 (6th Cir. 2013) ....................19

*Am. Booksellers Found. v. Dean*,
342 F.3d 96 (2d Cir. 2003) ....................19

*Blue Cross & Blue Shield v. AstraZeneca Pharms.*,
582 F.3d 156 (1st Cir. 2009) ....................17

*Camacho v. Autoridad de Telefonos de Puerto Rico*,
868 F.2d 482 (1st Cir. 1989) ....................1, 8

*Capron v. Off. of the Att'y Gen. of Mass.*,
944 F.3d 9 (1st Cir. 2019) ....................18

*Carver v. Cent. Ala. Elec. Coop.*,
845 F.3d 1135 (11th Cir. 2017) ....................10

*Commonwealth v. Maccini*,
2007 WL 1203560 (Mass. Super. Ct. Apr. 23, 2007) ....................16

*Commonwealth v. Rainey*,
205 N.E. 3d 1090 (Mass. 2023) ....................20

*In re Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Ass'n of Phila.*,
790 F.3d 457 (3d Cir. 2015) ....................18

*Dep't of Revenue of Ky. v. Davis*,
553 U.S. 328 (2008) ....................19

*Doe v. BJC Health System*,
2023 WL 369427 (E.D. Mo. Jan. 10, 2023) ....................13

*Doe v. Cape Cod Healthcare, Inc.*,
No. 23-cv-10080 (D. Mass. Jan. 25, 2023) ....................12, 13

*Doe v. UPMC*,
No. 20-cv-359, 2020 WL 4381675 (W.D. Pa. Jul. 31, 2020) ....................12, 14, 17, 20

*In re Google Inc. Cookie Placement Consumer Privacy Litig.*,
806 F.3d 125 (3d Cir. 2015) ....16

*Healy v. Beer Inst., Inc.*,
491 U.S. 324 (1989) ....19

*Heard v. Torrance Mem'l Med. Cntr.*,
2023 WL 2475544 (C.D. Cal. Mar. 13, 2023) ....12, 13

*Holdren v. Buffalo Pumps, Inc.*,
614 F. Supp. 2d 129 (D. Mass. 2009) ....14, 15

*Jefferson Cnty. v. Acker*,
527 U.S. 423 (1999) ....8, 16, 17, 18

*Latiolais v. Huntington Ingalls, Inc.*,
951 F.3d 286 (5th Cir. 2020) ....1

*Maglioli v. All. HC Holdings LLC*,
16 F.4th 393 (3d Cir. 2021) ....11

*Massachusetts v. Exxon Mobil Corp.*,
462 F. Supp. 3d 31 (D. Mass. 2020) ....14, 15

*Mayor & Cty. Council of Balt. v. BP P.L.C.*,
31 F.4th 178 (4th Cir. 2022) ....15

*McLemore v. Gumucio*,
2019 WL 3305131 (M.D. Tenn. Jul. 23, 2019) ....20

*Me. Cmty. Health Options v. United States*,
140 S. Ct. 1308 (2020) ....10

*Mohr v. Trs. of the Univ. of Pa.*,
2023 WL 3044594 (E.D. Pa. Apr. 20, 2023) ....12, 13

*Moore v. Elec. Boat Corp.*,
25 F.4th 30 (1st Cir. 2022) .... *passim*

*Ohio State Chiropractic Ass'n v. Humana Health Plan Inc.*,
647 F. App'x 619 (6th Cir. 2016) ....10, 11

*Pepper v. Charitable Res. Found.*,
2014 WL 12961327 (C.D. Cal. Oct. 14, 2014) ....20

*Pietrangelo v. Sununu*,
15 F.4th 103 (1st Cir. 2021) ....5

*Port of Corpus Christi Auth. of Nueces Cnty., Tx. v. Port of Corpus Christi L.P.*,
57 F.4th 432 (5th Cir. 2023) ....................11

*Quinto v. The Regence of the Univ. of Cal.*,
2023 WL 1448050 (N.D. Cal. Feb. 1, 2023) ....................12, 13

*Rhode Island v. Shell Oil Products Co.*,
979 F.3d 50 (1st Cir. 2020) ....................15

*Rousso v. State*,
204 P.3d 243 (Wash. Ct. App. 2009) ....................19

*Sawyer v. Foster Wheeler LLC*,
860 F.3d 249 (4th Cir. 2017) ....................13, 14

*Shepherd v. Air & Liquid Sys. Corp.*,
2012 WL 5874781 (D.R.I. Nov. 20, 2012) ....................8

*Stephenson v. Nassif*,
160 F. Supp. 3d 884 (E.D. Va. 2015) ....................10

*W. Va. State Univ. Bd. of Governors v. Dow Chem. Co.*,
23 F.4th 288 (4th Cir. 2022) ....................11

*Watson v. Philip Morris Cos.*,
551 U.S. 142 (2007) ....................8, 9, 10

*Willingham v. Morgan*,
395 U.S. 402 (1969) ....................8

*Zephyr v. Saxon Mortg. Servs.*,
873 F. Supp. 2d 1223 (E.D. Cal. 2012) ....................20

**Statutes**

28 U.S.C. § 1442(a)(1) ....................1, 8, 13

42 U.S.C. § 300jj-11(a) ....................3

42 U.S.C. § 300jj-31(a) ....................3, 10, 11, 13

42 U.S.C. § 300jj-33(a) ....................3

42 U.S.C. § 1395w-4(o)(2) ....................4

Massachusetts Wiretap Act, Mass. Gen. Laws Ann. ch. 272 § 99 ....................8, 19

Removal Clarification Act of 2011, Pub. L. No. 112-51, 125 Stat. 545 (2011) ....................14

American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115 (2009)....................3

**Rules & Regulations**

42 C.F.R. § 495.22(e)(8)(i) ....................5

42 C.F.R. § 495.24(d)(5)(i)(B)....................5

45 C.F.R. § 170.315(e)....................5, 6

Executive Order No. 13,335, 69 Fed. Reg. 24,059 (Apr. 27, 2004). ....................2

Medicare and Medicaid Programs; Electronic Health Rec. Incentive Program, 75 Fed. Reg. 44,314 (Jul. 28, 2010)....................4

Fed. R. Evid. 201(b)....................5

**Other Authorities**

Tommy G. Thompson & David J. Brailer, *The Decade of Health Information Technology: Delivering Consumer-centric and Information-rich Health Care* (July 21, 2004), https://permanent.fdlp.gov/gpo800/hitframework.pdf ....................3

C. Stephen Redhead, *The Health Information Technology for Economic and Clinical Health (HITECH) Act* (Apr. 27, 2009), https://crsreports.congress.gov/product/pdf/R/R40161/9 ....................3

## I. INTRODUCTION

Defendant Atrius Health, Inc. ("Atrius") demonstrated in its Notice of Removal that this suit belongs in federal court pursuant to the federal officer removal statute. 28 U.S.C. § 1442(a)(1). Over the past decade, Atrius has assisted the federal government to build a healthcare infrastructure centered on patient access to electronic health records ("EHR") by increasing engagement with its website and patient portal. *See* Notice of Removal ¶¶ 13–24, 28–33, ECF No. 1 ("Notice"). Federal agencies required Atrius to report on the progress it made against various interoperability and engagement requirements, with receipt of federal funds tied to meeting those requirements. Federal agencies, including the Centers of Medicare and Medicaid Services ("CMS") and the U.S. Department of Health and Human Services ("HHS"), also provided non-profit entities like Atrius with models of how to enhance patient engagement through deployment of website analytics tools like the ones at issue here. *See id.* ¶¶ 4, 35. Because Plaintiff Jane Doe ("Plaintiff") challenges the assistance Atrius provided to the federal government, removal is proper.

In seeking remand, Plaintiff ignores the fact that the federal government is required to construct a nationwide, interoperable health information technology system, the breadth of initiatives the government promulgated to enhance patient engagement with EHR, and the assistance Atrius has provided the government in support of those goals. Mem. of Law in Supp. of Pl.'s Mot. to Remand at 4–15, ECF No. 20 ("Mot."). That failure is tied to Plaintiff's misreading of the requirements of the federal removal statute. The statute does not require Atrius to identify an express order from a federal officer directing Atrius to deploy website analytics tools, let alone one that prescribes the manner in which it should do so. Imposing such a requirement necessitates the type of "crabbed reading of section 1442(a)(1)" courts have rejected repeatedly. *Camacho v. Autoridad de Telefonos de Puerto Rico*, 868 F.2d 482, 487 (1st Cir. 1989); *see also Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 290 (5th Cir. 2020) (similar).

Plaintiff also errs in asking the Court to reject Atrius' multiple colorable federal defenses. Atrius maintains a collaborative relationship with the federal government that is "inherently federal in character," and thus, Plaintiff's claim is preempted under *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 347 (2001). Moreover, Plaintiff's claim rests on an overly expansive interpretation of Massachusetts law that would have the effect of regulating commerce outside of the Commonwealth and would impose an undue burden on interstate commerce, running afoul of the dormant Commerce Clause.

For all these reasons, and as set forth more fully below, Plaintiff's Motion should be denied, and this case should proceed in federal court.

## II. BACKGROUND

Plaintiff's suit challenges actions that Atrius took in connection with carrying out the federal government's goal of creating a unified and interoperable system of patient EHR. As set forth in the Notice, both the Executive Branch and Congress have worked to create a national electronic healthcare infrastructure through the private sector. *See* Notice ¶¶ 13–24. The federal mission began in 2004 when President Bush ordered HHS to create the position of the National Health Information Technology Coordinator ("Coordinator"). Exec. Order No. 13,335, 69 Fed. Reg. 24,059 (Apr. 27, 2004). This Executive Order specified that the Coordinator "shall, to the extent permitted by law, develop, maintain, and direct the implementation of a strategic plan to guide the nationwide implementation of interoperable health information technology in both the public and private health care sectors." *Id.*

This goal was an important one. Studies had shown that the universal adoption of EHR could "improve patient health status," "reduce errors and improve use of medical evidence," as well as "induce concomitant changes in workflow, in relationships between physicians and patients, and in process control that together will trigger subsequent waves of positive change."

Tommy G. Thompson & David J. Brailer, *The Decade of Health Information Technology: Delivering Consumer-centric and Information-rich Health Care* at 10 (July 21, 2004), https://permanent.fdlp.gov/gpo800/hitframework.pdf. Providers, however, did not immediately capitalize on this opportunity. As of 2009, "only about 5% of physicians ha[d] a fully functional EHR that incorporates all or most of the recommended capabilities." C. Stephen Redhead, *The Health Information Technology for Economic and Clinical Health (HITECH) Act* at 1 (Apr. 27, 2009), https://crsreports.congress.gov/product/pdf/R/R40161/9 ("HITECH Act Report").

In response, Congress enacted the Health Information Technology for Economic and Clinical Health Act ("HITECH Act"). *See* American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115, 247 (2009) (codified as 42 U.S.C. § 300jj *et seq.*). In particular, this legislation codified the Office of the National Coordinator for Health Information Technology ("ONC"). *See* 42 U.S.C. § 300jj-11(a). The ONC was charged with "updat[ing] the Federal Health IT Strategic Plan (developed as of June 3, 2008) to include specific objectives, milestones, and metrics" regarding "[t]he electronic exchange and use of health information and the enterprise integration of such information," as well as "[s]trategies to enhance the use of health information technology in improving the quality of health care." *Id.* § 300jj-11(c)(3)(A).

The HITECH Act also directed that the HHS Secretary "shall . . . invest in the infrastructure necessary to allow for and promote the electronic exchange and use of health information for each individual in the United States consistent with the goals outlined in the strategic plan developed by the [Coordinator]." *Id.* § 300jj-31(a). The Secretary was required to "establish a program . . . to facilitate and expand the electronic movement and use of health information among organizations according to nationally recognized standards." *Id.* § 300jj-33(a).

To that end, Congress authorized the federal government to provide payments to private

healthcare providers for adopting health information technology, *see id.* § 1395w-4(o), and authorized the HHS Secretary to administer the health information technology initiatives. *See id.* §§ 1395w-4(o)(2)(A)–(B). These payments were intended to "encourage doctors and hospitals to adopt and use certified EHRs." HITECH Act Report at 2. The legislation was designed such that over time, those "payments [were] phased out . . . and replaced by financial penalties for physicians and hospitals that [were] not using certified EHRs." *Id.* By requiring the ONC to deploy programs of this kind, Congress intended to facilitate the construction of a "National Health Information Network," which was "envisioned as a 'network of networks'" that "interconnects state and regional health information exchanges (and other networks)" with "a shared set of standards and policies to permit interoperable health information exchange among providers, consumers, and others involved in supporting health care." *Id.* at 7.

In 2010, HHS adopted the Meaningful Use Program. *See* Medicare and Medicaid Programs; Electronic Health Record Incentive Program, 75 Fed. Reg. 44,314 (Jul. 28, 2010). HHS has noted that this program is part of the government's overarching project to facilitate the creation of an effective IT infrastructure across the healthcare industry: "Certified EHR technology used in a meaningful way is one piece of a broader [health information technology] infrastructure needed to reform the health care system and improve health care quality, efficiency, and patient safety." *Id.* at 44,321; *see also id.* ("HHS believes this ultimate vision of reforming the health care system and improving health care quality, efficiency and patient safety should drive the definition of meaningful use consistent with the applicable provisions of Medicare and Medicaid law.").

One central aim of these programs has been to increase patients' "meaningful use" and engagement with their EHR. For instance, federal regulations specified that, between 2015 and 2018, participating providers were required to "[p]rovide patients the ability to view online,

download, and transmit their health information within 4 business days of the information being available to the [provider]." *See* 42 C.F.R. § 495.22(e)(8)(i). These regulations also prescribed that participating providers must attest to ONC, as well as to CMS, regarding their progress with respect to enumerated criteria. *See* 45 C.F.R. § 170.315(e)(1)(i) (mandating that these attestations specify that "[p]atients (and their authorized representatives) [can] use internet-based technology to view, download, and transmit their health information"). Since 2019, the regulations have dictated that a provider must show that more than eighty percent (80%) of Medicaid patients received access to view, download, and transmit their health information to a third party in order to establish its compliance. 42 C.F.R. § 495.24(d)(5)(i)(B)(1).

ONC has issued strategic plans emphasizing that it will achieve its goals by "collaborat[ing] with [other federal agencies] and with state, local, tribal, and private stakeholders to . . . [b]uild a culture of electronic health information access and use." Notice Ex. E, ONC, *Federal Health IT Strategic Plan 2015-2020* at 7, ECF No. 9; *see also id.* at 2 ("[T]his is a shared undertaking. Efforts of state, local, and tribal governments, and private stakeholders are vital to ensure that health information is accessible when and where it is needed to improve and protect people's health and well-being.").[1] More recent guidance is to similar effect. *See* Notice Ex. F, ONC, *2020-2025 Federal Health IT Strategic Plan* at 15-17 (Oct. 2020), ECF No. 10.

Over the years, the federal government has incorporated the goals of the Meaningful Use Program into a series of other initiatives, including the Promoting Interoperability Program, the Merit-Based Incentive Payment System, and the Primary Care First Program. The Primary Care First Program, for example, requires participants to provide patients access to EHR within one business day and to EHR technology that allows a patient to "[i]dentify, record, and access

[1] The Court may take judicial notice of publicly available facts like these that are not reasonably subject to dispute. *See* Fed. R. Evid. 201(b); *Pietrangelo v. Sununu*, 15 F.4th 103, 106 n.1 (1st Cir. 2021).

information directly and electronically." 45 C.F.R. § 170.315(e)(3)(i). A healthcare provider who meets these specifications qualifies for a payment, which may be adjusted based on the provider's performance. *See* CMS Primary Care First Model Options (attached as Ex. A). These collective efforts have borne fruit: in 2020, nearly forty percent (40%) of individuals nationwide accessed a patient portal, a thirteen percentage (13%) point increase since 2014. *See* ONC Data Brief: Individuals' Access and Use of Patient Portals and Smartphone Health Apps at 2 (Sept. 2021) (attached as Ex. B).

Online portals are critical tools to enhance patient engagement with EHR. *See* Notice Ex. J, Nat'l Learning Consortium, *How to Optimize Patient Portals for Patient Engagement and Meet Meaningful Use Requirements* at 2–3 (May 2013), ECF No. 1-8. The federal government has stressed that healthcare providers will enjoy "better success meeting meaningful use requirements" by "integrat[ing] a patient portal effectively in [their] practice operations." *Id.* at 2. It also recommended that healthcare providers should "[l]earn the benefits of patient portals for patients and providers"; "[u]nderstand how a patient portal helps achieve meaningful use requirements"; "[i]mplement proactive, engaging portal features"; "[i]mplement the portal with a systematic process" as well as "[a]ctively promote and facilitate portal use." *Id.* ONC issued a "Patient Engagement Playbook" to emphasize the importance of employing effective marketing to promote patient use of and engagement with EHR. *See* ONC, *Patient Engagement Playbook* (attached as Ex. C). The playbook encouraged providers to "[m]arket and educate effectively," "leverage every educational opportunity," and "take every opportunity to promote patient portal enrollment." *Id.* at 18, 20. ONC urged providers to "[use] Playbook language on [their] website or Facebook page to let patients know how they can use the patient portal to participate in their care." *Id.* at 6.

CMS also has shown how to promote engagement with its own portal and website via third-

party analytics tools. Notably, it engaged Facebook to "place[] a cookie or pixel . . . for conversion tracking on certain pages of a CMS website" so that Facebook could "measure the performance of CMS advertisements based on consumer activity and to report the ad performance to CMS." Notice Ex. L, HHS, *Third Party Websites and Applications Privacy Impact Assessment—Facebook Ads* at 2 (Sept. 4, 2018), ECF No. 1-10.

Atrius took significant steps towards fulfilling the federal government's articulated goals. It developed a patient portal, which it made accessible through a public-facing website. *See* Notice Ex. M, Monsen Decl. ¶¶ 4, 7, 9, ECF No. 1-11. "As part of the Meaningful Use Program from 2011 to 2015," Atrius "submitted hundreds of reports on behalf of its [professionals eligible to participate] attesting to its level of achievement in meeting objectives of the program." *Id.* ¶ 7. It also "updated, modified and implemented new features in its patient portal that patients access through the Atrius Health website." *Id.* And through its participation in the Primary Care First Program, Atrius "submitted interoperability attestations for all twenty-five (25) of its primary care facilities in 2021." *Id.* ¶ 9; Notice Ex. K, Primary Care First Practice Participation Agreement at 82–83 (Dec. 14, 2021), ECF No. 1-9. In return, Atrius has received payments from the federal government. Notice Ex. M ¶ 8. Fulfilling this federal task has been facilitated by Atrius' efforts to enhance awareness of and engagement with its website and patient portal. *Id.* ¶ 10.

Plaintiff's Complaint challenges the manner in which Atrius used commonplace analytics technologies to achieve the federal government's aims. *See* Complaint ¶¶ 38–40, 54–95, ECF No. 1-13 ("Compl."). Plaintiff acknowledges that such technologies can "provide[] the website owner with insights about how users use the website, which the owner can use to improve the website," *id.* ¶ 37, and that Atrius could have used such technologies to "optimize its website or its marketing for a website." *Id.* ¶ 95. But, she alleges that Atrius acted unlawfully by using these technologies

secretly, *see id.*, even though such technologies are ubiquitous across the Internet and anyone can see their usage via a web browser, *id.* ¶¶ 59–60. She advances a single claim for relief based on Atrius' alleged conduct: violation of the Massachusetts Wiretap Act, Mass. Gen. Laws Ann. ch. 272 § 99. *Id.* ¶¶ 104–11.

## III. ARGUMENT

Removal in this case is proper pursuant to the federal officer removal statute. 28 U.S.C. § 1442(a)(1). Atrius has shown that it was a "person acting under" a federal officer that was sued in state court for conduct "relating to any act under color of such office" and that it "will assert a colorable federal defense." *Moore v. Elec. Boat Corp.*, 25 F.4th 30, 34 (1st Cir. 2022). The elements of the statute are liberally construed, *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007), as there is no presumption against federal officer removal, *Willingham v. Morgan*, 395 U.S. 402, 406–07 (1969), and the Supreme Court has made clear that the policy favoring federal officer removal "should not be frustrated by a narrow, grudging interpretation of [Section] 1442(a)(1)." *Id.* at 407; *see also Camacho*, 868 F.2d at 487. When Atrius' "theory of the case" is "credit[ed]," *Jefferson Cnty. v. Acker*, 527 U.S. 423, 432 (1999), and the facts set forth in the Notice of Removal are construed in the light most favorable to Atrius, *see Shepherd v. Air & Liquid Sys. Corp.*, 2012 WL 5874781, at *3 (D.R.I. Nov. 20, 2012), it is plain that this case should proceed in federal court.

Plaintiff does not dispute that Atrius is a "person" within the meaning of the federal officer removal statute, but instead contends that (1) Atrius did not act under a federal officer's authority, Mot. at 4–12, (2) the alleged conduct was not carried out in relation to the asserted federal authority, *id.* at 12–15, and (3) Atrius has not proffered a colorable federal defense, *id.* at 15–20. In support of these contentions, Plaintiff advances a "narrow, grudging" interpretation of the statute that does not credit Atrius' theory of the case and runs counter to the statute's liberal

construction. These arguments should be rejected, and the Court should uphold removal.

**A. Atrius "acted under" Federal Authority**

Atrius has shown that it "acted under" its federal superiors. As the Supreme Court has explained, "the word 'under'" refers to "a relationship that involves 'acting in a certain capacity, considered in relation to one holding a superior position or office.'" *Watson*, 551 U.S. at 151 (citation omitted). And the "words 'acting under' are broad, and . . . must be 'liberally construed.'" *Id.* at 147 (citation omitted). Thus, removal is proper where a private entity, such as Atrius, engages in "an effort to *assist*, or to help *carry* out, the duties or tasks of [a] federal superior." *Id.* at 152 (emphasis added). Plaintiff responds that the Notice is deficient because it "identifies no 'basic government task' for which [Atrius] acted 'on the Government's behalf.'" Mot. at 5 (citation omitted). As Plaintiff sees it, "[t]he laws and regulations to which Atrius points" do not count because they "are classic private market regulations," which seek only to "improve the functioning of the market." *Id.* at 4, 8–10. This argument rests on a misunderstanding of the law and a misstatement of the facts.[2]

To begin, although providing assistance for a basic governmental task is sufficient to establish that entity was acting under a federal officer, nothing in the statute states that such a showing is strictly necessary. The Supreme Court said as much in *Watson*, noting that it was not examining "whether and when" other circumstances "may enable private contractors to invoke the statute." 551 U.S. at 154. More to the point, nothing in *Watson* necessitates Plaintiff's flawed distinction between efforts expended to fulfill a federal officer's "statutory or constitutional obligation[s]," which can justify removal, and those marshalled to advance an officer's "regulatory

[2] Plaintiff also faults Atrius for failing to "connect the secret deployment of such technologies (the conduct giving rise to their liability under the [Massachusetts Wiretap Act]) to any regulation or guidance." *Id.* at 10–12 (emphasis omitted). That argument bears on the second, not the first, element of the federal officer removal statute and is addressed *infra* Section III.B.

goals," which cannot. Mot. at 5. To be sure, the Supreme Court has said that a defendant's mere "compliance with regulatory laws, rules, and orders" is insufficient to justify removal. *Watson*, 551 U.S. at 154. But, it does not follow that federal regulation cannot impose an obligation on the federal government that justifies removal. Rather, a defendant can show that it acted for the purpose of assisting a federal superior realize an important governmental goal, irrespective of whether that goal was articulated in the United States Code, the Code of Federal Regulations, or someplace else. *See Carver v. Cent. Ala. Elec. Coop.*, 845 F.3d 1135, 1142–44 (11th Cir. 2017) (upholding removal based on a rural electric cooperative's compliance with federal regulation where the cooperative was also partially funded by federal loans); *see also Stephenson v. Nassif*, 160 F. Supp. 3d 884, 889 (E.D. Va. 2015) (denying remand where defendant contractor provided an incident report to a federal agency, in accordance with the agency's operations manual).

Even accepting Plaintiff's argument on its own terms, it still fails. As set out above, the HITECH Act required the federal government to build out health technology infrastructure, which was further elaborated upon by regulation. That statute specifies: "The Secretary *shall* . . . invest in the infrastructure necessary to allow for and promote the electronic exchange and use of health information for each individual in the United States." 42 U.S.C. § 300jj-31(a) (emphasis added). And as the Supreme Court has explained, "[t]he first sign that [a] statute imposed an obligation is its mandatory language: 'shall.'" *Me. Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020). Thus, in the absence of assistance from private, non-profit entities like Atrius, the federal government would remain obligated to facilitate construction of this infrastructure itself.

*Ohio State Chiropractic Ass'n v. Humana Health Plan Inc.*, 647 F. App'x 619 (6th Cir. 2016), is not to the contrary. In that case, the Sixth Circuit considered whether Medicare Care Organizations "perform a job that the government would have to perform itself if it did not contract

with private firms." *Id.* at 623. It answered no, reasoning that "[i]f no health insurer chose to contract with CMS as a [Medicare Advantage Organization], it is doubtful that the government would get into the business of offering its own [Medicare Advantage] plans." *Id.* at 624. According to the court, the government need not "offer[] its own [Medicare Advantage] plans," as it could instead "fall back on traditional fee-for-service Medicare—which it must provide regardless." *Id.* Contrary to Plaintiff's assertions, Mot. at 6, that analysis actually supports Atrius' position here. There is no alternative for the federal government to fall back on to facilitate the construction of a nationwide health infrastructure, as required by statute. *See* 42 U.S.C. § 300jj-31(a).[3] Simply put, the federal government must either build this electronic health infrastructure itself or work with other entities, such as Atrius, to do so. It chose the latter.

Atrius has played a crucial role in the federal government's project, committing itself to assisting the federal government to create infrastructure that promotes adoption of nationwide, interoperable health information technology. It has done so by submitting hundreds of reports and attestations about its work in carrying out the federal government's directives and by reviewing the government's guidance as to how private actors can best achieve the government's goals. *See* Notice Ex. M ¶¶ 6–8. Plaintiff ignores the fact that Atrius' work is performed pursuant to agreements that it entered into with a federal agency, which specify how Atrius' reporting should

[3] The three other cases Plaintiff cites for the proposition that Atrius failed to demonstrate that it "carried out tasks the United States was otherwise required to do" are distinguishable for the same reason. Mot. at 6 & n.4. None of those cases involved a suit challenging a defendant's conduct committed in furtherance of a federal officer's statutory obligations, let alone conduct for which the defendant was compensated. *See Port of Corpus Christi Auth. of Nueces Cnty., Tx. v. Port of Corpus Christi L.P.*, 57 F.4th 432, 438 (5th Cir. 2023) (compliance with the terms of a federal permit issued to a third party did not amount to "carrying out a federal officer's tasks or duties"); *W. Va. State Univ. Bd. of Governors v. Dow Chem. Co.*, 23 F.4th 288, 306 (4th Cir. 2022) (finding suit did not challenge conduct the federal agency would have had to take absent the defendant's actions because it was predicated on a series of contingencies that might never materialize); *Maglioli v. All. HC Holdings LLC*, 16 F.4th 393, 405–06 (3d Cir. 2021) (remanding action where defendant only claimed that it was complying with guidance issued by a federal agency).

be completed and the terms by which Atrius will be paid for its work. *See* Notice Ex. M ¶ 9; Notice Ex. K at 82. At bottom, the role Atrius has played bears a closer relationship to a contractor with the federal government than it does to an entity merely complying with federal regulations.

That is the same conclusion reached in cases substantially similar to this one. *See Doe I v. UPMC*, 2020 WL 4381675 (W.D. Pa. Jul. 31, 2020), *appeal denied*, 2020 WL 5742685 (W.D. Pa. Sept. 25, 2020), and *Doe v. ProMedica Health Sys., Inc.*, 2020 WL 7705627 (N.D. Ohio Oct. 30, 2020), *appeal denied*, 2020 WL 7705713 (Dec. 14, 2020). As the *UPMC* court found, "participation in implementing a nationwide EHR network shows the relationship between [the defendant medical provider] and DHHS is less like the regulator-regulated relationship" and "more like the government contractor relationship." *UPMC*, 2020 WL 4381675, at *6. So too here; Atrius has participated in numerous federal incentive programs, submitted voluminous reports and attestations about its satisfaction of federal specifications, and hewed to federal government guidance and examples regarding how to best enhance patient engagement and access to portals.

Although other district courts have reached different conclusions,[4] none of these decisions is controlling, five have been appealed, and one was issued sua sponte without briefing.[5] Moreover, these decisions failed to address the extent to which the federal government is obligated to facilitate construction of infrastructure capable of supporting a nationwide interoperable health IT system, *see, e.g.*, *BJC Health System*, 2023 WL 369427, at *4, even though the HITECH Act provides that the federal government "*shall* . . . *invest* in the infrastructure necessary to allow for

---

[4] *See, e.g.*, *Mohr v. Trs. of the Univ. of Pa.*, 2023 WL 3044594, at *5 (E.D. Pa. Apr. 20, 2023), *appeal filed*, No. 23-1924 (3d Cir. May 24, 2023); *Heard v. Torrance Mem'l Med. Cntr.*, 2023 WL 2475544, at *2 (C.D. Cal. Mar. 13, 2023), *appeal filed*, No. 23-55345 (9th Cir. Apr. 14, 2023); *Quinto v. The Regents of the Univ. of Cal.*, 2023 WL 1448050, at *3 (N.D. Cal. Feb. 1, 2023); Slip Op., *Doe v. Cape Cod Healthcare, Inc.*, No. 23-cv-10080 (D. Mass. Jan. 25, 2023), ECF No. 10; *Doe v. BJC Health System*, 2023 WL 369427, at*4 (E.D. Mo. Jan. 10, 2023), *appeal filed*, No. 23-1107 (8th Cir. Jan. 20, 2023).

[5] *Doe v. BJC Health System* is further distinguishable because it applied a "causal" requirement that the First Circuit has rejected. *Compare id.*, 2023 WL 369427, at *5, *with Moore*, 25 F.4th at 35.

and promote the electronic exchange and use of health information." 42 U.S.C. § 300jj-31(a) (emphasis added). These decisions likewise did not consider the contractual obligations entities like Atrius undertook when they agreed to participate in federal programs like the Primary Care First Program. *See, e.g.*, *Heard*, 2023 WL 2475544, at *3; *Quinto*, 2023 WL 1448050, at *2–3. And these decisions overlooked the significant guidance that the federal government provided to private entities regarding the implementation and promotion of interoperable health information technology. *See, e.g.*, *Mohr*, 2023 WL 3044594, at *3–4. For all these reasons, Atrius respectfully disagrees with the reasoning of these courts, including Judge Stearns's margin order issued in *Doe v. Cape Cod Healthcare*.

**B. Atrius' Alleged Conduct "relates to" its Work on Behalf of CMS and ONC**

In addition to showing that it acted under federal official authority, Atrius has shown that the alleged conduct at issue is related to the federal authority. This requirement is given a "broad reading." *Moore*, 25 F.4th at 35. Thus, "no causal link is required," the nexus between Atrius' alleged conduct and the federal authority "is not to be understood as anything more than a 'related to' nexus," *id.* at 35–36, and "the ordinary meaning of the phrase 'relating to' is 'a broad one.'" *Id.* at 35 n.4 (citation omitted).

Plaintiff argues that Atrius "has not plausibly alleged that its secret use of tracking technologies relates to any act performed under a federal officer." Mot. at 12 (emphasis omitted). This argument fails because it again distorts the relevant standard for federal officer removal. The First Circuit has said that § 1442(a)(1) "does not 'demand[] a showing of a specific government direction.'" *Moore*, 25 F.4th at 36 (quoting *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 258 (4th Cir. 2017)). Requiring such a showing would go "well beyond the 'relating to' requirement." *Id.* (citation omitted). There "need be only 'a connection or association between the act in question and the federal office.'" *Sawyer*, 860 F.3d at 258 (citation omitted).

Atrius' allegedly "secret" use of website analytics tools is connected with the federal authority outlined above because of the direction provided to enhance website functionality and patient portal access. *See, e.g.*, Notice Ex. M ¶ 10. It is therefore no surprise that CMS used these technologies to promote user engagement with its website and portal. *See* Notice Ex. L at 2; Ex. C at 18, 20 (emphasizing the importance of marketing in promoting the use of EHR); *see also UPMC*, 2020 WL 4381675, at *6 (finding that because the complaint "addresse[d] the design and functionality of UPMC's website and patient portal," the plaintiffs' claims "implicat[ed] UPMC's implementation of the Meaningful Use Program, particularly as the implementation involves patient engagement and usership").

Plaintiff relies on two cases to argue that this connection is not close enough: *Holdren v. Buffalo Pumps, Inc.*, 614 F. Supp. 2d 129 (D. Mass. 2009), and *Massachusetts v. Exxon Mobil Corp.*, 462 F. Supp. 3d 31 (D. Mass. 2020). Neither case supports remand here.

*Holdren* is plainly inapposite. The analysis in that case relied on a prior version of the federal officer removal statute, which required the defendant to establish that "the specific acts or omissions complained of were committed pursuant to a federal duty," or, in other words, that there exists a "causal connection between its federal mandate and the very actions it now seeks to defend in federal court." 614 F. Supp. 2d at 149; *see also Sawyer*, 860 F.3d at 258 (noting that a defendant had to show "causal connection between the charged conduct and the asserted official authority"). Two years later, however, "Congress amended [the federal officer statute] to cover actions 'for *or relating to* any act under color of [federal] office,'" thereby "'broaden[ing] the universe of acts' that enable federal removal." *Sawyer*, 860 F.3d at 258 (citations omitted); *see also* Removal Clarification Act of 2011, Pub. L. No. 112-51, 125 Stat. 545 (2011); *Moore*, 25 F.4th at 35 (recognizing the import of the Removal Clarification Act). Because *Holdren* required the

defendant to proffer a "causal nexus" between its actions and any relevant federal authority, its analysis has no application here. 614 F. Supp. 2d at 150.

Plaintiff's reliance on *Exxon Mobil Corp.* is equally flawed. In that case, the Commonwealth of Massachusetts lodged multiple claims against defendant Exxon Mobil Corp. under a state consumer protection statute, alleging, *inter alia*, that it had "misrepresented and failed to disclose material facts regarding systemic climate change risks to its investors." 462 F. Supp. 3d at 38. The defendant then removed the suit, arguing the state was challenging its effort to explore, develop, and produce "oil and gas on federal lands pursuant to leases issued by the federal government." *Id.* at 46. The district court disagreed, finding that the suit instead focused on "Exxon Mobil's marketing and sales tactics," which "were not plausibly 'relat[ed] to [its] drilling and production activities.'" *Id.* at 47 (citation omitted).[6] But here there is a connection between Plaintiff's allegations and Atrius' efforts to fulfill the federal government's goal of constructing a nationwide, interoperable health information technology system. Plaintiff's suit challenges the manner in which Atrius chose to employ ordinary analytics technologies on its website. *See* Compl. ¶¶ 1–3; Mot. at 10–12. That technology played a critical role in Atrius' efforts to further the federal government's goal of enhancing patient use of and engagement with its EHR and in a manner consistent with the federal government's guidance on the issue. *See* Notice Ex. M ¶ 10; *see also* Notice Ex. J at 2 (noting that healthcare providers should "actively promote and facilitate portal use"); Notice Ex. L at 2 (explaining that the government's use of tracking pixels improves the targeting of its digital advertisements). Holding Atrius liable for alleged use of these technologies would target the means by which Atrius has furthered the government's ends.

---

[6] In a footnote, Plaintiff also cites to two other cases, *Rhode Island v. Shell Oil Products Co.*, 979 F.3d 50 (1st Cir. 2020) and *Mayor & Cty. Council of Balt. v. BP P.L.C.*, 31 F.4th 178 (4th Cir. 2022), which reached similar conclusions. Mot. at 13 n.5. They are equally unavailing for the reasons set forth above.

Plaintiff emphasizes that the Complaint does not "challenge[] the use of tracking technologies" generally, but instead Atrius' specific "use of the tracking technologies to secretly intercept Plaintiff's internet communications." Mot. at 14 (emphases omitted). She urges that removal could only be proper if Atrius can demonstrate that its "concealment of those interceptions was 'related to' any basic governmental task." *Id.* But in Atrius' view, there was no purported "concealment": communications between a website visitor's browser and third-party sites is how the modern Internet works and is no secret. *See, e.g., In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125, 130 (3d Cir. 2015) (noting that webpages are amalgams of content from "multiple independent servers"); *see also Commonwealth v. Maccini*, 2007 WL 1203560, at *3 (Mass. Super. Ct. Apr. 23, 2007) (rejecting wiretap claim because "[o]ne who uses" electronic means of communications "is on notice of the inherent recording, and implicitly consents to it"). A court cannot "choose between [the parties'] readings of [the Massachusetts Wiretap Act] . . . to decide the merits of the case" under the federal officer removal statute. *Acker*, 527 U.S. at 432; *see also Moore*, 25 F.4th at 36. And Plaintiff cannot insist that Atrius set out an "airtight case . . . in order to show the required causal connection." *Acker*, 527 U.S. at 432. Rather, the Court must credit Atrius' "theory of the case" and determine whether Atrius "made an adequate threshold showing." *Id.* Atrius has made that showing.

**C. Atrius Presents a Colorable Federal Defense to Plaintiff's Allegations**

Atrius also satisfies the final element of federal officer removal—i.e., presenting a "colorable federal defense." *Moore*, 25 F.4th at 37. The defense "need not be 'clearly sustainable.'" *Id.* (citation omitted). Rather, a federal defense is colorable unless it is "immaterial" or "wholly insubstantial and frivolous." *Id.* Atrius has cleared this low bar. As explained in the Notice, Atrius has asserted two colorable federal defenses. First, Plaintiff's claim is preempted under *Buckman*, as it seeks to interfere with Atrius' inherently federal relationship with the

government. Notice ¶¶ 38–39. Second, Plaintiff's expansive interpretation of the Massachusetts Wiretap Act runs counter to the dormant Commerce Clause. *Id.* ¶¶ 40–41. Here, as in *UPMC*, both defenses are colorable. *See UPMC*, 2020 WL 4381675, at *7.[7]

*Buckman* preemption arguably precludes Plaintiff's claim for relief. In *Buckman*, the Supreme Court held that the plaintiffs' state law fraud claims were impliedly preempted by the Food, Drug, and Cosmetic Act, determining that those claims conflicted with a "comprehensive scheme," where "flexibility" and consistent oversight were key, and "complying with the FDA's detailed regulatory regime in the shadow of 50 States' tort regimes [would] dramatically increase the burdens facing potential applicants." 531 U.S. at 350. The same conclusion follows here. Plaintiff's wiretap claim seeks to hold Atrius liable for its efforts to promote its patients' use of and engagement with the patient portal, in service of its contractual obligations with the federal government and the federal government's guidance.

Plaintiff argues that *Buckman* is inapposite because its holding does not extend to claims that merely "touch[] upon a federal regulation." Mot. at 17. In support, Plaintiff cites *Blue Cross & Blue Shield v. AstraZeneca Pharms.*, 582 F.3d 156 (1st Cir. 2009) and *Capron v. Off. of the Att'y Gen. of Mass.*, 944 F.3d 9 (1st Cir. 2019), *see* Mot. at 17–18, neither of which concerns federal officer removal or supports Plaintiff's argument.[8] In *Blue Cross & Blue Shield*, the court found that, unlike in *Buckman*, the allegations did not involve drug "disclosures that are fairly understood as to have been 'deemed appropriate by the Administration.'" 582 F.3d at 177 (citation

[7] Plaintiff observes that Atrius did not invoke either defense in removing to federal court a suit related to this one. *See* Mot. at 16 n.10. That is due to a simple fact: the plaintiffs in that suit invoked the Health Insurance Portability and Accountability Act ("HIPAA"), which formed the basis of a colorable federal defense, while Plaintiff here does not cite HIPAA once.

[8] *Blue Cross & Blue Shield* and *Capron* never considered whether *Buckman* might present a *colorable* defense, even if it was ultimately unpersuasive on the merits. *See, e.g., Acker*, 527 U.S. at 431 (explaining that a federal defense was colorable even though it was not persuasive on the merits).

omitted). Here, by comparison, Plaintiff's suit challenges use of analytics technologies that the federal government has itself employed in concert with its broader efforts to construct a nationwide, interoperable health information technology infrastructure. Thus, as in *Buckman*, Plaintiff's claim would impose liability for actions taken that were consistent with directives issued by a federal agency and for which Atrius has been compensated. Plaintiff's reliance of *Capron* is similarly misplaced. As an initial matter, the language in *Capron* Plaintiff cites concerned the doctrine of field preemption, not *Buckman*'s core holding. *Capron*, 944 F.3d at 23. More important, the preemption analysis in *Capron* pertained to the "operation of a federal program that promotes international cultural exchange," not a direct relationship between the federal government and an entity, where, as here, the entity worked to effectuate the government's goals. *Id.* at 12.

Plaintiff's flawed interpretation of *Buckman* is confirmed by other case law. In *Acker*, for instance, the Supreme Court upheld federal officer removal where a county's occupational tax on federal judges "'risk[ed] interfering with the operation of the federal judiciary' in violation of the intergovernmental tax immunity doctrine." 527 U.S at 431 (citation omitted). Likewise, in *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Association of Philadelphia*, 790 F.3d 457 (3d Cir. 2015), the court found *Buckman* preemption could apply to suits that would "interfere in the relationship" between a defendant and the relevant federal agency, even absent a statutory provision dictating the terms of that relationship. *Id.* at 474. The question is whether "it is plausible that the Congress intended for no one other than the [ONC] and the [CMS] to monitor and enforce [Atrius'] compliance" with their directives. *Id.* Because the answer is at least debatable, *Buckman* preemption provides a colorable federal defense.

Apart from *Buckman*, the dormant Commerce Clause presents another colorable defense

to Plaintiff's wiretap claim. State law "that has the 'practical effect' of regulating commerce occurring wholly outside that State's borders is invalid under the Commerce Clause." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 332 (1989). And state law that imposes a "burden" on interstate commerce that is clearly excessive in relation to the putative local benefits also violates the dormant Commerce Clause. *See Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 353 (2008).

Plaintiff tries to sidestep the dormant Commerce Clause, asserting that "Atrius and the putative class members are all Massachusetts residents." Mot. at 18. But that misses the point. Under Plaintiff's reading of the wiretap statute, any person or entity whose website could be accessed by a Massachusetts resident—which is to say every website owner in the country—is subject to significant potential criminal liability under the Massachusetts law. *See, e.g.*, Mass. Gen. Laws Ann. ch. 272 § 99(C)(1) (imposing criminal penalties including five years' imprisonment). The practical impact is to regulate and burden commerce outside the Commonwealth, as website owners across the country would be forced ensure their compliance with the Massachusetts Wiretap Act. *See, e.g.*, *Am. Beverage Ass'n v. Snyder*, 735 F.3d 362, 376 (6th Cir. 2013) (finding that "[t]he reach of this statute and the criminal penalty for violations" militated in favor of a finding that the statute violated the dormant Commerce Clause).

Plaintiff asserts that it is irrelevant the activity at issue occurred over the Internet. Mot. at 19–20. In service of that contention, Plaintiff tries to undercut the import of *American Booksellers Foundation v. Dean*, 342 F.3d 96 (2d Cir. 2003), but the cases Plaintiff cites merely stand for the proposition that *Dean* should not be interpreted to "preclude all state regulation of Internet conduct." *Rousso v. State*, 204 P.3d 243, 364 (Wash. Ct. App. 2009). Atrius is not arguing otherwise. Instead, Atrius contends that Plaintiff's expansive and erroneous interpretation of the state wiretap law will effectively criminalize the manner in which millions of out-of-state websites

operate. That regulates commerce wholly outside the Commonwealth and imposes burdens on interstate commerce that far outstrip any legitimate local interest. Far less substantial burdens have been found to implicate the dormant Commerce Clause's prohibitions. *See, e.g.*, *McLemore v. Gumucio*, 2019 WL 3305131, at *11 (M.D. Tenn. Jul. 23, 2019) (finding law that would "effectively require[] every online auctioneer . . . to obtain and maintain a Tennessee license" would "seriously burden interstate commerce"). And the Massachusetts Wiretap Act, last overhauled in 1968, was aimed at curbing secret recording of conversations between people in the fight against organized crime. *See Commonwealth v. Rainey*, 205 N.E. 3d 1090, 1103 (Mass. 2023). Prohibiting the use of analytics technologies related to browsing activity on public websites would not serve this purpose.

Finally, Plaintiff faults Atrius for not identifying a case that found a state wiretap law in violation of the dormant Commerce Clause. Mot. at 20. As a threshold matter, undersigned counsel is not aware of a court that has considered the merits of a dormant Commerce Clause defense in this context.[9] But more important, another case has squarely held that the dormant Commerce Clause constitutes a colorable federal defense to state wiretap claims related to use of website analytics technologies. *See UPMC*, 2020 WL 4381675, at *7 (noting that defendant's "website and patient portal 'provide[d] an easily accessible, interstate (and international) platform'") (citation omitted). This Court should too.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's Motion to Remand should be denied.

---

[9] The California cases that Plaintiff cites dealt with conventional wiretap claims, involving the unconsented-to-recording of a telephone conversation. *See Zephyr v. Saxon Mortg. Servs.*, 873 F. Supp. 2d 1223, 1230–32 (E.D. Cal. 2012) (rejecting challenge to application of California wiretap law to recording of unsolicited telephone calls); *Ades v. Omni Hotels Mgmt. Corp.*, 46 F. Supp. 3d 999, 1012–14 (C.D. Cal. 2014) (similar); *Pepper v. Charitable Res. Found.*, 2014 WL 12961327, at *4 (C.D. Cal. Oct. 14, 2014) (similar).

Dated: June 23, 2023

Respectfully submitted,

By: /s/ Anthony E. Fuller

Anthony E. Fuller (BBO #633246)
Maria R. Durant (BBO # 558906)
Kayla H. Ghantous (BBO # 709197)
HOGAN LOVELLS US LLP
125 High Street, Suite 2010
Boston, MA 02110
Telephone: (617) 371-100
Facsimile: (617) 371-1037
anthony.fuller@hoganlovells.com
maria.durant@hoganlovells.com
kayla.ghantous@hoganlovells.com

Allison Holt Ryan (*admitted pro hac vice*)
Adam A. Cooke (BBO # 679637)
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
allison.holt-ryan@hoganlovells.com
adam.a.cooke@hoganlovells.com

*Counsel for Defendant*

16



**CERTIFICATE OF SERVICE**

I hereby certify that on June 23, 2023, copies of the foregoing Defendant's Opposition to Plaintiff's Motion to Remand were served via electronic filing through the Court's ECF system to:

Edward F. Haber
Michele H. Blauner
Patrick J. Vallely
SHAPIRO HABER
& URMY LLP
One Boston Place
Suite 2600
Boston, MA 02108
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Counsel for Plaintiff Jane Doe, on behalf of herself and all others similarly situated*

*/s/ Anthony E. Fuller*
Anthony E. Fuller

*Counsel for Defendant*

I HEREBY ATTEST AND CERTIFY ON January 9, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: [signature]
Asst. Clerk

14

23-5978LS1 Suffolk Superior Court

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JANE DOE, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ATRIUS HEALTH, INC., *et al.*,<br><br>Defendant. | Case No.: 1:23-cv-10923-FDS |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO REMAND**

Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
**SHAPIRO HABER & URMY LLP**
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

***Counsel for Jane Doe***

I HEREBY ATTEST AND CERTIFY ON January 9, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: [signature]
Asst. Clerk

## Table of Contents

Page

I. Factual Background ....................3

II. Argument ....................3

A. Atrius Did Not Act Under a Federal Officer When It Aided the Secret Interception of Communications Between Consumers and Atrius ....................4

1. Private Parties Who Comply with Federal Law to Advance a Stated Regulatory Objective Do Not Act under a Federal Officer. ....................4

2. The Laws, Regulations, and Regulatory Guidance upon Which Atrius Relies Do Not Support Their Claim of Federal Officer Status ....................8

B. Atrius's Secret Use of Tracking Technologies Does Not Relate to Any Act Performed Under Color of Federal Officer. ....................12

C. Atrius Asserts No Colorable Federal Defense. ....................15

III. Conclusion ....................20

## Table of Authorities

Page

### Cases

*Ades v. Omni Hotels Mgmt. Corp.*,
46 F. Supp. 3d 999 (C.D. Cal. 2014) ....20

*Am. Booksellers Found. v. Dean*,
342 F.3d 96 (2d Cir. 2003) ....19

*Blue Cross & Blue Shield v. AstraZeneca Pharms.*,
582 F.3d 156 (1st Cir. 2009) ....17

*Buckman Co v. Plaintiffs' Legal Committee*,
531 U.S. 341 (2011) ....16, 17

*Camacho v. Autoridad de Telefonos de Puerto Rico*,
868 F.2d 482 (1st Cir. 1989) ....5

*Capron v. Office of the Attorney General of Massachusetts*,
944 F.3d 9 (1st Cir. 2019) ....17

*Crouch v. Saint Agnes Med. Ctr.*,
2023 U.S. Dist. LEXIS 68801 (E.D. Cal. Apr. 19, 2023) ....2, 7

*Doe v. Cape Cod Health Care*,
No. 1:23-cv-10080, ECF 10 (D. Mass. Jan. 25, 2023) ....2, 6

*Doe v. Hoag Mem'l Presbyterian Hosp.*,
2023 U.S. Dist. LEXIS 77443 (C.D. Cal. May 2, 2023) ....2, 7

*Doe v. ProMedica Health Sys.*,
2020 U.S. Dist. LEXIS 244916 (N.D. Ohio Oct. 30, 2020) ....2, 8, 15

*Doe v. Torrance Mem'l Med. Ctr.*,
2023 U.S. Dist. LEXIS 64619 (C.D. Cal. Apr. 12, 2023) ....2

*Doe v. UPMC*,
2020 U.S. Dist. LEXIS 136077 (W.D. Pa. July 31, 2020) ....2, 8, 15

*Estate of Maglioli v. Alliance HC Holdings LLC*,
16 F.4th 393 (3d Cir. 2021) ....6

*Gladstone, Realtors v. Village of Bellwood*,
441 U. S. 91 (1979) ....16

*Graves v. 3M Co.*,
17 F.4th 764 (8th Cir. 2021) ....................14

*Healy v. Beer Inst., Inc.*,
491 U.S. 324 (1989) ....................18

*Heard v. Torrance Mem'l Med. Ctr.*,
2023 U.S. Dist. LEXIS 42196 (C.D. Cal. Mar. 13, 2023) ....................2

*Hilbert v. Aeroquip, Inc.*,
486 F. Supp. 2d 135 (D. Mass. 2007) ....................11

*Holdren v. Buffalo Pumps, Inc.*,
614 F. Supp. 2d 129 (D. Mass. 2009) ....................12, 16

*Kennedy v. Heath Options, Inc.*,
329 F. Supp. 2d 1314 (S.D. Fl. 2004) ....................14

*Lake v. Ohana Military Cmtys., LLC*,
14 F.4th 993 (9th Cir. 2021) ....................14

*Massachusetts v. Exxon Mobil Corp.*,
462 F. Supp. 3d 31 (D. Mass. 2020) ....................13

*Mayor & City Council of Baltimore v. BP P.L.C.*,
31 F.4th 178 (4th Cir. 2022) ....................13

*McKnight v. Surgical Assocs. of Myrtle Beach LLC*,
2011 U.S. Dist. LEXIS 133989 (D.S.C. Nov. 18, 2011) ....................15

*Mesa v. California*,
489 U.S. 121 (1989) ....................16

*Mohr v. Trs. of the Univ. of Pa.*,
2023 U.S. Dist. LEXIS 69766 (E.D. Pa. Apr. 20, 2023) ....................2

*Moore v. Elec. Boat Corp.*,
25 F.4th 30 (1st Cir. 2022) ....................4, 5

*Ohio State Chiropractic Ass'n v. Humana Health Plan, Inc.*,
647 Fed Appx. 619 (6th Cir. 2016) ....................6

*Pepper v. Charitable Res. Found.*,
2014 U.S. Dist. LEXIS 206307 (C.D. Cal. Oct. 14, 2014) ....................20

*Philip Morris Inc. v. Reilly*,
267 F.3d 45 (1st Cir. 2001) ....................18

*Philip Morris, Inc. v. Reilly*,
312 F.3d 24 (1st Cir. 2002) ....19

*Port of Corpus Christi Auth. Of Nueces Cnty. v. Port of Corpus Christi L.P.*,
57 F.4th 432 (5th Cir. 2023) ....6

*Quinto v. Regents of the Univ. of Cal.*,
2023 U.S. Dist. LEXIS 17263 (N.D. Cal. Feb. 1, 2023) ....2, 7, 8, 10

*Rhode Island v. Shell Oil Prods. Co.*,
979 F.3d 50 (1st Cir. 2020) ....13

*Rousso v.* State,
204 P.3d 243 (Wash App. Ct. 2009) ....19

*SPGGC, LLC v. Blumenthal*,
505 F.3d 183 (2d Cir. 2007) ....19

*Tenn. Wine & Spirits Retailer Ass'n v. Thomas*,
139 S. Ct. 2449 (2019) ....18

*United Haulers Ass'n v. Oneider-Herkimer Solid Waste Mgmt. Auto.*,
550 U.S. 330 (2007) ....18

*W. Va. State Univ. Bd. Of Governors v. Dow Chem. Co.*,
23 F.4th 288 (4th Cir. 2022) ....6

*Watson v. Philip Morris Cos.*,
551 U.S. 142 (2007) ....4, 5

*Zephyr v. Saxon Mortg. Servs.*,
873 F. Supp. 2d 1223 (E.D. Cal. 2012) ....20

**Statutes and Constitutional Provisions**

123 Stat. 115 ....9

28 U.S.C. § 1442 ....1, 3, 4

M.G.L. c. 272 § 99 ....3

U.S. Const. Art. I § 8 ....4, 5

U.S. Const. Art. III § 2 ....16

**Regulations**

42 C.F.R. § 495.2–495.370 ....9

*Incentives for the Use of Health Information Technology*, Exec. Order 13335 (Apr. 27, 2004) ....8

ONC, *Federal Health Information Technology Strategic Plan 2015-2020*..........9

Plaintiff Jane Doe[1] ("Plaintiff") asserts a single state-law claim under the Massachusetts Wiretap Act, G.L. c. 272, § 99 ("MWA") against Atrius Health, Inc. ("Atrius"). The crux of Plaintiff's claim is that Atrius aided in the secret interception of Plaintiff's wire communications with Atrius through the Atrius Website. Specifically, Plaintiff alleges Atrius failed to disclose to healthcare consumers that it injected into its website hidden code for so-called "tracking technologies," including Google Analytics and Meta Pixel. These technologies assisted Google, Facebook, and other third parties in secretly intercepting Plaintiff's communications with Atrius.

Plaintiff filed her action in the Massachusetts Superior Court. Atrius filed a notice of removal ("Notice") pursuant to 28 U.S.C. § 1442(a)(1) (the "Federal Officer Removal Statute"), which permits the removal of state-law claims against federal officers or those acting under them in certain circumstances. Atrius's arguments for removal fail for several reasons.

*First*, Atrius fails to plausibly allege that it acted "under" a federal officer, as the Federal Officer Removal Statute requires. To satisfy this element, Atrius must show the government enlisted it to perform a basic government task—a function the government would itself have been required to perform. Conduct that merely complies with regulation or responds to regulatory incentives does not support removal. Atrius identifies no basic governmental task the government enlisted Atrius to perform. The laws, regulations, and guidance Atrius cites reflect classic regulation of commerce, which provides no basis for removal.

*Second*, Atrius fails to show that the conduct giving rise to liability—its failure to disclose to healthcare consumers its use of hidden tracking technologies on its website—relates to any government tasks it was enlisted to perform. Atrius does not allege the United States directed it to conceal the tracking technologies (because the government directed no such thing).

[1] The Massachusetts Superior Court granted Plaintiff's motion to proceed in pseudonym, given the privacy interests surrounding Plaintiff's status as an Atrius patient. Plaintiff disclosed her true identity to Atrius per the order of the Massachusetts Superior Court.

*Third*, Atrius must assert a colorable federal defense to invoke federal jurisdiction. Neither of the purported defenses Atrius describes are colorable. *Buckman* preemption applies only where a claim depends solely on a violation of a federal law that has its own comprehensive enforcement regime. Plaintiff here invokes traditional state law principles that do not depend upon federal law. And, the MWA is not an unconstitutional violation of the Commerce Clause. The MWA neither discriminates against out-of-state companies nor regulates conduct wholly outside of Massachusetts. The MWA's privacy protections fall comfortably within the state's legitimate exercise of power.

**<u>Eight</u>** decisions, including Judge Stearns in this District, have **<u>rejected</u>** the removal of cases involving tracking technologies similar to the claims here. *Doe v. Cape Cod Health Care*, No. 1:23-cv-10080, ECF 10 (D. Mass. Jan. 25, 2023) (Stearns, D.J.) (Ex. A hereto) ("*Cape Cod Health*"); *Doe v. BJC Health Sys.*, 2023 U.S. Dist. LEXIS 13954 (E.D. Mo. Jan. 10, 2023); *Quinto v. Regents of the Univ. of Cal.*, 2023 U.S. Dist. LEXIS 17263 (N.D. Cal. Feb. 1, 2023); *Heard v. Torrance Mem'l Med. Ctr.*, 2023 U.S. Dist. LEXIS 42196 (C.D. Cal. Mar. 13, 2023); *Doe v. Torrance Mem'l Med. Ctr.*, 2023 U.S. Dist. LEXIS 64619 (C.D. Cal. Apr. 12, 2023); *Crouch v. Saint Agnes Med. Ctr.*, 2023 U.S. Dist. LEXIS 68801 (E.D. Cal. Apr. 19, 2023); *Mohr v. Trs. of the Univ. of Pa.*, 2023 U.S. Dist. LEXIS 69766 (E.D. Pa. Apr. 20, 2023); *Doe v. Hoag Mem'l Presbyterian Hosp.*, 2023 U.S. Dist. LEXIS 77443 (C.D. Cal. May 2, 2023). The Court should follow these correctly decided cases.

The two earlier decisions Atrius cites—*Doe v. UPMC*, 2020 U.S. Dist. LEXIS 136077 (W.D. Pa. July 31, 2020) ("*UPMC*"), and *Doe v. ProMedica Health Sys.*, 2020 U.S. Dist. LEXIS 244916 (N.D. Ohio Oct. 30, 2020) ("*ProMedica*"), were wrongly decided. As *Quinto* explained in discussing the two decisions: "These cases entailed an overly broad interpretation of what it means to assist a federal superior with its tasks or duties, which would permit removal to federal court in circumstances far beyond anything Congress intended." 2023 U.S. Dist. LEXIS 17263, at *8 (citation omitted).

The Court should remand the case to the Massachusetts Superior Court.

## I. FACTUAL BACKGROUND

Atrius aided Google, Facebook, and other companies in secretly intercepting consumers' communications with Atrius by injecting hidden code into the Atrius Website. That hidden code enabled third parties to surreptitiously record healthcare consumers' communications with Atrius. Third parties, including Google and Facebook, could then associate the intercepted communications with the real-world identities of individuals and use the contents of those communications for their own commercial purposes, such as serving individually targeted advertising to those individuals.

Atrius did not disclose to consumers that it helps third parties such as Google and Facebook to intercept communications with Atrius, nor did Atrius seek or obtain their consent. Atrius instead falsely told consumers that it only shares information with third parties for other reasons, such as "law enforcement purposes" and "reporting victims of abuse," without disclosing any sharing to advertising and social media companies like Google and Facebook. Complaint ¶¶ 17–25.

Plaintiff asserts a single claim under the MWA, G.L. c. 272 § 99. The claim derives from the statutorily defined term "interception," which means "to <u>secretly</u> hear, <u>secretly</u> record, or aid another to <u>secretly</u> hear or <u>secretly</u> record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by <u>all parties</u> to [the] communication…." *Id.* § 99(B)(4) (emphasis added). Plaintiff's claims do not challenge the <u>use</u> of tracking technology generally; instead, the <u>secret</u> use of such technologies runs afoul of the Act.[2]

## II. ARGUMENT

The Federal Officer Removal Statute, 28 U.S.C. § 1442(a)(1), provides:

---

[2] The Massachusetts Superior Court upheld a similar claim against a hospital system under the MWA for the secret use of tracking technologies. *Doe v. Partners Healthcare Sys., Inc.*, No. 1984CV01651, Decision Allowing in Part and Denying In Part Motion to Dismiss (Mass. Super. Ct. Nov. 20, 2020) (Exhibit B hereto) ("motion is DENIED as to Counts I and II. . . for the reasons stated on the record at the hearing"), citing *Doe v. Partners Healthcare Sys., Inc.*, No. 1984CV01651, Transcript of R. 12 Hearing Before the Hon. Brian Davis, at pp. 14, 32, 34 (Mass. Super. Ct. Nov. 10, 2020) (Exhibit C hereto).

> A civil action or criminal prosecution that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States…:
>
> (1) The United States or any agency thereof of any officer (or **<u>any person acting under that officer</u>**) of the United States or of any agency thereof…**<u>for or relating to any act under color of such office</u>**….

(emphasis added). Removal by a private party under this provision requires that Atrius plausibly allege each of three elements: "(1) [it was] 'acting under a federal officer's authority,'… (2)…the charged conduct was carried out 'for or relating to' the asserted official authority…, <u>and</u> (3) [it] 'will assert a colorable federal defense to the suit.'" *Moore v. Elec. Boat Corp.*, 25 F.4th 30, 34 (1st Cir. 2022) (citations omitted) (emphasis added). The failure to allege <u>any one</u> of the elements defeats removal. Here, Atrius does not adequately plead <u>any</u> of those requirements.

**A. <u>Atrius Did Not Act Under a Federal Officer When It Aided the Secret Interception of Communications Between Consumers and Atrius</u>**

1. *Private Parties Who Comply with Federal Law to Advance a Stated Regulatory Objective Do Not Act under a Federal Officer.*

For Atrius's removal to have been proper, Atrius must have been "acting under [a federal] officer." 28 U.S.C. § 1442(a)(1). Although the language is broad, the Supreme Court has explained, the "language is not limitless." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007).

In *Watson*, the Supreme Court evaluated Philip Morris's contention that claims relating to the marketing of "light" cigarettes concerned conduct for which Philip Morris was "acting under" a federal officer because it used a government test to measure the nicotine content of cigarettes. In rejecting this contention, the Court distinguished private parties that assist the United States to "fulfill…basic government tasks," in which case removal may be proper, and private parties that are "simply complying with [federal] law," which does not support removal. Put another way, it is not enough that a private party acts to advance a federal <u>regulatory</u> objective. Of course, whenever Congress exercises its power to "regulate…commerce," U.S. Const. Art. I § 8. cl. 3, it has some objective—for example, to improve the functioning of the market or to protect the rights of market participants. Advancing such commerce-

regulating objectives by responding to regulatory incentives does not count as "acting under" a federal officer. Instead, the private party must, in essence, be acting "on the Government's agency's behalf." *Watson*, 551 U.S. at 152, 156. This distinction—between responding to regulatory incentives and the performance of "basic government tasks"—is the critical distinction upon which this element of the removal statute turns.

The classic example of a private party performing "basic government tasks" is where the government enlists a company to produce an item the United States would otherwise be obligated to produce. For example, the United States has a constitutional obligation to "maintain a Navy," *see* U.S. Const. Art. I § 8 cl. 13, which requires it to manufacture or procure instruments of war. For this reason, the First Circuit had little difficulty in *Moore* deciding that a private company that built submarines for the Navy was "acting under a federal officer." 25 F.4th at 32, 34; *Camacho v. Autoridad de Telefonos de Puerto Rico*, 868 F.2d 482, 486 (1st Cir. 1989) (telephone company acted under a federal officer when implementing wiretap per the direction of federal law enforcement to further law enforcement functions).

Atrius identifies no "basic government task" for which it acted "on the Government's behalf."[3] No statutory or constitutional obligation requires the United States to build a health technology infrastructure. Instead, the federal objectives underlying the Meaningful Use program were **regulatory** goals—an extension of Congress's power to **regulate** private interstate commerce rather than to fulfill a "basic government task." As explained in the following section, the commerce-regulating nature of the laws, regulations, and regulatory guidance on which Atrius relies is confirmed by the stated objectives of those regulations, including (i) "to improve the quality and efficiency of healthcare," Executive Order 13335 ; (ii) "reduc[ing] health care costs," 123 Stat. 115, 230; and (iii) "build[ing] a culture of electronic health information access and use," ONC, *Federal Health Information Technology Strategic Plan 2015-2020*.

[3] Atrius parrots *Watson*, arguing "[t]he federal government would not be able to 'carry out' these important federal healthcare initiatives without the assistance of providers like Atrius," Notice ¶ 33, but merely making that observation falls well short of establishing that the government itself had an obligation to create any health technology infrastructure—that is, that Atrius performed a "basic government task."

Atrius's argument is similar to the position a Medicare Advantage Organization (MAO) took in *Ohio State Chiropractic Ass'n v. Humana Health Plan, Inc.*, 647 Fed Appx. 619 (6th Cir. 2016). There, private health insurers sought to remove claims relating to their decision to withhold Medicare payments based on prior overpayments to healthcare providers. *Id.* at 620–21. The Sixth Circuit directed the district court to remand the case. Although regulations provided MAOs a financial "incentive to maximize enrollment" (similar to the financial incentives here for Atrius to maximize patient interaction with online medical records), MAOs were not performing a task "that the government would otherwise have to do." *Id.* at 623. The court reasoned: "If no health insurer chose to contract with CMS [a federal agency] as an MAO, it is doubtful that the government would get into the business of offering its own [Medicare Advantage] plans. It certainly doesn't *have* to." *Id.* at 623–24 (emphasis in original). The Sixth Circuit contrasted the insurer's position with government contractors who perform "tasks that the government would otherwise have to use its own agents to complete," such as "building naval warships." *Id.* at 624.

Atrius points to no constitutional or statutory provision requiring the government to itself create a health information infrastructure. And, Atrius has not demonstrated that **by concealing the secret interception of internet communications**, it carried out tasks the United States was otherwise required to do. Atrius was not "acting under" a federal officer for purposes of the removal statute.[4]

Judge Stearns's decision in *Cape Cod Health Care* aligns with *Watson*. The plaintiff's claims there, relating to a hospital's use of tracking technologies, constituted "the voluntary and unilateral adoption of a practice that may be consistent in some respects with a nonbinding federal policy." The court reasoned:

[4] *Estate of Maglioli v. Alliance HC Holdings LLC*, 16 F.4th 393, 404–05 (3d Cir. 2021) (nursing home compliance with COVID regulations did not support removal because nursing homes "are not delegated federal authority, nor do they provide a service that the federal government would otherwise provide"); *Port of Corpus Christi Auth. Of Nueces Cnty. v. Port of Corpus Christi L.P.*, 57 F.4th 432, 437 (5th Cir. 2023) (rejecting removal for liability for damage caused by federally permitted port dredging, reasoning: "The problem here is there is no federal endeavor involved with this permit, *i.e.*, there is no task or duty of a federal officer or agency [the defendants] are carrying out"); *W. Va. State Univ. Bd. Of Governors v. Dow Chem. Co.*, 23 F.4th 288, 306 (4th Cir. 2022) (rejecting as "speculative at best" argument that had the defendant not remediated contaminated property, the federal government would have been obligated to do so).

> If one takes the defendant's reasoning to its logical conclusion, the federal officer removal statute would sweep into the federal courts any case involving an instance in which a third-party voluntarily incorporated in its business model a practice consistent with a policy promoted by the federal government as socially desirable, which given the size of the federal government and the hundreds of agencies and officials issuing pronouncements on its behalf, would apply to nearly the entire gamut of human behavior. This is inconsistent with the constitutional role of the federal court as a court of limited jurisdiction.

Ex. A. Judge Stearns's holding is correct. The Court should follow it here.

*BJC Health* likewise properly applied *Watson*: "Despite the federal government's expressed desire to encourage the implementation of interoperable health information technology infrastructure, **the statute neither authorized nor obligates the federal government to create such an infrastructure itself,**"; "[t]herefore, it cannot be said that BJC's creation of a website and online patient portal fulfills a 'basic government task." 2023 U.S. Dist. LEXIS 13954, at *11–12 (emphasis added; quotations omitted).

*Quinto* similarly held that "UC has not shown that it acted under a federal officer or agency" simply because it "uses the Facebook Tracking Pixel as part of its broader effort to assist the federal government in achieving its 'mission of a nationwide digitized healthcare system.' That is not enough for removal on federal officer grounds." 2023 U.S. Dist. LEXIS 17263, at *6. The court rejected the hospital's argument that "it was subject to the close direction of a federal officer or agency by virtue of the 'specific framework and guidelines' that the Meaningful Use program sets out for healthcare providers to follow." *Id.* at 7. This is because "**merely being subject to a regulatory scheme is not the same as acting under a federal agency's close direction**." *Id.* (emphasis added); *Hoag Mem'l*, 2023 U.S. Dist. LEXIS 77443, at *7 ("If hospitals did not digitize their patient records, the federal government would be under no obligation to carry out the task itself."); *Crouch*, 2023 U.S. Dist. LEXIS 68801, at *17 ("At most, Defendant has demonstrated that, by choosing to participate in the Meaningful Use Program and follow its guidelines to receive incentive payments, it operated as a private entity subject to government regulations, which is not sufficient to show that it acted under a federal officer.") (quotation omitted).

The *UPMC* court's decision is not faithful to *Watson*. Although it discusses *Watson*, it concludes that UPMC acted under a federal officer without identifying any "governmental task" UPMC assisted. 2020 U.S. Dist. LEXIS 136077, at *15–16. The *UPMC* court appears to have been influenced by the fact that hospitals receive incentive payments under the Meaningful Use program but, economically speaking, incentive payments are no less "regulatory" than fines; both fines and rewards provide financial incentives to encourage compliance with **regulatory** objectives.

*ProMedica*'s cursory analysis is even less faithful to *Watson*. The court concluded that it was enough that ProMedica "[assisted] the federal government in its mission for a nationwide system of electronic health records." 2020 U.S. Dist. LEXIS 244916, at *5–6. Describing the program as a "mission" simply does not respond to *Watson's* distinction between **regulatory** "missions," which do **not** support removal, and "missions" that reflect "basic governmental tasks," which may support removal (if other requirements of removal are met). As the court held in *Quinto*, where it directly rejected *UPMC* and *ProMedica*: "**These cases entailed an overly broad interpretation of what it means to assist a federal superior with its tasks or duties, which would permit removal to federal court in circumstances far beyond anything Congress intended**." 2023 U.S. Dist. LEXIS 17263, at *8 (emphasis added).

2. *The Laws, Regulations, and Regulatory Guidance upon Which Atrius Relies Do Not Support Their Claim of Federal Officer Status.*

Atrius's removal petition is premised on a regulatory scheme implemented through various laws and regulations over time. The laws and regulations to which Atrius points are classic private market regulations; there is no evidence that Atrius manufactured a product or performed some function the government itself had any legal obligation to undertake.

As Atrius describes in its Notice of Removal (¶ 13), the origin of the Meaningful Use Program is a 2004 Executive Order described as establishing "Incentives for the Use of Health Information Technology." Exec. Order 13335, 69 Fed. Reg. 24,059 (Apr. 27, 2004). That order states a classic regulatory purpose: "the development and nationwide implementation of an interoperable health

information technology infrastructure to improve the quality and efficiency of healthcare." *Id.* The executive order does not suggest that the government was procuring the services of private healthcare providers to perform a basic government task the government was obliged to perform. Although the executive order referenced information technology "in both the public and private health sectors," there is no suggestion that the government enlisted private healthcare providers such as Atrius to provide any healthcare technology for the government's own use. There is certainly no suggestion Atrius was directed or required to conceal from the website users that they used tracking technologies that aid Google or Facebook to intercept healthcare consumers' communications with Atrius.

The Health Information Technology for Economic and Clinical Health Act of 2009 codified the Meaningful Use Program but did not change the program's regulatory nature. The Act's purpose was "the development of a nationwide health information technology infrastructure." 123 Stat. 115, 230. The underlying policy rationales for this "infrastructure," according to the Act, are classic regulatory objectives, including "improv[ing] health care quality," "reduc[ing] health care costs," and "promot[ing] early detection, prevention, and management of chronic diseases." *Id.*

The federal office responsible for implementing the HITECH Act published guidance describing the program. The language Atrius quotes in its notice of removal again reflects a classic regulatory goal—for federal agencies to "collaborate with…private stakeholders to…build a culture of electronic health information access and use." Notice ¶ 16 (quoting ONC, *Federal Health Information Technology Strategic Plan 2015-2020* at 7). Atrius also quotes more recent guidance that likewise reflects regulation, with no suggestion of any government function, including describing how government and private sector parties "have worked together to help digitize health information and healthcare." Notice ¶ 16 (quoting ONC, *Federal Health IT Strategic Plan 2020–2025* at 2).

Atrius also cites (Notice ¶ 17) implementing regulations for the Meaningful Use program, 42 C.F.R. § 495.2–495.370 (found, of course, in the Code of Federal **Regulations**.) These regulations provide monetary incentives to implement certain technologies, one of which is having an interoperable

patient portal. That is—private healthcare providers are paid more if they meet criteria outlined in regulations. Again, such incentives reflect classic **regulation**. Nothing in the regulations suggests Atrius performs a **governmental task** when it responds to these regulatory incentives. *Quinto*, 2023 U.S. Dist. LEXIS 17263, at *6 ("Contrary to UC's suggestion, …receiving incentive payments for acting in a way that promotes a broad federal interest—in an area outside the traditional responsibility of the federal government—is not the same as being contracted to carry out, or assist with, a basic governmental duty."); *BJC*, 2023 U.S. Dist. LEXIS 13954, at *11 ("I am not persuaded that BJC's receipt of statutory incentive payments means that it is 'acting under' a federal officer for purposes of the federal officer removal statute"); *Mohr*, 2023 U.S. Dist. LEXIS 69766, at *14 ("Defendant is simply a private entity that voluntarily elects to engage in a federal incentive program for financial gain. This does not fall within even the broadest interpretation of the federal official removal statute.").

Even if the laws, regulations, and guidance could be construed as enlisting healthcare providers to perform a basic government task (which they cannot), Atrius does not connect the **secret** deployment of such technologies (the conduct giving rise to their liability under the MWA) to any regulation or guidance. For example, Atrius points (Notice ¶ 18) to incentive payments for increasing patient engagement. None of those incentives have anything to do with and are certainly not intended to encourage Atrius's concealment of their injection of hidden code into its website to permit third parties secretly to intercept consumers' communications—the conduct that gives rise to liability here.

Atrius also observes that Medicare "created its own portal" for patients and thus "provided an example of how to engage with beneficiaries." Notice ¶ 23 & Ex. B (privacy policy for Medicare.gov). Atrius cites nothing for the proposition that the government intends the Medicare portal to provide an "example" for private healthcare providers, no less that by following the government's "example," Atrius carried out a basic governmental task. Atrius's characterization of the government as setting an "example" reflects a concession that the government did not tell Atrius how to set up its website. "It is not enough

to prove only that the relevant acts occurred under the general auspices of a federal office or officer" *Hilbert v. Aeroquip, Inc.*, 486 F. Supp. 2d 135, 146 (D. Mass. 2007) (quotation omitted).

With respect to the substance of the supposed "example" Medicare provides, Atrius observes that Medicare uses "third-party services" such as Facebook. Atrius cites nothing indicating the government encourages private healthcare providers to conceal such tracking technologies. Even assuming the government intended the Medicare portal to be an example of "how to engage" with consumers, Atrius failed to follow any such example. The Medicare portal's privacy policy (Notice Ex. B), contains several detailed disclosures which, in stark contrast to the disclosures on the Atrius Website, describe the tracking technologies used on the CMS website in some detail. For example, the Medicare privacy policy states:

> **Using third-party tools for website analytics:**
>
> We use a variety of third-party web tools for web analytics. We use these tools to collect basic information about visits to Medicare.gov. This information is then used to maintain the website, including: [i] Monitoring website stability[;], [ii] Measuring website traffic[;] [iii] Optimizing website content[;] [and iv] Helping make the website more useful to visitors.

Ex. B at 4. Then, the next section of the privacy policy expressly discloses the website's use of the "pixel" tracking technology and that it enables information to be collected by third parties.

> We use third-party web services to conduct outreach and education through the use of digital advertising for Medicare.gov. These third-party services may collect information through the use of <u>web beacons (also called pixels) that are located on our pages</u>. A web beacon is a see-through graphic image (usually 1 pixel x 1 pixel) that's placed on a web page and, in combination with a cookie, <u>allows us to collect information regarding the use of the web page that contains the web beacon</u>....
>
> We also use third-party tools to help deliver advertising. Vendors that operate the third-party tools may also gather information about your visits to third-party sites outside of Medicare.gov. While we don't track your internet activity outside of Medicare.gov, <u>our vendors may use information collected automatically by visiting Medicare.gov, and combine it with data they collect elsewhere for targeted advertising purposes</u>.

*Id.* at 5 (emphasis added). Atrius's privacy policies and other disclosures are nothing like the Medicare disclosures. They do not describe "third-party tools for website analytics," nor do they describe "pixels"

or third-party "vendors" that may track and later use browsing activities "for targeted advertising purposes." Instead, Atrius fails to disclose the tracking technologies, hence, Plaintiff's complaint here for a single claim under the MWA, which prohibits only "<u>secret</u>" interceptions of wire communications.

### B. <u>Atrius's Secret Use of Tracking Technologies Does Not Relate to Any Act Performed Under Color of Federal Officer.</u>

Even if Atrius had acted "under a federal officer" in deploying the tracking technology (which it did not), Atrius has not plausibly alleged that its <u>secret</u> use of tracking technologies relates to any act performed under a federal officer. As previously emphasized, Plaintiff does not claim that Atrius's <u>use</u> of tracking technologies such as Google Analytics and Meta Pixel is intrinsically unlawful. Instead, Plaintiff's claim arises from Atrius's <u>secret</u> use of such technologies, or put another way, Atrius's failure to disclose the interceptions. Two cases from this District are instructive on this distinction.

In *Holdren v. Buffalo Pumps, Inc.*, 614 F. Supp. 2d 129, 135 (D. Mass. 2009), the plaintiff alleged that a manufacturer failed to warn the plaintiff of asbestos contained in the manufacturer's products. 614 F. Supp. 2d at 135. The manufacturer attempted to invoke federal jurisdiction, arguing it acted at the behest of the Navy when it included asbestos in its products. *Id.* at 135. Under the "relates to" element, the court explained that the defendant "may remove the action only if the federal government was the source of the specific act for which the contractor now faces suit." *Id.* at 136. In *Holdren*, the defendant, like Atrius here, tried to generalize the claim to one concerning the <u>use</u> of asbestos (similar to how Atrius describes Plaintiff's claim as relating to the <u>use</u> of tracking technologies). The court rejected this effort to recast the claims, concluding that even if the government's specifications required the <u>use</u> of asbestos, no specifications prohibited the manufacturer from complying with its state-law <u>duty to warn</u>. "Generally speaking, a manufacturer could give the government precisely the product it ordered while complying with its state-law duties to warn. Such a warning does not, by itself, require a departure from the government's design specifications…." *Id.* at 143. The court reasoned, "it is difficult to see how the Navy 'caused' them to omit such precautions." *Id.* at 150.

Similarly, in *Massachusetts v. Exxon Mobil Corp.*, 462 F. Supp. 3d 31 (D. Mass. 2020), the Commonwealth of Massachusetts challenged Exxon's deception of consumers and investors regarding its use of fossil fuels. *Id.* at 38. To attempt to present its conduct as acting under a federal officer, Exxon tried to shift focus onto fossil fuel **use**, instead of the **deception** upon which the Commonwealth's claims were based. The court rejected that effort to recast the plaintiff's claims, explaining:

> ExxonMobil seeks to....overread[] the complaint, arguing that the "ultimate[]" goal of the complaint is "stopping or reducing the actions federal leases obliged ExxonMobil to pursue, namely the production and sale of fossil fuels"— that these activities are "at the heart" of the complaint.... A fair reading of the complaint tells a far different story....
>
> When read as a whole, the Complaint clearly seeks to challenge the promotion and sale of fossil fuel products without warning and is abetted by a sophisticated disinformation campaign. Of course, there are references to fossil fuel production in the Complaint.... But, by and large, these references are not the source of tort liability. [The Commonwealth] does not merely allege that Defendants contributed to climate change...by producing and selling fossil fuel products; it is the concealment and misrepresentations of the product's known dangers...that allegedly drove consumption....

*Id.* at 47 (case quotations omitted).[5]

Here, Atrius likewise "overreads" the Complaint to recast it as challenging the **use** of tracking technologies, ignoring the core of Plaintiff's claims is Atrius's failure to disclose its use of those technologies. For example, Atrius insists that "[t]he Complaint centers on Defendant's alleged use of commonplace web analytics tools," and therefore, that "Plaintiff thus challenges [the] development of Atrius's website." Notice ¶ 35. This is simply not so. Plaintiff, throughout her Complaint, emphasizes that her claim turns on the **secret** deployment of such technologies.[6] Plaintiff expressly disavows any

[5] *See also Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178, 233–34 (4th Cir. 2022) ("misrepresentation of the product's known dangers" was not an act performed under federal authority); *Rhode Island v. Shell Oil Prods. Co.*, 979 F.3d 50, 60 (1st Cir. 2020) (holding no "nexus between" the "misinformation campaign about the harmful effects of [defendant's] products on the earth's climate" and "anything the oil companies allegedly did at the behest of a federal officer").

[6] Complaint ¶ 1 ("secret interception...without [class members'] knowledge or consent"); ¶ 2 ("hidden code"); ¶ 3 ("Atrius did not disclose" the technologies); ¶¶ 21–24 (detailing inadequate Atrius disclosures); ¶¶ 4, 8, 38, 51, 55, 56, 72, 73, 74, 76, 77, 79, 80, 82, 83, 85, 87, 89, 91, 92, 93, 95, 100, 105, 107, 109, 110 (repeatedly emphasizing "hidden code" and "secret" nature of interceptions).

notion that she challenges the **use** of tracking technologies.[7] Atrius is liable under the MWA for its use of the tracking technologies to **secretly** intercept Plaintiff's internet communications. Atrius does not show that their concealment of those interceptions was "related to" any basic governmental task. Because a federal superior did not even arguably mandate such deception, the "relates to" element for removal is not satisfied.[8]

*Holdren* and *Exxon Mobil* are consistent with established law, which provides that the "relates to" element requires some connection between the specific conduct giving rise to liability and the government task for which the defendant assists. It is not enough that both concern the same general subject matter. For example, while providing Medicare benefits may, in general, help carry out a statutory obligation of a federal officer (the provision of healthcare to the elderly), it does not follow that every act that in any way relates to the provision of such care comes within federal officer jurisdiction. *Kennedy v. Heath Options, Inc.*, 329 F. Supp. 2d 1314, 1318 (S.D. Fl. 2004) ("Under Defendant's theory that federal jurisdiction arises merely from being a provider of Medicare benefits without any direct causal connection to the decision that gives rise to Plaintiff's claim, all cases brought against intermediaries who have a contract to provide such benefits would be entitled to federal jurisdiction."). Here too, the Court should reject Atrius's attempt to generalize its conduct to such an extent that any conduct that touches on some federal objective provides ground for federal jurisdiction. Were the Court to accept Atrius's position, as Judge Stearns explained in *Cape Cod*, then "given the size of the federal government and the hundreds of

---

[7] *Id.* ¶ 95 ("[E]ven if Atrius wanted to use tracking technologies to optimize its website or its marketing for a website, there is no legitimate or lawful reason for Atrius (i) to keep secret from its website users the use of these tracking technologies; (ii) to falsely and deceptively claim that Atrius does not share the communications with others when it does; or (iii) to claim that Atrius maintains the privacy of those communications when it does not.").

[8] *See also Graves v. 3M Co.*, 17 F.4th 764, 770 (8th Cir. 2021) (fact that defendant made earplugs per military specifications did not support removal where the state law claim focused on a failure to warn of hearing loss rather than product design); *Lake v. Ohana Military Cmtys., LLC*, 14 F.4th 993, 1004–05 (9th Cir. 2021) ("relates to" element not met in claim involving homebuilder's failure to warn buyers of pesticide contamination that occurred during work for Navy because "[d]efendants do not argue that the Navy had control over [defendant's] decision whether to disclose the pesticide contamination" to homebuyers).

agencies and officials issuing pronouncements on its behalf, would apply to nearly the entire gamut of human behavior." Ex. A; *see also McKnight v. Surgical Assoc. of Myrtle Beach LLC*, 2011 U.S. Dist. LEXIS 133989, at *21 (D.S.C. Nov. 18, 2011) (rejecting removal based on mere fact that HIPAA relevant to a claim; permitting such claims to be removed "would federalize an entire category of state-based unfair trade practice claims 'when Congress has not indicated any intent to do so") (internal quotations omitted).

On the "relates to" requirement, the *UPMC* case is both distinguishable and wrongly decided. In *UPMC*, plaintiffs also asserted claims for breach of "provider-patient confidentiality," 2020 U.S. Dist. LEXIS 136077, at *3, which Plaintiff does not assert. In analyzing the "relating to" element, *UPMC* focused on the use of tracking technologies rather than the relevant conduct from which Plaintiff's claim derives here—the secret use of the technologies. *Id.* at *18–19. *Promedica*, likewise, fails to grapple with the focus of a wiretap claim, assuming that the plaintiff's claim there turned on the use of tracking technologies more generally, without addressing whether the secret deployment of such technologies relates to any basic governmental task. 2020 U.S. Dist. LEXIS 244916, at *6–7.

### C. Atrius Asserts No Colorable Federal Defense.

Removal is also improper because Atrius asserts no colorable federal defense. This requirement is in addition to the first two requirements of the removal statute. That is, even if there is a colorable federal defense, removal is improper if the first two elements of the removal statute are not met.

The "colorable federal defense" element differs from the first two elements in that Article III of the United States Constitution mandates it. The Constitution limits the power of federal courts to consider only those types of disputes set forth by Article III, including, as relevant here, "Cases…arising under…the Laws of the United States." *See* U.S. Const. Art. III § 2.[9] Congress lacks the power to confer

[9] There are bases for federal court jurisdiction under Article III other than "federal question" jurisdiction, but none apply here; Atrius relies solely on the federal officer removal statute, which relies upon the "arising under…the Laws of the United States" clause of Article III to provide constitutional jurisdiction.

jurisdiction to the federal courts without a constitutional basis for such jurisdiction. *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 100 (1979) ("In no event. . .may Congress abrogate the Art. III minima").

In cases involving federal officer removal, "[a]s a constitutional matter, a defendant must aver something more than his status as a federal officer in order to bring his case in a federal forum. It is only the assertion of a colorable federal defense that justifies the federal court's limited Article III jurisdiction in these cases." *Holdren*, 614 F. Supp. 2d at 140; *Mesa v. California*, 489 U.S. 121, 136 (1989) ("Section 1442(a)…cannot independently support Art. III 'arising under' jurisdiction. Rather, it is the raising of a federal question [that confers] Art. III [jurisdiction]"). "Because it alone confers Article III jurisdiction, the 'colorable' standard requires that a federal court carefully weigh the plausibility of the proffered defense." *Holdren*, 614 F. Supp. 2d at 140. "[T]he court must still satisfy itself that the defense has enough substance to trigger the right to a federal forum.… A colorable federal defense…is not a requirement that may be reduced to the point of vanishing altogether." *Id.* at 141.

Atrius asserts two purported defenses. Neither is colorable.[10]

*First*, Atrius asserts that Plaintiff's claim is preempted under *Buckman Co v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001), reasoning that because Atrius "followed the directives of the federal government," the relationship between Atrius is '"inherently federal in character,"' preempting Plaintiff's state-law claim. Notice ¶¶ 38, 39. Atrius misstates the requirements for *Buckman* preemption. Merely "following directives of the federal government" is not enough; were that so, broad swaths of the economy would enjoy preemption against state-law regulation merely by being subject to federal law (as most industries are).

In *Buckman*, the plaintiff's claim derived from a defendant's fraud committed on the FDA during a medical device approval process. The Court found that the "comprehensive [federal law] scheme"

[10] Underscoring the weakness of both defenses, Atrius articulated **neither** purported defense in its notice of removal of a previously removed case against Atrius that overlaps with the Plaintiff's complaint here. *See Doe v. Atrius Health, Inc.*, No. 1:22-cv-12196-ADB (D. Mass.), Dkt. No. 1 ¶¶ 39–41.

regarding submissions to the FDA preempted a state law claim premised on FDA submissions. The Court made clear that preemption applied because the plaintiff's claim arose "solely from the violation of [a] requirement" of federal law. *Id.* 347–48. Distinguishing non-preempted cases that do not so rely on federal law, the Court explained: "[W]ere plaintiffs to maintain their fraud-on-the-agency claims here, they would **not be relying on traditional state tort law which has predated the federal enactments in question.... On the contrary, the existence of these federal enactments is a critical element of their case**." *Id.* at 352–53 (emphasis added). Here, Plaintiff's claim does not rely on any federal enactment; proof of her claim will not entail proof of any federal law violation. *Buckman* does not apply.

*Buckman* is clear enough, but controlling First Circuit precedent, which Atrius fails to acknowledge, conclusively rejects Atrius's expansive reading of *Buckman*. In *Blue Cross & Blue Shield v. AstraZeneca Pharms.*, 582 F.3d 156 (1st Cir. 2009), the First Circuit rejected the notion that the mere fact that a claim touches upon a federal regulation is enough to trigger *Buckman* preemption:

> *Buckman* is not so broad as to sanction the conclusion that, simply because the deceptive practices at issue in this case depended on the structure of the Medicare program, it was therefore [federal law's] exclusive dominion to combat them. On the contrary, *Buckman* addressed a more narrow scenario: the plaintiffs in that case employed a "fraud on the agency" theory to attempt to create derivative standing for their own suits, which were based in state law but which sought remedies for fraudulent misrepresentations to the [FDA] during the approval process for certain medical devices.....

*Id.* at 176–77. *Buckman* preemption did not apply because the plaintiff pursued a "state law remedy for deceptive practices," and "policing deceptive conduct is...a traditional area of state concern." *Id.* at 177.

The First Circuit again rejected an expansive reading of *Buckman* in *Capron v. Office of the Attorney General of Massachusetts*, 944 F.3d 9 (1st Cir. 2019). In that case, a party, like Atrius, attempted to spin *Buckman* as providing for preemption whenever a company's conduct is "federal in character" because it followed government directives. *Id.* at 23. The First Circuit rejected this attempt to invoke one phrase from *Buckman* while ignoring *Buckman*'s essential elements: "The mere fact that a state law implicates the interests of persons who are the subject of federal regulation...does not provide a basis for inferring that the federal regulatory regime was intended to preempt a field that encompasses [a] state law." *Id.* at 24.

Here, Plaintiff's claims do not depend on any federal enactment; instead, just like in *Blue Cross*, the MWA provides a remedy for secretive, deceptive interceptions, an area of traditional state concern.

*Second*, Atrius's purported defense that the MWA is unconstitutional because it violates the "dormant commerce clause" is likewise not colorable. Atrius's own authority makes clear the dormant Commerce Clause "restricts state protectionism" and remedies interstate "trade barriers." *Tenn. Wine & Spirits Retailer Ass'n v. Thomas*, 139 S. Ct. 2449 (2019). It prevents a state "from discriminating against out-of-state goods or nonresident economic actors," *id.* at 2464, a situation Atrius does not argue is present here (the MWA applies equally to resident and nonresident actors). The Commerce Clause also restricts state laws that "directly control[] commerce occurring wholly outside the boundaries of a State," *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989). Although Atrius mentions this rule, it presents no allegations or evidence suggesting that the MWA—on its face or as applied—regulates conduct occurring "wholly outside" the Commonwealth. Plaintiff asserts a Massachusetts claim on behalf of Massachusetts residents against a Massachusetts company. Practically all of the relevant conduct occurred in the Commonwealth.

Finally, although courts have, in rare circumstances, restricted state laws that impose an "excessive" burden on interstate commerce, *United Haulers Ass'n v. Oneider-Herkimer Solid Waste Mgmt. Auto.*, 550 U.S. 330, 669 (2007), the Supreme Court cabined this doctrine substantially, rejecting efforts to turn it into a *Lochner*-esque doctrine that would restrain state power to regulate matters of local concern:

> [This doctrine is not an] invitation…to rigorously scrutinize economic legislation passed under the auspices of the police power. There was a time when this Court presumed to make such binding judgments for society, under the guise of interpreting the Due Process Clause. *See Lochner v. New York*, 198 U.S. 45 (1905). We should not seek to reclaim that ground for judicial supremacy under the banner of the dormant Commerce Clause.

*Id.* at 347.

Atrius focuses on excessive burden—the prospect that non-Massachusetts companies might have to comply with Massachusetts law. *See* Notice ¶ 41. That concern is not present here, as that Atrius and the putative class members are all Massachusetts residents. In any event, the First Circuit rejected this precise argument in *Philip Morris Inc. v. Reilly*, 267 F.3d 45 (1st Cir. 2001). There, Philip Morris argued that

the Massachusetts "Disclosure Act," which required Philip Morris to disclose ingredients in cigarettes, impeded interstate commerce. *Id.* at *7, 9. Consistent with *United Haulers*, the First Circuit recognized "a residuum of power in the state law to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce" and that the "residuum" is particularly strong when a state acts in the interest of health and consumer protection. *Id.* at *44, 45. The court upheld the law, reasoning that a statute that merely "requires that the manufacturers, should they choose to do business in Massachusetts," provide certain information does not run afoul of the Commerce Clause. *Id.* at *50.[11]

Like the Disclosure Act (and state consumer protection laws), the MWA addresses legitimate local concerns. The mere prospect that non-Massachusetts companies might have to comply with Massachusetts law when interacting with Massachusetts residents does not create a colorable argument that the MWA is unconstitutional.[12]

The fact that Atrius's violation of the MWA occurred over the Internet does not change the outcome. The sole case upon which Atrius relies to argue that Internet regulation presents special concerns, *Am. Booksellers Found. v. Dean*, 342 F.3d 96 (2d Cir. 2003), has been widely criticized and limited to the category of state laws at issue there (regulating minors' access to adult websites). *Rousso*, 204 P.3d at 365 ("The *[American Booksellers]* approach has been persuasively and widely criticized as resting on an impoverished understanding of the architecture of the Internet, misreading dormant Commerce Clause jurisprudence, and misunderstanding the economics of state regulation of transborder transactions.")

---

[11] The First Circuit on rehearing *en banc* found the Disclosure Act unconstitutional as a violation of the Fifth Amendment's Taking Clause. *Philip Morris, Inc. v. Reilly*, 312 F.3d 24 (1st Cir. 2002). The court, however, did not reconsider its Commerce Clause analysis. *Id.* at 30 ("Our review does not include revisiting...whether the Disclosure Act violates the Commerce Clause.").

[12] That companies may have to comply with laws of multiple states is typical and unremarkable. *Rousso v. State*, 204 P.3d 243, 363–64 (Wash. App. Ct. 2009) ("[I]t is common for firms doing business in the United States to incur costs learning about and complying with fifty state regulations..... Absent a showing that the local regulation is excessive under the balancing test,...there should be no further concern about inconsistent Internet regulations.") (quotations omitted); *SPGGC, LLC v. Blumenthal*, 505 F.3d 183, 196 (2d Cir. 2007) ("Consumer protection matters are typically left to the control of the states precisely so that different states can apply different regulatory standards based on what is locally appropriate.").

(quotations omitted, collecting authorities); *SPGGC*, 505 F.3d at 196 ("The fact that an ordinary commercial transaction happens to occur in cyberspace does not insulate it from otherwise applicable state consumer protection laws….. [Defendant] does not state a valid claim for relief under the dormant Commerce Clause simply because it conducts business over the internet.").

Atrius cites no case where any court has ever held a wiretap or similar law unconstitutional on dormant Commerce Clause grounds. Courts that have addressed the issue uphold wiretap statutes against dormant Commerce Clause challenges. *Zephyr v. Saxon Mortg. Servs.*, 873 F. Supp. 2d 1223, 1230–32 (E.D. Cal. 2012) (rejecting dormant Commerce Clause challenge to California wiretap act **even where the intercepting party is outside of California**, reasoning conduct does not occur "in entirely another state" because one party to the communication was in California, and there is no "differential treatment of in-state versus out-of-state" parties committing the violation, and burdens on interstate commerce are only "incidental"); *Ades v. Omni Hotels Mgmt. Corp.*, 46 F. Supp. 3d 999, 1012–14 (C.D. Cal. 2014) (same); *Pepper v. Charitable Res. Found.*, 2014 U.S. Dist. LEXIS 206307, at *13 (C.D. Cal. Oct. 14, 2014) (same).

## III. CONCLUSION

For the foregoing reasons, the Court should remand this action to the Business Litigation Session of the Superior Court for the Commonwealth of Massachusetts.

Dated: May 26, 2023

*/s/ Patrick J. Vallely*
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
**SHAPIRO HABER & URMY LLP**
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

***Attorneys for Plaintiff***

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading was filed electronically through the Court's electronic filing system and that notice of this filing will be sent to all counsel of record in this matter by operation of the Court's ECF system.

Dated: May 26, 2023

*/s/ Patrick J. Vallely*
Patrick J. Vallely

15

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JANE DOE,

For herself and the Class,

Plaintiff,

v.

ATRIUS HEALTH, INC.

Defendant.

Civil Action No. 1:23-cv-10923

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
OCT 30 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

**DEFENDANT'S ASSENTED-TO MOTION TO EXTEND TIME**

Defendant Atrius Health, Inc. ("Defendant") moves to extend the deadline to respond to Plaintiffs Jane Doe's ("Plaintiff") Complaint to thirty days after Plaintiff's anticipated motion to remand is decided by the Court.

Plaintiff filed the Complaint on March 10, 2023 in the Business Litigation Session of the Suffolk County Superior Court, Case No. 2384CV00597-BLS1. Defendant accepted service on March 28, 2023, and removed the action to this Court on April 27, 2023. The deadline for Defendant to file its responsive pleading is currently May 29, 2023. Counsel for Plaintiff has advised that they now intend to file a motion to remand the action back to Superior Court.

To conserve the resources of the Court, and the parties and to promote the efficient adjudication of this action, Defendant's response to the Class Action Complaint and associated briefing should be deferred until after the Court decides Plaintiffs' motion to remand.[1] With

[1] Courts in this District, including this one, have granted like extensions in cases removed on substantially similar grounds where a motion to remand is forthcoming. *See Doe v. UMass Memorial Health Care, Inc.*, Case No. 4:22-cv-12022-ADB, ECF No. 8 (D. Mass. Dec. 5, 2022); *Doe v. Atrius Health, Inc.*, Case No. 1:22-cv-12196-FDS, ECF No. 11 (D. Mass. Dec. 30, 2022).

Plaintiff's assent, Defendant respectfully requests that the Court extend Defendant's deadline to respond to the Complaint to thirty days after Plaintiff's forthcoming motion to remand is decided. The requested extension will not alter any other deadlines set by the Court.

**CERTIFICATE PURSUANT TO LOCAL RULE 7.1(a)(2)**

Counsel for Defendant certify that they have conferred with Plaintiff's counsel of record on this motion and that Plaintiff's counsel assents to the motion.

Dated: May 8, 2023

Respectfully submitted,

By: */s/ Anthony E. Fuller*

Anthony E. Fuller (BBO #663246)
Maria R. Durant (BBO # 558906)
Kayla H. Ghantous (BBO # 709197)
125 High Street, Suite 2010
Boston, MA 02110
Telephone: (617) 371-1000
Facsimile: (617) 371-1037
maria.durant@hoganlovells.com
kayla.ghantous@hoganlovells.com

Allison Holt Ryan*
Adam A. Cooke (BBO # 679637)
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
allison.holt-ryan@hoganlovells.com
adam.a.cooke@hoganlovells.com

**Pro hac vice application forthcoming*

*Counsel for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 8, 2023, copies of the foregoing Motion to Extend Time were sent via electronic mail, as indicated below, to:

Edward F. Haber
Michelle H. Blauner
Patrick J. Vallely
SHAPIRO HABER
& URMY LLP
One Boston Place
Suite 2600
Boston, MA 02108
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Counsel for Plaintiff Jane Doe, For herself and the Class*

/s/ *Anthony E. Fuller*
Anthony E. Fuller

*Counsel for Defendant*

I HEREBY ATTEST AND CERTIFY ON January 9, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: Margaret M [signature]
Asst. Clerk

23-597-BLS1 Suffolk Superior Court 17

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JANE DOE, on behalf of herself and all others similarly situated,

Plaintiff,

v.

ATRIUS HEALTH, INC., *et al.*,

Defendant.

Case No.: 1:23-cv-10923-FDS

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
OCT 30 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

**ASSENTED-TO MOTION FOR LE AVE TO FILE**
**REPLY MEMORANDUM ON MOTION TO REMAND**

Pursuant to L.R. 7.1(b)(3), Plaintiff respectfully seeks leave to file a reply memorandum not to exceed three (3) pages in support of its motion to remand. Plaintiff filed a motion to remand this case to the Massachusetts Superior Court on May 26, 2023. ECF 19. Defendant opposed the motion on June 23, 2023. ECF 23. Plaintiff seeks to file a targeted, three-page reply to respond to Atrius's arguments and to bring to the Court's attention additional pertinent decisions in cases involving similar issues. Plaintiff conferred with Defendant, who assents to the relief sought in this motion (leave to file a reply brief).

For the foregoing reasons, Plaintiff respectfully requests leave to file a three-page reply in support of her motion to remand. Should this Court grant this motion for leave, Plaintiff will file her reply memorandum within two business days of the Court granting leave.

Dated: July 6, 2023

*/s/ Patrick J. Vallely*
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
**SHAPIRO HABER & URMY LLP**
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Attorneys for Plaintiff*

I HEREBY ATTEST AND CERTIFY ON January 9, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: Asst. Clerk

**CERTIFICATE PURSUANT TO LOCAL RULE 7.1(A)(2)**

Counsel for Plaintiff certifies that they conferred with counsel with counsel for Defendant on June 28, 2023; June 29, 2023; and July 5, 2023, and attempted in good faith to reach agreement on this motion. Defendant on July 5, 2023 indicated that it assents to the relief requested in this motion.

Dated: July 6, 2023

*/s/ Patrick J. Vallely*
Patrick J. Vallely

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading was filed electronically through the Court's electronic filing system and that notice of this filing will be sent to all counsel of record in this matter by operation of the Court's ECF system.

Dated: July 6, 2023

*/s/ Patrick J. Vallely*
Patrick J. Vallely

18

23-597BLS1 Suffolk Superior Court

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
OCT 30 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JANE DOE, on behalf of herself and all others similarly situated,

Plaintiff,

v.

ATRIUS HEALTH, INC., *et al.*,

Defendant.

Case No.: 1:23-cv-10923-FDS

**Leave to file granted per ECF No. 25**

**PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF HER MOTION TO REMAND**

Plaintiff Jane Doe respectfully submits this Reply Memorandum in Support of Plaintiff's Motion to Remand to briefly respond to Defendant Atrius's arguments in opposition to the Motion to Remand and to advise the Court of thirteen recent additional federal court decisions that remanded to state court similar actions that had been removed pursuant to the Federal Officer Removal Statute.

In Plaintiff's May 26, 2023, Memorandum of Law in Support of Plaintiff's Motion to Remand (ECF 20) ("Plaintiff's Opening Memorandum"), at 2, Plaintiffs cited eight recent federal district court decisions—all issued in 2023–that rejected the removal pursuant to the Federal Officer Removal Statute of cases involving tracking technologies similar to the claims here. They included Judge Stearns' decision in *Doe v. Cape Cod Health Care,* No. 1:23-cv-10080, ECF 10 (D. Mass. Jan. 25, 2023), which Plaintiff quoted at length at pages 6–7 of Plaintiff's Opening Memorandum, ECF No. 20.

In response, Atrius says it "respectfully disagrees with the reasoning of these courts, including Judge Stearns's margin order issued in *Doe v. Cape Cod Healthcare.*" ECF 23, at 19. But, most tellingly, Atrius does not cite any recent contrary decisions **because there are none**. To the best of Plaintiff's counsel's knowledge, informed by their careful research, no federal court since the two discredited 2020

decisions addressed in Plaintiff's Opening Memorandum[1] have sustained removal pursuant to the Federal Officer Removal Statute of cases involving tracking technologies. Rather, the federal courts continue to uniformly reject removal of these cases.

This is seen in thirteen additional recent district court decisions that have ordered remand of similar cases removed pursuant to the Federal Officer Removal Statute. These decisions include a trio of decisions issued by Judge Burroughs of this District in three related cases against UMass Memorial. *Doe v. Umass Mem'l Health Care, Inc.*, No. 22-cv-12022-ADB, 2023 U.S. Dist. LEXIS 131491 (D. Mass. July 13, 2023); *Progin v. UMass Mem'l Health CARE, Inc.*, No. 23-cv-10113-ADB, 2023 U.S. Dist. LEXIS 131490 (D. Mass. July 13, 2023); *Colleton v. UMass Mem'l Health Care, Inc.*, No. 22-cv-40154-ADB, 2023 U.S. Dist. LEXIS 120379 (D. Mass. July 13, 2023).

Ten decisions from various courts outside of this District have recently reached the same conclusion. *Doe v. Cedars-Sinai Health Sys.*, 2023 U.S. Dist. LEXIS 71443 (C.D. Cal. Apr. 24, 2023); *Browne v. Cedars-Sinai Health Sys.*, 2023 U.S. Dist. LEXIS 73143 (C.D. Cal. Apr. 26, 2023); *Beltran v. Cedars-Sinai Health Sys.*, 2023 U.S. Dist. LEXIS 90987 (C.D. Cal. May 24, 2023); *Davis v. Hoag Memorial Hospital Presbyterian*, 2023 U.S. Dist. LEXIS 108882 (C.D. Cal. June 23, 2023); *Beauford v. Johns Hopkins Health Sys. Corp.*, No. JKB-23-0660, 2023 U.S. Dist. LEXIS 113333 (D. Md. June 27, 2023); *Horton v. Willis-Knighton Med. Ctr.*; No. 1:23-CV-00314, 2023 U.S. Dist. LEXIS 146745 (W.D. La. July 27, 2023); *Martin v. LCMC Health Holdings, Inc.*, No. 23-411, 2023 U.S. Dist. LEXIS 122961 (E.D. La. July 5, 2023); *Doe v. Christ Hosp.*, No. 1:23-cv-27, 2023 U.S. Dist. LEXIS 129792 (S.D. Ohio July 26, 2023); *Doe v. Mosaic Health Sys.*, No. 23-06008-CV-SJ-JAM, 2023 U.S. Dist. LEXIS 140560 (W.D. Mo. July 20, 2023); *Valladolid v. Mem'l Health Servs.*, No. CV 23-3007-MWF (ASx), 2023 U.S. Dist. LEXIS 111559 (C.D. Cal. June 27, 2023).

In language completely applicable here, the Court in *Davis* explained:

> [W]hile the Meaningful Use program may subject private entities like [Defendant] Hoag to some degree of government control, "'simply complying with a law or regulation is not

[1] *Doe v. UPMC*, 2020 U.S. Dist. LEXIS 136077 (W.D. Pa. July 31, 2020) ("*UPMC*"), and *Doe v. ProMedica Health Sys.*, 2020 U.S. Dist. LEXIS 244916 (N.D. Ohio Oct. 30, 2020) ("*ProMedica*") discussed in Plaintiff's Opening Memorandum at 2, 8 and 15.

> enough to 'bring a private person within the scope of the statute.'" *Saldana v. Glenhaven Healthcare LLC*, 27 F.4th 679, 684 (9th Cir. 2022) (citation omitted).... Indeed, this Court and multiple other courts in this Circuit have rejected Hoag's arguments and held that compliance with the Meaningful Use program is insufficient to support federal officer removal.

*Id.* at *8.

One final observation: In its opposition, Atrius utterly fails to acknowledge, let alone address, the fundamental point made by Judge Stearns in *Cape Cod*:

> If one takes the defendant's reasoning to its logical conclusion, the federal officer removal statute would sweep into the federal courts any case involving an instance in which a third party voluntarily incorporated in its business model a practice consistent with a policy promoted by the federal government as socially desirable, which given the size of the federal government and the hundreds of agencies and officials issuing pronouncements on its behalf, would apply to nearly the entire gamut of human behavior. This is inconsistent with the constitutional role of the federal court as a court of limited jurisdiction.

Ex. A to Plaintiff's Opening Memorandum.

This Court does not have jurisdiction over this removed action, and the Court must remand it to the Business Litigation Session of the Massachusetts Suffolk Superior Court, where Plaintiff filed it.

Dated: September 11, 2023

/s/ Patrick J. Vallely
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
**SHAPIRO HABER & URMY LLP**
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

***Attorneys for Plaintiff***

I HEREBY ATTEST AND CERTIFY ON January 9, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Asst. Clerk

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading was filed electronically through the Court's electronic filing system and that notice of this filing will be sent to all counsel of record in this matter by operation of the Court's ECF system.

Dated: September 11, 2023

*/s/ Patrick J. Vallely*
Patrick J. Vallely

23-5978LS1 Suffolk Superior Court

19

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Certified to be a true and correct copy of the original
Robert M. Farrell, Clerk
U.S. District Court
District of Massachusetts
By: [signature] Deputy Clerk
Date: 10/25/2023

| | |
|---|---|
| JANE DOE, et al., Plaintiff, v. ATRIUS HEALTH, INC., Defendant. | Civil Action No. 23-10923-FDS |

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
OCT 30 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

**MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION TO REMAND**

**SAYLOR, C.J.**

This is a putative class action against a non-governmental healthcare provider alleging systematic violation of patients' state-law privacy rights. The complaint was originally filed in the Suffolk County Superior Court before being removed to federal court under 28 U.S.C. § 1442(a)(1). Plaintiffs have moved to remand, contending that federal subject-matter jurisdiction is lacking because defendant has failed to meet the requirements of § 1442(a)(1). For the reasons set forth below, the motion to remand will be granted.

## I. Background

### A. Factual Background

Atrius Health, Inc. is the parent company for dozens of medical practices in Massachusetts. (Compl. ¶ 13). Its principal place of business is in Massachusetts, and it is a Massachusetts corporation. (*Id.* ¶ 11). Atrius operates websites designed for patient communications, scheduling, searching for physicians, paying bills, requesting medical records, learning about medical issues, and joining support groups. (*Id.* ¶¶ 14-15).

The complaint alleges that plaintiff is a patient of Atrius and regularly visits its websites and enters data, including personal health information. (*Id.* ¶ 10). The complaint alleges that Atrius's websites utilized Google Analytics and Facebook's Meta Pixel tools—computer codes that track users' activities on a website, allowing that information to be processed and analyzed by Google or Facebook, and shared with third-party advertisers. (*Id.* ¶¶ 26-40).

In its notice of removal, Atrius asserts that it acted in accordance with a series of federal programs that sought to create a nationwide health-information technology infrastructure. (Notice ¶ 11).

**1. <u>Federal Regulatory Framework</u>**

In 2004, President Bush ordered the Secretary of Health and Human Services to establish the position of National Health Information Technology Coordinator. Exec. Order No. 13,335, 69 Fed. Reg. 24,059 (Apr. 27, 2004). The Executive Order specified that the Coordinator "shall, to the extent permitted by law, develop, maintain, and direct the implementation of a strategic plan to guide the nationwide implementation of interoperable health information technology in both the public and private health care sectors." *Id.*

In 2009, Congress passed the Health Information Technology for Economic and Clinical Health Act ("HITECH Act"). *See* American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115 (2009). The Act codified the Office of the National Coordinator for Health Information Technology ("ONC"). 42 U.S.C. § 300jj-11(a). The ONC is headed by a National Coordinator, who is directed to "update the Federal Health IT Strategic Plan . . . to include specific objectives, milestones, and metrics" regarding "[t]he electronic exchange and use of health information and the enterprise integration of such information," as well as

"[s]trategies to enhance the use of health information technology in improving the quality of health care." *Id.* § 300jj-11(c)(3)(A).

In 2010, HHS adopted the Meaningful Use program.[1] *See* Medicare and Medicaid Programs; Electronic Health Record Incentive Program, 75 Fed. Reg. 44314-01 (Jul. 28, 2010). HHS stated that the program is aimed at using "[c]ertified [electronic health record] technology" "in a meaningful way" as "one piece of a broader [health-information technology] infrastructure needed to reform the health care system and improve health care quality, efficiency, and patient safety." *Id.* at 44321. To achieve that goal, payment incentives are provided to certain healthcare providers "who adopt and meaningfully use certified electronic health record (EHR) technology." 42 C.F.R. § 495.2(a).

Over the years, the federal government has incorporated the goals of the Meaningful Use program into a series of other initiatives, including the Merit-Based Incentive Payment System ("MIPS"), and the Primary Care First program. *See, e.g.*, 45 C.F.R. § 170.315(e)(3).

**B. Procedural History**

On March 10, 2023, plaintiff filed a putative class action complaint in the Suffolk County Superior Court against Atrius. The complaint alleges a single count of intercepting wire communications in violation of Mass. Gen. Laws ch. 272, § 99. (Compl. ¶ 104-11).

On April 27, 2023, the case was removed to this court pursuant to the federal-officer removal statute, 28 U.S.C. § 1442(a)(1). On May 26, 2023, plaintiff moved to remand for lack of subject-matter jurisdiction.

[1] The Meaningful Use Program has since been renamed the Promoting Interoperability Program. However, as the parties use the Program's original name, the Court will do the same.

## II. Legal Standards

### A. Motion to Remand

A district court must remand a case to state court if "at any time before final judgment it appears that the district court lacks subject[-]matter jurisdiction." 28 U.S.C. § 1447(c). The removing party bears the burden of establishing federal jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

### B. Removal Under § 1442(a)(1)

The federal-officer removal statute provides that a civil action commenced in state court may be removed if it is against or directed to:

> The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

28 U.S.C. § 1442(a)(1).

The removing party "bears the burden under § 1442(a)(1) to establish: (1) that it was acting under a federal officer's authority; (2) that the charged conduct was carried out for or relating to the asserted official authority; and (3) that it will assert a colorable federal defense to the suit." *Moore v. Electric Boat Corp.*, 25 F.4th 30, 34 (1st Cir. 2022) (internal citations and quotation marks omitted).

## III. Analysis

To succeed in its contention that removal is proper in this case, Atrius must show that it was "acting under a federal officer's authority." *Rhode Island v. Shell Oil Prods*, 979 F.3d 50, 59 (1st Cir. 2020), *summarily vacated on other grounds*, 141 S. Ct. 2666, 210 (2021). "'Acting under' connotes 'subjection, guidance, or control' and involves 'an effort to assist, or to help carry out, the duties or tasks of the federal superior.'" *Id.* (quoting *Watson v. Philip Morris Cos.*,

551 U.S. 142, 152 (2007)). "A private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase 'acting under' a federal 'official[,]' . . . even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored." *Watson*, 551 U.S. at 153.

Here, Atrius contends that its alleged use of Google Analytics and Facebook's Meta Pixel tools are part of its effort to comply voluntarily with regulations that assist the government with its goal of enhancing patient engagement with EHR and supporting the creation of infrastructure to promote adoption of nationwide interoperable health-information technology. Without more, that is insufficient to support federal-officer removal, because even "a highly regulated firm cannot find a statutory basis for removal in the fact of federal regulation alone." *Id.*

While a contract or formal delegation might be sufficient to place defendant under a federal officer's authority, neither is alleged to be present here. *See id.* at 153-54; *Moore*, 25 F.4th at 34 n.3. Instead, Atrius relies on the direction and incentive payments it receives through the various federal programs as creating something "akin to a government-contractor relationship." (Notice ¶ 31).

That is also insufficient. The issue of federal-officer removal in cases involving healthcare providers such as Atrius that receive incentive payments for increasing patient access to EHRs is not one of first impression. An overwhelming majority of district courts, including in this district, have remanded similar data-privacy cases to state courts. *See, e.g.*, *Progin v. UMass Mem'l Health Care, Inc.*, 2023 WL 4535129, at *4 (D. Mass. July 13, 2023) ("[T]he fact that incentive payments will, in the future, shift to penalty payments if a provider fails to comply with the Meaningful Use Program further suggests that this is a regulation rather than a government contract."); *Quinto v. Regents of Univ. of California*, 2023 WL 1448050, at *2 (N.D. Cal. Feb. 1,

2023) ("[R]eceiving incentive payments for acting in a way that promotes a broad federal interest—in an area outside the traditional responsibility of the federal government—is not the same as being contracted to carry out, or assist with, a basic governmental duty."); *Doe v. BJC Health Sys.*, 2023 WL 369427, at *4 (E.D. Mo. Jan. 10, 2023); *Doe v. Cape Cod Healthcare, Inc.*, No. 23-cv-10080, slip op. at 10 (D. Mass. Jan. 25, 2023); *Crouch v. Saint Agnes Med. Ctr.*, 2023 WL 3007408, at *4 (E.D. Cal. Apr. 19, 2023); *Mohr v. Trustees of Univ. of Pennsylvania*, 2023 WL 3044594, at *5 (E.D. Pa. Apr. 20, 2023); *Browne v. Cedars-Sinai Health Sys.*, 2023 WL 3095551, at *3 (C.D. Cal. Apr. 26, 2023); *Beltran v. Cedars-Sinai Health Sys.*, 2023 WL 3620740, at *3 (C.D. Cal. May 24, 2023).

Defendant cites two district-court decisions that agree with its theory of federal-officer jurisdiction. (*See* Notice ¶ 12 (citing *Doe v. UPMC*, 2020 WL 4381675 (W.D. Pa. July 31, 2020); *Doe v. ProMedica Health Sys., Inc.*, 2020 WL 7705627 (N.D. Ohio Oct. 30, 2020))). However, these opinions are unpersuasive and inapposite given the precedent in this circuit. *See Moore*, 25 F.4th at 34; *Rhode Island*, 979 F.3d at 60.

Atrius's compliance in exchange for incentive payments under the Meaningful Use program, MIPS, or the Primary Care First program does not constitute "assist[ing]" the federal government in the "duties or tasks of the federal superior." Rather, Atrius is a private entity that voluntarily participates in federal incentive programs for its own financial gain. Activity of that sort does not fall within the ambit of the federal-officer removal statute. Accordingly, remand to Massachusetts state court is proper. Because that factor is dispositive, the Court need not consider whether Atrius's actions "relat[e] to the asserted official authority" or whether "it will assert a colorable federal defense to the suit."

## IV. Conclusion

For the foregoing reasons, the Court finds that it lacks subject-matter jurisdiction over this matter, and the matter is not removable under 28 U.S.C. § 1442(a)(1). Plaintiffs' motion to remand is therefore GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Chief Judge, United States District Court

Dated: October 25, 2023

I HEREBY ATTEST AND CERTIFY ON January 9, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: [signature]
Asst. Clerk

20

23-5978LS1

Suffolk Superior Court

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
OCT 30 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

**R.N. Jane Doe**

Plaintiff

CIVIL ACTION

V.

NO. 1:23-10923-FDS

**Atrius Health, Inc.**

Defendant

**ORDER OF REMAND**

Saylor, C. J.

In accordance with the Court's Memorandum and Order dated October 25, 2023 (Dkt. No. 27), the above-entitled action is hereby REMANDED to Suffolk County Superior Court.

10/25/2023
Date

/s/ Flaviana de Oliveira
Deputy Clerk

Certified to be a true and correct copy of the original
Robert M. Farrell, Clerk
U.S. District Court
District of Massachusetts

By: Flaviana de Oliveira
Deputy Clerk

Date: 10/25/2023

I HEREBY ATTEST AND CERTIFY ON January 9, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: [signature]
Asst. Clerk

23-597 BLS1 Suffolk Superior Court

CLOSED 21

**United States District Court**
**District of Massachusetts (Boston)**
**CIVIL DOCKET FOR CASE #: 1:23-cv-10923-FDS**

Doe v. Atrius Health, Inc.
Assigned to: Chief Judge F. Dennis Saylor, IV
related Case: 1:22-cv-12196-FDS
Case in other court: Commonwealth of Massachusetts, 2384CV00597-BLS1
Cause: 28:1442 Notice of Removal

Date Filed: 04/27/2023
Date Terminated: 10/25/2023
Jury Demand: Plaintiff
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: Federal Question

**Plaintiff**

**R.N. Jane Doe**
*For herself and the Class*

represented by **Edward F. Haber**
Shapiro Haber & Urmy LLP
One Boston Place
Suite 2600
Boston, MA 02108
617-439-3939
Email: ehaber@shulaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michelle H. Blauner**
Shapiro Haber & Urmy LLP
One Boston Place
Suite 2600
Boston, MA 02108
617-439-3939
Email: mblauner@shulaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick J. Vallely**
Shapiro Haber & Urmy LLP
One Boston Place
Suite 2600
Boston, MA 02108
617-439-3939
Email: pvallely@shulaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Certified to be a true and correct copy of the original
Robert M. Farrell, Clerk
U.S. District Court
District of Massachusetts

By: Flaviana de Oliveira
Deputy Clerk

Date: 10/25/2023

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED

OCT 30 2023

I HEREBY ATTEST AND CERTIFY ON January 9, 2025 THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: [signature]
Asst. Clerk

V.

**Defendant**

| | | |
|---|---|---|
| **Atrius Health, Inc.** | represented by | **Allison M. Holt-Ryan**<br>Hogan Lovells US LLP<br>555 Thirteenth Street, N.W.<br>Washington, DC 20004-1109<br>202-637-5600<br>Email: allison.holt@hoganlovells.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Anthony E. Fuller**<br>Hogan Lovells US LLP<br>125 High Street<br>Suite 2010<br>Boston, MA 02110<br>617-371-1000<br>Fax: 617-371-1037<br>Email: anthony.fuller@hoganlovells.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Adam A. Cooke**<br>Hogan Lovells US LLP<br>555 Thirteenth Street, N.W.<br>Washington, DC 20004-1109<br>202-637-5479<br>Email: adam.a.cooke@hoganlovells.com<br>*ATTORNEY TO BE NOTICED*<br><br>**Kayla Ghantous**<br>Hogan Lovells US LLP<br>125 High Street<br>Suite 2010<br>Boston, MA 02110<br>781-308-8610<br>Email: kayla.ghantous@hoganlovells.com<br>*ATTORNEY TO BE NOTICED*<br><br>**Maria R. Durant**<br>Hogan Lovells US LLP<br>125 High Street<br>Suite 2010<br>Boston, MA 02110<br>617-371-1000/617-371-1024<br>Fax: 617-371-1037<br>Email: maria.durant@hoganlovells.com<br>*ATTORNEY TO BE NOTICED* |

Email All Attorneys
Email All Attorneys and Additional Recipients

| Date Filed | # | Docket Text |
|---|---|---|
| 04/27/2023 | 1 | NOTICE OF REMOVAL by Atrius Health, Inc. ( Filing fee: $ 402, receipt number AMADC-9829133 Fee Status: Filing Fee paid) (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit G, # 6 Exhibit H, # 7 Exhibit I, # 8 Exhibit J, # 9 Exhibit K, # 10 Exhibit L, # 11 Exhibit M, # 12 Exhibit N, # 13 Exhibit O, # 14 Exhibit P, # 15 Exhibit Q, # 16 Exhibit R, # 17 Exhibit S, # 18 Exhibit T, # 19 Civil Cover Sheet, # 20 Category Form, # 21 Local Rule 40.1(g)(5)(B) Certification)(Fuller, Anthony) (Entered: 04/27/2023) |
| 04/27/2023 | 2 | CORPORATE DISCLOSURE STATEMENT by Atrius Health, Inc.. (Fuller, Anthony) (Entered: 04/27/2023) |
| 04/27/2023 | 3 | NOTICE of Appearance by Anthony E. Fuller on behalf of Atrius Health, Inc. (Fuller, Anthony) (Entered: 04/27/2023) |
| 04/27/2023 | 4 | NOTICE of Appearance by Maria R. Durant on behalf of Atrius Health, Inc. (Durant, Maria) (Entered: 04/27/2023) |
| 04/27/2023 | 5 | NOTICE of Appearance by Adam A. Cooke on behalf of Atrius Health, Inc. (Cooke, Adam) (Entered: 04/27/2023) |
| 04/27/2023 | 6 | NOTICE of Appearance by Kayla Ghantous on behalf of Atrius Health, Inc. (Ghantous, Kayla) (Entered: 04/27/2023) |
| 04/28/2023 | 7 | ELECTRONIC NOTICE of Case Assignment. Chief Judge F. Dennis Saylor, IV assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Judith G. Dein. (Finn, Mary) (Entered: 04/28/2023) |
| 04/28/2023 | 8 | Certified Copy of Notice of Removal Provided to Defense Counsel by mail (Geraldino-Karasek, Clarilde) (Entered: 04/28/2023) |
| 04/28/2023 | 9 | EXHIBIT re 1 Notice of Removal,, *(EXHIBIT E)* by Atrius Health, Inc.. (Fuller, Anthony) (Entered: 04/28/2023) |
| 04/28/2023 | 10 | EXHIBIT re 1 Notice of Removal,, *(EXHIBIT F)* by Atrius Health, Inc.. (Fuller, Anthony) (Entered: 04/28/2023) |
| 05/08/2023 | 11 | Assented to MOTION for Extension of Time to Respond to Plaintiff's Complaint by Atrius Health, Inc..(Fuller, Anthony) (Entered: 05/08/2023) |
| 05/08/2023 | 12 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 11 Assented to MOTION for Extension of Time to Respond to Plaintiff's Complaint. Response due 30 days after Motion to Remand is ruled on. (McKillop, Matthew) (Entered: 05/08/2023) |
| 05/08/2023 | 13 | MOTION for Leave to Appear Pro Hac Vice for admission of Allison Holt Ryan Filing fee: $ 125, receipt number AMADC-9844153 by Atrius Health, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Ghantous, Kayla) (Entered: 05/08/2023) |
| 05/08/2023 | 14 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 13 Motion for Leave to Appear Pro Hac Vice Added Allison Holt Ryan.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account,** |

| | | |
|---|---|---|
| | | **not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(Dore, Samantha) (Entered: 05/08/2023) |
| 05/15/2023 | 15 | NOTICE of Appearance by Allison M. Holt-Ryan on behalf of Atrius Health, Inc. (Holt-Ryan, Allison) (Entered: 05/15/2023) |
| 05/18/2023 | 16 | STATE COURT Record. (Ghantous, Kayla) (Entered: 05/18/2023) |
| 05/26/2023 | 18 | NOTICE of Appearance by Patrick J. Vallely on behalf of Jane Doe (Vallely, Patrick) (Entered: 05/26/2023) |
| 05/26/2023 | 19 | MOTION to Remand by Jane Doe.(Vallely, Patrick) (Entered: 05/26/2023) |
| 05/26/2023 | 20 | MEMORANDUM in Support re 19 MOTION to Remand filed by Jane Doe. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Vallely, Patrick) (Entered: 05/26/2023) |
| 06/01/2023 | 21 | Assented to MOTION for Extension of Time to File Response/Reply as to 19 MOTION to Remand *Until June 23, 2023* by Atrius Health, Inc..(Fuller, Anthony) (Entered: 06/01/2023) |
| 06/08/2023 | 22 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 21 Assented to MOTION for Extension of Time to File Response/Reply as to 19 MOTION to Remand *Until June 23, 2023* (McKillop, Matthew) (Entered: 06/08/2023) |
| 06/23/2023 | 23 | Opposition re 19 MOTION to Remand filed by Atrius Health, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Proposed Order) (Fuller, Anthony) (Entered: 06/23/2023) |
| 07/06/2023 | 24 | Assented to MOTION for Leave to File *Reply Memorandum on Motion to Remand* by Jane Doe.(Vallely, Patrick) (Entered: 07/06/2023) |
| 08/10/2023 | 25 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 24 Assented to MOTION for Leave to File Reply Memorandum on Motion to Remand. (McKillop, Matthew) (Entered: 08/10/2023) |
| 09/11/2023 | 26 | REPLY to Response to 19 MOTION to Remand filed by Jane Doe. (Vallely, Patrick) (Entered: 09/11/2023) |
| 10/25/2023 | 27 | Chief Judge F. Dennis Saylor, IV: ORDER entered. MEMORANDUM AND ORDER.<br><br>For the foregoing reasons, the Court finds that it lacks subject-matter jurisdiction over this matter, and the matter is not removable under 28 U.S.C. § 1442(a)(1). Plaintiffs' motion to remand (Dkt. No. 19 ) is therefore GRANTED. |

| | | |
|---|---|---|
| | | **So Ordered.** (de Oliveira, Flaviana) (Entered: 10/25/2023) |
| 10/25/2023 | 28 | Chief Judge F. Dennis Saylor, IV: ORDER entered. ORDER OF REMAND to Suffolk County Superior Court. (de Oliveira, Flaviana) (Entered: 10/25/2023) |
| 10/25/2023 | 29 | Case file sent to Suffolk County Superior Court. (de Oliveira, Flaviana) (Entered: 10/25/2023) |

Date Filed 11/16/2023 [redacted]PM
Superior Court - Suffolk
Docket Number 2384CV00597

11/21 NOTIFY 22

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss. SUPERIOR COURT

| | |
|---|---|
| JANE DOE, For herself and the Putative Class,<br>Plaintiff,<br>v.<br>ATRIUS HEALTH, INC.,<br>Defendant. | Civil Action No. 2384-cv-00597-BLS1<br>kg |

**ATRIUS HEALTH, INC.'S ASSENTED-TO MOTION TO STAY DEADLINE TO RESPOND TO COMPLAINT**

Defendant Atrius Health, Inc. ("Atrius") moves with the assent of Plaintiff Jane Doe ("Plaintiff") (collectively, with Atrius, the "Parties"), to stay Atrius' deadline to respond to Plaintiff's Complaint. As grounds for this Motion, Atrius states that another putative class action with similar allegations against Atrius, *Doe v. Atrius Health, Inc.*, Civil Action No. 2382-cv-00982, is pending in Norfolk County Superior Court ("Norfolk County Action"). To conserve the Court's and the Parties' resources, Atrius, with the assent of the plaintiffs in the Norfolk County Action, will move to transfer that Action to the Business Litigation Session ("BLS"), which is already overseeing more than ten putative class actions with similar allegations. If the BLS accepts the Norfolk County Action, Atrius understands that Plaintiff in this case and the plaintiffs in the Norfolk County Action will undertake to consolidate the two cases. Atrius therefore seeks to stay its deadline to respond to Plaintiff's Complaint until a schedule is entered following the Norfolk County Action's acceptance into the BLS.

11-20-23 ALLOWED. H. Karanjian, J.

**ARGUMENT**

On March 10, 2022, Plaintiff filed her Complaint in this Court. Plaintiff alleges in the

Complaint that through use of certain technologies on Atrius' website, information about visitors' interactions with the website was sent to third parties without their knowledge or consent. Based on these allegations, Plaintiff asserts a claim under the Massachusetts Wiretap Act. Atrius denies these allegations and maintains that Plaintiff's claims fail as a matter of law. On April 27, 2023, Atrius removed this action to the United States District Court for the District of Massachusetts, which remanded the case on October 25, 2023. The United States District Court for the District of Massachusetts also remanded the Norfolk County Action on October 20, 2023, after Atrius removed it on December 23, 2023.

Atrius plans to move to transfer the Norfolk County Action, with the assent of the plaintiffs, to the BLS and to stay its deadline to respond to the complaint in that case. If the BLS accepts the Norfolk County Action, Atrius understands that Plaintiff in this case and the plaintiffs in the Norfolk County Action will undertake to consolidate the actions. In the interests of judicial economy, and to conserve the Court's and Parties' resources, Atrius' deadline to respond to Plaintiff's Complaint in this action should be stayed to facilitate transfer of the Norfolk County Action and consolidation of the cases. Atrius therefore requests that the Court stay its deadline to respond to Plaintiff's Complaint until a schedule is entered following the Norfolk County Action's acceptance into the BLS.

## CONCLUSION

For the reasons set forth above, Atrius requests that the Court stay Atrius' deadline to respond to Plaintiff's Complaint until a schedule is entered following the Norfolk County Action's acceptance into the BLS.

November 16, 2023

Respectfully submitted,

ATRIUS HEALTH, INC.

By their attorneys,

/s/ *Anthony E. Fuller*
Anthony E. Fuller (BBO No. 633246)
Kayla H. Ghantous (BBO No. 709197)
HOGAN LOVELLS US LLP
125 High Street, Suite 2010
Boston, MA 02110
(617) 371-1000
anthony.fuller@hoganlovells.com
kayla.ghantous@hoganlovells.com

Allison Holt Ryan (admitted *pro hac vice*)
Adam A. Cooke (BBO No. 679637)
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600
allison.holt-ryan@hoganlovells.com
adam.a.cooke@hoganlovells.com

I HEREBY ATTEST AND CERTIFY ON January 9, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: Asst. Clerk

**CERTICATE PURSUANT TO LOCAL RULE 7.1**

On November 10, 2023, counsel for Atrius conferred with counsel for Plaintiffs, who do not oppose this Motion.

/s/ *Adam A. Cooke*
Adam A. Cooke

**CERTIFICATE OF SERVICE**

I, Anthony E. Fuller, hereby certify that on November 16, 2023, a copy of the foregoing was filed electronically and served on all counsel of record by email.

/s/ *Anthony E. Fuller*
Anthony E. Fuller

Date Filed 1/22/2024 12:46 PM
Superior Court - Suffolk
Docket Number 2384CV00597

01.24 NOTIFY

23

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss. SUPERIOR COURT

| | |
|---|---|
| JANE DOE, For herself and the Putative Class,<br>Plaintiff,<br>v.<br>ATRIUS HEALTH, INC.,<br>Defendant. | Civil Action No. 2384-cv-00597-BLS1 |

**DEFENDANT'S ASSENTED-TO MOTION TO STAY PROCEEDINGS PENDING COMPLETION OF INTERLOCUTORY APPEALS AND CONSOLIDATION**

Defendant Atrius Health, Inc. ("Atrius") moves with the assent of Plaintiff Jane Doe ("Plaintiff") (collectively, with Atrius, the "Parties"), to stay all proceedings in this case pending completion of interlocutory appeals in two substantially similar lawsuits, *Vita v. Beth Israel Deaconess Med. Cntr., Inc.*, No. 2384CV00480-BLS1 and *Vita v. New England Baptist Hosp.*, No. 2384CV00857-BLS1 (collectively, the "BIDMC and NEBH Cases"), and consolidation of this action with the related action, *Doe v. Atrius Health, Inc.*, No. 2384CV02704-BLS1 (the "Related Action").

On March 10, 2023, Plaintiff initiated this case on behalf of herself and a putative class of Massachusetts residents who, in the previous three years, accessed Atrius' public website while present in the Commonwealth. *See* Dkt. 1 ("Complaint") ¶¶ 11, 96. Plaintiff alleges that Atrius implemented on its website analytics technologies that transmitted to certain third-parties information related to users' browsing activity without their knowledge. *See id.* ¶¶ 1-3. According to Plaintiff, these allegations amount to a violation of the Massachusetts Wiretap Act, Mass. Gen. Laws ch. 272, § 99 (the "Wiretap Statute"). *Id.* ¶¶ 104-11. At least 15 similar cases, including the

1/22/24 After review, ALLOWED. Proceedings in this case are stayed pending a decision in the appeals of Vita v. Beth Israel Deaconess and Vita v. New England Baptist (together, the Vita Appeals). Within 14 days of the decision in the Vita Appeals, the parties shall notify the court and propose three alternative dates in the following 60 days when all parties could attend a Rule 16 conference in this matter. [signature]

Related Action as well as the BIDMC and NEBH Cases, are currently pending in Massachusetts courts.

All proceedings in this case should be stayed during the pendency of the appeals in the BIDMC and NEBH Cases. On October 31, 2023, this Court denied motions to dismiss in both these suits, but reported for interlocutory review its decisions to the Massachusetts Appeals Court, pursuant to Mass. R. Civ. P. 64(a). In reaching that conclusion, the Court observed: "If . . . the Massachusetts Wiretap Statute does not apply to business-related internet tracking, significant judicial and party resources will be saved by the quick resolution of these cases before discovery and other stages of litigation." *Vita v. Beth Israel Deaconess Med. Cntr.. Inc.*, No. 2384CV00480-BLS-1 (Suffolk Super. Ct., Oct. 31, 2023) at 11; *see Vita v. New England Baptist Hosp.*, No. 2384CV00857-BLS-1 (Suffolk Super. Ct., Oct. 31, 2023) at 11 (same). Consistent with that observation, the Court then stayed all further proceedings in the BIDMC and NEBH Cases. And the Court has since stayed proceedings in five similar cases: *Doe v. Boston Med. Cntr. Corp.*, No. 2384CV00326-BLS1; *Doe v. The Children's Hosp. Corp.*, No. 2384CV00411-BLS1; *Nova v. Boston Med. Cntr. Corp.*, No. 2384CV01086-BLS1; and *Doe v. Cape Cod Healthcare, Inc.*, No. 2384CV01236-BLS1; and *Doe v. Baystate Health System, Inc.*, No. 2384CV01949-BLS1. The same relief is warranted here.

The interlocutory appeals in the BIDMC and NEBH Cases present a question central to this litigation: whether the alleged use of analytics technologies on a public website can amount to a violation of the Wiretap Statute. Because the answer to that question could be dispositive of this suit, and because Plaintiff does not oppose this relief, a stay pending the resolution of the interlocutory appeals in the BIDMC and NEBH Cases is appropriate.

Further, Atrius understands the plaintiffs in this case and the Related Action intend to

consolidate their suits. Accordingly, on November 16, 2023, Atrius requested the Court to stay its deadline to respond to the Complaint until the Related Action, which was then pending in the Norfolk County Superior Court, could be transferred to the Business Litigation Session ("BLS") for consolidation with this case. *See* Dkt. 22. On November 20, 2023, the Court granted that request, staying Atrius' response deadline until the entry of a schedule following the acceptance of the Related Action into the BLS. The Related Action was accepted into the BLS on November 21, 2023, and its transfer to this Court was effectuated one week later, on November 28, 2023.

For the reasons set forth above, Atrius requests, with Plaintiff's assent, that the Court issue an order granting the following relief:

1. All Superior Court proceedings, time standards, and deadlines in this matter be stayed during the pendency of the interlocutory appeals in the BIDMC and NEBH Cases;
2. No discovery requests or responses, including but not limited to, interrogatories, requests for production of documents, or deposition notices, will be exchanged between the Parties while the stay is in place.
3. After the interlocutory appeals in the BIDMC and NEBH Cases are completed (including the exhaustion or expiration of the Parties' rights to rehearing, reconsideration, or further appellate review), and to the extent consistent with the outcome of the appeals, the stay will be automatically lifted for the limited purpose of consolidation of this case with the Related Action.
4. Fourteen days after this case is consolidated with the Related Action, or the Court denies such consolidation, the stay will be lifted fully and the case will be subject to the schedule entered by the Court.

January 22, 2024

Respectfully submitted,

ATRIUS HEALTH, INC.

By its attorneys,

*/s/ Anthony E. Fuller*
Anthony E. Fuller (BBO No. 633246)
Kayla H. Ghantous (BBO No. 709197)
HOGAN LOVELLS US LLP
125 High Street, Suite 2010
Boston, MA 02110
(617) 371-1000
anthony.fuller@hoganlovells.com
kayla.ghantous@hoganlovells.com

Allison Holt Ryan (admitted *pro hac vice*)
Adam A. Cooke (BBO No. 679637)
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600
allison.holt-ryan@hoganlovells.com
adam.a.cooke@hoganlovells.com

I HEREBY ATTEST AND CERTIFY ON January 9, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: Margaret M. Buckley
Asst. Clerk

## CERTICATE PURSUANT TO LOCAL RULE 7.1

On January 22, 2024, counsel for Atrius conferred with counsel for Plaintiffs, who do not oppose this Motion.

*/s/ Adam A. Cooke*
Adam A. Cooke

## CERTIFICATE OF SERVICE

I, Anthony E. Fuller, hereby certify that on January 22, 2024, a copy of the foregoing was filed electronically and served on all counsel of record by email.

*/s/ Anthony E. Fuller*
Anthony E. Fuller

MS



**COMMONWEALTH OF MASSACHUSETTS**

**Suffolk, ss.**

| | |
|---|---|
| JANE DOE,<br><br>For herself and the Class,<br><br>v.<br><br>ATRIUS HEALTH, INC.<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**<br><br>CIVIL ACTION NO. 2384CV00597-BLS1<br><br>**JURY TRIAL DEMANDED** |

## AMENDED COMPLAINT

Plaintiff Jane Doe[1] ("Plaintiff"), on behalf of herself and the proposed Class (defined below), alleges as follows:

### Preliminary Statement

1. Plaintiff brings this action to remedy the secret interception of the contents of highly sensitive communications between healthcare consumers and the defendant, Atrius Health, Inc. ("Atrius"), including those consumers' individually identifiable health information ("IHII") and protected health information ("PHI") (referred to collectively as "Private Information"). Specifically, Atrius aided in the interception of communications between Plaintiff and other Class Members (defined below) and a website maintained by Atrius (the "Atrius Website"). Atrius assisted in the interception of these communications by Google, Facebook (now known as "Meta," but referred to in this complaint as "Facebook"), and other companies that provide so-called "tracking technology." The Plaintiff's and Class Members' electronic communications with Atrius were secretly and

[1] "Jane Doe" is a pseudonym used to protect the privacy of the Plaintiff, given that this case involves private health information of Jane Doe. Ms. Doe's identity has been disclosed to counsel for the Defendant per the Court's order of March 10, 2023.

contemporaneously intercepted, recorded, and transmitted to these third parties without their knowledge or consent whenever they visited any page of the Atrius Website.

2. Atrius actively aided the secret interceptions of healthcare consumers' communications with their website by injecting hidden code into the website. During the loading of webpages on the Atrius Website, Atrius assists Google, Facebook, and others to intercept communications surreptitiously, including, without limitation, requests for information on particular conditions and treatments, keyword searches, requests for appointments, doctor searches, bill payments, prescription requests, and access to the website's patient portal. Those interceptions enabled the third parties to know that a specific patient was seeking confidential medical care. That recipient, in turn, sells Plaintiff's and Class Members' Private Information to marketers who target Plaintiff and Class Members with online advertisements based on communications obtained via tracking technologies.

3. Atrius did not disclose to healthcare consumers that it helps third parties such as Google and Facebook to intercept the contents of their communications with the Atrius Website, nor did Atrius seek or obtain their consent for such interception. On the contrary, Atrius deceptively tells healthcare consumers that they disclose consumers' information to third parties only in limited circumstances, not including sharing such information with technology or social media companies such as Google or Facebook.

4. Atrius owed common law, contractual, statutory, and regulatory duties to keep Plaintiff's and Class Members' Private Information safe, secure, and confidential. Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Atrius assumed legal and equitable duties to patients to protect and safeguard their Private Information from unauthorized disclosure.

5. Despite the stigmas that, unfortunately, are so often associated with certain health issues and treatments, Atrius chose to put its business interests over the privacy of its patients. The unilateral disclosure of users' Private Information in this manner violated the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. 104-191, 110 Stat. 1936 (codified as amended in scattered § of 42 U.S.C.S.), among other statutory and common laws.

6. As described more fully below, Plaintiff and Class Members have suffered injury as a result of Atrius's conduct. These injuries include (i) invasion of privacy; (ii) unwanted targeted advertisements; (iii) loss of the benefit of the bargain; (iv) diminution of value of the disclosed Private Information; (v) statutory damages; (vi) unjust enrichment; and (vii) the continued and ongoing risk of further disclosure of their Private Information.

7. In this lawsuit, Plaintiff initially asserted a single claim under the Massachusetts Wiretap Act, M.G.L. c. 272 § 99(A). On October 31, 2023, the Massachusetts Superior Court, in similar cases against two other hospitals—Beth Israel Deaconess Medical Center, Inc. and New England Baptist Hospital—denied those hospitals' motions to dismiss but reported that decision for interlocutory review. The Massachusetts Supreme Judicial Court took direct appellate review of those cases. On October 24, 2024, the Supreme Judicial Court reversed the Superior Court's order denying the motion to dismiss in those cases, holding that the Massachusetts Wiretap Act does not encompass the electronic website communications upon which the plaintiffs' claims in those cases were based (which are similar to the communications Plaintiff alleges in this case). *Vita v. New England Baptist Hospital*, 494 Mass. 824 (2024). The Court, however, "emphasize[d] that the Legislature has provided other statutory and common-law causes of action" that may be "cognizable," including "negligence, breach of implied contract, unjust enrichment, breach of fiduciary duty, [and a] right to privacy," including referencing, in particular, the Massachusetts Right to Privacy Act, G.L. c. 214 § 1B. *Id.* at 849-50. The Court also observed that the federal wiretap act, known as the Electronic

Communications Privacy Act ("ECPA") (18 U.S.C. § 2511(1), *et seq.*), had been amended (unlike the Massachusetts act) to unambiguously cover "electronic communications," which is defined in a way that "would appear to cover many website browsing activities." *Id.* at 846.

8. In light of the Supreme Judicial Court's decision, which Plaintiff recognizes implicates her claim here under the Massachusetts Wiretap Act, Plaintiff now amends her complaint to assert new claims under the ECPA, the Massachusetts Privacy Act, and several claims under common law.

9. The ECPA, like the Massachusetts Wiretap Act, prohibits the interception of the content of any electronic communication. Although the ECPA is often described as a one-party consent wiretap statute, the ECPA's prohibitions apply even when one of the parties to the communications knows about the interception if the communication is intercepted for the purpose of committing any criminal or tortious act—that is, in such circumstances, the ECPA becomes a one-party consent statute similar to the Massachusetts Wiretap Act. Here, Atrius intercepted the electronic communications at issue in a manner that violated HIPAA. The ECPA thus provides a private remedy for Atrius's interception of electronic communications, enforceable against both the intercepting party and any party that aids such an interception.

10. Plaintiff now asserts statutory remedies under the ECPA both on her own behalf and on behalf of all other Massachusetts residents who accessed the Atrius Website. Plaintiff also asserts class claims under the Massachusetts Right to Privacy Act, G.L. c. 214 § 1B, and common claims for breach of fiduciary duty, negligence, breach of confidence, breach of contract, and unjust enrichment.

## PARTIES

11. Plaintiff is a resident of Burlington, Massachusetts. Plaintiff is a patient of Atrius. Plaintiff regularly uses the Atrius Website to (i) search for and obtain information about Atrius doctors (including their credentials and backgrounds); (ii) search for information on particular symptoms,

conditions, and medical procedures; and (iii) obtain and review medical records through the website's patient portal.

12. As described below, Atrius implemented tracking technologies that intercepted communications between Atrius and healthcare consumers on nearly every page of the Atrius website. The webpages Plaintiff visited on the Atrius website were among the webpages on which Atrius embedded code for various tracking technologies, including Meta Pixel and Google Analytics. *See* ¶¶ 89-92, *infra* (tracking technologies embedded on webpages used to find doctors); ¶¶ 81-85, *infra* (tracking technologies embedded on pages about symptoms, conditions, and medical procedures); ¶¶ 78-79, *infra* (tracking technologies embedded in way that tracks access to patient portal).

13. Plaintiff did not consent to or authorize the use of Private Information by third parties or Atrius enabling third parties to access and use such Private Information.

14. Defendant Atrius Health, Inc. is a corporation that operates in Boston, Massachusetts. Atrius provides medical services and care to patients in Massachusetts, focusing primarily on primary care and specialty medical services. Atrius currently has approximately 614 primary care and specialty physicians. Atrius Health currently serves approximately 689,000 adult and pediatric patients across eastern Massachusetts with approximately 1.9 million visits annually.

## JURISDICTION

15. The exercise of personal jurisdiction over Atrius is proper according to M.G.L. c. 223 § 3 because, among other things, Atrius is located in and conducts business in Massachusetts, and Plaintiff's claim arises out of Atrius's activities and conduct in the Commonwealth of Massachusetts.

## FACTUAL ALLEGATIONS

**Atrius and Its Website**

16. Atrius operates dozens of healthcare facilities throughout Massachusetts. Atrius offers care to Massachusetts residents across various specialties, including heart and vascular care, orthopedics, gastroenterology, diabetes, surgery, obstetrics and gynecology, and neurology.

17. Atrius maintains the Atrius Website for its medical practices, found at https://www.atriushealth.org/. Through its website, healthcare consumers can obtain information about the services Atrius provides, including information about doctors, services, and treatments provided by Atrius for particular medical conditions.

18. The Atrius Website is designed for communications with healthcare consumers. The website includes the following functions:

(a) The Atrius Website provides general information about Atrius.

(b) The Atrius Website provides information about healthcare services provided at Atrius, communicated through service-specific pages for a range of services such as "Obstetrics/Gynecology," "Neurology," "Psychiatry and Behavioral Health," and "Pediatrics," among many others.

(c) The Atrius Website provides substantive information about specific health conditions, including symptoms and causes of those conditions, diagnoses and treatments, and programs and services offered by Atrius.

(d) The Atrius Website permits healthcare consumers to use a "Find a Doctor" function to search for doctors by condition, specialty, gender, language, and location.

(e) The Atrius Website permits healthcare consumers to book an appointment online through the website.

(f) The Atrius Website permits healthcare consumers to renew their medications online through the website.

(g) The Atrius Website permits healthcare consumers to access and pay bills online.

(h) The Atrius Website lets healthcare consumers access their private medical information online through the MyHealth Online patient portal.

19. Because the Atrius Website provides an interactive experience through which a healthcare consumer can obtain information about particular medical conditions, doctors, specialties, and the website user's own healthcare condition and needs, a website user's interaction with the website reveals information about the website user that the user would expect to remain private.

**Reasonable Expectations of Users of the Atrius Website**

20. Healthcare consumers have an interest in preserving the confidentiality of communications with healthcare providers. Among the ways healthcare consumers communicate with healthcare providers is through those providers' websites, such as the Atrius Website.

21. Users of healthcare-related websites such as the Atrius Website have a legitimate expectation and understanding that their communications with Atrius through the website will be private. They also have a legitimate expectation that healthcare providers such as Atrius will not share with third parties their communications with Atrius without their consent.

22. The expectations and understandings of website users are supported by state law, which prohibits healthcare providers such as Atrius from using or disclosing individuals' "communications" with healthcare providers without valid authorization from the individual. *See* M.G.L. c. 111 § 70E. The expectations and understandings of website users are supported further by federal law, including HIPAA, which prohibits healthcare providers such as Atrius from using or disclosing individuals' protected health information without valid authorization from the individual. See 45 C.F.R. § 164.508(a)(1), (3). No exception allows healthcare providers to share protected information with social media and other technology companies for marketing purposes.

23. Healthcare consumers would **not** anticipate or expect that their communications with healthcare providers, including Atrius, which reveal information about that individual's personal health conditions, will be intercepted and secretly shared with third parties such as Google and Facebook for marketing purposes.

24. The expectations and understanding of users of the Atrius Website are informed by what Atrius tells them and does not tell them about how it handles their personal information.

25. The Atrius website features no pop-up or other prominent notification communicating to visitors of the website that Atrius is using any tracking technologies or otherwise facilitating the interception of communications between healthcare consumers and Atrius.

26. The Atrius Website, until approximately April 6, 2023 (about a month after the initial complaint in this case), did contain a small, inconspicuous link at the bottom of each page to what it describes as a "Web Privacy Statement," but that statement contained no disclosure that Atrius used any tracking technologies or otherwise facilitated the interception of communications between healthcare consumers and Atrius. The Web Privacy Statement, in fact, said nothing about privacy, focusing instead on other issues such as indicating that Atrius does not "practice medicine" through the website, and that material on the website is protected by copyright.

27. On or around April 6, 2023, shortly after this lawsuit was filed (and apparently in response to the initial complaint's allegations), Atrius rolled out a new Online Services Privacy Policy. That policy contains a section entitled "Cookies and Tracking" that discloses tracking technologies in general terms. Although the substance of the disclosure has improved, Atrius still fails to adequately notify website users about these disclosures; there is no clickwrap agreement or even a pop-up that directs website users to the policy. Accordingly, despite the change in disclosure, Atrius continues to fail to adequately disclose to website users its use of tracking technologies and the resulting implications for healthcare consumers' privacy, or to obtain their consent to any such use or disclosure of healthcare consumers' communications.

28. The Atrius Website also contains a "Medical Information Privacy Notice," but that notice contains no disclosure that Atrius uses any tracking technologies or otherwise facilitates the interception of communications between healthcare consumers and Atrius. It does not focus on the

Atrius Website itself but instead discusses Atrius's practices in protecting patient medical information more generally. Although the notice contains disclosures about when Atrius may share "health information" with third parties, such as "for law enforcement purposes" and "for reporting victims of abuse," the notice does not disclose that Atrius shares any information with third-party technology and social media companies such as Google or Facebook or that those third parties may use such information for their own commercial purposes.

29. In short, healthcare consumers expect that their communications with healthcare-related websites will not be shared with third parties without their consent—an understanding reinforced by Atrius's deceptive statements on the Atrius Website. The interceptions of website users' communications with Atrius were, therefore, truly secret and made without any consent from Plaintiff or the other class member website users.

**Third Parties Offering Tracking Technologies**

30. Plaintiff describes in this complaint various tracking technologies implemented on the Atrius Website that cause the secret interception, recording, and transmission of the contents of Class Members' internet communications with Atrius. The next section presents a basic overview of how the technologies work. This section provides a brief overview of the third parties that intercept and record the contents of Class Members' internet communications with Atrius and the purposes for which interceptions are made.

31. Meta Platforms, Inc., referred to in this complaint by its former and more familiar name, "Facebook,"[2] is a multinational technology conglomerate based in Menlo Park, California. It owns and operates social media platforms, including Facebook and Instagram, as well as various other software and technology products and services.

[2] Facebook rebranded its parent company as "Meta" in October 2021.

32. Facebook maintains detailed profiles on individuals that include the users' real names, locations, email addresses, friends, and communications that Facebook associates with personal identifiers, including IP addresses and device identifiers.

33. Facebook derives most of its revenues from selling targeted advertising to users of its platforms, including Facebook and Instagram. Facebook tailors advertising toward particular individuals by building extensive behavioral profiles about each individual. These profiles are based not only on those individuals' use of Facebook products, such as Facebook and Instagram, but also on the activities of those individuals on other websites that Facebook does not own.

34. Among the ways Facebook tracks users on websites not owned by Facebook to supplement its detailed individual profiles is by offering websites with the tracking technology known as Meta Pixel, formerly known as Facebook Pixel. Facebook advertises that Meta Pixel allows website owners to track users across their website and to optimize Facebook advertising based on how they use the websites.

35. Facebook explains on its own website: "The Meta Pixel is a snippet of JavaScript code that allows [companies] to track visitor activity on your website."

36. Facebook explains further: "Once you've set up the Meta Pixel, the Pixel will log when someone takes an action on your website.... The Meta Pixel receives these actions, or events, which you can view on your Meta Pixel page in Events Manager."

37. Therefore, the Meta "pixel allows Facebook to be a **silent third-party watching whatever you're doing**."[3]

[3] *Facebook spies on us but not by recording our calls. Here's how the social network knows everything*, Jefferson Graham, USA Today, https://www.usatoday.com/story/tech/2020/03/04/facebook-not-recording-our-calls-but-has-other-ways-snoop/4795519002/(last visited Aug. 11, 2022) (emphasis added).

38. Google LLC is a multinational technology conglomerate and a wholly owned subsidiary of Alphabet Inc. Google LLC is referred to in this complaint as simply "Google." Google owns and operates various software services, including the popular Gmail email service, Google's search platform, and numerous other internet software services. It also manufactures technology products, including cell phones, smart home devices, and computers.

39. Google maintains detailed profiles on individuals that include information such as their real names, dates of birth, email addresses, phone numbers, and details on interactions such individuals have with Google's services, such as Gmail. Google maintains detailed profiles on individuals, whether or not they have a Google account.

40. Google derives a substantial portion of its revenues through individually targeted advertising. Specifically, Google uses the information it collects on individuals to tailor advertising specifically to the individual, making Google's advertising more valuable than other forms of advertising that are not customized to the individual.

41. One way Google collects information to build its detailed profiles on individuals is through the tracking technology known as Google Analytics. Google incentivizes websites to use Google Analytics by offering it as a free tool for websites to track the behavior of users on its website. The tracking information recorded through Google Analytics and accessible by the website owner provides the website owner with insights about how users use the website, which the owner can use to improve the website. Although Google provides Google Analytics to website owners for "free," Google benefits and profits from Google Analytics by using the data collected through Google Analytics for its own commercial purposes, including using that data to build individuals' profiles further. Google can then use this information to serve such individuals with better-targeted individualized advertisements.

<u>Website Tracking Technologies on the Atrius Website</u>

42. Atrius injects hidden code into the Atrius Website that permits third parties to contemporaneously intercept healthcare consumers' communications with Atrius. The tracking technologies permit third parties such as Google and Facebook to associate a website user's browsing activity with particular individuals known to Google and Facebook. This includes, for example, associating the content of the communications between the website user and Atrius with the website user's Facebook profile.

43. These tracking technologies transmit to Google, Facebook, and other companies, contemporaneously with the website communications between Class Members and Atrius, the contents of those communications and identifying information about the Class Members. The contents intercepted include private health information, including the individual's medical conditions, doctors they may be seeing, medical searches the individual performs on the website, and personal medical information the user enters into forms on the website.

44. Atrius uses or has used several tracking technologies on its website, including Google Analytics and Meta Pixel. The tracking technologies are implemented through similar means.

45. Before describing how such technologies work, it is important to first define some basic technological terms.

46. A **"browser"** or **"web browser"** is software on a computer or other device (such as a tablet or cell phone) that permits a website user to view a webpage. Examples include Google Chrome, Safari, and Firefox.

47. An **"IP address"** is a unique combination of four numbers, each between 0 and 255, that serves as a particular device's address on the internet. Both websites and website users have IP addresses. For example, the IP address for the Atrius Website, as of the time of this complaint, is 198.168.31.233. When they connect to the internet, particular individuals also have their own unique

IP addresses. Companies such as Google and Facebook associate particular individuals with IP addresses to help track them across the internet for commercial purposes.

48. A **"URL"** is another form of an address specifically for websites (or a webpage on a website) that a web browser can translate into an IP address to load the website. A URL is the familiar address often preceded by "http://." For example, the URL for the main landing page for the Atrius Website is https://www.atriushealth.org/. Numerous URLs also point to specific pages on that website. Sometimes, the text contained in a URL will reveal information about the particular webpage itself or the substance of the information provided on it. Such URLs are called "descriptive" URLs. The Atrius Website was configured to make broad use of descriptive URLs, which means that the URLs revealed the substance of the communications made through a particular page on the Atrius Website. For example, the Atrius Website has a page specifically about Atrius's obstetrics and gynecology practice; that page's URL is https://www.atriushealth.org/specialties-and-services/obstetrics-gynecology/. That is, one can tell from the URL itself the substance of the communication between Atrius and the healthcare consumer—that the consumer is requesting information about obstetrics or gynecology treatment or services.

49. A **"cookie"** is a file saved on a website user's device that helps track the user across different web pages or websites. As described below, Google Analytics and Meta Pixel are not themselves cookies but are instead implemented by JavaScript code. Both technologies, however, sometimes use cookies in addition to other means to help a third party such as Google or Facebook confirm the real-world identity of a person browsing a website. Notably, both Google Analytics and Meta Pixel continue to intercept communications even if a user has set their browser settings to turn off cookies.

50. **"JavaScript"** is a type of computer code that can be included on a website. A website user's browser downloads and "runs" the code within the browser. The JavaScript code can perform

various functions, including causing the browser to load components of the website, providing interactive functionality in the website, transmitting information from the browser to servers on the internet, or performing other functions in the background. Unlike many other components of a website, such as text and images, which are visible to the website user, the JavaScript code itself is not visible. The execution of JavaScript code may or may not result in the presentation of visible components of the website.

51. With those basic terms in mind, the tracking technologies described in this complaint—in particular, Google Analytics and Meta Pixel—work as follows. In general terms, a website owner (here, Atrius) inserts into its website code that causes an individual's web browser, when loading the website, to also load a JavaScript file from a third-party server (such as Google or Facebook). That JavaScript code is then executed automatically within the individual's web browser.

52. The execution of the JavaScript code causes the individual's web browser to retrieve a very small file from the third party's website, such as a transparent single-pixel image file from Facebook's server (hence the origin of the phrase "Meta Pixel" or "Facebook Pixel" to describe the tracking technology).

53. When the JavaScript code causes the user's web browser to retrieve a file from the third party's website, the JavaScript code also causes the browser to communicate certain information to the third-party website. That information can include: (i) the URL of the website the user is visiting (that is, the website address, such as https://www.atriushealth.org/); (ii) the title of the particular webpage being visited; (iii) metadata from the website, including information describing the content of the website; (iv) information the user has submitted to the website, such as search terms or any other information inputted into a form (even if the user has not yet "submitted" the form); (v) whether and to what degree the user has scrolled through the website; (vi) if a user has made a selection on any

drop-down menu on the website, the content of that selection; and (vii) prior pages the website user has visited before viewing the current page.

54. When the JavaScript code causes the browser to communicate the information described in the paragraph above to third-party servers such as Google or Facebook, the code also causes the browser to reveal the website user's IP address to the third-party website. This disclosure permits the third party, such as Google or Facebook, to associate the information it has received about the individual's communications with the website to the identity of a particular individual known to Google and Facebook. A third party such as Google and Facebook can then add the content of the user's communications with Atrius to its collection of information it already has about the individual, which it can then use for advertising purposes. For example, when Meta Pixel's JavaScript code causes a "pixel" to be loaded from Facebook's servers, Facebook records and associates the content of the communications it has intercepted with an individual's Facebook and Instagram profiles, which includes the individual's real name and other information about them.

55. The code for tracking technologies is invisible to a website user. By design, the tracking technologies work so that no visible evidence of the technology is shown to the user. For example, even though some technologies may load a small single-pixel image or another file, that image is not displayed as part of the website; instead, it is loaded in the background solely for the purpose of transmitting the content of the user's communications and the user's identity to the third party such as Google or Facebook. The tracking technologies are detectible only by using specialized tools that divulge the code underlying a webpage and the network traffic the website components generate.

56. The tracking technologies described in this complaint intercept and transmit to third parties the contents of communications between healthcare consumers and Atrius contemporaneously with those communications. The tracking technologies intercept and transmit the contents of those communications to third parties before the webpage has even completed loading.

57. The use of tracking technologies became an important news story in June 2022 following a report by the online magazine The Markup reporting that "Facebook Is Receiving Sensitive Medical Information from Hospital Websites."[4] (the "Markup Article"). That article detailed how many of the nation's top hospitals had Meta Pixel code on their websites, which caused the unauthorized disclosure of individuals' communications and other personal information to Facebook. The Markup Article has triggered Congressional investigations and increased scrutiny of hospitals' data practices.[5] In reaction to the Markup Article, some healthcare providers removed Meta Pixel code from their websites completely or severely limited its use.

58. Atrius appears to be among these healthcare providers that removed Meta Pixel in reaction to the Markup Article. Due to changes Atrius made in mid-2021 as to how it injected the Meta Pixel code onto its website, Plaintiff cannot identify the precise date that Atrius removed the Meta Pixel code, although the evidence does confirm that Atrius used Meta Pixel during a substantial portion of the class period. Atrius, however, continues, to the present, to secretly inject Google Analytics and several other third-party tracking technologies onto its website. These tracking technologies are each substantially similar to the now-removed Meta Pixel code, both in their surreptitious deployment on the website and their contemporaneous interception of website users' communications with Atrius.

**<u>Atrius's Use of Tracking Technologies on the Atrius Website</u>**

59. Atrius uses various tracking technologies across the Atrius Website. Several of those tracking technologies are injected into the code of all, or almost all, of the pages within the Atrius

---

[4] *See* "Facebook Is Receiving Sensitive Medical Information from Hospital Websites," https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

[5] *See* "Meta Faces Mounting Questions from Congress on Health Data Privacy As Hospitals Remove Facebook Tracker," https://www.healthcareitnews.com/news/senator-questions-zuckerberg-over-metas-healthcare-data-collection-policies.

Website. For example, on nearly every page of the Atrius Website, Atrius injects hidden code that loads Google Analytics. It also appears Meta Pixel was injected onto many pages on the Atrius Website before Atrius removed Meta Pixel.

60. The code for tracking technologies such as Meta Pixel and Google Analytics is invisible to website users but becomes visible only when using special "developer" software such as Google's "Developer Mode," a tool designed for web developers. Google's Developer Mode displays hidden components of websites and records the content of network traffic generated by website components (including the loading and execution of JavaScript code and the text that the JavaScript code causes to be transmitted to third-party web servers when it loads a small file or image).

61. Below is an image of the main landing page for the Atrius Website:




62. When a user loads the main landing page for the Atrius Website, the webpage causes the user's web browser to download from Google's servers a file called "analytics.js," which contains the JavaScript code for Google Analytics ("analytics" refers to "Google Analytics," and "js" standards

for JavaScript). The website then causes the user's web browser to execute the JavaScript code contained in the "analytics.js" file. That code, in turn, causes the user's web browser to connect to Google's servers again to load a small file. When the user's web browser loads this small file, the Google Analytics JavaScript code causes the user's web browser to intercept and transmit certain information to Google.

63. The image below depicts the landing page for the Atrius Website on the left-hand-side, and to the right of it, Google Developer Mode, which inspects the components of the website and the network traffic those components generate:




64. A closer view of Google Developer Mode, focusing specifically on the contents of the communication intercepted and transmitted to Google, is presented below (with highlighting added). The "Payload" is a technological term that refers to information transmitted from a user's web browser to a web server when the browser retrieves a file from that web server. In this case, the "Payload" reflects the information that the Google Analytics JavaScript code causes the user's web browser to intercept and transmit to Google when a small file is loaded from Google's servers:

× Headers Payload Preview Response Initiator Timing

▾ **Query String Parameters** view source view URL-encoded

v: 2
tid: G-WXKQ94QWHT
gtm: 45je3310
_p: 1529880836
cid: 1529696143.1678056936
ul: en-us
sr: 1920x1080
uaa: x86
uab: 64
uafvl: Chromium;110.0.5481.178|Not%20A(Brand;24.0.0.0|Googl
e%20Chrome;110.0.5481.178
uamb: 0
uam:
uap: Windows
uapv: 10.0.0
uaw: 0
_s: 1
sid: 1678056936
sct: 1
seg: 1
dl: https://www.atriushealth.org/
dt: Atrius Health | Care. About You. | Welcoming New Patien
ts
en: page_view

65. Among the information transmitted to Google's servers contemporaneously with the communications between the website user and the Atrius Website are:

(a) The URL of the webpage visited (the text after the letters "dl," which includes the text "https://www.atriushealth.org"); and

(b) The title of the webpage (after the letters "dt," which includes "Atrius Health | Care. About. You. Welcoming New Patients").

66. The other information Google intercepts includes data about the user's web browser configuration (including screen resolution, device information, and browser settings); a unique

identifier for the particular user visiting the website, which Google retrieves through a cookie set in the website user's browser (which enables Google to track that individual across the website); and identification codes used to connect the browsing activity with a Google Analytics account held by the website (here, Atrius).

67. Notably, when the website user's web browser intercepts the contents of communications between the website user and the Atrius Website and contemporaneously transmits those contents to Google, the connection established between the user's web browser and Google's servers reveals the user's IP address to Google. Google then uses that IP address to associate the user's communications with the website with particular individuals known to Google, including those individuals' Google accounts and real-world identities (whether or not the individual has a Google account). After Google associates the website user's communications with Atrius with the identity of particular individuals known to Google, Google can use that information for its own commercial purposes, including serving personalized advertisements upon that individual on other websites owned by Google or any other third parties that use Google's advertising platforms (many do).

68. Google can further confirm the identity of the user communicating with Atrius through the Atrius Website through a "cookie" file saved on the user's computer, which the Google Analytics code retrieves. The cookie further confirms the website user's identity, enabling Google to associate the user's communications with a particular individual known to Google (including the individual's real-world identity).

69. Moreover, by communicating information about the website user's browser configuration and device (such as screen resolution and other browser configuration settings), Google can confirm the user's identity through a technique known as "browser fingerprinting." In short, browser fingerprinting associates particular individuals with unique combinations of web browser

settings. This permits Google to confirm further that a specific individual using Google's services (for example, a person with a Gmail account) and an individual visiting the Atrius Website are the same.

70. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[6] Browser fingerprints are also considered personal identifiers, and tracking pixels can collect browser fingerprints from website visitors. Browser fingerprints are protected personal identifiers under HIPAA. *See* 45 C.F.R. § 164.514(b)(2)(i)(M), (R).

71. As noted, Atrius recently removed Meta Pixel from its website, likely in response to press coverage and Congressional scrutiny following the Markup Article. An archived version of the main page of the Atrius website, saved before Atrius removed Meta Pixel, confirms that Atrius used Meta Pixel code on the main landing page of its website during the class period.

72. When Atrius used Meta Pixel, the Atrius Website would load a JavaScript file called "fbevents.js." That JavaScript code, in turn, caused the website user's browser to secretly and contemporaneously intercept and transmit to Facebook the website user's communications with the Atrius Website. Below is an example of the contents of the communication between the website user and Atrius, which the hidden Meta Pixel would intercept and transmit to Facebook:

[6] https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/.

× Headers Payload Preview Response Initiator Timing Cookies

▾ **Query String Parameters** view source view URL-encoded

id: 110459582760837
ev: Microdata
dl: https://www.atriushealth.org/
rl:
if: false
ts: 1586697697627
cd[DataLayer]: []
cd[Meta]: {"title":"\n\tAtrius Health | Care. About You. | Welcoming New Patients\n","meta:description":"Atrius Health provides primary and specialty care to more than 745,000 adult and pediatric patients at 31 medical practice locations in eastern Massachusetts. Find a doctor today."}
cd[OpenGraph]: {"og:description":"Atrius Health provides primary and specialty care to more than 745,000 adult and pediatric patients at 31 medical practice locations in eastern Massachusetts. Find a doctor today.","og:image":"http://www.atriushealth.org/app_media/24da6292bbd749e28f3ebf65f805c507.ashx","og:title":"Atrius Health | Care. About You. | Welcoming New Patients"}
cd[Schema.org]: []
cd[JSON-LD]: [{"@context":"https://web.archive.org/web/20200412132127/http://schema.org","@type":"WebSite","url":"https://web.archive.org/web/20200412132127/https://www.atriushealth.org","potentialAction":{"@type":"SearchAction","target":"https://web.archive.org/web/20200412132127/https://www.atriushealth.org/search/site-search?q={search_term_string}","query-input":"required name=search_term_string"}}]
sw: 1920
sh: 1080
v: 2.9.15
r: stable
ec: 1
o: 30
fbp: fb.0.1586697697114.1669629872

73. Similar to Google Analytics, Meta Pixel caused the user's web browser to intercept and transmit to Facebook the contents of the communications between the website user and the Atrius Website, including the URL of the webpage visited, the title of the webpage, and descriptions of contents of the webpage. The interception and transmission to Facebook also included information

about the user's browser configuration and various codes to associate the communications with Atrius's advertising account with Facebook.

74. Also, the JavaScript code for Meta Pixel caused the user's web browser to reveal the user's IP address to Facebook. This identifier permitted Facebook to associate the content of the website user's communications with the website to the user's Facebook profile (or the profile of other websites owned by Facebook, such as Instagram). With that information, Facebook could then use the contents of communications between the website user and Atrius to serve personalized advertising to the website user in the future.

75. Moreover, the transmission to Facebook of the user's browser configuration permitted Facebook to confirm the user's identity through browser fingerprinting (that is, comparing the unique combination of browser settings revealed to Facebook via the Meta Pixel Code to Facebook's own records of the same browser configuration when the same individual visits Facebook, Instagram, and other Facebook-owned websites).

76. The text fields communicated to Facebook by the Meta Pixel code also included a persistent identifier for each particular user, which permitted Facebook to track that individual across the Atrius Website and further confirm that individual's real-world identity.

77. As reflected in the screenshots depicted above, the landing page included a button inviting new patients to make an appointment by clicking the "Book Now" button. By clicking on that button, the website user communicates an intention to receive medical care from Atrius. When a website user clicks that button, hidden Google Analytics code contemporaneously intercepts that communication and transmits its contents to Google. The screenshot below shows the contents of the communication intercepted and transmitted to Google (with highlighting added):

× Headers **Payload** Preview Response Initiator Timing

▾ **Query String Parameters** view source view URL-encoded

v: 2
tid: G-WXKQ94QWHT
gtm: 45je3310
_p: 744539169
_gaz: 1
cid: 1529696143.1678056936
ul: en-us
sr: 1920x1080
uaa: x86
uab: 64
uafvl: Chromium;110.0.5481.178|Not%20A(Brand;24.0.0.0|Googl
e%20Chrome;110.0.5481.178
uamb: 0
uam:
uap: Windows
uapv: 10.0.0
uaw: 0
_s: 3
sid: 1678056936
sct: 1
seg: 1
dl: https://www.atriushealth.org/
dt: Atrius Health | Care. About You. | Welcoming New Patien
ts
en: Outbound Link Click
ep.link_url: https://bit.ly/atrius-health-open-scheduling-her
o
_et: 69

That is, hidden Google Analytics code intercepted and transmitted to Google that the user made an "Outbound Link Click" to an Atrius Health "scheduling" page. (Google knows the more detailed contents of that destination page—that it is designed to permit an individual to make an appointment—through Google's scraping of website data for purposes of its Google search platform.)

78. On the Atrius landing page, existing patients were also presented with an option to access Atrius's "MyHealth Online" patient portal by clicking on the "MyHealth Online" button shown on that page (a button that is available on nearly every page on the website). When a user clicks that button, the user is communicating the fact that the user is an existing patient of Atrius. When a user clicks the button, hidden Google Analytics code intercepts and transmits to Google the content of that communication. The screenshot below reflects the information intercepted by and transmitted to Google (with highlighting added):

× Headers Payload Preview Response Initiator Timing

▾ **Query String Parameters** view source view URL-encoded

v: 2
tid: G-WXKQ94QWHT
gtm: 45je3310
_p: 744539169
_gaz: 1
cid: 1529696143.1678056936
ul: en-us
sr: 1920x1080
uaa: x86
uab: 64
uafvl: Chromium;110.0.5481.178|Not%20A(Brand;24.0.0.0|Googl
e%20Chrome;110.0.5481.178
uamb: 0
uam:
uap: Windows
uapv: 10.0.0
uaw: 0
_s: 5
sid: 1678056936
sct: 1
seg: 1
dl: https://www.atriushealth.org/
dt: Atrius Health | Care. About You. | Welcoming New Patier
ts
en: Outbound Link Click
ep.link_url: https://myhealth.atriushealth.org/
_et: 1665

That is, hidden Google Analytics code intercepts that the user has made an "Outbound Link Click" to the Atrius MyHealth Online patient portal.

79. Before Atrius removed Meta Pixel from the Atrius Website, hidden Meta Pixel code intercepted the same communication when a user clicked on the "MyHealth Online" button to log into Atrius's patient portal. The content of the communication intercepted via Meta Pixel's hidden code is shown below (with highlighting added):

× Headers Payload Preview Response Initiator »

▾ Query String Parameters view source view URL-encoded

id: 110459582760837
ev: SubscribedButtonClick
dl: https://www.atriushealth.org/
rl:
if: false
ts: 1586697715652
cd[buttonFeatures]: {"classList":"login-btn","destination":"https://myhealth.atriushealth.org/","id":"","imageUrl":"","innerText":"MYHEALTH ONLINE","numChildButtons":0,"tag":"a","name":""}
cd[buttonText]: MYHEALTH ONLINE
cd[formFeatures]: []
cd[pageFeatures]: {"title":"\n\tAtrius Health | Care. About You. | Welcoming New Patients\n"}
cd[parameters]: []
sw: 1920
sh: 1080
v: 2.9.15
r: stable
ec: 2
o: 30
fbp: fb.0.1586697700469.1669629872
it: 1586697697583
coo: false
es: automatic
tm: 3
rqm: GET

That is, the hidden Meta Pixel could would intercept a "ButtonClick" event, that the user specifically clicked in a "login" button to connect to "MYHEALTH ONLINE."

80. Atrius configured its website to intercept and retransmit to Google, Facebook, and other third parties specific information about the webpages a healthcare consumer visits within the website, which in turn may reveal personal information about the healthcare consumer. The further examples presented below do not reflect webpages Plaintiff personally visited but are presented for illustrative purposes. To maintain her medical privacy, Plaintiff does not describe in this complaint the specific pages she visited, but Plaintiff visited webpages within the categories of pages described below into which Atrius embedded Meta Pixel, Google Analytics, and other tracking technologies. Her communications with Atrius, including Private Information, were intercepted similarly to the illustrative examples set forth below.

81. The Atrius Website contains dozens of subpages for specific "Specialties & Services." For example, the Atrius Website contains a page entitled "Obstetrics/Gynecology," designed to inform the website user about OB/GYN services Atrius offers. By visiting that webpage, a user reveals to Atrius that the user has some interest in OB/GYN services (for example, the user may be pregnant or know someone who is). When the user communicates with Atrius by visiting this particular webpage, Atrius causes the secret interception and transmission of that communication to Google and other third parties. Below is a screenshot of the Atrius Obstetrics/Gynecology webpage:




82. The graphic below presents the contents of the communication between the website user and Atrius that are secretly intercepted and transmitted to Google when the above page loads as a result of the Google Analytics JavaScript code that Atrius secretly injects into the website (with highlighting added):

× Headers Payload Preview Response Initiator Timing

▾ **Query String Parameters** view source view URL-encoded

v: 2
tid: G-WXXQ94QWHT
gtm: 45je3310
_p: 1496954154
cid: 1529696143.1678056936
ul: en-us
sr: 1920x1080
uaa: x86
uab: 64
uafvl: Chromium;110.0.5481.178|Not%20A(Brand;24.0.0.0|Google%20Chrome;110.0.5481.178
uamb: 0
uam:
uap: Windows
uapv: 10.0.0
uaw: 0
_s: 1
sid: 1678056936
sct: 1
seg: 1
dl: https://www.atriushealth.org/specialties-and-services/obstetrics-gynecology
dr: https://www.atriushealth.org/specialties-and-services
dt: Obstetrics and Gynecology | Atrius Health
en: page_view

83. As reflected in the above screenshot, the code injected into the Atrius Website causes the user's browser to contemporaneously intercept and transmit to Google the fact that the website user is visiting an "Obstetrics and Gynecology" webpage on the Atrius Website—information that Google retains and can use for its own commercial purposes, and because Google retains it, can be accessible by third parties by subpoena or otherwise.[7]

[7] *See, e.g.*, "How data from period-tracking and pregnancy apps could be used to prosecute pregnant people," https://www.latimes.com/business/story/2022-08-17/privacy-reproductive-health-apps.

84. Before Atrius removed Meta Pixel code from the Atrius Website, the same webpage contained hidden code that intercepted the user's communication with the website and retransmitted that same information to Facebook. Atrius caused the secret interception and transmission to Facebook of the contents of the communication between the website user and Atrius, including that the user is visiting an Obstetrics & Gynecology webpage, information that Facebook retained and can use for commercial purposes.

85. The Atrius Website contains dozens of similar pages on particular medical specialties and practices that Atrius offers. By visiting those other pages that concern specific specialties and practices, website users communicate to Atrius information about themselves, including conditions they may have or services in which they may be interested. For each such page, the Atrius Website aids or aided Google and Facebook's secret interception of the contents of communications with Atrius, similar to the above Obstetrics/Gynecology department example.

86. The Atrius Website also includes a search function that permits an individual to search for medical or other information relevant to them. Healthcare consumers often enter search terms that reveal private health information about them, for example, when an individual uses the search function for particular symptoms, conditions, or medical specialties offered by Atrius. When an individual uses the search function, Atrius aids in the secret interception of the contents of that search and transmission of those contents to Google and other third parties. Below, for example, is the search results page for "pregnant."




87. When a user performs this search on the Atrius Website, and the results page then loads, the Google Analytics code is activated, causing the individual's web browser to intercept the user's search terms and transmit them to Google. Below is the portion of the communication that the Google Analytics code causes to be transmitted to Google (with highlighting added):

× Headers Payload Preview Response »

**▾ Query String Parameters** view source view decoded

v: 2
tid: G-WXKQ94QWHT
gtm: 45je3360
_p: 1509835185
cid: 1903265724.1678313469
ul: en-us
sr: 1920x1080
uaa: x86
uab: 64
uafvl: Chromium%3B110.0.5481.178%7CNot%2520A(Brand%3B24.0.0.0%7CGoogle%2520Chrome%3B110.0.5481.178
uamb: 0
uam:
uap: Windows
uapv: 10.0.0
uaw: 0
sid: 1678313469
sct: 1
seg: 1
dl: https%3A%2F%2Fwww.atriushealth.org%2Fsearch%2Fsite-search%3Fq%3Dpregnant
dr: https%3A%2F%2Fwww.atriushealth.org%2F
dt: Site%20Search%20Results
_s: 1

**▾ Request Payload**

en=page_view
en=view_search_results&ep.search_term=pregnant

As reflected in the above screenshot, the hidden Google Analytics code causes the precise search terms entered by the user to be intercepted and transmitted to Google, which Google can then use for its own commercial purposes, including associating those search terms with the individual's real-world identity for targeted advertising purposes.

88. Upon information and belief, before Atrius removed Meta Pixel from the Atrius Website, healthcare consumers' searches on the Atrius Website were similarly intercepted and transmitted to Facebook through the hidden Meta Pixel code.

89. The Atrius Website also includes a "Find A Doctor" feature that permits healthcare consumers to search for doctors using filtering criteria, such as specialties, location, doctor gender, and language. For example, the screenshot below depicts the search results page when a user indicates she is looking for a female doctor in "Obstetrics & Gynecology" within five miles of Boston zip code 02210:



90. Depicted below are the contents of the user's communication with the Atrius website that are intercepted and transmitted to Google via hidden Google Analytics Code (with highlighting added):

× Headers **Payload** Preview Response Initiator »

▾ **Query String Parameters** view source view URL-encoded


v: 2
tid: G-WXKQ94QWHT
gtm: 45je3360
_p: 1301291835
cid: 1903265724.1678313469
ul: en-us
sr: 1920x1080
uaa: x86
uab: 64
uafvl: Chromium;110.0.5481.178|Not%20A(Brand;24.0.0.0|Google%20Chrome;110.0.5481.178
uamb: 0
uam:
uap: Windows
uapv: 10.0.0
uaw: 0
_s: 1
sid: 1678313469
sct: 1
seg: 1
dl: https://www.atriushealth.org/search/clinician-specialist-results-page?specializations=obstetrics%2Fgynecology&locations=&cityandzip=02210
dr: https://www.atriushealth.org/find-a-doctor
dt: New Clinician Specialist Results Page
en: page_view


91. The above screenshot reflects that when an individual enters a search on the Atrius "Find a Doctor" page and chooses other filtering criteria, Google Analytics intercepts the contents of the search and transmits them to Google, including the other filtering criteria the user has selected,

including a location near 02210 and a "specialization" of "obstetrics" and "gynecology." The intercepted information reveals that the individual is a patient or prospective patient of Atrius. Google retains all this information and may use it for its own commercial purposes, including associating find-a-doctor search criteria with the individual's real-world identity for targeted advertising purposes.

92. Before Atrius removed Meta Pixel from the Atrius Website, Atrius also injected hidden Meta Pixel code that intercepted communications on the Find-A-Doctor page of the Atrius Website, permitting Facebook to associate those communications with the individual's accounts held by Facebook-owned platforms (including Facebook and Instagram).

93. The Atrius Website includes an "Online Bill Pay" feature that permits patients to pay their Atrius medical bills online. By accessing that portion of the website, the website user communicates that the user is a patient of Atrius. A screen capture of the main "Online Bill Pay" page is shown below:



94. When a user visits the Atrius Website's Online Bill Pay page, hidden Google Analytics code Atrius has injected onto the webpage intercepts the user's communication with Atrius and sends the communication to Google and other third parties. The intercepted information reveals that the individual is a patient of Atrius. The contents of the communication intercepted and sent to Google are depicted below (with highlighting added), reflecting the user's communication with Atrius through which the user accesses the "Bill Pay" portion of the website is intercepted and sent to Google[8]:

× Headers Payload Preview Response Initiator Timing

▾ Query String Parameters view source view URL-encoded

utmwv: 5.7.2
utms: 1
utmn: 1295267102
utmhn: apps.atriushealth.org
utmcs: UTF-8
utmsr: 1920x1080
utmvp: 1324x979
utmsc: 24-bit
utmul: en-us
utmje: 0
utmfl: -
utmdt: Atrius Health Bill Pay
utmhid: 531370889
utmr: https://www.atriushealth.org/
utmp: /BillPay/Account.aspx
utmht: 1678314557801
utmac: UA-24614374-1
utmcc: __utma=44105332.1903265724.1678313469.1678314558.1678314558.1;+__utmz=44105332.1678314558.1.1.utmcsr=atriushealth.org|utmccn=(referral)|utmcmd=referral|utmcct=/;
utmjid: 1571695935
utmredir: 1
utmu: qAAAAAAAAAAAAAAAAAABAAAE~

[8] The prefixes preceding the text fields for this example (and the next one) are different than the other Google Analytics examples (for example, "utmdt," and "utmp") , because this particular page used a different version of Google Analytics code.

95. The Atrius Website also features an online form that patients may fill out to obtain a prescription refill. By accessing this part of the website, a website user communicates to Atrius that the user is a patient needing medicine. The online "Prescription Refill" form is shown below:




96. When the website user initiates this communication, hidden Google Analytics code that Atrius has injected into its website causes the website user's communication with Atrius to be intercepted and contemporaneously transmitted to Google. The intercepted information reveals that the individual is a patient or prospective patient of Atrius. The contents of the interception, including that the user is seeking "Prescriptions/RxRefills" from "Atrius Health," are depicted below (with highlighting added):

Date Filed 12/5/2024 3:15 PM
Superior Court - Suffolk
Docket Number 2384CV00597

× Headers **Payload** Preview Response Initiator »

▾ **Query String Parameters** view source view URL-encoded

utmwv: 5.7.2
utms: 1
utmn: 656374756
utmhn: apps.atriushealth.org
utmcs: UTF-8
utmsr: 1920x1080
utmvp: 1351x979
utmsc: 24-bit
utmul: en-us
utmje: 0
utmfl: -
utmdt: Atrius Health
utmhid: 661813939
utmr: https://www.atriushealth.org/
utmp: /Prescriptions/RxRefills.aspx
utmht: 1678390532390
utmac: UA-24614374-1
utmcc: __utma=44105332.915625968.1678381612.167838161
6.1678390532.2;+__utmz=44105332.1678390532.2.2.utmcsr
=atriushealth.org|utmccn=(referral)|utmcmd=referral|u
tmcct=/;
utmjid: 1920884704
utmredir: 1
utmu: qAAAAAAAAAAAAAAAAAAAAAAE~

97. In addition to Google and Facebook, Atrius enables or has enabled the communications between healthcare consumers and Atrius to be intercepted and transmitted to various other companies without the consumer's knowledge or consent. These additional third parties include:

(a) **Doubleclick.** Google Doubleclick is an internet advertising platform. Like Google Analytics and Meta Pixel, Atrius has inserted code into their website that causes communications between the user and the website to be intercepted and transmitted to Google. The contents intercepted include the URL and title of each website visited and the user's IP address. Google can then monetize that information through advertisements.

(b) **Sharethis**. Sharethis is a company that tracks the behavior of users of websites. Similar to Google Analytics and Meta Pixel, Atrius inserts code on its website that causes the contents of the user's communications with the website, including pages viewed, the contents of searches, and other information, to be sent to the sharethis.com server. The code also causes the user's IP address to be revealed to Sharethis.

(c) **New Relic**. New Relic offers a "Browser Monitoring" analytics service that is similar to Google Analytics. Similar to Google Analytics and Meta Pixel, Atrius, during the class period, inserted hidden code into their website that caused communications between the user and Atrius to be intercepted by and transmitted to New Relic at bam.nr-data.net. The contents intercepted include the URL of each webpage visited and the user's IP address, among other things.

(d) **Twitter Pixel.** When Atrius previously used it during the class period, Twitter Pixel operated much the same way as Meta Pixel. It used hidden JavaSript code that caused the user's web browser to intercept contents of the user's communication with the Atrius Website and transmit those contents to Twitter. Through the use of IP addresses and other identifiers, Twitter could associate a particular website user's intercepted communications with individuals known to Twitter (such as individuals with Twitter accounts).

**The Secret Use of Website Tracking Technologies Such as Meta Pixel and Google Analytics Is Not Necessary**

98. The secret use of tracking technologies such as Meta Pixel and Google Analytics is not necessary for the Atrius Website's operation. The Atrius Website can and would operate just the same from the perspective of healthcare consumers without the secret use of tracking technologies described in this complaint.

99. Tracking technologies such as Google Analytics and Meta Pixel are distinct from and are not necessary to feature Google or Facebook-associated functionality on the website. For example, a website can contain links to its Facebook profile or invite website users to interact with Atrius via Facebook without using Meta Pixel. Meta Pixel is an entirely distinct feature from a Facebook button or a link to a Facebook profile; any website can have one without the other.

100. Moreover, even if Atrius wanted to use tracking technologies to optimize its website or its marketing for a website, there is no legitimate or lawful reason for Atrius (i) to keep secret from its website users the use of these tracking technologies; (ii) to falsely and deceptively claim that Atrius

does not share the communications with others when it does; or (iii) to claim that Atrius maintains the privacy of those communications when it does not.

**Atrius Violated HIPAA and the FTC Act.**

101. Under federal law, a healthcare provider may not disclose personally identifiable, nonpublic medical information about a patient, a potential patient, or a household member of a patient without the patient's express written authorization.[9]

102. Although healthcare providers regulated under HIPAA are not entirely prohibited from using third-party tracking technologies such as Google Analytics or the Meta Pixel, their ability to use such tools is strictly constrained by the purpose for which such tools are used and the adequacy of consent obtained from healthcare consumers for such use.

103. HIPAA's Privacy Rule defines IIHI as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and either (i) "identifies the individual"; or (ii) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

104. The HIPAA Privacy Rule sets forth policies to protect all IIHI that covered entities hold or transmit. HIPAA sets forth a non-exhaustive list of 18 identifiers that are IIHI because this information can be used to identify, contact, or locate a specific person or can be used with other sources (such as a person's Facebook account) to identify a single individual.[10]

[9] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).
[10] Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html

105. Under the HIPAA de-identification rule, "health information is **not** individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed." 45 C.F.R. § 164.514 (emphasis added). The listed identifiers include device identifiers, dates related to an individual, email addresses, web URLs, and IP addresses, plus "[a]ny other unique identifying number, characteristic, or code." *Id.* Additionally, the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

106. The Privacy Rule broadly defines PHI as IIHI that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

107. The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of PHI and sets limits and conditions on the uses and disclosures that may be made of PHI without authorization. 45 C.F.R. §§ 160.103, 164.502.

108. "Covered entities" include "a health care provider who transmits any health information in electronic form" in connection with HIPAA-related transactions. 45 C.F.R. § 160.103. "Health care provider" includes providers of "medical or health services," including "physicians' services," i.e., "services and supplies . . . furnished as an incident to a physician's professional service,"

---

(HIPAA identifiers include among other things, device identifiers and serial numbers; web URL; internet protocol (IP) address; and any other characteristic that could uniquely identify the individual).

including diagnostic services, psychologist and clinical social worker services, and a variety of other services. *See* 42 USCS § 1395x(s).

109. An individual's patient status with a particular entity is PHI. The Department of Health and Human Services instructs health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[11]

110. Consistent with this restriction, HHS marketing guidance provides: "With limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list."[12]

111. In December 2022, HHS issued a bulletin (the "HHS Bulletin") warning regulated entities like Atrius about the risks presented by the use of tracking technologies on their websites:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. For example, disclosures of PHI to tracking technology vendors for marketing purposes without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.[13]

[11] Guidance Regarding Methods for De-Identification of Protected Health Information, *supra* n.10.
[12] Marketing, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html.
[13] Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates (Dec. 1, 2022), available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html. (emphasis added)

112. In other words, the HHS has expressly stated that entities like Atrius that implement Meta Pixel and Google Analytics and disclose patient information have violated HIPAA Rules unless those entities obtain a HIPAA-complaint authorization.

113. The HHS Bulletin discusses the harms that disclosure may cause patients:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.

114. Additionally, HHS has warned healthcare providers that protected information is not limited exclusively to patient portals that require a patient to log in to access a secure portion of a website. Instead, healthcare providers must also protect information on publicly accessible, non-password-protected (i.e., "unauthenticated") webpages. Citing the 2013 Final Rulemaking, HHS observed that "information that connects the individual to a regulated entity (i.e., that is indicative that the individual has received or will receive health care services or benefits from the covered entity)…relates to the individual's past, present, or future health or health care or payment for care."

115. The HHS Bulletin went on to state:

> Tracking technologies on a regulated entity's unauthenticated webpage that addresses specific symptoms or health conditions, such as pregnancy or miscarriage, or that permits individuals to search for doctors or schedule appointments without entering credentials may have access to PHI in certain circumstances. For example, tracking technologies could collect an individual's email address and/or IP address when the individual visits a regulated entity's webpage to search for available appointments with a health care provider. In this example, the regulated entity is disclosing PHI to the tracking technology vendor, and thus the HIPAA Rules apply.

116. Atrius's provision of Private Information to third parties such as Facebook and Google violated the Privacy Rule.

117. Atrius is a "covered entity" under HIPAA and thus subject to the Privacy Rule.

118. Atrius's use of tracking technologies violates the Privacy Rule because those technologies intercept and transmit healthcare consumers' Private Information to third parties without their authorization.

119. Atrius improperly disclosed to third parties Plaintiff's and Class Members' Private Information, including information regarding, among other things, (a) patient symptoms and health conditions, (b) patients' doctors, (c) the content of search terms entered on the website; and (d) patients' status as patients of Atrius by using tracking technologies on webpages that are designed specifically for patients (including doctor searches, prescription requests, medical records access, and links to Atrius patient portal).

120. For example, by using tracking technologies on the webpages Plaintiff visited—including those permitting searches for doctors, requests for information about symptoms and medical procedures, and access to Atrius's patient portal, Atrius permitted third parties to intercept the identity of Plaintiff's doctors, specific symptoms and treatments connected to Plaintiff, and Plaintiff's patient status, each of which is protected information under HIPAA notwithstanding that the pages are publicly accessible.

121. Atrius improperly disclosed to third parties Plaintiff's and Class Members' HIPAA identifiers, including their computer IP addresses, device identifiers, web URLs visited, browser fingerprints, and other identifiers that would permit third parties such as Facebook, Google, and others to identify the individual. Atrius disclosed HIPAA identifiers together with PHI, such as conditions and treatments for which consumers sought information, searches for doctors, their status as patients, provider information, and appointment information.

122. Atrius violated HIPAA by failing to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information," 45 C.F.R. § 164.306(c), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

123. Atrius further violated other HIPAA regulations as follows:

(a) Atrius failed to ensure the confidentiality and integrity of electronic PHI that Atrius created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

(b) Atrius failed to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

(c) Atrius failed to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Atrius in violation of 45 C.F.R. § 164.308(a)(6)(ii);

(d) Atrius failed to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

(e) Atrius failed to protect against reasonably anticipated uses or disclosures of electronic PHI of individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3); and

(f) Atrius failed to design, implement, and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. § 164.530(c).

124. Commenting on a June 2022 report discussing the use of tracking technologies by hospitals and medical centers, David Holtzman, a health privacy consultant and a former senior privacy adviser in HHS OCR, which enforces HIPAA, stated, "I am deeply troubled by what [the hospitals] are doing with the capture of their data and the sharing of it … It is quite likely a HIPAA violation."[14]

[14] 'Deeply Troubled': Security experts worry about Facebook trackers on hospital sites, ADVISORY BOARD, https://www.advisory.com/daily-briefing/2022/06/17/data-trackers.

125. Atrius's undisclosed use of tracking technologies on their website violates Plaintiff's and Class Members' privacy rights under federal law. While HIPAA does not have a private right of action, Atrius's violation demonstrates its unlawful conduct, which is relevant to other claims and establishes a breach of its duty to maintain patient privacy.

126. Further reiterating the importance of and necessity for data security and privacy concerning health information, the Federal Trade Commission ("FTC") recently published a bulletin entitled Protecting the privacy of health information: A baker's dozen takeaways from FTC cases, in which it noted:

> Health information is not just about medications, procedures, and diagnoses. Rather, **it is anything that conveys information—or enables an inference—about a consumer's health**. Indeed, [recent FTC enforcement actions involving] Premom, BetterHelp, GoodRx and Flo Health make clear that the fact that a consumer is using a particular health-related app or website—one related to mental health or fertility, for example—or how they interact with that app (say, turning 'pregnancy mode' on or off) may itself be health information.[15]

127. The FTC is unequivocal in its stance as it informs—in no uncertain terms—healthcare companies that they should not use tracking technologies to collect sensitive health information and disclose it to various platforms without informed consent:

> Don't use behind-the-scenes tracking technologies that contradict your privacy promises or otherwise harm consumers.
>
> In today's surveillance economy, the consumer is often the product. Consumer data powers the advertising machine that goes right back to the consumer. But when companies use consumers' sensitive health data for marketing and advertising purposes, such as by sending that data to marketing firms via tracking pixels on websites or software development kits on apps, watch out.

128. The federal government takes violations of health data privacy and security seriously, as reflected in several high-profile FTC settlements with healthcare providers.

[15] See Elisa Jillison, Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases, the FTC Business Blog (July 25, 2023) (emphasis added), https://www.ftc.gov/business-guidance/blog/2023/07/protecting-privacy-health-information-bakers-dozen-takeaways-ftc-cases.

129. For example, FTC enforcement actions such as "BetterHelp, GoodRx, Premom, and Flo make clear that [the use of tracking technologies] may run afoul of the FTC Act if they violate privacy promises or if the company fails to get consumers' affirmative express consent for the disclosure of sensitive health information.[16]

130. Last year, the FTC imposed a $1.5 million penalty on GoodRx for violating the FTC Act by sharing its customers' sensitive personal health information with advertising companies and platforms, including Facebook, Google, and Criteo. The FTC also reached a $7.8 million settlement with online counseling service BetterHelp after it had shared customer health data with Facebook and Snapchat for advertising purposes. The FTC ordered Easy Healthcare to pay a $100,000 civil penalty for violating the Health Breach Notification Rule when its ovulation tracking app Premon shared health data for advertising purposes.[17]

**<u>Atrius Violated Industry Standards</u>**

131. A medical provider's duty of confidentiality is embedded in the physician-patient and hospital-patient relationship.

132. The American Medical Association's ("AMA") Code of Medical Ethics creates rules protecting the privacy of patient data and communications.

[16] *Id.* (noting further that GoodRx & Premom underscore that this conduct may also violate the Health Breach Notification Rule, which requires notification to consumers, the FTC, and, in some cases, the media, of disclosures of health information without consumers' authorization).

[17] *See How FTC Enforcement Actions Will Impact Telehealth Data Privacy*, https://www.techtarget.com/healthtechsecurity/answer/How-FTC-Enforcement-Actions-Will-Impact-Telehealth-Data-Privacy; *see also Allison Grande, FTC Targets GoodRx In 1st Action Under Health Breach Rule*, Law360 (Feb. 1, 2023), www.law360.com/articles/1571369/ftc-targets-goodrx-in1st-action-underhealth-breach-rule?copied=1 ("The Federal Trade Commission signaled it won't hesitate to wield its full range of enforcement powers when it dinged GoodRx for allegedly sharing sensitive health data with advertisers, teeing up a big year for the agency and boosting efforts to regulate data privacy on a larger scale."); https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-gives-finalapproval-order-banning-betterhelp-sharing-sensitive-health-data-advertising; https://www.ftc.gov/news-events/news/press-releases/2023/05/ovulation-tracking-app-premom-willbe-barred-sharing-health-data-advertising-under-proposed-ftc.

133. AMA Code of Ethics Opinion 3.1.1 provides:

> Protecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)[.]

134. AMA Code of Medical Ethics Opinion 3.2.4 provides:

> Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (a) Only provide data that has been deidentified [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

135. AMA Code of Medical Ethics Opinion 3.3.2 provides:

> Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must: (c) Release patient information only in keeping ethics guidelines for confidentiality.[18]

136. Atrius, through the conduct described in this complaint, violated the AMA Code of Medical Ethics by gathering and recording information about patients that Atrius failed to keep confidential by sharing it with Facebook, Google, and other third parties without de-identifying the data or fully informing patients about the purposes for which access would be granted.

[18] AMA Principles of Medical Ethics: I, IV, Chapter 3: Opinions on Privacy, Confidentiality & Medical Records, https://code-medical-ethics.ama-assn.org/chapters/privacy-confidentiality-medical-records.

**Plaintiff and Class Members Suffered Harm from Atrius's Unlawful Interceptions and Disclosures of Plaintiff's and Class Member's Private Information**

137. As a direct and proximate cause of Atrius's unauthorized interceptions and disclosures of Plaintiff's and Class Member's Private Information, Plaintiff and Class Members have been damaged by Atrius's conduct in the following ways:

(a) Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private, thus reducing its value to Plaintiff and Class Members;

(b) Plaintiff and Class Members face ongoing unwanted targeted advertisements based upon the improperly intercepted and disclosed Private Information;

(c) Atrius denied Plaintiff and Class Members the benefit of the bargain insofar as Plaintiff and Class Members would not have used Atrius's services or would have demanded compensation for Atrius's use of their Private Information if they had known of Atrius's practices;

(d) Atrius eroded the essential confidential nature of the provider-patient relationship;

(e) General damages for invasion of Plaintiff's and Class Member's rights in an amount to be determined by a jury;

(f) Nominal damages for each independent violation;

(g) Atrius took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation for such data;

(h) Atrius's actions violated the property rights Plaintiff and Class members have in their Private Information; and

(i) Statutory damages, where applicable (in particular, with respect to Plaintiff's and Class Members' ECPA claim).

**Class Action Allegations**

138. Plaintiff brings this action under Mass. R. Civ. Proc. 23 on behalf of herself and the Class, which includes:

All Massachusetts residents who, while in the Commonwealth of Massachusetts, accessed any portion of the website at www.atriushealth.org within three years prior to the date of the filing of the initial complaint in this action.

139. This action is properly maintainable as a class action.

140. The Class Members are so numerous that joinder of all members in a single lawsuit is impractical.

141. Common questions of law and fact exist for all Class Members, and those questions predominate over any questions solely affecting individual members of the Class. Among the predominant questions of law and fact common to the Class are:

(a) Whether communications between Class Members and Atrius, through the Atrius Website, were electronic communications under the ECPA;

(b) Whether Atrius inserted tracking technologies into the hidden code of the Atrius Website, including Google Analytics and Meta Pixel;

(c) Whether the tracking technologies inserted into the hidden code of the Atrius Website are "electronic devices" as defined in the ECPA;

(d) Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between Atrius and users of the Atrius Website;

(e) Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others disclosed to third parties such as Google, Facebook, and others the identity of the parties to the communication, the existence of the communication, and the communications' content, substance, purport, and meaning;

(f) Whether by inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, Atrius installed an electronic device on their website with the intent to aid Google, Facebook, and other companies to intercept communications between the Class Members and Atrius;

(g) Whether and to what extent Atrius had a duty to protect the IHII and PHI of Plaintiff and Class Members;

(h) Whether Atrius had duties not to disclose the IHII and PHI of Plaintiff and Class Members to unauthorized third parties;

(i) Whether the terms of Atrius's privacy policy either were or formed part of a contract between Atrius and Plaintiff and Class Members;

(j) Whether Atrius's disclosure of Plaintiff's and Class Members' IHII and PHI breached Atrius's promises set forth in its privacy policy, giving rise to liability for breach of contract;

(k) If Plaintiff prevails on the merits of her statutory or common law claims, the remedies afforded under those causes of actions to Class Members, including statutory remedies, actual damages, disgorgement, attorneys' fees, and litigation disbursements.

142. Plaintiff's claims are typical of Class Members' claims because, like Plaintiff, each Class Member accessed the Atrius Website and had their communications with that website secretly intercepted and transmitted to third parties without their knowledge or consent.

143. Plaintiff will fairly and adequately protect the interests of the Class Members and has retained counsel with extensive experience prosecuting consumer class actions and who, with Plaintiff, are fully capable of, and intent upon, vigorously pursuing this action. Plaintiff has no interest adverse to the Class.

144. A class action is superior to all other available methods for this controversy's fair and efficient adjudication. Furthermore, any individual Class member's damages are not likely substantial enough to justify the expense and burden of individual litigation. Hence, it would be impracticable for all Class Members to redress the wrongs done to them individually. There will be no difficulty in managing this action as a class action.

145. Atrius has acted on grounds generally applicable to the Class, making appropriate the relief Plaintiff seeks for the Class as a whole.

**COUNT I**

**(Violation of the ECPA, 18 U.S.C. § 2511, on behalf of the Class)**

146. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

147. The ECPA, 18 U.S.C. § 2511, prohibits the intentional interception of the content of any electronic communications.

148. An individual's communications with a website constitute "electronic communications" as defined by the ECPA, 18 U.S.C. § 2510(12). The communications between Plaintiff and other Class Members and Atrius, through the Atrius Website, were electronic communications under the ECPA.

149. The tracking technologies inserted into the hidden code of the Atrius Website, including Google Analytics and Meta Pixel, are "electronic devices" as defined in ECPA, 18 U.S.C. § 2510(5). "Electronic devices" also include (i) any devices Class Members used to access the Atrius Website; (ii) Class Members' web browsers used to access the Atrius Website; (iii) Atrius's own computer servers; and (iv) the computer servers of third parties such as Google and Facebook which intercepted Class Members' communications with the Atrius Website.

150. The computer code for tracking technologies such as Google Analytics, Meta Pixel, and others enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between Atrius and users of the Atrius Website, including, but not limited to, (i) information about the webpages the user visited; (ii) the precise text of search queries; (iii) the search criteria individuals used to find doctors; and (iv) the precise contents of information the individuals inputted onto forms on the website.

151. As reflected in the facts presented in this complaint, including a technical analysis of the substance of information intercepted by third parties through the tracking technologies, Atrius configured both its website and the tracking technologies in a manner that revealed the contents of communications between healthcare consumers and Atrius, including by using and permitting the interception of descriptive URLs (URLs that contain words that provide information on the substance of the communication between the consumer and Atrius), permitting the interception of the substance of requests for information on particular doctors, permitting the interception of the substance of search terms inputted by healthcare consumers, and using tracking technologies on pages that would

confirm to third parties such as Google and Facebook the healthcare consumers' likely status as Atrius patients.

152. With respect to Plaintiff, the tracking technologies revealed information regarding Plaintiff's doctors, treatments, and request for medical records, revealing Plaintiff's status as a patient seeking medical records, by configuring the tracking technologies to reveal the substance of communications regarding Plaintiff's doctors and treatments and requests for medical records.

153. By inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, Atrius intentionally intercepted, endeavored to intercept, and procured another person to intercept the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

154. Additionally, through the above-described tracking technologies, after Atrius intercepted communications, the intercepted information was, in turn, used by third parties, such as Facebook and Google, to 1) place Plaintiff in specific health-related categories based on their past, present, and future health conditions and 2) target Plaintiff with particular advertising associated with their specific health conditions.

155. Atrius facilitated the interception of communications between the Class Members and Atrius, and Atrius disclosed such intercepted communications to Google, Facebook, and other third parties without their knowledge or consent. Moreover, their privacy interests were violated by the interception.

156. The party exception in § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

157. Atrius intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the

Constitution or laws of the United States or of any State—namely, violation of HIPAA and the FTC Act, as well as the other causes of action set forth in this complaint.

158. Because of Atrius's simultaneous, unknown duplication, forwarding, and interception of Plaintiff's and Class Members' Private Information, Atrius does not qualify for the party exemption.

159. As alleged above, Atrius violated a provision of HIPAA, specifically 42 U.S.C. § 1320d-6(a)(3), which imposes a criminal penalty for knowingly disclosing IIHI to a third party.

160. HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

42 U.S.C. § 1320d-(6).

161. Plaintiff's Private Information that Atrius disclosed to third parties qualifies as IIHI, and Atrius violated Plaintiff's expectations of privacy and constitutes tortious and/or criminal conduct by violating 42 U.S.C. § 1320d(6). Atrius used the intercepted electronic communications to increase its revenues.

162. The penalty for violating HIPAA is enhanced where "the offense is committed with intent to sell, transfer, or use IIHI for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6. Atrius specifically used tracking technologies to intercept and disclose Plaintiff's and Class Members' Private Information for financial gain.

163. Atrius's conduct violated 42 U.S.C. § 1320d-6 in that it: (i) used and caused to be used identifiers associated with specific patients without patient authorization; and (ii) disclosed IIHI to Facebook and other third parties without patient authorization.

164. Atrius's conduct is subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Atrius's use of the Facebook source code was for Atrius's commercial advantage to increase revenue from existing patients and gain new patients.

165. The ECPA (18 U.S.C. § 2520(a)) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of the ECPA.

166. Pursuant to the ECPA, Plaintiff seeks for herself and each Class Member statutory damages of $100 for each day of Atrius's violation of the ECPA for Plaintiff and each Class Member or $10,000 with respect to the Plaintiff and each Class Member, whichever is higher, plus reasonable attorneys' fees and other litigation disbursements that her counsel has incurred and will reasonably incur in prosecuting this action.

## COUNT II

**(Violation of the Massachusetts Right to Privacy Act, M.G.L. c. 214 § 1B, on behalf of the Class)**

167. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

168. The Massachusetts Right to Privacy Act, M.G.L. c. 214 § 1B, confers a right to Massachusetts citizens against unreasonable, substantial, or serious interference with the individual's privacy and confers a private right of action for an award of damages for any violation of the statute.

169. The Massachusetts Right to Privacy Act provides a statutory remedy for claims traditionally asserted at common law under the torts of public disclosure of private facts and intrusion upon seclusion.

170. Atrius had a legal duty to adequately safeguard the confidentiality and privacy of Plaintiff's and Class Members' Private Information.

171. Plaintiff and Class Members did not authorize Defendant to disclose their Private Information to Facebook, Google, or any other third party for a purpose unrelated to their medical care and treatment.

172. Atrius distributed Plaintiff's and Class Members' Private Information to unauthorized third parties to market its services and increase revenues, and those third parties can and did provide or permit the use of the same information to numerous other third parties (including advertisers and data brokers), and therefore, Atrius's conduct reflected a public disclosure of private facts.

173. Additionally, Atrius's injection of hidden code into their website that disclosed Private Information to third parties constituted an intrusion upon the seclusion of Plaintiff and Class Members by invading Plaintiff's and Class Member's private affairs—their communications with healthcare providers—in a manner that a reasonable person would deem highly offensive.

174. Atrius's conduct constitutes an unreasonable and substantial invasion of Plaintiff's and Class Members' privacy, which has subjected them to unnecessary attention, stigma, and other harms.

175. Plaintiff and Class Members suffered injuries as a direct and proximate result of Atrius's disclosure of their Private Information and intrusion upon Plaintiff's and Class Members' seclusion.

176. Atrius's acts or omissions violate the Massachusetts Right to Privacy Act.

177. Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 137, *supra*), plus costs and attorneys' fees.

## COUNT III

**(Breach of Fiduciary Duty, on behalf of the Class)**

178. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

179. A fiduciary relationship existed between Atrius, a healthcare provider, and Plaintiff, an Atrius patient. Furthermore, Atrius assumed the role of a fiduciary by undertaking to collect the Private Information of Plaintiff.

180. When possessing nonpublic medical information, medical providers such as Atrius have a duty to keep such information completely confidential.

181. Plaintiff had a reasonable expectation of privacy in the responses and communications entrusted to Atrius through its website, which included highly sensitive Private Information. Atrius's policies bolstered that expectation, given Atrius's promises to Plaintiff that Atrius would not disclose communications on the website to third parties.

182. Contrary to its duties as a healthcare provider and its express promises of confidentiality, Atrius installed the tracking technologies to disclose and transmit to third parties Plaintiff's and Class Members' Private Information, including information relating to their healthcare.

183. These disclosures were made without Plaintiff's knowledge, consent, or authorization.

184. Atrius's secret and unauthorized disclosures of Plaintiff's Private Information constituted a breach of Atrius's fiduciary duties to Plaintiff to safeguard and protect their Private Information.

185. Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 137, *supra*).

## COUNT IV

**(Negligence, on behalf of the Class)**

186. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

187. Upon accepting, storing, and controlling the Private Information of Plaintiff and the Class, Atrius owed a duty to Plaintiff and the Class to exercise reasonable care to secure, safeguard, and protect their highly sensitive Private Information.

188. Atrius breached this duty by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure.

189. It was reasonably foreseeable that Atrius's failures to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Private Information through their tracking technologies would result in unauthorized third parties gaining access to such Private Information for no lawful purpose.

190. Atrius's duty of care to use reasonable measures to secure and safeguard Plaintiff's and Class Members' Private Information arose due to the special relationship between Atrius and its patients, which is recognized by statute, regulations, industry ethical rules (including the AMA rules described above), and the common law.

191. In addition, Atrius had a duty under state (M.G.L. c. 111 § 70E) and HIPAA privacy laws, which the Massachusetts legislature and Congress enacted to protect the confidentiality of clients' healthcare information, set strict conditions under which providers may use such information, and limit to whom providers can disclose such information.

192. Atrius's conduct also created a foreseeable risk of harm to Plaintiff and Class Members and their Private Information. Defendant's misconduct included the failure to (i) secure Plaintiff's and Class Members' Private Information; (ii) comply with industry-standard data security practices; (iii)

implement adequate website and event monitoring; and (iv) implement the systems, policies, and procedures necessary to prevent unauthorized disclosures resulting from the use of tracking technologies.

193. Atrius's wrongful actions and/or inactions and the resulting unauthorized disclosure of Plaintiff's and Class Members' Private Information constituted negligence at common law.

194. Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 137, *supra*), plus costs and attorneys' fees.

## COUNT V

**(Breach of Confidence, on behalf of the Class)**

195. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

196. Medical providers have a duty to their patients to keep nonpublic medical information completely confidential and to safeguard sensitive personal and medical information. This duty arises from the implied covenant of trust and confidence that is inherent in the physician-patient relationship.

197. Medical providers also have a duty to maintain the confidentiality of Plaintiff's PHI under HIPAA and its implementing regulations.

198. When possessing nonpublic medical information, medical providers such as Atrius have a duty to keep such information completely confidential.

199. Plaintiff had a reasonable expectation of privacy in the responses and communications entrusted to Atrius through its website, which included highly sensitive Private Information. Atrius's

policies bolstered that expectation, given Atrius's promises to Plaintiff that Atrius would not disclose communications on the website to third parties.

200. In light of the special relationship between Atrius and Plaintiff and Class Members, whereby Atrius became a guardian of Plaintiff's and Class Members' Private Information, Atrius became a fiduciary by its undertaking and guardianship of the Private Information to act primarily for the benefit of its patients, including Plaintiff and Class Members: (1) for the safeguarding of Plaintiff's and Class Members' Private Information; (2) to timely notify Plaintiff and Class Members of disclosure of their Private Information to unauthorized third parties; and (3) to maintain complete and accurate records of what patient information (and where) Atrius did and does store and disclose.

201. Contrary to its duties as a medical provider and its express and implied promises of confidentiality, Atrius installed tracking technologies that disclosed and transmitted to third parties Plaintiff's and Class Members' communications with Atrius and the contents of those communications, including Private Information.

202. Atrius made these disclosures for its own commercial purposes without Plaintiff's or Class Members' knowledge, consent, or authorization.

203. Atrius disclosed Plaintiff's and Class Members' Private Information to third parties in a manner that allowed them to identify Plaintiff and the individual Class Members.

204. The harm arising from a breach of provider-patient confidentiality includes eroding the essential confidential relationship between the healthcare provider and the patient.

205. Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 137, *supra*), plus costs and attorneys' fees

## COUNT VI

**(Breach of Contract, on behalf of the Class)**

206. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

207. Atrius required Plaintiff and Class Members to provide their Private Information, including names, email addresses, phone numbers, computer IP addresses, appointment information, and other content submitted to the Atrius Website as a condition of receiving healthcare services. Plaintiff's and Class Member's provision of such Private Information provided consideration for Atrius's provision of services through the Atrius Website, including the provision of information and the use of the website to obtain medical services.

208. In so doing, Plaintiff and Class Members entered into express contracts with Atrius (or, in the alternative, implied contracts) by which Atrius agreed to safeguard and protect such information, in its privacy policies and elsewhere, to keep such information secure and confidential. Atrius's contractual promises included that it would disclose or use health information for only specified purposes, which did not include bartering the information to third-party marketing and technology companies in exchange for marketing services.

209. Plaintiff and Class Members fully performed their obligations under the contract with Atrius.

210. Atrius breached its agreement with Plaintiff and Class Members by directly breaching its promise to disclose health information only for limited purposes specified in its policies, and by failing to safeguard and protect such confidential information.

211. As a direct and proximate result of Atrius's above-described breaches of contract, Plaintiff and Class Members have suffered the compromise and disclosure of their Private Information and have been denied the benefit of the bargain of their agreement with Atrius.

212. As a direct and proximate result of Defendant's above-described breach of contract, Plaintiff and Class Members should recover actual, consequential, and nominal damages, including without limitation the forms of damages set forth in paragraph 137, *supra,* plus costs and attorneys' fees.

**COUNT VII**

**(Unjust Enrichment, on behalf of the Class)**

213. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

214. This claim is pleaded in the alternative to Plaintiff's other causes of action.

215. Atrius benefits from using Plaintiff's and Class Members' Private Information and unjustly retained those benefits at Plaintiff's and Class Members' expense.

216. Plaintiff and Class Members conferred a benefit upon Defendant in the form of the monetizable Private Information that Defendant collected from them and disclosed to third parties, including Facebook and Google, without authorization and proper compensation.

217. Atrius consciously collected and used this information for its own gain, providing Atrius with economic, intangible, and other benefits, including substantial monetary compensation.

218. Atrius unjustly retained those benefits at the expense of Plaintiff and Class Members because Atrius's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff or Class Members.

219. The benefits that Atrius derived from Plaintiff and Class Members were not offered by Plaintiff or Class Members gratuitously and, thus, rightly belong to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles for Atrius to retain any revenues or other

benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

220. Had Atrius informed Plaintiff that it collected and shared Plaintiff's Private Information with Facebook, Google, and other third parties, Plaintiff would have refused to consent to such use of her Private Information or would have demanded compensation for such usage. Now knowing of Atrius's practices, Plaintiff demands compensation for the unauthorized use of their Private Information.

221. The Court should compel Atrius to disgorge into a common fund for the benefit of Plaintiff and the Class the value of all unlawful or inequitable benefits that Atrius unjustly received and such other relief as the Court may deem just and proper.

## Prayers for Relief

WHEREFORE, Plaintiff prays for relief in the form of an order as follows:

a. Certifying this action as a class action under Massachusetts Rule of Civil Procedure 23, and appointing Plaintiff as class representative and her attorneys as class counsel;

b. Awarding damages (including statutory damages) to Plaintiff and Class Members;

c. Awarding attorneys' fees, expenses, and the costs of this suit, together with prejudgment and post-judgment interest at the maximum rate allowed by law; and

d. Awarding such other and further relief which the Court finds just and proper.

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon counsel of record for Defendant by email on December 5, 2024

*/s/ Patrick J. Vallely*
Patrick J. Vallely

**Jury Demand**

Plaintiff demands a trial by jury on all claims so triable.

Dated: December 5, 2024

Respectfully submitted,

*/s/ Patrick J. Vallely*

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

I HEREBY ATTEST AND CERTIFY ON January 9, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: [signature]
Asst. Clerk

**COMMONWEALTH OF MASSACHUSETTS**

**Suffolk, ss.**

| | |
|---|---|
| JANE DOE,<br>For herself and the Class,<br>v.<br>ATRIUS HEALTH, INC.<br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**<br><br>CIVIL ACTION NO. 2384CV00597-BLS1 |

**JOINT NOTICE OF SUPREME JUDICIAL COURT DECISION IN *VITA v. NEW ENGLAND BAPTIST HOSPITAL***

Pursuant to the Court's order of January 24, 2024, the parties hereby jointly notify the Court that on October 24, 2024, the Supreme Judicial Court issued its decision in *Vita v. New England Baptist Hospital*, 494 Mass. 824 (2024), reversing the Superior Court's denial of motions to dismiss in the two cases on appeal. Rescript issued in both appealed cases on November 21, 2024. The parties have conferred and are available for a Rule 16 conference on January 7, 2025, January 8, 2025, or January 15, 2025. The parties disagree about the scope and nature of this hearing, however.

Plaintiffs' position:

Defendant has proposed an omnibus Rule 16 conference involving sixteen cases pending in this Court and has indicated that counsel for all Defendants are available, but no one has yet conferred with Plaintiff's counsel from all sixteen cases. Plaintiff is available on the dates Defendant has proposed but believes it is premature to have a joint conference, given Plaintiff has today amended her complaint in this case as of right pursuant to Mass. R. Civ. Proc. 15(a), and Plaintiff's counsel intends to soon file amended complaints (or move for leave to amend complaints) in other cases, which may affect the procedural posture of those cases.

Defendant's position:

There are 16 putative class actions pending in this Court challenging the alleged use of website technologies. That includes this action as well as a second case against Defendant Atrius Health, Inc. ("Atrius"), *see Doe v. Atrius Health, Inc.*, No. 2384CV02704-BLS1 (the "Related Action"), which Plaintiff stated would be consolidated with this action, subject to the Court's approval. *See* Dkt. 23 at 2-3. Nonetheless, earlier today Plaintiff filed an amended complaint, abandoning her claim under the Massachusetts Wiretap Act and purporting to assert seven new causes of action.

In order to determine how this suit, the Related Action, as well as the other actions pending in this Court and stayed pending the disposition of *Vita* should proceed, Atrius asks that a Rule 16 Conference be a joint Conference to address next steps. Atrius has consulted with counsel for defendants in the actions and understands that counsel for defendants are currently available for such a Conference on the dates above. Further, counsel for plaintiffs in the Related Action, who also represent plaintiffs in multiple cases listed below, advised that they are amenable to a joint Conference and are available on the aforementioned dates.

For the Court's convenience, the related actions that have been stayed pending resolution of *Vita* are as follows:

| Case Name | Case No. |
|---|---|
| *Joseph Alves v. BJ's Wholesale Club, Inc.* | No. 2284CV02509-BLS1 |
| *Janice Progin, et al. v. UMass Mem'l Health Care, Inc., et al.* | No. 2284CV02889-BLS1 |
| *Jane Doe v. Steward Health Care Sys., LLC* | No. 2384CV00174-BLS1 |
| *John Doe et al. v. Boston Med. Ctr. Corp.* | No. 2384CV00326-BLS1 |
| *Jane Doe v. Children's Hosp. Corp.* | No. 2384CV00411-BLS1 |
| *Kathleen Vita v. Beth Israel Deaconess Med. Ctr., Inc.* | No. 2384CV00480-BLS1 |

| | |
|---|---|
| *Kathleen Vita v. Blue Cross & Blue Shield of Mass., Inc., et al.* | No. 2384CV00542-BLS1 |
| *Jane Doe v. Atrius Health, Inc.* | No. 2384CV00597-BLS1 |
| *Jane Doe v. Lawrence Gen Hosp.* | No. 2384CV00728-BLS1 |
| *Kathleen Vita v. New England Baptist Hosp.* | No. 2384CV00857-BLS1 |
| *Karen McManus v. Tufts Med. Ctr., Inc.* | No. 2384CV00930-BLS1 |
| *Elizabeth Nova v. Boston Med. Ctr., Corp.* | No. 2384CV01086-BLS1 |
| *Jane Doe v. Cape Cod Healthcare, Inc.* | No. 2384CV01236-BLS1 |
| *Jane Doe v. Baystate Health Sys., Inc.* | No. 2384CV01949-BLS1 |
| *John Doe et al., v. UMass Mem'l Health Care, Inc.* | No. 2384CV02448-BLS1 |
| *John Doe et al., v. Atrius Health, Inc.* | No. 2384CV02704-BLS1 |

Respectfully submitted this 5th day of December 2024:

*/s/ Patrick J. Vallely*
SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place, Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
pvallely@shulaw.com

*Counsel for Plaintiff and the Proposed Class*

*/s/ Anthony Fuller (e-signed with permission)*
HOGAN LOVELLS US LLP
Anthony Fuller (BBO #633246)
Kayla H. Ghantous (BBO No. 709197)
125 High Street, 20th Floor
Boston, MA 02110
(617) 371-1000 – Telephone
(617) 371-1037 – Facsimile
anthony.fuller@hoganlovells.com
kayla.ghantous@hoganlovells.com

*Counsel for Defendant Atrius Health, Inc.*

I HEREBY ATTEST AND CERTIFY ON January 9, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: [signature]
Asst. Clerk

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon Defendant's counsel by email on December 5, 2024.

*/s/ Patrick J. Vallely*
Patrick J. Vallely

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JANE DOE, on behalf of herself and all others similarly situated,

Plaintiff,

v.

ATRIUS HEALTH, INC., *et al.*,

Defendant.

Case No.: 1:23-cv-10923-FDS

## NOTICE OF APPEARANCE

Please enter the appearance of Patrick J. Vallely of Shapiro Haber & Urmy LLP, One Boston Place, Suite 2600, Boston, MA 02108, as attorney for plaintiff Jane Doe in the above-captioned matter.

Dated: May 26, 2023

Respectfully submitted,

*/s/ Patrick J. Vallely*

Patrick J. Vallely (BBO #663866)
**SHAPIRO HABER & URMY LLP**
One Boston Place, Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
pvallely@shulaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to the attorney of record for each party indicated as non- registered participants on this 26th day of May 2023.

*/s/ Patrick J. Vallely*
Patrick J. Vallely

Suffolk Superior Court

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JANE DOE,<br>For herself and the Class,<br>Plaintiff,<br>v.<br>ATRIUS HEALTH, INC.<br>Defendant. | Civil Action No. 1:23-cv-10923 |

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
OCT 30 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

## NOTICE OF APPEARANCE

**Please enter the appearance of** Maria R. Durant of the law firm Hogan Lovells US LLP, 125 High Street, Suite 2010, Boston, Massachusetts, 02110, as counsel for Defendant Atrius Health, Inc. in the above-captioned case.

Dated: April 27, 2023

Respectfully submitted,

*/s/ Maria R. Durant*

Maria R. Durant (BBO #558906)
HOGAN LOVELLS US LLP
125 High Street, Suite 2010
Boston, MA 02110
Telephone: (617) 371-1000
Facsimile: (617) 371-1037
maria.durant@hoganlovells.com

**CERTIFICATE OF SERVICE**

I hereby certify that on April 27, 2023, copies of the foregoing Notice of Appearance were sent via electronic mail and overnight delivery, as indicated below, to:

Shapiro Haber & Urmy LLP
Edward F. Haber
Michelle H. Blauner
Patrick J. Vallely
One Boston Place
Suite 2600
Boston, MA 02108
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Counsel for Plaintiff Jane Doe, For herself and the Class*

*/s/ Maria R. Durant*
*Counsel for Atrius Health, Inc.*

Suffolk Superior Court

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JANE DOE,<br>For herself and the Class,<br>Plaintiff,<br>v.<br>ATRIUS HEALTH, INC.<br>Defendant. | Civil Action No. 1:23-cv-10923 |

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
OCT 30 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

**NOTICE OF APPEARANCE**

**Please enter the appearance of** Adam. A. Cooke of the law firm Hogan Lovells US LLP, 555 Thirteenth Street NW, Washington DC 20004, as counsel for Defendant Atrius Health, Inc. in the above-captioned case.

Dated: April 27, 2023

Respectfully submitted,

*/s/ Adam A. Cooke*

Adam A. Cooke (BBO # 679637)
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
adam.a.cooke@hoganlovells.com

**CERTIFICATE OF SERVICE**

I hereby certify that on April 27, 2023, copies of the foregoing Notice of Appearance were sent via electronic mail and overnight delivery, as indicated below, to:

Shapiro Haber & Urmy LLP
Edward F. Haber
Michelle H. Blauner
Patrick J. Vallely
One Boston Place
Suite 2600
Boston, MA 02108
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Counsel for Plaintiff Jane Doe, For herself and the Class*

/s/. Adam A. Cooke
*Counsel for Atrius Health, Inc.*

Suffolk Superior Court

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JANE DOE, For herself and the Class, Plaintiff, v. ATRIUS HEALTH, INC. Defendant. | Civil Action No. 1:23-cv-10923 |

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
OCT 30 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

**NOTICE OF APPEARANCE**

**Please enter the appearance of** Anthony Fuller of the law firm Hogan Lovells US LLP, 125 High Street, Suite 2010, Boston, Massachusetts, 02110, as counsel for Defendant Atrius Health, Inc. in the above-captioned case.

Dated: April 27, 2023

Respectfully submitted,

*/s/ Anthony E. Fuller*
Anthony E. Fuller (BBO #633246)
HOGAN LOVELLS US LLP
125 High Street, Suite 2010
Boston, MA 02110
Telephone: (617) 371-1000
Facsimile: (617) 371-1037
anthony.fuller@hoganlovells.com

**CERTIFICATE OF SERVICE**

I hereby certify that on April 27, 2023, copies of the foregoing Notice of Appearance were sent via electronic mail and overnight delivery, as indicated below, to:

Shapiro Haber & Urmy LLP
Edward F. Haber
Michelle H. Blauner
Patrick J. Vallely
One Boston Place
Suite 2600
Boston, MA 02108
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Counsel for Plaintiff Jane Doe, For herself and the Class*

*/s/ Anthony E. Fuller*
*Counsel for Atrius Health, Inc.*

26

ML

**COMMONWEALTH OF MASSACHUSETTS**

**Suffolk, S.S.**

| | |
|---|---|
| JANE DOE,<br>For herself and the Proposed Class,<br><br>Plaintiff,<br><br>v.<br><br>ATRIUS HEALTH, INC.<br><br>Defendant. | **Superior Court Department**<br>**Of the Trial Court**<br>**Business Litigation Session**<br><br>Civil Action No. 2384CV00597-BLS1 |

**NOTICE OF FILING OF NOTICE OF REMOVAL**

PLEASE TAKE NOTICE THAT on January 3, 2025, Defendant Atrius Health, Inc. ("Atrius") removed this action to federal court by filing a Notice of Removal pursuant to 28 U.S.C. § 1441 in the United States District Court for the District of Massachusetts. A true and correct copy of the Notice of Removal is attached hereto as Exhibit A.

PLEASE TAKE FURTHER NOTICE that pursuant to Local Rule 81.1(a) of the Local Rules of the United States District Court for the District of Massachusetts, Atrius respectfully requests that the Court provide it with certified or attested copies of all records and proceedings in the action pending in the Business Litigation Session of the Suffolk County Superior Court and a certified or attested copy of all docket entries in the action pending in Business Litigation Session of the Suffolk County Superior Court.

PLEASE TAKE FURTHER NOTICE that, upon the filing of the Notice of Removal with the United States District Court for the District of Massachusetts, and filing copies thereof with the Clerk at the Business Litigation Session of the Suffolk County Superior Court, Atrius has

effected removal and the Superior Court shall proceed no further in this action unless the action is remanded pursuant to 28 U.S.C. § 1446(d).

Dated: January 3, 2025

Respectfully submitted,

By its attorneys,

*_/s/ Anthony E. Fuller_*
Anthony E. Fuller (BBO # 633246)
Kayla H. Ghantous (BBO # 709197)
125 High Street, Suite 2010
Boston, MA 02110
Telephone: (617) 371-1000
Facsimile: (617) 371-1037
anthony.fuller@hoganlovells.com
kayla.ghantous@hoganlovells.com

Allison Holt Ryan*
Adam A. Cooke (BBO # 679637)
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
allison.holt-ryan@hoganlovells.com
adam.a.cooke@hoganlovells.com

**Pro hac vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 3, 2025, copies of the foregoing Notice of Filing of Notice of Removal were sent via electronic mail by operation of the Court's electronic filing system to the addresses listed below:

Shapiro Haber & Urmy LLP
Edward F. Haber
Michelle H. Blauner
Patrick J. Vallely
One Boston Place
Suite 2600
Boston, MA 02108
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Counsel for Plaintiff Jane Doe, For herself and the Class*

*/s/ Anthony E. Fuller*
*Counsel for Defendant Atrius Health, Inc.*

I HEREBY ATTEST AND CERTIFY ON January 9, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: Margaret M Buckley
Asst. Clerk

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

Certified to be a true and correct copy of the original
Robert M. Farrell, Clerk
U. S. District Court
District of Massachusetts
By: [signature] Deputy Clerk

Date: 01/07/2025

| | |
|---|---|
| JANE DOE,<br>For herself and the Proposed Class,<br>Plaintiff,<br>v.<br>ATRIUS HEALTH, INC.<br>Defendant. | Civil Action No. ________________<br>[Superior Court Department of the Trial Court Business Litigation Session Case No. 2384CV00597-BLS1]<br>**DEFENDANT'S NOTICE OF REMOVAL UNDER 28 U.S.C. § 1441(a)** |

## NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1441(a) and 1446, Defendant Atrius Health, Inc. ("Atrius") gives notice of the removal of this action from the Business Litigation Session of the Suffolk County Superior Court, Case No. 2384CV00597-BLS1, to the United States District Court for the District of Massachusetts. In support of its Notice of Removal, Atrius states as follows:

## NATURE OF THE REMOVED ACTION

1. On March 10, 2023, Plaintiff Jane Doe filed a Class Action Complaint ("Complaint") against Atrius in the Business Litigation Session of Suffolk County Superior Court (the "BLS"), Case No. 2384CV00597-BLS1. The Complaint included a single claim for relief under the Massachusetts Wiretap Act, Mass. Gen. Laws c. 272 § 99 (the "Massachusetts Wiretap Act"), which was predicated on Atrius' alleged use of technologies on its public website, www.atriushealth.org (the "Website").

2. This suit is one of at least twenty similar putative class actions lodged against hospitals, healthcare providers, and healthcare systems in federal and state courts in the

Commonwealth of Massachusetts, including a second case against Atrius, *see Doe v. Atrius Health, Inc.*, No. 2384CV02704-BLS1 (Mass. Super Ct., Suffolk Cnty.) (the "Related Action").

3. On April 27, 2023, Atrius timely removed the case to the United States District Court for the District of Massachusetts, maintaining that removal was proper pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1). *See Doe v. Atrius Health, Inc.*, No. 1:23-cv-10923-FDS (D. Mass. Apr. 27, 2023), Doc. 1. Plaintiff subsequently moved to remand the suit, *see Doe v. Atrius Health, Inc.*, No. 1:23-cv-10923-FDS (D. Mass. May 26, 2023), Doc. 19, and the Court granted that motion on October 25, 2023, *see Doe v. Atrius Health, Inc.*, No. 1:23-cv-10923-FDS (D. Mass. Oct. 25, 2023), Doc. 27.

4. A few days later, the BLS denied motions to dismiss filed in two parallel suits asserting claims under the Massachusetts Wiretap Act against other hospital defendants. *See Vita v. Beth Israel Deaconess Med. Cntr., Inc.*, No. 2384CV00480-BLS1 (Mass. Super. Ct., Suffolk Cnty. Oct. 31, 2023), Doc. 17, and *Vita v. New England Baptist Hosp.*, No. 2384CV00857-BLS1 (Mass. Super. Ct., Suffolk Cnty. Oct. 31, 2023), Doc. 16. The BLS reported these decisions for interlocutory review to the Massachusetts Appeals Court pursuant to Mass. R. Civ. P. 64(a). *See id.* And on January 17, 2024, the Massachusetts Supreme Judicial Court granted the hospital defendants' application for direct appellate review, which proceeded as *Vita v. Beth New England Hospital et al.*, No. SJC-13542 (the "*Vita* Appeals").

5. In the following weeks, Atrius filed assented-to motions to stay this case and the Related Action, which had been transferred from the Superior Court of Norfolk County to the BLS so the actions could be consolidated. The motions sought to stay proceedings pending resolution of the *Vita* Appeals and pending consolidation of the two cases. *See Doe v. Atrius Health, Inc.*, No. 2384CV00597-BLS1 (Mass. Super. Ct., Suffolk Cnty., Jan. 22, 2024), Doc. 23; *Doe et al. v.*

*Atrius Health, Inc.*, No. 2384CV02704-BLS1 (Mass. Super Ct., Suffolk Cnty., Jan. 30, 2024), Doc. 33. Both motions were granted soon thereafter. *See Doe v. Atrius Health, Inc.*, No. 2384CV00597-BLS1 (Mass. Super. Ct., Suffolk Cnty., Jan. 24, 2024), Doc. 23-1; *Doe et al. v. Atrius Health, Inc.*, No. 2384CV02704-BLS1 (Mass. Super Ct., Suffolk Cnty., Jan. 30, 2024), Doc. 33-1.

6. On October 24, 2024, the Massachusetts Supreme Judicial Court issued its decision in *Vita v. New England Baptist*, 494 Mass. 824 (2024), reversing the BLS's denial of the motions to dismiss in those cases. Rescripts issued on November 27, 2024. *See Vita v. Beth Israel Deaconess Med. Cntr., Inc.*, No. 2384CV00480-BLS1 (Mass. Super. Ct., Suffolk Cnty. Nov. 27, 2024), Doc. 22.

7. On December 5, 2024, Plaintiff amended her pleading in this action. *See Doe v. Atrius Health, Inc.*, No. 2384CV00597-BLS1 (Mass. Super. Ct., Suffolk Cnty., Jan. 24, 2024), Doc. 24 ("Amended Complaint"). The Amended Complaint abandoned Plaintiff's claim under the Massachusetts Wiretap Act, and in its place, asserted a claim under the federal wiretap statute, 18 U.S.C. § 2510 *et seq.* (the "Federal Wiretap Act"), as well as six state law claims.

8. Atrius understands that the plaintiffs in the Related Action likewise intend to amend their suit to assert a claim under the Federal Wiretap Act, at which time Atrius will remove that case to this Court. Atrius further understands that following removal of the Related Action, the parties anticipate working to consolidate the suits.

**BASIS FOR REMOVAL**

9. Under 28 U.S.C. § 1441(a), "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."

10. Federal courts have original jurisdiction over civil actions arising under federal statutes pursuant to 28 U.S.C. § 1331. Further, 28 U.S.C. § 1367(a) provides that courts may exercise supplemental jurisdiction over state law claims that "derive from a common nucleus of operative facts" as federal claims. *See Lanciani v. Allstate Insur. Co.*, 2023 WL 6172457, at *3 (D. Mass. Sept. 22, 2023) (explaining that supplemental jurisdiction "exist[s] over all state-law causes of action that 'derive from a common nucleus of operative fact'" as a federal law claim "'or are such that they would ordinarily be expected to be tried in one judicial proceeding'") (citation omitted).

11. Here, the Court has original jurisdiction over Count I of the Amended Complaint, which asserts a claim under the Federal Wiretap Act. *See* 28 U.S.C. § 1331. Plaintiff's remaining claims all relate to the same factual allegations that undergird her federal claim: Atrius's alleged use of technologies on the Website. *Compare* Amended Complaint ¶¶ 146-66 (Count I) *with id.* ¶¶ 167-221 (Counts II through VII). Therefore, the Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

**PROCEDURAL REQUIREMENTS**

12. All the procedural requirements for removal under 28 U.S.C. § 1446 are satisfied.

13. Atrius is filing this Notice of Removal within thirty days of its receipt of the Amended Complaint on December 5, 2024. 28 U.S.C. § 1446(b)(3); *see Romulus v. CVS Pharma., Inc.*, 770 F.3d 67, 74 (1st Cir. 2014) (explaining that the thirty-day deadline in "Section 1446(b)(3) does not apply until removability can first be ascertained from the plaintiffs' own papers").

14. This Court is the federal court that encompasses the BLS, where the suit was originally filed. Venue is therefore proper under 28 U.S.C. §§ 101 and 1441(a).

15. Atrius has attached hereto a copy of the Amended Complaint and all other publicly available filings from the state court docket as Exhibits 1-33.

16. Upon filing this Notice, Atrius will promptly "give written notice thereof to all adverse parties," and will "file a copy of the notice with the clerk" of the BLS, as required under 28 U.S.C. § 1446(d), and will also file certified or attested copies of the State Court record, in accordance with Local Rule 81.1(a) of the United States District Court for the District of Massachusetts.

**WHEREFORE**, Notice is given that this action is removed from the BLS to the United States District Court for the District of Massachusetts.

Dated: January 3, 2025

Respectfully submitted,

By: */s/ Anthony E. Fuller*

Anthony E. Fuller (BBO #663246)
Kayla H. Ghantous (BBO # 709197)
HOGAN LOVELLS US LLP
125 High Street, Suite 2010
Boston, MA 02110
Telephone: (617) 371-100
Facsimile: (617) 371-1037
anthony.fuller@hoganlovells.com
kayla.ghantous@hoganlovells.com

Allison Holt Ryan (*admitted pro hac vice*)
Adam A. Cooke (BBO # 679637)
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
allison.holt-ryan@hoganlovells.com
adam.a.cooke@hoganlovells.com

*Counsel for Defendant*

I HEREBY ATTEST AND CERTIFY ON January 9, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: Margaret M Buckley
Asst. Clerk

**CERTIFICATE OF SERVICE**

I hereby certify that on January 3, 2025, copies of the foregoing Notice of Removal and accompanying exhibits were sent via electronic mail to:

Edward F. Haber
Michelle H. Blauner
Patrick J. Vallely
SHAPIRO HABER
& URMY LLP
One Boston Place
Suite 2600
Boston, MA 02108
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Counsel for Plaintiff Jane Doe, For herself and the Class*

/s/ *Anthony E. Fuller*
Anthony E. Fuller

*Counsel for Defendant*