**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JANE DOE, for herself and the Proposed Class,<br>Plaintiffs,<br>v.<br>ATRIUS HEALTH, INC.,<br>Defendant. | Case No. 1:25-cv-10020-FDS<br>Jury Trial Demanded |

# CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiffs John Doe, Jane Doe #1, and Jane Doe #2 ("Plaintiffs"),[1] individually and on behalf of all other persons similarly situated ("Class Members"), bring suit against Defendant Atrius Health, Inc. ("Defendant" or "Atrius Health"), and upon personal knowledge as to Plaintiffs' own conduct and on information and belief as to all other matters based upon investigation by counsel, allege as follows:

## NATURE OF ACTION AND ALLEGATIONS

1. This case arises from Defendant's systematic violation of the medical privacy rights of its patients, exposing highly sensitive healthcare communications, including communications that reveal those consumers' personal identifiable information and protected health information (together, "PII/PHI"), to multiple third parties (the "Third Parties") without those patients' knowledge or consent.

2. Defendant's Medical Information Privacy Notice ("Privacy Notice") assures patients that Defendant is prohibited by law from "selling your health information to others" or

[1] The names for each plaintiff are pseudonyms used to protect the privacy of the Plaintiffs, given that this case involves private health information of Plaintiffs. Plaintiffs' identities have been disclosed to counsel for the Defendant per orders of Massachusetts Superior Court entered prior to the removal of these cases.

"using or disclosing your health information" for "promotional communications" without patients' "written authorization."[2] Defendant's Privacy Notice further notes that Defendant is "required by law to protect the privacy of your health information."[3] Contrary to these assurances, Defendant does not follow these policies, nor the law prohibiting such disclosures.

3. At all relevant times, Defendant disclosed information about its patients—including their status as patients, their physicians, their medical treatments, the hospitals they visited, and their personal identities—to Facebook, Google, and other Third Parties without their patients' knowledge, authorization, or consent.

4. Atrius Health discloses healthcare communications, including communications that reveal PII/PHI, through the deployment of various digital marketing and automatic rerouting tools that Defendant has embedded on its websites and patient portal mobile app[4] that purposefully and intentionally redirect patients' personal healthcare communications containing PII/PHI to multiple Third Parties. Those Third Parties, including Google and Facebook, among other companies that engage in online marketing and advertising activities, then associated the intercepted communications with the real-world identities of individuals known to those Third Parties, including Google and Facebook. Those Third Parties and Atrius Health then subsequently exploit

---

[2] https://www.atriushealth.org/patient-information/privacy-practices. Defendant's current Privacy Notice went into effect on September 30, 2022. Defendant's prior "Notice of Privacy Practices" may be found at https://web.archive.org/web/20220713190254/https://www.atriushealth.org/patient-information/privacy-practices. That Privacy Notice informed patients that "Access" to patients' medical records and other information maintained by Atrius Health "is restricted to clinicians and staff who need the information for treatment, payment, or health care operations purposes." Defendant's prior Privacy Notice further promised patients that "We will not use or share your information other than as described here unless you tell us we can in writing." Defendant's prior Privacy Notice also promised that Defendant would "never share your information" for "Marketing Purposes" or "Sale of your information" unless "you give written permission."

[3] https://www.atriushealth.org/patient-information/privacy-practices

[4] Plaintiffs' counsel anticipates seeking discovery regarding whether Defendant deployed tracking technology inside its web-based patient portal—as is commonly the case in matters such as this—and will seek leave to supplement if and to the extent appropriate.

that information for advertising purposes, including by enabling Defendant to exploit the intercepted communications for purposes of targeted advertising and "re-targeting" (described further below) by using the Third Parties' advertising platforms.

5. The tracking technologies advanced Defendant's marketing efforts by enabling Defendant to use Google's, Facebook's, and other Third Parties' advertising platforms to target patients whose communications were intercepted with advertising and to optimize the Atrius Health website and patient portal mobile app to more effectively market Atrius Health to its customers (*i.e.*, its patients). That is, Atrius Health had an incentive, which it acted on, to disclose sensitive healthcare communications, including communications that revealed PII/PHI, to Third Parties, including Google and Facebook, to advance its own marketing efforts.

6. Defendant's use of these tools caused its patients' communications, including communications that reveal PII/PHI, exchanged with Defendant to be automatically redirected to Third Parties in violation of those patients' reasonable expectations of privacy, their rights as patients, and both the express and implied promises of Defendant.

7. As shown herein, Defendant intercepted its patients' communications for the primary purpose of committing criminal and tortious acts, including acts that violate the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. 104-191, 110 Stat. 1936 (codified as amended in scattered sections of 42 U.S.C.S.), and the Massachusetts Right to Privacy Act, G.L. c. 214 § 1B, and the Massachusetts common law torts described below. In particular, HIPAA prohibits the (i) disclosure **or** (ii) use of PII/PHI without informed consent, including, specifically, the use of PII/PHI for marketing purposes. As detailed in and supported by the factual allegations throughout this complaint (*see, e.g.,* ¶¶ 35-76, 163-165, 179, 183, 185-187, 189, 191, 193, 197, 203, 206, 209, 249-251, 292-294), Defendant intercepted healthcare communications,

including communications that reveal PII/PHI, for the primary purpose of (i) disclosing the contents of those communications to third-party marketing companies; and (ii) subsequently using the intercepted communications to advance Defendant's marketing of its services to patients, including later using the contents of the intercepted communications for Defendant's targeting of advertisements to those patients through Google's and Facebook's advertising platforms. Those acts violate, among other things, HIPAA, the Massachusetts Right to Privacy Act, and Massachusetts tort law.

8. Defendant used Facebook's and Google's advertising platforms, which enabled Defendant to target advertisements to patients based on the healthcare communications that Defendant intercepted and disclosed to Facebook and Google. After the interceptions, Defendant engaged in extensive targeted advertising on those platforms using the communications and PII/PHI that Defendant intercepted from Plaintiffs and Class Members.

9. Moreover, Defendant knew of the privacy implications of deploying the tracking technologies throughout its patient portal mobile app and websites, including on pages like the bill payment pages and pages used to navigate to Atrius Health's patient portal, the use of which reflected patient status. As detailed below, the functionality of the tracking technologies was well-known to businesses that deployed them, and Google and Facebook expressly directed Defendant to obtain user consent for all tracking technologies and not to use tracking technologies on healthcare webpages. Notwithstanding this knowledge, Defendant deployed the tracking technologies anyway, including on pages specifically designed for patients such as its bill pay webpage and pages used to navigate to the patient portal. Indeed, Defendant deployed the tracking technologies for that very purpose: to disclose an individual's status as a patient of Defendant, and that patient's communications on its website or patient portal mobile app, so that Defendant and

others could target those patients with advertising on Google and Facebook's advertising platforms. This benefited Defendant—at its patients' expense—in multiple ways. As noted, Defendant was able to conduct targeted advertising campaigns for its services, which was intended to and did increase its revenue and profits. Further, because Defendant was able to conduct digital advertising campaigns in a targeted manner using lower-cost advertising technology made available by Google, Facebook, and other Third Parties, Defendant benefited in the form of substantially reduced expenses for, and increased ROI from, its online advertising and digital marketing activities.

10. Defendant's conduct in disclosing such healthcare communications, including communications that reveal PII/PHI, about its patients to Facebook and other Third Parties violates both Massachusetts and Federal law.

## PARTIES TO THE ACTION

11. Defendant Atrius Health, Inc. is a Massachusetts corporation with its principal office at 275 Grove St., Suite 3-300, Newton, Massachusetts, 02466. Defendant is the parent company for more than 30 medical practice locations in Massachusetts, including Harvard Vanguard Copley, Harvard Vanguard Chestnut-Hill Roxbury, Harvard Vanguard Beverly, Harvard Vanguard Braintree, Harvard Vanguard Burlington, Harvard Vanguard Cambridge, Harvard Vanguard Chelmsford, Harvard Vanguard Quincy, Harvard Vanguard Concord, Duxbury-PMG, Bourne-PMG, and Dedham Medical Associates.[5]

12. Plaintiff Jane Doe #1 is a resident of Burlington, Massachusetts. She is a patient of Atrius Health. She has been a patient of Atrius Health and its predecessor companies since she was an infant. During the Class Period, Plaintiff Jane Doe #1 regularly saw her primary care physician,

[5] https://www.atriushealth.org/locations; *see also* https://www.atriushealth.org/about-us

who is an Atrius Health physician, and has seen various specialists who are also Atrius Health physicians.

13. Plaintiff Jane Doe #2 is an individual living in Norfolk County, Massachusetts, has been treated by Defendant's physicians, and has been a patient at Harvard Vanguard Quincy, one of Defendant's facilities,[6] and thus is also a patient of Defendant.

14. Plaintiff John Doe is an individual living in Middlesex County**,** Massachusetts, has been treated by Defendant's physicians, a patient at Harvard Vanguard Chelmsford, one of Defendant's facilities,[7] and thus also a patient of Defendant.

## JURISDICTION AND VENUE

15. Atrius Health invoked this Court's jurisdiction and asserted the existence of subject matter jurisdiction through its Notice of Removal, Doc. No. 1, pursuant to 28 U.S.C. §§ 1331, 1441, and 1446 (*i.e.*, federal question jurisdiction).

16. Through its Notice of Removal, Atrius Health also asserts venue is appropriate in this Court because the Massachusetts Superior Court from which this case was removed is within this District.

## FACTUAL BACKGROUND

### A. Plaintiffs' experience with Defendant.

17. Plaintiff Jane Doe #1 regularly used the Atrius Health website, patient portal, and patient portal mobile app during the Class Period (defined below) to (i) search for and obtain information about Atrius Health doctors (including their credentials and backgrounds); (ii) search for information on particular symptoms, conditions, and medical procedures; and (ii) obtain and

[6] https://www.atriushealth.org/locations/quincy-harvard-vanguard

[7] https://www.atriushealth.org/locations/chelmsford-harvard-vanguard

review medical records through Atrius Health's patient portal, including reviewing office visit summary notes and test results.

18. As described below, Atrius Health implemented tracking technologies that intercepted communications between Atrius Health and healthcare consumers throughout the Atrius Health website and on the patient portal mobile app. During the Class Period, Plaintiff Jane Doe #1 visited specific pages on the Atrius Health website that were among the webpages on which Atrius Health embedded code for various tracking technologies, including the Meta Pixel, DoubleClick, and Google Analytics. The pages Plaintiff Jain Doe #1 visited included:

(i) Atrius Health's patient portal (*see* ¶¶ 32-33, 183, 184, 205, 206, 294, *infra*, for an explanation of how Atrius Health deployed tracking technologies to intercept patients' navigation to the patient portal for marketing and commercial purposes, and how those intercepted communications were disclosed to and subsequently used by Google, Facebook, Atrius Health, and other companies);

(ii) Atrius Health's searchable "Find-a-Doctor" database (*see* ¶¶ 166, 171(b), 173-176, *infra*, for an explanation of how Atrius Health deployed tracking technologies on its searchable database of doctors for marketing and commercial purposes, and how the intercepted communications were disclosed to and subsequently used by Google, Facebook, Atrius Health, and other companies); and

(iii) pages about specific symptoms, conditions, and medical procedures Plaintiff obtained (*see* ¶¶ 171(d), 177-180, 185-187, *infra*, for an explanation of how Atrius Health deployed tracking technologies on its pages about specific symptoms, conditions, and medical procedures for marketing and commercial purposes, and how the intercepted

communications were disclosed to and subsequently used by Google, Facebook, Atrius Health, and other companies).

19. Plaintiff John Doe is a patient of Defendant who receives treatment at, among other of Defendant's facilities, Harvard Vanguard Chelmsford.[8] Since at least 2022, Plaintiff John Doe visited Defendant's website and patient portal at www.atriushealth.org regularly. When doing so, he entered identifying information and information related to his medical condition and treating physician, including queries about treatment for shoulder injuries. He did not consent to Defendant sharing information about these activities to Facebook, Google, or any other Third Party.

20. Plaintiff Jane Doe #2 is a patient of Defendant who receives treatment at Harvard Vanguard Quincy.[9] Plaintiff Jane Doe #2 has been using Defendant's website and accessing Defendant's patient portal and patient portal mobile app since 2011. Plaintiff Jane Doe #2 has used Defendant's website, patient portal, and patient portal mobile app to search for information about doctors, pay for medical services, make appointments, view test results, message with her doctors and nurses, upload insurance information, and search for information related to her medical treatment. Specifically, she has used the website, patient portal, and patient portal mobile app in connection with a variety of medical conditions over the past decade, including spine issues, degenerative disk disease, pain care, high blood pressure, yearly skin checks, primary care, and routine gynecological care. This has resulted in the disclosure of her PII/PHI to Third Parties without her consent, including her specific search queries about "HPV" and "Cervical."

21. Unbeknownst to Plaintiffs, Defendant installed tracking technologies across its webpages that caused the medical information Plaintiffs entered on those webpages, their

[8] https://www.atriushealth.org/locations/chelmsford-harvard-vanguard

[9] https://www.atriushealth.org/locations/quincy-harvard-vanguard

personally identifiable information, including their IP Addresses and Browser Fingerprints, and Plaintiffs' interactions with Defendant's webpages, to be transmitted to third-party advertisers, including Google and Facebook, without their consent. Defendant's use of tracking pixels resulted in details about Plaintiffs' every communication with Defendant's website being shared with Third Parties, including such information as the search terms they used, the doctors and medical treatments that they reviewed, their patient status, their Facebook IDs, their IP addresses, and their browser fingerprints.

22. Plaintiffs were unaware of and did not consent to or authorize this disclosure or use by Third Parties or Atrius Health of their communications with Atrius Health or any PII/PHI contained therein. They were also unaware of and did not consent to the use of their healthcare communications or PII/PHI by Atrius Health for marketing purposes.

**B. Defendant routinely discloses the PII/PHI of its patients to Third Parties, including Facebook and Google.**

23. Under G.L. c. 214, § 1B, all persons "have a right against unreasonable, substantial, or serious interference" with their privacy.

24. Medical patients such as Plaintiffs have a legal interest in preserving the confidentiality of their communications with healthcare providers and have reasonable expectations of privacy that their PII/PHI and communications with their medical providers will not be disclosed to Third Parties by Defendant without their express written consent and authorization, and that their healthcare communications and PII/PHI will not be used for marketing purposes without their consent.

25. Patients also have reasonable expectations of privacy that their PII/PHI and communications will not be disclosed to Third Parties, or subsequently used by Atrius Health and

those Third Parties for marketing purposes, without their express written consent and authorization.

26. As a healthcare provider, Defendant has ethical, fiduciary, common law, and statutory duties to protect the confidentiality of patients' PII/PHI and communications.

27. Defendant expressly and impliedly promises patients that it will maintain and protect the confidentiality of patients' PII/PHI and communications.

28. Defendant operates websites for patients, including www.atriushealth.org.

29. Defendant's websites are designed for interactive communication with patients, including scheduling appointments, searching for physicians, paying bills, requesting medical records, learning about medical issues and treatment options, and joining support groups.

30. Defendant encourages patients to use digital tools on its website to seek and receive health services.

31. The home page of Defendant's website is designed for use by patients. The homepage provides patients with tools to seek treatment, such as finding a doctor, researching services and treatments, paying bills, and learning about Defendant's services.

32. Defendant also maintains a patient portal and patient portal mobile app, which allow patients to make appointments, access medical records, view lab results, and exchange communications with their health care providers.

33. Certain pages of the Atrius Health website are designed specifically for patients. These pages included those permitting Atrius Health patients to navigate to the patient portal, to pay their bills, enabling patients to request appointments, enabling patients to request prescription refills, and permitting patients to search for and contact particular Atrius Health physicians. The

entirety of Defendant's patient portal mobile app is likewise designed specifically for patients and enables patients to engage in all the foregoing activities and communications.

34. Notwithstanding patients' reasonable expectations of privacy, Defendant's legal duties of confidentiality, and Defendant's express promises to the contrary, Defendant discloses the contents of patients' communications, including communications that reveal PII/PHI, via automatic re-routing mechanisms embedded in the websites operated by Defendant and in Defendant's patient portal mobile app without patients' knowledge, authorization, or consent.

**C. The primary purpose for which Atrius Health used tracking technologies on its website and patient portal mobile app was to disclose to Google and Facebook, and subsequently use, the intercepted communications for Atrius Health's own commercial purposes, including targeted advertising.**

35. Plaintiffs describe in this complaint various tracking technologies that Atrius Health implemented on its website and patient portal mobile app, which caused the secret interception, recording, and transmission of the contents of Plaintiffs' and Class Members' communications with Atrius Health. This section presents a basic overview of how the technologies work, including how Third Parties intercept and record the contents of Plaintiffs' and Class Members' communications with Atrius Health and the purposes for which interceptions are made.

36. Meta Platforms, Inc., referred to in this complaint by its former and more familiar name, "Facebook,"[10] is a multinational technology conglomerate based in Menlo Park, California. It owns and operates social media platforms, including Facebook and Instagram, as well as various other software and technology products and services.

[10] Facebook rebranded its parent company as "Meta" in October 2021.

37. Facebook was founded in 2004 and originally designed as a social networking website for college students.

38. Facebook maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications. These profiles are associated with personal identifiers, including IP addresses, cookies, and other device identifiers. Facebook also tracks non-users across the web through its internet marketing products and source code. Facebook employs algorithms, powered by machine learning tools, to determine what advertisements to show users based on their habits and interests, and utilizes tracking software such as the Meta Pixel to monitor and exploit users' habits and interests.

39. Facebook describes itself as a "real identity" platform.[11] This means that users are permitted only one account and must share "the name they go by in everyday life."[12] To that end, Facebook requires users to provide their first and last name, along with their birthday, telephone number and/or email address, and gender, when creating an account.[13]

40. In 2007, realizing the value of having direct access to millions of consumers, Facebook began monetizing its platform by launching "Facebook Ads," proclaiming this service to be a "completely new way of advertising online" that would allow "advertisers to deliver more tailored and relevant ads."[14] Facebook has since evolved into one of the largest advertising companies in the world.[15] Facebook can target users so effectively because it surveils user activity

---

[11] https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701#:~:text=Facebook%20said%20in%20its%20most,of%20them%20than%20developed%20ones.

[12] https://transparency.fb.com/policies/community-standards/account-integrity-and-authentic-identity/

[13] https://www.facebook.com/help/406644739431633

[14] https://about.fb.com/news/2007/11/facebook-unveils-facebook-ads/

[15] https://www.pewresearch.org/fact-tank/2021/06/01/facts-about-americans-and-facebook/

both on and off its website through the use of tracking pixels.[16] This allows Facebook to make inferences about users based on their interests, behavior, and connections.[17]

41. Today, Facebook provides advertising on its own social media platforms, as well as other websites through its Facebook Audience Network. Facebook has more than 2.9 billion users.[18]

42. Facebook derives most of its revenue from selling targeted advertising directed to users of its platforms, including Facebook and Instagram. Facebook tailors advertising to particular individuals by building extensive behavioral profiles for each individual. These profiles are based not only on those individuals' use of Facebook products, such as Facebook and Instagram, but also on the activities of those individuals on other websites that Facebook does not own.

43. Tracking information about users' habits and interests is a critical component of Facebook's business model because it is precisely this kind of information that allows Facebook to sell advertising to its customers.[19] Facebook uses plug-ins and cookies to track users' browsing histories when they visit third-party websites. Facebook then compiles these browsing histories into personal profiles, which are sold to advertisers to generate profits.

44. Facebook offers several advertising options based on the type of audience that an advertiser wants to target. Those options include targeting "Core Audiences," "Custom Audiences," "Look Alike Audiences," and even more granulated approaches within audiences called "Detailed Targeting."[20] Each of Facebook's advertising tools allow an advertiser to target

---

[16] https://www.facebook.com/business/help/742478679120153?id=1205376682832142

[17] https://www.facebook.com/business/ads/ad-targeting

[18] https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide/

[19] *See* Meta Platforms, Inc. Form 10-K at 18, *available at* https://www.sec.gov/Archives/edgar/data/1326801/000132680124000012/meta-20231231.htm?utm_source=chatgpt.com (discussing importance of ad targeting to Meta's revenues).

[20] *See, e.g.,* https://www.facebook.com/groups/learnwithfreelancerlab/posts/376303544342962/.

users based, among other things, on their personal data, including geographic location, demographics (*e.g.*, age, gender, education, job title, etc.), interests (*e.g.*, preferred food, movies), connections (*e.g.*, particular events or Facebook pages), and behaviors (*e.g.*, purchases, device usage, and pages visited). This audience can be created by Facebook, the advertiser, or both working in conjunction.

45. Ad Targeting has been extremely successful due to Facebook's ability to target individuals at a granular level. For example, among many possible target audiences, "Facebook offers advertisers 1.5 million people 'whose activity on Facebook suggests that they're more likely to engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'"[21] These are but a few of the many discrete target audiences Facebook offers. Aided by highly granular data used to target specific users, Facebook's advertising segment quickly became Facebook's most successful business unit, with millions of companies and individuals utilizing Facebook's advertising services.

46. Among the ways Facebook tracks users on websites not owned by Facebook to supplement its detailed individual profiles is by offering websites with the tracking technology known as the Meta Pixel (formerly the Facebook Pixel). The "Meta Pixel" is one of Facebook's most powerful tools. The Meta Pixel is a snippet of code embedded on a third-party website that tracks users' activities as users navigate through a website.[22] Once activated, the Meta Pixel "tracks the people and type of actions they take."[23]

---

[21] https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html

[22] https://developers.facebook.com/docs/meta-pixel/

[23] https://www.facebook.com/business/goals/retargeting

47. The Meta Pixel can track and log each page a user visits, what buttons they click, and specific information they input into a website.[24] The Meta Pixel works by sending Facebook a detailed log of a user's interactions with a website, such as clicking on a product or running a search via a query box. The Meta Pixel also captures information such as what content a user views on a website or how far down a web page they scrolled.[25]

48. Facebook advertises that the Meta Pixel allows website owners to track users across their website and to optimize Facebook advertising based on how those users use the websites. Once a business owner like Atrius Health installs the Meta Pixel on its website, by default, it begins sending user information to Facebook automatically.[26]

49. Facebook states: "The Meta Pixel is a piece of code on your website that can help you better understand the effectiveness of your advertising and the actions people take on your site."[27] Among the key features of the Meta Pixel, touted by Facebook, are:




---

[24] https://www.facebook.com/business/help/742478679120153?id=1205376682832142

[25] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector

[26] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector

[27] https://www.facebook.com/business/tools/meta-pixel.

50. Indeed, the express purpose of Meta Pixel is to track and disclose to Facebook a user's communications on a website, identify that individual user, and target that individual with advertising from the website owner (here, Atrius Health). For example, Facebook tells website owners to "[i]nstall the Facebook pixel if you want to retarget your website visitors."[28] Facebook explains that "[t]he Facebook pixel is a small snippet of code that you, your website engineer or a Facebook Business Partner can paste in your code. It tracks the people and the types of actions they take when they engage with your brand, including any of Your Facebook ads they saw before going to your website, the pages of your site they visit and the items they add to their carts."[29]

51. Facebook receives and monetizes intercepted communications regardless of whether a website user has a Facebook account.[30] Even for someone without an account with any Facebook platform (there are few such people; Facebook has over 2.9 billion users), Facebook still combines data it obtains through the Meta Pixel with other sources (including data obtained through data brokers) to identify the individual, and Facebook then sells the intercepted communications obtained through Meta Pixel, together with identifying information, to data brokers (*i.e.*, companies that are in the business of collecting and compiling data on individuals from various sources then reselling that data to advertisers).

52. Facebook explains further: "Once you've set up the Meta Pixel, the Pixel will log when someone takes an action on your website…."[31] The Meta Pixel receives these actions, or "events," and displays them for review in an "Events Manager" dashboard made available to the party that set up the Meta Pixel on its pages.

---

[28] https://www.facebook.com/business/goals/retargeting

[29] *Id.*

[30] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector

[31] https://my-mm.facebook.com/business/help/742478679120153

53. Therefore, the Meta "pixel allows Facebook to be a **silent third-party watching whatever you're doing**."[32]

54. The primary reason businesses such as Atrius Health embed Meta Pixel on their website is to maximize the effectiveness of the business's targeted advertising on Facebook's advertising platforms (including Facebook, Instagram, and other Facebook services). Facebook tells website owners like Atrius Health that they can use the Meta Pixel to "[o]ptimize delivery of your ad campaigns," and after the Meta Pixel is deployed, business owners can better "reach [their customers] through future Meta ads by retargeting those who have interacted with your website."[33]

55. Atrius Health advertises through Facebook's advertising platforms (this is, in fact, the reason why businesses use Meta Pixel—to advance their advertising efforts on Facebook's advertising platforms). Atrius Health has an incentive to share as much information as possible with Facebook through the tracking technologies, including disclosing the identity of its patients, their treatments, and other sensitive information about them, to maximize the effectiveness of Atrius Health's advertising through Facebook platforms.

56. Facebook touted the Meta Pixel as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website."[34] According to Facebook, the Meta Pixel also provides an analytics tool that allows businesses to measure the effectiveness of their advertising by understanding the actions people take on their websites."[35]

---

[32] "Facebook spies on us but not by recording our calls. Here's how the social network knows everything," Jefferson Graham, USA TODAY, https://www.usatoday.com/story/tech/2020/03/04/facebook-not-recording-our-calls-but-has-other-ways-snoop/4795519002/(last visited Aug. 11, 2022) (emphasis added).

[33] https://www.facebook.com/government-nonprofits/blog/the-facebook-pixel

[34] https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/

[35] https://www.oviond.com/understanding-the-facebook-pixel

57. In addition to permitting businesses like Atrius Health that use the Meta Pixel to later use the content of the intercepted communications for targeted advertising on Facebook's advertising platforms, Facebook provides website owners like Defendant with analytics about the ads they've placed on Facebook and Instagram and tools to target people who have visited their website.[36] The business may also analyze a user's experience and activity on the website to assess the website's functionality and traffic.

58. Facebook can then share analytic metrics with the business deploying Meta Pixel (here, Atrius Health), while at the same time sharing the information it collects with businesses purchasing advertising on Facebook platforms (including Atrius Health) who can then target users based on the information collected and shared by Facebook.

59. Facebook warns web developers that the Meta Pixel is a personal identifier because it enables Facebook "to match your website visitors to their respective Facebook User accounts."[37]

60. Facebook recommends that the Meta Pixel code be added to the base code on every website page (including the website's persistent header) to reduce the chance of browsers or code blocking the Meta Pixel's execution and to ensure that visitors will be tracked.[38]

61. Given the detailed content of communications that is intercepted, disclosed, and later used for targeted advertising through the Meta Pixel, Facebook directed Atrius Health to "provide[] robust and sufficiently prominent notice to users regarding [the Meta Pixel]," including, a "clear and prominent notice on each web page where our pixels are used that links to a clear explanation…that third parties, including Meta, may…collect or receive information from your

[36] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from- hospital-websites

[37] https://developers.facebook.com/docs/meta-pixel/get-started

[38] https://developers.facebook.com/docs/meta-pixel/get-started

websites…and use that information to…target and deliver ads."[39] Facebook also directs businesses not to use Meta Pixel on any webpage that "that includes health…information."[40] Despite these warnings that expressly put Atrius Health on notice about the operation of Meta Pixel and its implications for patients' privacy, Atrius Health ignored the directions and warnings and deployed Meta Pixel without website users' consent on pages that contain health information.

62. Defendant knew Facebook could not be trusted with its patients' sensitive PII/PHI given Facebook's history of violating consumers' privacy through unauthorized use of their personal information both in general and for marketing purposes specifically.

63. Despite knowing that the Meta Pixel code embedded in its websites was sending patients' PII/PHI to Facebook, Defendant did nothing to protect its patients from egregious intrusions into its patients' privacy, choosing instead to benefit at those patients' expense.

64. Additionally, there is widespread knowledge within the healthcare community that installation of the Meta Pixel on hospital websites results in the disclosure of patients' PII/PHI to Facebook, as evidenced by multiple data breaches experienced by hospitals where data gathered by the Meta Pixel code was stolen by cybercriminals. There is also widespread recognition that such disclosures are not only illegal but fundamentally unethical, given the type of information and privacy rights involved.

65. Google LLC is a multinational technology conglomerate and a wholly owned subsidiary of Alphabet Inc. Google LLC is referred to in this complaint as simply "Google." Google owns and operates various software services, including the popular Gmail email service,

---

[39] https://www.facebook.com/legal/technology_terms

[40] https://www.facebook.com/legal/terms/businesstools

Google's search platform, and numerous other internet software services. It also manufactures technology products, including cell phones, smart home devices, and computers.

66. Google maintains detailed profiles on individuals, including their real names, dates of birth, email addresses, phone numbers, and details on their interactions with Google's services. Google maintains detailed profiles on individuals, whether or not they have a Google account.

67. Google derives a substantial portion of its revenues through individually targeted advertising. Specifically, Google uses the information it collects on individuals to tailor advertising to those individuals, making Google's advertising more valuable than other forms of advertising that are not so tailored.

68. One way Google collects information to build its detailed profiles on individuals is through the tracking technology known as Google Analytics, a marketing tool Google offers to website owners. Google incentivizes website owners to use Google Analytics by offering it as a free tool for website owners to track the behavior of users on their websites. The intercepted communications analyzed through Google Analytics provide the website owners with insights about how users use their websites, which the owners can use to improve the marketing of their businesses. According to Google, Google Analytics is designed to "improve marketing ROI" and to "check the performance of [a business's] marketing." Google tells business owners like Atrius Health that Google Analytics "works with Google's advertising and published products, so that" business owners "can use [Google Analytics] insights to deliver business results."[41]

69. Although Google provides Google Analytics to website owners for "free," Google benefits and profits from Google Analytics by using the data collected through Google Analytics for its own commercial purposes, including using that data to build individuals' profiles further.

---

[41] https://marketingplatform.google.com/about/analytics/.

Google can then use this information to serve such individuals with better-targeted individualized advertisements. Furthermore, website owners (like Atrius Health here), after the interceptions, use communications intercepted through Google Analytics to advance their own marketing objectives, including by using the insights provided by Google Analytics to inform website marketing to potential customers.

70. Google also tells business owners like Atrius Health that after data is collected through Google Analytics, "in addition to using the data in [Google Analytics] reports, [business owners] can use the data in audiences for analyzing different groups of users and for exporting the data to advertising platforms like Google Ads so [the business] can run more data-driven advertisements."[42] By tying in Google Analytics with Google Ads, Atrius Health could "share [it]s Analytics audiences with those products," thus advancing its targeted advertising efforts.[43] That is, Google Analytics data is used directly to facilitate "ads personalization," permitting Atrius Health to target advertising based on the intercepted communications.[44]

71. Another way Google collects information to build its detailed profiles on individuals is through its "DoubleClick" tags. DoubleClick was previously an independent company, founded in 1997, and was a pioneer of online, dynamically targeted advertising. Google acquired DoubleClick in 2007 and now operates it as an advertising division of Google. Google's DoubleClick advertising tags operate much the same way as Meta Pixel in that the "tags" are implemented through JavaScript code and designed to track a user's actions on the website. Like the Meta Pixel, Google then associates the data collected through the advertising tags with

---

[42] https://support.google.com/analytics/answer/14430645?hl=en&sjid=5860316122186797017-NA&visit_id=638953584132868414-3109291497&ref_topic=12270146&rd=1

[43] https://support.google.com/analytics/topic/14277381?hl=en&ref_topic=9303474&sjid=5860316122186797017-NA

[44] [GA4] Advanced settings to allow for ads personalization - Analytics Help.

particular individuals to enable website owners such as Atrius Health to serve targeted advertising directed to the individual and measure the efficacy of Atrius Health's advertising campaigns through Google's advertising programs.

72. Atrius Health extensively used Google platforms during the Class Period to advertise, thus exploiting the information Atrius Health intercepted and disclosed to Google through Google's tracking technologies, as reflected by the examples below of Atrius Health's advertisements through Google's ad platform:




73. Atrius Health had an incentive to share as much information as possible with Google, including disclosing the identity of its patients, their treatments, and other sensitive information about them, to maximize the effectiveness and ROI of Atrius Health's advertising through Google platforms, such as the advertising examples above, and to maximize the reduction in its online marketing expenses.

74. Given the detailed content of communications that is intercepted, disclosed, and later used for targeted advertising through Google Analytics and DoubleClick, Google directed

website owners like Atrius Health that they "must disclose [to users] the use of Google Analytics, and how it collects and processes data."[45] Atrius Health did not do so.

75. Google also warns businesses such as Atrius Health that its tracking technologies are not appropriate for use on health-related webpages and websites. Indeed, Google warns web developers that "Health" is a prohibited category that should not be used by advertisers to target ads to users or promote advertisers' products or services.

76. In summary, both Google Analytics and DoubleClick Ads intercept the content of communications between the website user and any webpage on which the code for either product is injected. Google can and does retain communications intercepted through both Google Analytics and DoubleClick tags, and Google can and does use those intercepted communications for its own commercial purposes, and Atrius Health also uses the intercepted communications when it uses Google's advertising platforms for its own marketing (that is, in fact, the primary purpose of the tracking technologies).

### D. Defendant misuses sophisticated software to automatically collect and disclose patient PII/PHI to third-party advertising companies like Google and Facebook.

77. Atrius Health injected hidden code into its websites and patient portal mobile app that intercepted patients' communications and disclosed them to Third Parties. The tracking technologies permitted Third Parties such as Google and Facebook to associate a website user's browsing activity with particular individuals known to Google and Facebook. This included, for example, associating the content of the user's communications with Atrius Health with the website user's Facebook profile.

[45] https://marketingplatform.google.com/about/analytics/terms/us/.

78. Atrius Health has used several tracking technologies on its website, including Google Analytics, DoubleClick, and the Meta Pixel. The tracking technologies are implemented through similar means.

79. For each tracking technology, the JavaScript code for the technology first acquires the content of the communications made through a particular webpage, and then, subsequently, connects to the tracking technology vendor's servers (for example, Google or Facebook servers) to disclose the content of the intercepted communications to the tracking technology vendor. Although the acquisition/interception and disclosure occur through the same JavaScript program, they are distinct events activated by different parts of the code for each tracking technology. Although they are distinct, sequential events, the interception and disclosure to the Third Party occur contemporaneously with the website communications between Class Members and Atrius Health. The contents intercepted include PII/PHI, including the individuals' status as a patient, medical conditions, doctors they may be seeing, medical searches the individual performs on the website, and personal medical information they enter into forms on the website.

80. Defendant's disclosures of patients' PII/PHI occur because Defendant intentionally deploys source code on the websites it operates, including www.atriushealth.org, that causes patients' personally identifiable information (including the exact contents of their communications) to be transmitted to Third Parties.

81. By design, Atrius Health intercepts the exact contents of patients' communications and discloses the contents of those communications to Third Parties, including Google and Facebook, before the full response from Atrius Health to patients has been rendered on the screen of the patients' computer device and while the communication between Atrius Health and the patient remains ongoing.

82. For example, when Plaintiffs or a Class Member accessed Defendant's website pages onto which Atrius Health embedded the code for the Meta Pixel, that code caused the patients' browsers to send a message to Facebook's servers. The information that Defendant sent to Facebook included any PII/PHI that Plaintiffs and Class Members communicated to Atrius Health through the Atrius Health website, such as the type of medical appointment the patient made, the date, and the specific doctor the patient was seeing. Such private information allows third-party advertising companies like Facebook to determine that a specific patient was seeking a specific type of confidential medical treatment. This kind of disclosure also allows Facebook to reasonably infer that a specific patient was being treated for specific types of medical conditions, such as cancer and pregnancy, thereby allowing a patient's medical condition and treatment to be linked to their Facebook account for future retargeting and exploitation.

83. Websites, including those maintained by Atrius Health, are hosted by a computer server through which the business in charge of the website exchanges and communicates with internet users via their web browsers.

84. Web browsers are software applications that allow users to exchange electronic communications over the internet.

85. Each exchange of an electronic communication over the internet typically consists of an HTTP request from a client device and an HTTP response from a server. When a user types a URL into a web browser, for example, the URL is sent as an HTTP request to the server corresponding to the web address, and the server then returns an HTTP response that consists of a web page to display in the client device's web browser.

86. In addition to specifying the URL, HTTP requests can also send data to the host server, including users' cookies. Cookies are text files stored on client devices to record data, often containing sensitive PII.

87. In turn, HTTP responses may consist, among other things, of a web page, another kind of file, text information, or error codes. A web page consists primarily of "Markup" and "Source Code." The markup of a web page comprises the visible portion of that web page. Markup is displayed by a web browser in the form of words, paragraphs, images, and videos displayed on a users' device screen. A web page's source code is a set of instructions that commands browsers to take certain actions, either when the web page loads or when a specified event triggers the code.

88. For example, typing https://www.atriushealth.org/ into a browser sends an HTTP request to Defendant's website, which returns a HTTP response in the form of the home page of Defendant's website:



89. Source code is not visible on the client device's screen, but it may change the markup of a webpage, thereby changing what is displayed on the client device's screen. Source code may also execute a host of other programmatic instructions, including commanding a web browser to send data transmissions in the form of HTTP requests to the website's server, or, as is the case with Defendant's website, to Third Parties via pixels.

90. For example, Atrius Health embedded on its website software code that intercepts and then transmits HTTP requests directly to Facebook, including patients' PII/PHI, every time a patient interacts with a page on its website.

91. When someone visits a third-party website that includes the Meta Pixel code, the Meta Pixel code is able to replicate and send the user data to Facebook through a separate (but simultaneous) channel in a manner that is undetectable by the user.[46]

92. The transmission is instantaneous—indeed Facebook often receives the information before the health care provider does.

93. The transmission is invisible.

94. The transmission is made without any affirmative action taken by the patient.

95. The basic command that web browsers use to exchange data and user communications is called a GET request.[47] For example, when a patient types "heart failure treatment" into the search box on Defendant's website and hits "Enter," the patient's web browser makes a connection with the server for Defendant's website and sends the following request: "GET search/q=heart+failure+treatment."

---

[46] *See, e.g., In re Facebook, Inc. Internet Tracking Litigation,* 956 F.3d 589, 596 (9th Cir. 2020) (explaining functionality of Facebook software code on third-party websites).

[47] https://www.w3schools.com/tags/ref_httpmethods.asp

96. When a server receives a GET request, the information becomes appended to the next URL (or "Uniform Resource Locator") accessed by the user. For example, if a user enters "respiratory problems" into the query box of a website search engine, and the search engine transmits this information using a GET request method, then the words "respiratory" and "problems" will be appended to the query string at the end of the URL of the webpage showing the search results.

97. The other basic transmission command utilized by web browsers is POST, which is typically employed when a user enters data into a form on a website and clicks "Enter" or some other form of submission button. POST sends the data entered in the form to the server hosting the website that the user is visiting.

98. In response to receiving a GET or POST command, the server for the website with which the user is exchanging information will send a set of instructions to the web browser and command the browser with source code that directs the browser to render the website's responsive communication.

99. The information the Meta Pixel captures and discloses to Facebook includes a referrer header (or "URL"), which includes significant information regarding the user's browsing history, including the identity of the individual internet user and the web server, as well as the name of the web page and the search terms used to find it.[48] When users enter a URL address into their web browser using the "http" web address format, or click hyperlinks embedded on a web page, they are actually telling their web browsers (the client) which resources to request and where to find them. Thus, the URL provides significant information regarding a user's browsing history,

[48] *In re Facebook*, 956 F.3d at 596.

including the identity of the individual internet user and the web server, as well as the name of the web page and the search terms that the user used to find it.

100. These search terms and the resulting URLs divulge a user's personal interests, queries, and habits on third-party websites operating outside of Facebook's own platform. In this manner, Facebook tracks users browsing histories on third-party websites, and compiles these browsing histories into personal profiles which are sold to advertisers to generate revenue.[49]

101. For example, if the Meta Pixel is incorporated on a shopping website, it may log what searches a user performed, which items of clothing a user clicked on, whether they added an item to their cart, as well as what they purchased. Along with this data, Facebook also receives PII like IP addresses, Facebook IDs, and other data that allow Facebook to identify the user. All this personally identifying data is available each time the Meta Pixel forwards a user's interactions with a third-party website to Facebook's servers. Once Facebook receives this information, Facebook processes it, analyzes it, and assimilates it into datasets like its Core Audiences and Custom Audiences. Facebook can then sell this information to companies that wish to display advertising for products similar to what the user looked at on the original shopping website.

102. Unbeknownst to users, however, the website's server may also redirect the user's communications to Third Parties, like Facebook and Google. Indeed, Google warns website developers and publishers that installing its ad tracking software on webpages employing GET requests will result in users' personally identifiable information being disclosed to Google.[50] The execution of the code itself provides no visual or other indication that these disclosures are being made. Accordingly, unless the website owner discloses to the website user that such disclosures

---

[49] *In re Facebook*, 956 F.3d at 596.

[50] https://support.google.com/platformspolicy/answer/6156630?hl=en

are being made (and Atrius Health here did not do so), the website user does not know that his or her communications are being intercepted.

103. Third parties (such as Facebook and Google) use the information they receive to track user data and communications for targeted advertising to particular individuals based on the content of the intercepted communications, including marketing on behalf of the business that has chosen to put the tracking technologies on its website (here, Atrius Health).

104. In many cases, third-party marketing companies acquire the content of user communications through a 1x1 pixel (the smallest dot on a user's screen) called a tracking pixel, a web-bug, or a web beacon. These tracking pixels are tiny and are purposefully camouflaged to remain invisible to users.

105. These tracking pixels can collect dozens of data points about individual website users who interact with a website.

106. Tracking pixels such as the Meta Pixel tool allow Defendant and Facebook to secretly track, intercept, record, and transmit every patient communication made on Defendant's websites. When patients visit Defendant's websites, unbeknownst to them, the web page displayed on the patient's browser includes the Meta Pixel as embedded code, which is not visible to patients or other visitors to Defendant's websites. This code is triggered when a patient or visitor interacts with the web page. Each time the Meta Pixel is triggered, the software code is executed and intercepts and then discloses to Facebook the patient's communications with Defendant, including communications that reveal PII/PHI.

107. The Meta Pixel and similar tracking pixels act like a physical wiretap on a phone. Like a physical wiretap, pixels do not appear to alter the function of the communication device on which they are surreptitiously installed. Instead, these pixels lie in wait until they are triggered by

an event, at which time they effectively open a channel through the website to funnel data about users and their actions to Third Parties via a hidden HTTP request that is never shown to or agreed to by the user.

108. Once the Meta Pixel is installed on a business's website, the Meta Pixel tracks users as they navigate through the website and logs which pages are visited, which buttons are clicked, the specific information entered in forms (including PII/PHI), as well as "optional values" set by the business website.[51]

109. For example, a patient can trigger an HTTP request by interacting with the search bar on Defendant's website by typing a term such as "breast cancer" into the search bar and then hitting enter. Defendant's servers in turn send an HTTP response, which results in the search results being displayed.

110. This is not the only HTTP request, however, that is created by a patient's interaction with Defendant's website. In fact, at the very same time the web page is instructed to send an HTTP request to Defendant requesting search results, the embedded source code, acting as a tap, is triggered, intercepting such communications, and then causing the user's browser also to send an HTTP request directly to Facebook, Google, and other Third Parties disclosing to them the patient's exact search and the patient's identifiable information.

111. These communications with Facebook happen silently, without users' knowledge. By default, the transmission of information to Facebook's servers is invisible. The Meta Pixel allows third-party websites to capture and send the PII/PHI a user provides to match them with Facebook or Instagram profiles, even if they are not logged in to Facebook at the time.[52]

---

[51] https://developers.facebook.com/docs/meta-pixel/

[52] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector

112. Facebook tracks non-Facebook users through its widespread internet marketing products and source code, and Mark Zuckerberg has conceded that the company maintains "shadow profiles" on nonusers of Facebook.[53]

113. In addition to employing the Meta Pixel to track patients, Defendant's websites and patient portal mobile app used Google Analytics to track and disclose patient activity—including Plaintiffs' and Class Members'—without their consent. Unbeknownst to patients, the installation of this code inside the patient portal mobile app resulted in disclosures of patients' PII/PHI, including their patient status, whenever they logged in to the patient portal mobile app for routine purposes such as reviewing medical records, checking lab results, and communicating with their doctors. The tracking technology deployed in the patient portal mobile app also disclosed when patients viewed specific pages, including prescription information and test results.

114. In addition, through Google Analytics, Defendant disclosed Plaintiffs' activity by tracking and disclosing their IP addresses, cookies, geolocation, and other unique device identifiers. Defendant routinely disclosed patients' PII/PHI to Google using this technology.

115. A business owner, such as Atrius Health, who chooses to deploy third-party source code like a tracking pixel on its website must enter the third-party source code directly onto the website for every Third Party to whom they wish to send user data and communications.

116. Tracking pixels can be placed directly on the code for a web page or they can be funneled through a "tag manager" service to make the invisible tracking run more smoothly. A tag manager further obscures the Third Parties to whom user data is transmitted.

117. Tag managers are simple enough that non-programmers can use them to deploy digital tracking tools on websites with just the click of a few buttons.

[53] https://techcrunch.com/2018/04/11/facebook-shadow-profiles-hearing-lujan-zuckerberg/

118. Defendant deployed Google Tag Manager on its websites through an "iframe"—a nested "frame" that exists within the Defendant's website that is, in reality, an invisible window through which Defendant funneled tracking pixels for Third Parties to secretly acquire the content of patient communications without any knowledge, consent, authorization, or further action of patients.

119. By design, none of the tracking was visible to patients visiting Defendant's websites or using Defendant's patient portal mobile app.

**E. Tracking pixels provide Third Parties with a trove of personally identifying data, permitting them to uniquely identify the individuals browsing a website.**

120. Tracking pixels are especially pernicious because they result in the disclosure of a variety of data that permits Third Parties to determine the unique personal data of website visitors, which therefore permits the Third Parties, such as Google and Facebook, to identify the visitor. While most users believe that the internet provides them with anonymity when, for example, they browse a hospital website for treatment information about a medical condition, that is not the case when the hospital website has embedded third-party tracking devices, as Defendant has.

121. For example, an IP address is a numerical identifier that identifies each computer connected to the internet. IP addresses are used to identify and route communications on the internet. IP addresses of individual users are used by internet service providers, websites, and tracking companies to facilitate and track internet communications and content. IP addresses also offer advertising companies like Facebook a unique and semi-persistent identifier across devices—one that has limited privacy controls.[54]

[54] https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/

122. Because of their uniquely identifying characteristics, IP addresses are considered protected PII under HIPAA. *See* 45 CFR § 164.514(b)(2)(i)(O). Tracking pixels can (and typically do) collect website visitors' IP addresses.

123. Likewise, internet cookies also provide PII. Cookies are small text files that web servers can place on a user's browser and computer when a user's browser interacts with a website server. Cookies are typically designed to acquire and record an individual internet user's communications and activities on websites and were developed by programmers to aid with online advertising.

124. Cookies are designed to operate as a means of identification for internet users. Advertising companies like Facebook and Google have developed methods for monetizing and profiting from cookies. These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell targeted advertising that is customized to a user's personal communications and browsing history. To build individual profiles of internet users, Third Party advertising companies assign each user a unique (or a set of unique) identifiers to each user.

125. Cookies fall within the personal identifiers protected by HIPAA. *See* 45 CFR § 164.514(b)(2)(i)(H), (J), (M), and (R). Tracking pixels can collect cookies from website visitors.

126. In general, cookies are categorized by (1) duration and (2) party.

127. There are two types of cookies classified by duration.

128. "Session cookies" are placed on a user's computing device only while the user is navigating the website that placed and accesses the cookie. The user's web browser typically deletes session cookies when the user closes the browser.

129. "Persistent cookies" are designed to survive beyond a single internet-browsing session. The party creating the persistent cookie determines its lifespan. As a result, a persistent cookie can acquire and record a user's internet communications for years and over dozens or even hundreds of websites. Persistent cookies are also called "tracking cookies."

130. Cookies are also classified by the party that uses the collected data.

131. "First-party cookies" are set on a user's device by the website with which the user is exchanging communications. First-party cookies can be helpful to the user, server, and/or website to assist with security, login, and functionality.

132. "Third-party cookies" are set on a user's device by website servers other than the website or server with which the user is exchanging communications. For example, the same patient who visits Defendant's website will also have cookies on their device from Third Parties, such as Facebook and Google. Unlike first-party cookies, third-party cookies are not typically helpful to the user. Instead, third-party cookies are typically used for data collection, behavioral profiling, and targeted advertising.

133. Data companies like Facebook have developed methods for monetizing and profiting from cookies. These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell advertising that is customized to a user's communications and habits. To build individual profiles of internet users, third-party data companies assign each user a unique identifier or set of unique identifiers.

134. Traditionally, first-party and third-party cookies were kept separate. An internet security policy known as the same-origin policy required web browsers to prevent one web server from accessing the cookies of a separate web server. For example, although Defendant can deploy source code that uses Facebook third-party cookies to help Facebook acquire and record a patient's

communications, Defendant is not permitted direct access to Facebook third-party cookie values. The reverse *was* also true: Facebook was not provided direct access to the values associated with first-party cookies set by companies like Defendant. But data companies have designed a way to hack around the same-origin policy so that third-party data companies like Facebook can gain access to first-party cookies.

135. JavaScript source code developed by third-party data companies and placed on a webpage by a business owner (like Defendant here) can bypass the same-origin policy to send a first-party cookie value in a tracking pixel to the third-party data company. This technique is known as "cookie syncing," and it allows two cooperating websites to learn each other's cookie identification numbers for the same user. Once the cookie syncing operation is completed, the two websites can exchange any information that they have collected and recorded about a user that is associated with a cookie identifier number. The technique can also be used to track an individual who has chosen to deploy third-party cookie blockers.

136. In effect, cookie syncing is a method through which Facebook, Google, and other third-party marketing companies set and access third-party cookies that masquerade as first-party cookies. By designing these special third-party cookies that are set for first-party websites, Facebook and Google hack their way around any cookie blockers that users set up to stop their tracking. On information and belief, the letters fbp are an acronym for Facebook Pixel.

137. The Facebook _fbp cookie is a Facebook identifier that is set by Facebook source code and associated with the healthcare provider using the Meta Pixel.

138. The _fbp cookie is also a third-party cookie in that it is also a cookie associated with Facebook that is used by Facebook to associate information about a person and their

communications with non-Facebook entities while the person is on a non-Facebook website or app.

139. Defendant requires patients using its patient portal to enable first-party cookies on their web browsers to gain access to its patient portal.

140. The _fbp cookie is used as a unique identifier for patients by Facebook.

141. If a patient takes an action to delete or clear third-party cookies from their device, the _fbp cookie is not impacted—even though it is a Facebook cookie—because Facebook has disguised it as a first-party cookie. Facebook also uses IP addresses and user-agent information to match the PII/PHI it receives from Defendant with Facebook users.

142. Defendant engages in cookie syncing with Facebook, Google, and other Third Parties.

143. Defendant's cookie disclosures include the deployment of cookie syncing techniques that cause the disclosure of the first-party cookie values that Defendant assigns to patients to also be made to Third Parties.

144. Defendant uses and causes the disclosure of patient cookie identifiers with each redirected communication described herein, including patient communications concerning individual providers, conditions, and treatments.

145. A third type of personally identifiable information is what data companies refer to as a "browser-fingerprint." A browser-fingerprint is information collected about a computing device that can be used to identify the specific device.

146. These browser-fingerprints can be used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked and can provide a wide variety of data. As Google explained: "With fingerprinting, developers have found ways to use tiny bits

of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[55] The value of browser fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[56] Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their PII/PHI is collected.[57]

147. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[58]

148. Browser fingerprints are considered protected personal identifiers under HIPAA (*see* 45 C.F.R. § 164.514(b)(2)(i)(M), (R)), and tracking pixels can collect browser-fingerprints from website visitors.

149. Defendant uses and causes the disclosure of data sufficient for Third Parties to create a browser-fingerprint identifier with each redirected communication described herein, including patient communications concerning individual providers, conditions, and treatments.

150. A fourth kind of PII protected by law against disclosure are unique user identifiers (such as Facebook's "Facebook ID") that permit companies like Facebook to quickly and automatically identify the personal identity of its user across the internet whenever the identifier is encountered. A Facebook ID is an identifiable number string that is connected to a user's

---

[55] https://www.blog.google/products/chrome/building-a-more-private-web/

[56] https://pixelprivacy.com/resources/browser-fingerprinting/

[57] https://www.blog.google/products/chrome/building-a-more-private-web/

[58] https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/

Facebook profile. Anyone with access to a user's Facebook ID can locate a user's Facebook profile.[59]

151. Unique PII such as a person's Facebook ID are protected by HIPAA (*see* 45 C.F.R. § 164.514(b)(2)(i)(M), (R)) and are likewise capable of collection through pixel trackers.

152. The tracking technologies described in this complaint, including Meta Pixel and Google Analytics, each rely on the personally identifying data elements described above, including IP addresses, cookies, browser fingerprints, and unique identifiers.

153. Each of the individual data elements described above is personally identifiable on its own. However, Defendant's disclosures of such personally identifiable data elements do not occur in a vacuum. The disclosures of the different data elements are tied together and, when taken together, these data elements are even more accurate in identifying individual patients, particularly when disclosed to data companies such as Facebook, Google, and other internet marketing companies that expressly state that they use such data elements to identify individuals.

**F. Facebook's Meta Pixel tool allows Facebook to track the personal data of individuals across a broad range of third-party websites.**

154. For Facebook, the Meta Pixel tool embedded on third-party websites acts as a conduit for information, sending the information it collects to Facebook through scripts running in a user's internet browser, similar to how a "bug" or wiretap can capture audio information.

155. For example, the Meta Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific data."[60] HTTP headers collect data including "IP addresses, information about

[59] https://smallseotools.com/find-facebook-id/

[60] https://developers.facebook.com/docs/meta-pixel/

the web browser, page location, document, referrer and person using the website."[61] Pixel-specific data includes such data as the "Pixel ID and the Facebook Cookie."[62]

156. The Meta Pixel takes the information it harvests and sends it to Facebook with PII, such as a user's IP address, name, email, phone number, and specific Facebook ID, which identifies an individual's Facebook user account. Anyone who has access to this Facebook ID can use this identifier to quickly and easily locate, access, and view a user's corresponding Facebook profile. Facebook stores this information on its servers, and, in some instances, maintains this information for years.[63]

157. Facebook also receives personally identifying information in the form of users' unique IP addresses that stay the same as users visit multiple websites. When browsing a third-party website that has embedded Facebook code, a user's unique IP address is forwarded to Facebook by GET requests, which are triggered by Facebook code snippets. The IP address enables Facebook to keep track of the website page visits associated with that address.

158. Facebook also places cookies on visitors' computers. It then uses these cookies to store information about each user. For example, the "c_user" cookie is a unique identifier that identifies a Facebook user's ID. The c_user cookie value is the Facebook equivalent of a user identification number. Each Facebook user has one—and only one—unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications.

159. The data supplied by the c_user cookie allows Facebook to identify the Facebook account associated with the cookie. One simply needs to log in to Facebook, and then type

---

[61] https://developers.facebook.com/docs/meta-pixel/

[62] https://developers.facebook.com/docs/meta-pixel/

[63] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

www.facebook.com/#, with the c_user identifier in place of the "#." For example, the c_user cookie for Mark Zuckerberg is 4. Logging in to Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

160. Similarly, the "lu" cookie identifies the last Facebook user who logged in using a specific browser. Like IP addresses, cookies are included with each request that a user's browser makes to Facebook's servers. Facebook employs similar cookies such as "datr," "fr," "act," "presence," "spin," "wd," "xs," and "fbp" cookies to track users on websites across the internet.[64] These cookies allow Facebook to easily link the browsing activity of its users to their real-world identities, and to such highly sensitive data as their medical information, religion, and political preferences.[65]

161. Facebook also uses browser fingerprinting to uniquely identify individuals. Web browsers have several attributes that vary between users, like the browser software system, plugins that have been installed, fonts that are available on the system, the size of the screen, color depth, and more. Together, these attributes create a fingerprint that is highly distinctive. The likelihood that two browsers have the same fingerprint is at least as low as 1 in 286,777, and the accuracy of the fingerprint increases when combined with cookies and the user's IP address. Facebook recognizes a visitor's browser fingerprint each time a Facebook button is loaded on a third-party website page. Using these various methods, Facebook can identify individual users, watch as they browse third-party websites like www.emersonhospital.org and target users with advertising based on their web activity.

[64] https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a#:~:text=browser%20session%20ends.-,%E2%80%9Cdatr%E2%80%9D,security%20and%20site%20integrity%20features.

[65] https://securehomes.esat.kuleuven.be/~gacar/fb_tracking/fb_plugins.pdf

162. Facebook sells advertising space by highlighting its ability to identify and then target users. Facebook can target users so effectively because it surveils user activity both on and off its official website. This allows Facebook to make inferences about users far beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[66] Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to create highly specific targeted advertising. Indeed, Facebook utilizes precisely the type of PII/PHI that Defendant bartered to Facebook so that Facebook can identify, target, and market products and services to individuals.

**G. Defendant has discreetly embedded the Meta Pixel tool on its website, capturing and disclosing patients' PII/PHI to Facebook.**

163. Facebook's intrusion into the personal data of visitors to third-party websites incorporating the Meta Pixel is both significant and unprecedented. When the Meta Pixel is incorporated into a website (such as Atrius Health's websites) unbeknownst to users and without their consent, Facebook gains the ability to surreptitiously gather every user interaction with the website, ranging from what the user clicks on to the personal information entered on a website search bar. Facebook aggregates this data against all websites.[67] Facebook benefits from obtaining this information because it improves its advertising technology and network, including its machine-learning algorithms and its ability to identify and target users with ads. Atrius Health also benefits because it uses Facebook's advertising platforms to direct individually targeted advertising to patients based on their communications intercepted through the Meta Pixel.

164. Facebook provides businesses like Atrius Health using the Meta Pixel on their websites with the data it captures in the "Meta Pixel page" in its Events Manager, as well as tools

[66] https://www.facebook.com/business/ads/ad-targeting

[67] https://www.facebook.com/business/help/742478679120153?id=1205376682832142

and analytics to reach these individuals through future Facebook ads.[68] For example, websites can use this data to create "custom audiences" to target specific Facebook users, as well as other Facebook users who match "custom audience's" criteria.[69] Businesses that use Meta Pixel can also search through Meta Pixel data to find specific types of users to target, such as men over a certain age.

165. Businesses install the Meta Pixel software code to help drive and decode key performance metrics from visitor traffic to their websites.[70] Businesses also use the Meta Pixel to build custom audiences on Facebook that can be used for advertising purposes.[71]

166. For example, when a user on many hospital websites clicks on a "Schedule Online" button next to a doctor's name, Meta Pixel sends the text of the button, the doctor's name, and the search term (such as "cardiology") used to find the doctor to Facebook. If the hospital's website has a drop-down menu to select a medical condition in connection with locating a doctor or making an appointment, that condition is also transmitted to Facebook through the Meta Pixel.

167. Facebook has designed the Meta Pixel such that Facebook receives information about patient activities on hospital websites as they occur in real time. Indeed, the moment a patient takes any action on a webpage that includes the Meta Pixel—such as clicking a button to register, login, logout, or create an appointment—Facebook code that a hospital such as Atrius Health embedded on that page intercepts and discloses to Facebook the content of the patient's communications with the hospital to Facebook while the exchange of information between the patient and hospital is still occurring.

---

[68] https://www.facebook.com/business/help/742478679120153?id=1205376682832142

[69] https://developers.facebook.com/docs/marketing-api/reference/custom-audience/

[70] https://instapage.com/blog/meta-pixel

[71] https://instapage.com/blog/meta-pixel

168. Defendant is among the hospital systems that have embedded the Meta Pixel on their websites. At least as recently as October 2022, Defendant had incorporated the Meta Pixel on pages throughout its website, resulting in the substantial and unauthorized disclosure of its patients' communications with it to Facebook and other Third Parties.

169. When a patient entered their personal information through Defendant's websites that incorporate the Meta Pixel, including to locate a doctor or make an appointment, this information, including what the patient is being treated for, those communications are immediately and instantaneously routed to Facebook via the Meta Pixel. The acquisition and disclosure of these communications occurs contemporaneously with the transmission of these communications by patients.

170. This data, which can include health conditions (*e.g.*, addiction, Alzheimer's, or heart disease), diagnoses, procedures, test results, the treating physician, medications, and other PII/PHI is obtained and used by Facebook, as well as other parties, for the purpose of targeted advertising.

171. Defendant has also disclosed patient PII/PHI collected across its websites including (but not limited to) the following additional types of communications:

a. when patients search via Defendant's search bars for their required care (*e.g.*, for "substance abuse");

b. when patients search for a physician or provider—which reveals their location and required medical services and medical conditions (*e.g.*, searching for "Gynecology");

c. when patients search for, register for, and/or click on classes or events;

d. when patients research treatment information and medical services; and

e. when patients select "Locations" and then enter their ZIP code, the medical service they are seeking (*e.g.*, "Behavioral Health"), and required location type (*e.g.*, "Hospital").

172. In other words, Facebook and Google learned not just that patients were seeking treatment, but where and typically when they were seeking treatment, along with other information that patients would reasonably assume that Defendant was not sharing with Third Party marketing companies.

173. For example, a patient searching for a doctor on Defendant's website is asked to provide a variety of information to filter the various physicians available to treat various medical conditions, including the doctor's specialty, the patient's condition, the patient's hometown, and the patient's language preference, among other information:



174. All this data is disclosed to Facebook simultaneously in real time via the Meta Pixel as patients transmit their information, along with other data, such as patients' unique Facebook IDs that are captured by the c_user cookie, which allow Facebook to link this information to patients' unique Facebook accounts. Defendant also discloses other personally identifying information to Facebook, such as patient IP addresses, cookie identifiers, browser fingerprints, and device identifiers.

175. Plaintiff Jane Doe #1 used the "Find a Doctor" feature depicted above during the Class Period to communicate with Atrius Health to obtain information about physicians. As a result, the above-described contents of Jane Doe #1's communications with Atrius Health were disclosed to Facebook via the Meta Pixel via the mechanisms described above.

176. Defendant discloses such personally identifying information and sensitive medical information even when patients are searching for doctors to assist with them with conditions such as HIV:




177. Likewise, a patient who searches the website for information about the most sensitive medical conditions imaginable, including HIV, psychotherapy, and addiction treatment also has information about their queries and the specific web pages that the patient has visited intercepted by Defendant and forwarded to Facebook and Google:




178. Atrius Health has many pages on its website where patients can communicate with Atrius Health to obtain information about specific symptoms, conditions, and medical services and procedures, similar to the above example regarding Psychiatry and Behavioral Health. Both Jane Doe #1 and Jane Doe #2 communicated with Atrius Health via such webpages to obtain information about particular symptoms, conditions, or medical procedures.

179. Each time a patient communicated with Atrius Health regarding such symptoms, conditions, and medical services or procedures, Atrius intercepted those communications (including the names of the symptoms, conditions, or medical services or procedures) and disclosed them to Google and Facebook. Google and Facebook retained those intercepted

communications and used them for their own commercial purposes. Google, Facebook, and Atrius Health also subsequently use the content of such intercepted communications for their own commercial and marketing purposes, including targeted advertising by Atrius Health over Google's and Facebook's advertising platforms.

180. Defendant also discloses patient information from across its websites including (but not limited to) communications that are captured by the website's search bar, communications that are captured when a patient searches for "Services" offered by Defendant, communications made by patients using the website's Bill Pay/Financials function, communications made when patients access Defendant's patient portal, and communications made when patients are researching specific medical conditions such as COVID-19.

181. Defendant intercepted patient communications and disclosed them to Facebook, Google, and other Third Parties when patients click on the "Log in" buttons of the password-protected portions of its website, including its bill pay function, confirming to these companies that the website users are Atrius Health patients.

182. Defendant also intercepted patient communications and disclosed them to Facebook, Google, and other Third Parties when patients used Defendant's patient portal mobile app, confirming to these companies that the patient portal mobile app users are Atrius Health patients.

183. The Atrius Health patient portal and patient portal mobile app permitted a patient to obtain medical records, view details regarding upcoming visits and medical treatments, view laboratory reports, review medications, and review discharge instructions, among other tasks. The patient portal included a publicly available page permitting patients to log in to the patient portal. In particular, each page on the Atrius Health website included a "MYHEALTH ONLINE" button

that allowed patients to navigate to and access the Atrius Health patient portal. Atrius Health elected to deploy tracking technologies on that button, resulting in the interception and disclosure to Google and Facebook of patients' communications through which they navigated to the patient portal. By using tracking technologies in this way, Atrius Health intercepted and disclosed to Facebook, Google, and other Third Parties communications that revealed an individual's status as an Atrius Health patient, which Atrius Health, Google, Facebook, and other Third Parties later commercially exploited for marketing purposes, including through targeted advertising based on the PII/PHI contained in the intercepted communications.

184. Plaintiffs each regularly used the Atrius Health patient portal during the Class Period, and accordingly, their communicaitons used to access the portal were intercepted and transmitted to Google and Facebook, which permitted Google, Facebook, and Atrius Health to target them with advertising based on the disclosure of their status as a patients, in combination with the other interceptions of Plaintiffs' communications described above, including interceptions regarding their specific conditions and doctors on the Atrius Health website.

185. Atrius Health's website also allows patients to search for and obtain information about various "Specialties" and "Services" Atrius Health offers, such as "Cardiology," "Fertility and Reproductive Health," "Neurology," and "Gastroenterology."[72] A patient searching for information about cancer treatment or pregnancy, however, not only shares their PII/PHI with Defendant, but also unknowingly shares their PII/PHI with Facebook and Google, including the precise services about which the patient is requesting information. When the user communicates with Atrius Health by requesting and obtaining information about a particular specialty or service, hidden code Atrius Health has embedded on its website intercepts and discloses to Google,

[72] https://www.atriushealth.org/services

Facebook, and other Third Parties the precise specialties or services about which the patient has requested information. Google, Facebook, and Atrius Health subsequently use the content of such intercepted communications for their own commercial and marketing purposes, including targeted advertising by Atrius Health over Google's platforms.

186. Indeed, Atrius Health used Google's advertising platforms to target individuals with respect to particular specialties, such as pediatrics. Given how Google Ads works, these advertisements would have been served to individuals who had shown an interest in particular specialties and services, such as people who had visited pages regarding those specialties or services on Atrius Health's website, on which Atrius Health deployed Google Analytics and DoubleClick tracking technologies to facilitate advertisements targeted to such individuals.

187. Plaintiffs visited during the Class Period pages for specific specialties and services, and their communications were therefore intercepted, and Google, Facebook, and Atrius Health then used the intercepted communications for commercial and marketing purposes, including targeted advertising by Atrius Health.

188. The Atrius Health Website also includes a search function that permits an individual to search for medical or other information relevant to them. Healthcare consumers often enter search terms that reveal personal information about themselves, for example, when an individual uses the search function for particular symptoms, conditions, or medical specialties offered by Atrius Health. When individuals have used the search function, Atrius Health intercepted the precise contents of that search and transmitted those contents to Google, Facebook, and other Third Parties.

189. Atrius Health, through the hidden Google Analytics, DoubleClick, and Meta Pixel code, intercepted the precise search terms entered by the user to be intercepted and transmitted to

Google and Facebook, which Google and Facebook then use for their own commercial purposes. Atrius Health also uses the intercepted communications to advance its own marketing efforts, including targeted advertising on Google and Facebook's based on the precise search terms the user has entered.

190. The Atrius Health website includes an "Online Bill Pay" feature that permits patients to pay their Atrius Health medical bills online. By accessing that portion of the website, the website user communicates that the user is a patient of Atrius Health. For example, Plaintiff Jane Doe #2 used the bill pay function on the Atrius Health website during the Class Period. A screen capture of the main "Online Bill Pay" page is shown below:




191. When a user visits the Atrius Health website's "Online Bill Pay" page, hidden code Atrius Health injected onto the webpage intercepts the user's communication with Atrius Health and discloses the content of the communication to Google and other Third Parties. The intercepted

information reveals that the individual is a patient of Atrius Health. The contents of the communication intercepted and sent to Google include that the user is communicating with Atrius Health's "Bill Pay" function of the website. Atrius Health later uses the content of the intercepted communication for marketing purposes by using Google and other Third Parties' advertising platforms to target advertising for Atrius Health to the individual whose communications were intercepted.

192. The Atrius Health Website also features an online form that patients may fill out to obtain a prescription refill. By accessing this part of the website, a website user communicates to Atrius Health that the user is a patient needing medicine. The online "Prescription Refill" form is shown below:



193. When the website communicates with Atrius Health through the prescription refill page, hidden Google Analytics and DoubleClick code that Atrius Health has injected into its website causes the website user's communication with Atrius Health to be intercepted and contemporaneously transmitted to Google. The contents of the communication, including that the user is seeking "Prescriptions/RxRefills" from "Atrius Health," are intercepted and disclosed to Google, and Atrius Health and Google later use the intercepted communications for marketing purposes by using Google's advertising platforms to target advertising for Atrius Health to the individuals whose communications were intercepted.

194. Facebook's Meta Pixel collects and forwards this data to Facebook, including the full referral URL (including the exact subpage of the precise terms being reviewed) and Facebook then correlates the URL with the patient's Facebook user ID, time stamp, browser settings, and even the type of browser used. In short, the URLs, by virtue of including the particular document within a website that a patient views, reveal a significant amount of personal data about a patient. The captured search terms and the resulting URLs divulge a patient's medical issues, personal interests, queries, and interests on third-party websites operating outside of Facebook's platform.

195. The transmitted URLs contain both the "path" and the "query string" arising from patients' interactions with Defendant's websites. The path identifies where a file can be found on a website. Likewise, a query string provides a list of parameters. The query string parameters in this search indicate that a search was done at Defendant's website for information about HIV. In other words, the Meta Pixel captures information that connects a particular user to a particular healthcare provider and that patient's specific healthcare issue. To illustrate, an example of a full-string URL that provides a query string is https://www.atriushealth.org/search?q=cancer. The query string parameters in this search indicate that a search was done at Defendant's website for

information about cancer. In other words, the Meta Pixel captures information that connects a particular user with a particular health condition to a particular healthcare provider.

196. Defendant also provides Facebook and Google with details about online forms that patients fill out in the form of POST requests, including forms such as the online "Prescription Refill" form that Defendant offered. All the information that patients provided when filling out these forms was also disclosed to Facebook and Google.

197. As the above demonstrates, knowing what information a patient is reviewing on Defendant's website can reveal deeply personal and private information. For example, a simple search for "pregnancy" on Defendant's website allows Meta Pixel to capture that search term and tell Facebook that the patient is likely pregnant. Indeed, Facebook might learn that the patient is pregnant before the patient's close family and friends. But there is nothing visible on Defendant's website that would indicate to patients that, when they use Defendant's search function, their personally identifiable data and the precise content of their communications with Defendant are being automatically captured and disclosed to Facebook, and then that Defendant and Facebook both then use that information for advertising purposes even when patients search for treatment options for sensitive medical conditions such as cancer or substance abuse.

198. The amount of data collected is significant. Via the Meta Pixel, when patients interact with its website, Defendant discloses a full-string, detailed URL to Facebook, which contains the name of the website, folder, and sub-folders on the web server, and the name of the precise file requested. For example, when a patient types a search term into the search bar on Defendant's website, the website returns links to information relevant to the search term. When patients then click these links, a communication is created that contains a GET request and a full-string detailed URL.

199. By compelling visitors to its websites to disclose PII/PHI to Facebook and other Third Parties, Defendant knowingly discloses information that allows Facebook and other advertisers to link its patients' PII/PHI to their private identities, which enables businesses, including Atrius Health, to target them with advertising. Defendant intentionally shares the PII/PHI of its patients with Facebook in order to advance its own targeted advertising over Facebook's advertising platforms, and gain access to the benefits of the Meta Pixel tool.

200. The contents of patients' search terms shared with Facebook plainly relate to (and disclose) both the past, present, or future physical or mental health or condition of individual patients who interact with Defendant's website and the provision of health care to those patients. Worse, no matter how sensitive the area of the Defendant's website that a patient reviews, the full-string URL generated by patient searches is acquired by Facebook along with personally identifiable information.

201. The nature of the collected data is also important. Defendant's unauthorized disclosures result in Facebook obtaining a comprehensive browsing history of an individual patient, no matter how sensitive the patient's medical condition. Facebook is then able to correlate that history with the time of day and other user actions on Defendant's website. This process results in Facebook acquiring a vast repository of personal data about patients—all without their knowledge or consent.

202. Defendant also disclosed the same kind of patient data described above to other Third Parties, including Google, Twitter, New Relic, Acquia, and ShareThis.com via tracking software that Defendant installed on its website. As with the Facebook Meta Pixel, Defendant provides patients and prospective patients with no notice that Defendant is disclosing the contents

of their communications to these Third Parties. Likewise, Defendant does not obtain consent from patients and prospective patients before forwarding their communications to these companies.

203. These disclosures to Third Parties other than Facebook are equally disturbing. Google Analytics, for example, has been described by the Wall Street Journal as "far and away the web's most dominant analytics platform," which "tracks you whether or not you are logged in."[73] Like Facebook, Google tracks internet users with IP addresses, cookies, geolocation, and other unique device identifiers. Defendant routinely discloses patients' personal health information to such Google services as Google Analytics, Google DoubleClick, and Google AdWords. Atrius Health can then use the intercepted communications it has disclosed to Google for purposes of targeted advertising on Google's advertising platforms.

204. Google cookies provide personally identifiable data about patients who visit Defendant's website to Google. Defendant transmits personally identifiable Google cookie data to Google.

205. Defendant deploys Google tracking tools throughout its websites, resulting in the disclosure of communications exchanged with patients to be transmitted to Google. These transmissions occur simultaneously with patients' communications with Defendant and include communications that Plaintiffs and Class Members made about specific medical providers, treatments, conditions, appointments, bill payments, and pages and buttons used to access Defendant's patient portal. Incredibly, Defendant continues to deploy Google Analytics on its website as of December 2025.

206. By compelling visitors to its websites and users of its patient portal and patient portal mobile app to disclose personally identifiable data and sensitive medical information to

[73] https://www.wsj.com/articles/who-has-more-of-your-personal-data-than-facebook-try-google-1524398401

Facebook and Google, Defendant knowingly discloses information that allows Facebook, Google, and other advertisers to link their patients' PII/PHI to their private identities and target them with advertising, including advertising for Atrius Health (or do whatever else Facebook may choose to do with their information, including running "experiments" on its customers by manipulating the information they are shown on their Facebook pages[74]). Defendant intentionally shares the PII/PHI of its patients with Facebook and Google in order to gain access to the benefits of, and of using, the Meta Pixel, Google Analytics, and Google DoubleClick services, including facilitating individually targeted advertising on Google and Facebook platforms on behalf of Atrius Health, reducing Atrius Health's online marketing expenses, and increasing the ROI from its online marketing campaigns.

207. The information Plaintiffs and Class Members provide to Atrius Health via its website (and then shared illegally with Facebook) can be combined with other information in Facebook and Google's possession, like their names, dates of birth, and phone numbers, to more effectively target Plaintiffs with advertisements (including advertising for Atrius Health) or sell Plaintiffs' data to Third Parties.

208. Because Defendant embedded the Meta Pixel, Google Analytics, and DoubleClick on its websites and patient portal mobile app, Defendant disclosed intimate details about Plaintiffs' interactions with the websites and patient portal mobile app, including Plaintiffs' scrolling, typing, and selecting options from drop-down menus. Each time those tracking technologies were triggered, they caused Plaintiffs' information to be intercepted and secretly transmitted to Facebook and Google's servers, as well as additional information that captures and discloses the

[74] https://www.theatlantic.com/technology/archive/2014/06/everything-we-know-about-facebooks-secret-mood-manipulation-experiment/373648/

communications' content and Plaintiffs' identities. For example, as described in detail above, when Plaintiffs and Class Members visited Defendant's websites, their PII/PHI was transmitted to Facebook and Google, including such engagement as using the website's search bar, using the website's "Find a Doctor" function, and typing content into online forms. During these same transmissions, Defendant's websites would also provide Facebook with Plaintiffs' and Class Members' Facebook and Google IDs, IP addresses, device IDs, and other information that Plaintiffs and Class Members provided. This is precisely the type of information that state and federal law require healthcare providers to de-identify to protect the privacy of patients.

209. Defendant knew that by embedding the Meta Pixel, Google Analytics, and DoubleClick advertising tools in its websites and patient portal mobile app, it was permitting Facebook and Google to collect, use, and share Plaintiffs' and the Class Members' PII/PHI. Defendant was also aware that such information would be shared with Facebook simultaneously with patients' interactions with its websites. Defendant made the decision to barter its patients' PII/PHI to Facebook because it wanted access to the Meta Pixel, Google Analytics, and DoubleClick tracking tools, including to advance Atrius Health's own targeted advertising on Facebook's and Google's platforms. While that bargain may have benefited Defendant, Google, and Facebook, it betrayed the rights of Plaintiffs and Class Members.

## H. Plaintiffs and Class Members did not consent to the interception and disclosure of their PII/PHI.

210. Plaintiffs and Class Members had no idea when they interacted with Defendant's websites and patient portal mobile app that their PII/PHI was being collected and transmitted to Google and Facebook. That is because, among other things, the Meta Pixel, Google Analytics, and DoubleClick are seamlessly integrated into Defendant's websites and are invisible to patients visiting those websites.

211. For example, when Plaintiffs visited Defendant's website at www.atriushealth.org there was no indication that the Meta Pixel was embedded on that website or that it would collect and transmit their sensitive medical data to Facebook. The same was true for the other tracking technologies Defendant deployed.

212. Plaintiffs and Class Members could not consent to Defendant's conduct when there was no indication that their sensitive medical information would be collected and transmitted to Facebook, Google, and other Third Parties in the first place.

213. While Defendant purports to have "Privacy Practices," those Privacy Practices are effectively hidden from patients, buried inside a link labeled "Notice of Privacy Practices" that is concealed at the bottom of Defendant's homepage in type so small as to be unreadable to many visitors:




214. Defendant's current "Notice of Privacy Practices," which went into effect on September 30, 2022, gives no indication to patients that Defendant routinely allows Facebook to capture and exploit patients' PII/PHI. Indeed, Defendant expressly promises in its "Notice of Privacy Practices" that it would never share patients' PII/PHI with marketing companies without their express written authorization:

> [W]e will use and disclose your health information only with a

> written authorization from you. This includes, except for limited circumstances allowed by federal privacy law, not using or disclosing psychotherapy notes about you, selling your health information to others, or using or disclosing your health information for certain promotional communications that are prohibited marketing communications under federal law, without your written authorization.[75]

215. Defendant's prior "Notice of Privacy Practices" likewise not only assured patients that Atrius would protect their PII/PHI, but also expressly promised that Defendant would *never* sell or share patients' PII/PHI for marketing purposes without patients' written consent:

> Protecting patient privacy is an important element of the trust between our caregivers and their patients, and an important legal and ethical obligation. Atrius Health is deeply committed to protecting our patients' rights to privacy, and to safeguarding patient information….[76]
>
> In these cases we never share your information unless you give us written permission:
>
> - Marketing purposes
> - Sale of your information

216. These statements are false, deceptive, and misleading. Defendant in fact tracks patients' and potential patients' IP addresses, cookies, browser-fingerprints, and device identifiers, which it then causes to be transmitted to Third Parties along with patients' and potential patients' sensitive medical information.

217. What is more, even if a patient had stumbled upon Defendant's carefully concealed "Notice of Privacy Practices," nothing in Defendant's various privacy notices would have been understood by any reasonable patient to mean that Defendant routinely allowed Facebook and Google to capture and exploit patients' PII/PHI.

---

[75] https://www.atriushealth.org/patient-information/privacy-practices

[76] https://web.archive.org/web/20220517025937/https://www.atriushealth.org/patient-information/privacy-practices

218. On or around April 6, 2023, after this lawsuit was filed (and apparently in response to the initial complaint's allegations), Atrius Health rolled out a new Online Services Privacy Policy. That policy contains a section entitled "Cookies and Tracking" that discloses tracking technologies in general terms. Although the substance of the disclosure has improved, Atrius still fails to adequately notify website users about these disclosures; there is no clickwrap agreement or even a pop-up that directs website users to the policy. Accordingly, despite the change in disclosure, Atrius continues to fail to adequately disclose to website users its use of tracking technologies and the resulting implications for healthcare consumers' privacy, or to obtain their consent to any such use or disclosure of healthcare consumers' communications.

219. Defendant does not have a legal right to share Plaintiffs' and Class Members' PII/PHI with Facebook, because this information is protected from such disclosure by law. *See* G.L. c. 214, §1B; 45 C.F.R. § 164.508. Moreover, Defendant is not permitted to disclose patients' PII/PHI to Third Party advertising and marketing companies like Google and Facebook without express written authorization from patients.

220. Defendant failed to obtain a valid written authorization from Plaintiffs or any of the Class Members to allow the capture and exploitation of their PII/PHI and the contents of their communications by Third Parties for their own direct marketing purposes.

221. A patient's reasonable expectation that their health care provider will not share their information with Third Parties for marketing purposes is not subject to waiver via an inconspicuous privacy policy hidden away on a company's website. Such "Browser-Wrap" statements do not create an enforceable contract against consumers. Further, Defendant expressly promised its patients that it would never sell or use their PII/PHI without express authorization.

222. Accordingly, Defendant lacked authorization to intercept, collect, and disclose Plaintiffs and Class Members' PII/PHI to Facebook, Google, and other Third Parties, or aid in the same.

**I. Defendant's disclosures of patients' PII/PHI to Facebook, Google, and other Third Parties are unnecessary.**

223. There is no information anywhere on the websites or patient portal mobile app operated by Defendant that would alert patients that some of their most private and sensitive information (such as their identifiers, their medical conditions, and their medical providers) is being automatically transmitted to Google, Facebook, and other Third Parties. Nor are any of Defendant's disclosures of PII/PHI to Facebook, Google, and other Third Parties necessary for Defendant to maintain its healthcare website or provide medical services to patients.

224. For example, it is possible for a healthcare website to provide a doctor search function without allowing disclosures to third-party advertising companies about patient sign ups or appointments. It is also possible for a website developer to utilize tracking tools without allowing disclosure of patients' PII/PHI, including to companies like Facebook and Google. Likewise, it is possible for Defendant to provide medical services to patients without sharing their PII/PHI with companies like Facebook and Google so that this information can be exploited for advertising purposes.

225. Despite the wholly unnecessary nature of online tracking technology for Defendant to run its business, Defendant willfully chose to implement Meta Pixel on its websites and patient portal mobile app and aid in the disclosure of PII/PHI about its patients to Third Parties, including Facebook.

### J. Plaintiffs and Class Members have a reasonable expectation of privacy in their PII/PHI.

226. Patient confidentiality "is a cardinal rule of the medical profession, faithfully adhered to in most instances, and thus has come to be justifiably relied upon by patients seeking advice and treatment." *Alberts v. Devine*, 395 Mass. 59, 65 (1985).

227. As patients of Defendant, Plaintiffs and Class Members had a reasonable expectation of privacy that Defendant would not disclose their healthcare-related communications, including communications that reveal PII/PHI, to Third Parties, or later use that information for advertising purposes, without their express authorization. Defendant's surreptitious interception, collection, disclosure, and subsequent marketing use of patients' healthcare communications, including communications that reveal PII/PHI, to Facebook, Google, and other Third Parties violated Plaintiffs' and Class Members' privacy interests.

228. Patient healthcare communications, including communications that reveal PII/PHI, are specifically protected by law. *E.g.*, G.L. 111, § 70E(b); G.L. 214, § 1B (Right to Privacy). The prohibitions against disclosing patients' PII/PHI include prohibitions against disclosing personally identifying data such as patient names, IP addresses, and other unique characteristics or codes. *See* G.L. c. 111, § 70E (Patients' and Residents' Rights); 105 Mass. Code Regs. 300.120; 45 C.F.R. § 164.514(b)(2)(i). And both HIPAA and Massachusetts law subject medical providers who treat conditions such as substance abuse to heightened duties of confidentiality. 42 C.F.R. § 2.12(a)(1)(i); M.G.L. c. 111B, § 11. This legal framework applies to health care providers, such as Defendant.

229. The modern Hippocratic Oath provides: "I will respect the privacy of my patients, for their problems are not disclosed to me that the world may know."[77] Likewise, the American Medical Association's ("AMA's") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications. For example, the AMA has issued medical ethics opinions providing that "[p]rotecting information gathered in association with the care of a patient is a core value in health care. However, respecting patient privacy in other forms is also fundamental, as an expression of respect for patient autonomy and a prerequisite for trust…. Physicians must seek to protect patient privacy in all settings to the greatest extent possible and should … [m]inimize intrusion on privacy when the patient's privacy must be balanced against other factors [and inform] the patient when there has been a significant infringement on privacy of which the patient would otherwise not be aware."[78]

230. The AMA's ethics opinions have further cautioned physicians and hospitals that "[d]isclosing information to Third Parties for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship."[79]

231. Several studies examining the collection and disclosure of consumers' sensitive medical information confirm that the disclosure of sensitive medical information violates expectations of privacy that have been established as general social norms.

[77] https://www.pbs.org/wgbh/nova/doctors/oath_modern.html

[78] https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (opinion 3.1.1).

[79] https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (opinion 3.2.4).

232. Privacy polls and studies also uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

233. For example, a recent study by *Consumer Reports* showed that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believed that internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[80]

234. Users act consistently with these preferences. For example, following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to share data when prompted.[81]

235. The concern about sharing PII/PHI is compounded by the reality that advertisers view this type of information as particularly valuable. For example, having access to the data women share with their healthcare providers allows advertisers to obtain data on children before they are even born. As one recent article noted, "What is particularly worrying about this process of datafication of children is that companies like [Facebook] are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles."[82]

---

[80] https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/

[81] https://www.wired.co.uk/article/apple-ios14-facebook

[82] https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/

236. Many privacy law experts have expressed serious concerns about patients' sensitive medical information being disclosed to third-party companies like Facebook. As those critics have pointed out, having a patient's personal health information disseminated in ways the patient is unaware of could have serious repercussions, including affecting their ability to obtain life insurance, how much they might pay for such coverage, the rates they might be charged on loans, and the likelihood of their being discriminated against.

**K. Defendant harmed Plaintiffs when it illicitly collected, disclosed, and exploited Plaintiffs' PII/PHI—which, after all, is Plaintiffs' property and has economic value.**

237. It is common knowledge that there is an economic market for consumers' personal data—including the kind of data that Defendant has collected and disclosed from Plaintiffs and Class Members.

238. In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and location information" were being sold for approximately "$0.50 per 1,000 people."[83]

239. In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30" per name.[84] That same article noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data can vary from $15 to more than $40 per user.[85]

240. In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set

[83] https://ig.ft.com/how-much-is-your-personal-data-worth/

[84] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/

[85] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/

its own price."[86] This price is only increasing. According to Facebook's own financial statements, the value of the average American's data in advertising sales rose from $19 to $164 per year between 2013 and 2020.[87]

241. Despite the protections afforded by law, there is an active market for health information. Medical information obtained from health providers garners substantial value because of the fact that it is not generally available to Third Party data marketing companies because of the strict restrictions on disclosure of such information by state laws and provider standards, including the Hippocratic oath. Even with these restrictions, however, a multi-billion-dollar market exists for the sale and purchase of such private medical information.[88]

242. Further, individuals can sell or monetize their own data if they so choose. For example, Facebook has offered to pay individuals for their voice recordings,[89] and has paid teenagers and adults up to $20 a month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smartphones.[90]

243. A myriad of other companies and apps such as DataCoup, Nielsen Computer, Killi, and UpVoice also offer consumers money in exchange for access to their personal data.[91]

244. Given the monetary value that data companies like Facebook have already paid for personal information in the past, Defendant has deprived Plaintiffs and the Class Members of the

---

[86] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/

[87] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/

[88] https://revealnews.org/blog/your-medical-data-is-for-sale-and-theres-nothing-you-can-do-about-it/; *see also* https://slate.com/technology/2022/06/health-data-brokers-privacy.html

[89] https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-prounounciations-app

[90] https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html

[91] https://www.creditdonkey.com/best-apps-data-collection.html; *see also* https://www.monetha.io/blog/rewards/earn-money-from-your-data/

economic value of their sensitive medical information by collecting, using, and disclosing that information to Facebook and other Third Parties without consideration for Plaintiffs' and the Class Members' property.

### L. Defendant is enriched by making unlawful, unauthorized, and unnecessary disclosures of its patients' PII/PHI.

245. The primary motivation and a determining factor in Defendant's interception and disclosure of Plaintiffs' and Class Members' PII/PHI was to commit criminal and tortious acts in violation of federal and state laws as alleged herein, namely, the use of patient data for advertising in the absence of express written consent. Defendant's further use of the PII/PHI after the initial interception and disclosure for marketing, revenue generation, and cost-saving purposes was in violation of HIPAA and an invasion of privacy. In exchange for disclosing PII/PHI about its patients, Defendant has been compensated by Facebook with enhanced online advertising services, including (but not limited to) retargeting and enhanced analytics functions.

246. Retargeting is a form of online targeted advertising that targets users with ads based on their previous internet actions, which is facilitated through the use of cookies and tracking pixels. Once an individual's data is disclosed and shared with a third-party marketing company, the advertiser is able to show ads to the user elsewhere on the internet.

247. For example, retargeting allows a business owner such as Atrius Health to show advertisements on other websites to customers or potential customers based on the specific communications exchanged by a patient or their activities on a website. Using the Meta Pixel, Atrius could target ads on Facebook itself or on the Facebook advertising network.

248. Once patients' PII/PHI is disclosed to Third Parties like Facebook, Defendant loses the ability to control how that information is subsequently disseminated and exploited.

249. Upon information and belief, as part of its marketing campaign, Defendant re-targeted patients and potential patients to get more patients to use its services. Defendant did so through use of the intercepted patient data it obtained, procured, and/or disclosed in the absence of express written consent.

250. By utilizing the tracking technology, the cost of advertising and retargeting was reduced through use of the unlawfully intercepted and disclosed PII/PHI, thereby benefiting Defendant while invading the privacy of Plaintiffs and Class Members and violating their rights under federal and Massachusetts law.

251. The monetization of the data being disclosed by Defendant, both by Defendant and Third Parties, demonstrates the inherent value of the information being collected.

## TOLLING, CONCEALMENT, AND ESTOPPEL

252. The applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein.

253. Defendant seamlessly incorporated Meta Pixel, Google Analytics, DoubleClick, and other tracking pixels into its websites and patient portal mobile app, providing no indication to users that they were interacting with a website enabled by such tracking technologies. Defendant had knowledge that its websites and patient portal mobile app incorporated Meta Pixel and other trackers yet failed to disclose that by interacting with its websites that Plaintiffs and Class Members' sensitive medical information would be intercepted, collected, used by, and disclosed to Facebook.

254. Plaintiffs and Class Members could not with due diligence have discovered the full scope of Defendants' conduct, because there were no disclosures or other indication that they were interacting with websites and a patient portal mobile app employing tracking technology.

255. The earliest that Plaintiffs and Class Members, acting with due diligence, could have reasonably discovered this conduct would have been on June 15, 2022, following the release of the Markup's investigation.

256. All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Defendant's illegal interception and disclosure of patients' PII/PHI has continued unabated through the date of the filing of Plaintiffs' Original Complaint. What's more, Defendant was under a duty to disclose the nature and significance of their data collection practices but did not do so. Defendant is therefore estopped from relying on any statute of limitations defenses.

## CLASS ACTION ALLEGATIONS

257. Defendant's conduct violates the law and breaches its express and implied privacy promises.

258. Defendant's unlawful conduct has injured Plaintiffs and Class Members.

259. Defendant's conduct is ongoing.

260. Plaintiffs bring this action individually and as a class action against Defendant.

261. Plaintiffs seek class certification for the following proposed Class:

> **The Atrius Health Class:** During the fullest period allowed by law, all current Massachusetts citizens who are, or were, patients of Atrius Health, Inc. or any of its affiliates and who exchanged communications at Atrius Health, Inc's website(s), including www.atriushealth.org and any other Atrius Health, Inc. affiliated websites, and patient portal mobile app(s).

> **The Nationwide Class:** During the fullest period allowed by law, all current or former patients of Atrius Healthcare or any of its affiliates who exchanged communications at Atrius Healthcare's websites, including www.atriushealth.org and any other Atrius Health, Inc. affiliated website, and patient portal mobile app(s).

262. Excluded from the proposed Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) the Defendant, Defendant's subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendant or its parent has a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiffs' counsel and Defendant's counsel.

263. Plaintiffs reserve the right to redefine the Class and/or add Subclasses at, or prior to, the class certification stage, in response to discovery or pursuant to instruction by the Court.

264. This action is properly maintainable as a class action as specifically defined in Federal Rule of Civil Procedure 23.

265. **Numerosity:** While the exact number of Class Members is unknown to Plaintiffs at this time, the Classes, based on information and belief, consist of thousands of people, such that joinder of all members is impracticable. The exact number of Class Members can be determined by review of information maintained by Defendants.

266. **Commonality and Predominance:** There are questions of law and fact common to Class Members and which predominate over any questions affecting only individual members. A class action will generate common answers to the questions below, which are apt to drive resolution:

a. Whether Defendant's acts and practices violated Plaintiffs and Class Members' privacy rights;

b. Whether Defendant's acts and practices violate 18 U.S.C § 2510, *et seq.*;

c. Whether Defendant's acts and practices violate G.L. c. 214, § 1B;

d. Whether Defendant's acts and practices violate G.L. c. 111, § 70E;

e. Whether Defendant knowingly allowed the surreptitious collection and disclosure of Plaintiffs and Class Members' PII/PHI to Facebook and other Third Parties;

f. Whether Defendant's acts and practices constitute a breach of fiduciary duty;

g. Whether Defendant profited from disclosures of PII/PHI to Third Parties including Facebook;

h. Whether Defendant was unjustly enriched;

i. Whether Defendant's acts and practices harmed and continue to harm Plaintiffs and Class Members and, if so, the extent of that injury;

j. Whether Plaintiffs and Class Members are entitled to equitable relief including, but not limited to, injunctive relief, restitution, and disgorgement; and

k. Whether Plaintiffs and Class Members are entitled to actual, statutory, punitive or other forms of damages, and other monetary relief.

267. These common questions of law and fact predominate over any questions affecting only the individual Class Members.

268. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the other Class Members. Identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quantity and quality, to the numerous common questions that dominate this action.

269. **Typicality:** Plaintiffs' claims are typical of the claims of other Class Members and Plaintiffs have substantially the same interest in this matter as other Class Members. Plaintiffs have no interests that are antagonistic to, or in conflict with, the interests of other members of the Class. Plaintiffs' claims arise out of the same set of facts and conduct as all other Class Members.

Plaintiffs and all Class Members are patients of Defendant who used the websites and patient portal set up by Defendant for patients and are victims of Defendant's respective unauthorized disclosures to Third Parties including Facebook. All claims of Plaintiffs and Class Members are based on Defendant's wrongful conduct and unauthorized disclosures.

270. **Adequacy of Representation:** Plaintiffs are committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiffs' claims are coincident with, and not antagonistic to, those of other Class Members they seek to represent. Plaintiffs have no disabling conflicts with Class Members. Accordingly, Plaintiffs are adequate representatives of the Class and, along with counsel, will fairly and adequately protect the interests of the Class and any Subclasses.

271. **Superiority:** A class action is the superior method for fair and efficient adjudication of the controversy. Although all Class Members have claims against Defendant, the likelihood that individual Class Members will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation. The damages, harm, and other detriment suffered individually by Plaintiffs and other Class Members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Defendant, making it impractical for Class Members to individually seek redress for Defendant's wrongful conduct. Moreover, serial adjudication in numerous venues is not efficient, timely, or proper. Judicial resources would be unnecessarily depleted by the prosecution of individual claims. The prosecution of separate actions by individual Class Members could create a risk of inconsistent or varying adjudications with respect to individual members of the Cass, which could establish incompatible standards of conduct for Defendant or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the

members of the Class Members who are not parties to the adjudications. If a class action is not permitted, Class Members will continue to suffer losses and Defendant's misconduct will continue without proper remedy.

272. Plaintiffs anticipate no unusual difficulties in the management of this litigation as a class action. The Class is readily ascertainable and direct notice can be provided from the records maintained by Defendant, electronically or by publication, the cost of which is properly imposed on Defendant.

273. For the above reasons, among others, a class action is superior to other available methods for the fair and efficient adjudication of this action.

## CAUSES OF ACTION

### COUNT I
### Interception of Wire Communications in Violation of 18 U.S.C. § 2510, *et seq.*
### (On Behalf of Plaintiffs and the Nationwide Class)

274. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

275. The Electronic Communications Privacy Act (the "ECPA"), 18 U.S.C. § 2510, protects individuals against eavesdropping committed with an improper purpose.

276. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119 of Title 18 of the United States Code.

277. A violation of Chapter 119 and the ECPA occurs where any person "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any . . . electronic communication" or "intentionally discloses, or endeavors to disclose, to any other person the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic

communication" or "intentionally uses, or endeavors to use, the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication." 18 U.S.C. §§ 2511(1)(a), (c)-(d).

278. Plaintiffs' communications with Atrius Health on its websites, patient portal, and patient portal mobile app are covered communications under 18 U.S.C. §§ 2510, 2511.

279. Plaintiffs' and Class Members' communications with Atrius Health constitute "electronic communications" because each communication was the transfer of data or intelligence, including, but not limited to:

a. the parties to the communications;

b. the precise text of patient search queries;

c. personally identifying information such as patients' IP addresses, Facebook IDs, browser fingerprints, and other unique identifiers;

d. the precise text of patient communications about specific doctors;

e. the precise text of patient communications about specific medical conditions;

f. the precise text of patient communications about specific treatments;

g. the precise text of patient communications about scheduling appointments with medical providers;

h. the precise text of patient communications about billing and payment;

i. the precise text of specific buttons on Defendant's website(s) that patients click to exchange communications, including Log-Ins, Registrations, Requests for Appointments, Search, and other buttons;

j. the precise dates and times when patients click to Log-In on Defendant's website(s);

k. The precise dates and times when patients visit Defendant's websites;

l. information that is a general summary or informs Third Parties of the general subject of communications that Defendant sent back to patients in response to search queries and requests for information about specific doctors, conditions, treatments, billing, payment, and other information; and

m. any other content that Defendant has aided Third Parties in scraping from its websites or patient portal mobile app .

280. Plaintiffs and Class Members's communications with Atrius Health constitute "electronic communications" because they were wholly or partially transmitted by wire, electromagnetic, and/or photoelectronic systems including but not limited to:

a. Plaintiffs and Class Members' personal computing devices;

b. Plaintiffs and Class Members' web browsers;

c. Plaintiffs and Class Members' browser-managed files;

d. Facebook's Meta Pixel;

e. Internet cookies;

f. Defendant's computer servers; and

g. Third-party source code used by Defendants.

281. Whenever Plaintiffs and Patient Class members interacted with Atrius Health's websites and patient portal mobile app, Atrius Health, through the source code it imbedded and ran on its websites and patient portal mobile app, contemporaneously and intentionally divulged the contents of Plaintiffs and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communications, including Facebook and Google.

282. Atrius Health configured both its websites, patient portal mobile app, and the tracking technologies therein in a manner that revealed the contents of communications between healthcare consumers and Atrius Health, including by using and permitting the interception of descriptive URLs (URLs that contain words that provide information on the substance of the communication between the consumer and Atrius Health), permitting the interception of descriptions of services for which patients sought treatment, the substance of requests for information on particular doctors, and interception of the precise words used in searches inputted by healthcare consumers. Atrius Health also used tracking technologies on pages that would confirm to Third Parties, such as Google and Facebook, the user's likely status as an Atrius Health patient, including pages through which patients could access Atrius Health's patient portal, obtain information on doctors, request appointments, pay bills, or request prescription refills.

283. Defendant's intercepted communications include, but are not limited to, the contents of communications to/from Plaintiffs and Class Members regarding PII/PHI, treatment, medication, and scheduling.

284. The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."

285. Thus, although Atrius Health is a "part[y] to the communications" at issue, it still incurs liability under the ECPA because it captured and redirected Plaintiffs' and Class Members' information to Third Parties without consent and for criminal and tortious purposes, as alleged throughout this complaint.

286. Atrius Health's acquisition of patient communications that were used and disclosed to Facebook, Google, and other Third Parties was done for purposes of committing criminal and

tortious acts in violation of the laws of the United States and Massachusetts including, among other things:

a. Criminal violation of HIPAA, 42 U.S.C. § 1320d-6;

b. Invasion of privacy in violation of G.L. c. 214, § 1B;

c. Breach of confidentiality of medical records in violation of G.L. c. 111, § 70E; and

d. Breach of the common law duty of confidentiality.

287. For example, under 42 U.S.C. § 1320d-6, it is a criminal violation for a person to "use[] or cause[] to be used a unique health identifier" or to "disclose[] individually identifiable health information to another person … without authorization" from the patient.

288. An individual's patient status with a particular entity is PHI. The Department of Health and Human Services instructs health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[92]

289. The HIPAA Privacy Rule also expressly provides that "a covered entity must obtain an authorization [from the patient] for any use or disclosure of protected health information for marketing…." 45 C.F.R. § 164.508(a)(3). That rule is directly implicated by tracking technologies in that a primary function of the tracking technologies is to permit both the tracking technology provider (for example, Google and Facebook) and the website owner (here, Atrius Health) to use

[92] Guidance Regarding Methods for De-Identification of Protected Health Information, *supra* n.**Error! Bookmark not defined.**.

the contents of the intercepted communications for marketing purposes after the interception occurs.

290. Consistent with this restriction, HHS marketing guidance provides: "With limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list."[93]

291. The penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

292. Defendant violated 42 U.S.C. § 1320d-6 when it:

a. Used and caused to be used cookie identifiers associated with specific patients without patient authorization; and

b. Disclosed individually identifiable health information to Facebook, Google, and other Third Parties without patient authorization.

c. Subsequently used the intercepted PII/PHI for commercial purposes, including Atrius Health's targeted advertising to individuals on Google's, Facebook's, and other Third Parties' advertising platforms based on the intercepted communications.

[93] Marketing, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html.

293. Atrius Health accessed, obtained, and disclosed Plaintiffs' and Class Members' PII/PHI for the purpose of committing the crimes and torts described herein because it would not have been able to obtain the information or the marketing services if it had complied with the law.

294. The PII/PHI of Plaintiffs and Class Members that Atrius Health intercepted and disclosed to Google, Facebook, and other Third Parties included communications confirming their status as patients of Atrius Health by using tracking technologies on webpages designed specifically for patients (including doctor searches, bill payment pages, pages used to navigate to the patient portal, and the patient portal mobile app).

295. Atrus Health was well aware of the restrictions imposed by HIPAA and that the disclosure of PII/PHI without written consent violated HIPAA. In Atrius Health's Notice of Privacy Practices (available on its website), Atrius Health wrote during the Class Period: "We have to meet many conditions in the law before we can share your information for these purposes," referring specifically to HIPAA. It also recognized: "We will share information about you if state or federal laws require it, including with the Department of Health and Human Services if it wants to see that we're complying with federal privacy law."

296. Atrius Health's primary purpose in deploying the tracking technologies was to engage in conduct made impermissible by HIPAA and the Massachusetts tort causes of action set forth in this complaint, including the Massachusetts Right to Privacy Act. As detailed in and supported by the factual allegations throughout this complaint (*see, e.g.*, ¶¶ 35-76, 163-165, 179, 183, 185-187, 189, 191, 193, 197, 203, 206, 209, 249-251, 292-294), Atrius Health knowingly and intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the primary purpose of committing a criminal and/or tortious acts in violation

of the Constitution or laws of the United States or of any State—including violation of HIPAA, the FTC Act, and the Massachusetts Right to Privacy Act.

297. Before engaging in such criminal and tortious acts, Atrius Health was warned not to use tracking technology on webpages with health information or on its patient portal mobile app without informed consent, which Atrius Health did not obtain. In committing such criminal and tortious acts, Atrius Health was motivated by its own financial self-interest in maximizing the effectiveness of its online marketing. Atrius Health's financial motivations demonstrate that its purpose was to commit a criminal or tortious act, as well as the other causes of action set forth in this complaint. Atrius Health had an incentive, which it acted on, to disclose sensitive patient communications and PII/PHI to Google, Facebook, and other Third Parties and later to use the same intercepted communications for marketing purposes, in order to advance its own marketing on those Third Parties' advertising platforms.

298. Atrius Health violated a provision of HIPAA, specifically 42 U.S.C. § 1320d-6(a)(3), which imposes a criminal penalty for knowingly disclosing individually identifiable health information ("IHII") to a Third Party, and then subsequently using the same information for marketing purposes, all without patient consent.

299. HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

42 U.S.C. § 1320d-(6).

300. The sensitive healthcare communications and PII/PHI of Plaintiffs and Class Members that Atrius Health disclosed to Third Parties, which both Atrius Health and the third parties later used for marketing purposes, qualify as IIHI, and Atrius Health violated Plaintiffs' expectations of privacy and constitutes tortious and/or criminal conduct by violating 42 U.S.C. § 1320d(6). Atrius Health used the intercepted electronic communications to increase its revenues.

301. The penalty for violating HIPAA is enhanced where "the offense is committed with intent to sell, transfer, or use IIHI for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6. Atrius Health specifically used tracking technologies to intercept, disclose, and later use for marketing purposes, Plaintiffs' and Class Members' PII/PHI.

302. Atrius Health violated 42 U.S.C. § 1320d-6 in that it: (i) used and caused to be used identifiers associated with specific patients without patient authorization; and (ii) disclosed IIHI to Google, Facebook, and other Third Parties without patient authorization.

303. Atrius Health's conduct is subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Atrius Health's use of the tracking technology was for Atrius Health's commercial advantage to increase revenue from existing patients and gain new patients through, among other things, targeted advertising.

304. The same acts that are criminal violations under HIPAA—including the disclosure and subsequent marketing use of healthcare communications, including communications that revealed PII/PHI, without consent are likewise tortious acts under Massachusetts law, as detailed in the other counts of this complaint. Accordingly, Atrius Health additionally intercepted communications for the purpose of committing acts that are tortious under Massachusetts law (*see* ¶¶ 309-336, *infra*, which explains how the acts described in this complaint are tortious acts that

give rise to liability, and how Atrius Health intercepted communications for the primary purpose of performing those acts that are tortious under Massachusetts law).

305. Because Atrius Health intercepted Plaintiffs' and Class Members' communications for the purpose of committing both criminal and tortious acts, Atrius Health cannot viably claim any exception to ECPA liability.

306. As a result, Atrius Health harmed Plaintiffs and the Class, breaching the confidentiality of their medical information, violating their privacy, breaching their contract with the hospital, depriving them of the full benefit of their bargain with Atrius Health for care, and causing actual damages in an amount to be proven at trial.

307. The ECPA provides that persons whose electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119 may recover statutory damages of the greater of $100 a day for each day of violation or $10,000. 18 U.S.C. § 2520.

308. For these reasons, Plaintiffs, individually and on behalf of the Class Members, seek all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

**COUNT II**
**Invasion of Privacy in Violation of G.L. c. 214, § 1B**
**(On Behalf of Plaintiffs and the Massachusetts Class)**

309. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

310. Plaintiffs bring this claim on behalf of themselves and all members of the Class.

311. G.L. c. 214, § 1B provides that "a person shall have a right against unreasonable, substantial, or serious interference with his privacy. The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages."

312. All health care providers owe their patients a duty not to disclose medical information about a patient without a patient's informed consent.

313. G.L. c. 111, § 70E provides that every patient or resident of a Massachusetts health care facility shall have the right to "confidentiality of all records and communications to the extent provided by law."

314. Maintaining the confidentiality of the doctor-patient relationship is a cardinal rule of the medical profession which has come to be justifiably relied on by patients seeking advice and treatments.

315. Plaintiffs and Class Members are patients of Atrius Health.

316. Atrius Health owes Plaintiffs and Class Members a duty of confidentiality.

317. Despite its duty not to disclose healthcare communications, including communications that reveal PII/PHI, without informed consent and written authorization, Atrius Health disclosed such communications to Third Parties without their knowledge, consent, or authorization.

318. The information disclosed included PII/PHI, Plaintiffs and Class Members' statues as patients of Atrius Health, and the exact contents of communications exchanged between Plaintiffs and/or Class Members with Atrius Health, including but not limited to information about treating doctors, potential doctors, conditions, treatments, appointments, search terms, bill payment, and logins to Atrius Health's website and patient portal mobile app.

319. The disclosure of healthcare communications, including communications that reveal PII/PHI, constitutes an unreasonable, substantial, and serious interference with Plaintiffs and Class Members' rights to privacy.

320. Plaintiffs and Class Members did not consent to, authorize, or know about Atrius Health's disclosure of their PII/PHI to Google, Facebook, and other Third Parties at the time it occurred, nor did Plaintiff or Class Members authorize Atrius Health to later commercially exploit the improperly disclosed communications for marketing purposes, including targeted advertising to Atrius Health patients. Plaintiffs and Class Members never agreed that their sensitive medical information could be collected, used, and monetized by Atrius Health, Google, Facebook, and other Third Parties.

321. Atrius Health's intentional disclosure of patients' communications, including communications that reveal PII/PHI, to Third Party advertising companies like Google and Facebook without consent would be highly offensive to a reasonable person. Plaintiffs and Class Members reasonably expected that their communications would not be collected, used, and monetized by Third Party advertising companies.

322. Atrius Health's disclosure of healthcare communications, including communications that reveal PII/PHI, from thousands of individuals, and Atrius Health's subsequent use of intercepted healthcare communications for marketing purposes, was highly offensive because it violated expectations of privacy that have been established by social norms. Privacy polls and studies show that Americans believe that one of the most important privacy rights is the need for an individual's affirmative consent before their personal data is collected, shared, or used.

323. Given the nature of the communications and the PII/PHI therein that Atrius Health disclosed to Google, Facebook, and other Third Parties, including such items as patients' names, email addresses, phone numbers, information entered into forms, doctors' names, potential doctors' names, the search terms used to locate doctors (*e.g.*, "Alzheimer's"), the condition

selected from dropdown menus (*e.g.*, "Heart Disease"), medications, and details about upcoming doctors' appointments, this kind of intrusion would be (and in fact is) highly offensive to a reasonable person.

324. Atrius Health's breach caused Plaintiffs and Class Members, at minimum, the following damages:

a. Atrius Health harmed Plaintiffs' and Class Members' interest in privacy;

b. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

c. Atrius Health eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

d. Atrius Health took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

e. Atrius Health was unjustly enriched by its misconduct in the form of reduced costs for its online marketing efforts and increased ROI and profits from the same that were made possible by its disclosure and exploitation of Plaintiffs' and Class Members' PII/PHI;

f. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Atrius Health's duty to maintain the confidentiality of their PII/PHI; and

g. Atrius Health's actions diminished the value of Plaintiffs' and Class Members' PII/PHI.

325. Plaintiffs and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights.

326. Plaintiffs and Class Members have been damaged as a direct and proximate result of Atrius Health's invasion of their privacy and are entitled to seek just compensation, including monetary damages.

327. Plaintiffs and Class Members seek appropriate relief for their injuries, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as well as a disgorgement of profits made by Atrius Health as a result of its intrusions on Plaintiffs and Class Members' privacy.

328. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Atrius Health's actions, which caused injury to Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Atrius Health from engaging in such conduct in the future.

329. Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT III**
**Breach of Fiduciary Duty and/or Common Law Duty of Confidentiality**
**(On Behalf of Plaintiffs and the Massachusetts Class)**

330. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

331. Plaintiffs bring this claim on behalf of themselves and all members of the Class.

332. All conditions precedent to this action have been performed or occurred.

333. In *Alberts v. Devine*, 479 N.E.2d 113, 120 (1985), the Massachusetts Supreme Court held that a duty of confidentiality arises from the physician-patient relationship and that a violation of that duty gives rise to a cause of action sounding in tort.

334. As a medical provider for Plaintiffs and Class Members, Atrius Health owes Plaintiffs and Class Members a fiduciary duty of confidentiality in the data and content of communications exchanged between Atrius Health and Plaintiffs or Class Members.

335. Atrius Health breached its duty of confidentiality by disclosing Plaintiffs' and Class Members' PII/PHI, including their status as patients, the content of their communications, and information about their doctors, potential doctors, conditions, treatments, appointments, search terms, and bill payment.

336. Atrius Health's breach caused Plaintiffs and Class Members the following damages:

a. Atrius Health harmed Plaintiffs' and Class Members' interest in privacy;

b. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

c. Atrius Health eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

d. Atrius Health took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

e. Atrius Health was unjustly enriched by its misconduct in the form of reduced costs for its online marketing efforts and increased ROI and profits from the same that were made possible by its disclosure and exploitation of Plaintiffs' PII/PHI;

f. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Atrius Health's duty to maintain the confidentiality of their PII/PHI; and

g. Atrius Health's actions diminished the value of Plaintiffs and Class Members' PII/PHI.

**COUNT IV**
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and the Massachusetts Class)**

337. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

338. Plaintiffs bring this claim on behalf of themselves and all members of the Class.

339. Atrius Health's Medical Information Privacy Notice ("Privacy Notice") assures patients that Atrius Health is prohibited by law from "selling your health information to others" or "using or disclosing your health information" for "promotional communications" without patients' "written authorization."[94] Atrius Health's Privacy Notice further notes that Atrius Health is "required by law to protect the privacy of your health information."[95]

340. Atrius Health solicited and invited Plaintiffs and Class Members to provide their PII/PHI on its websites and through its patient portal mobile app as part of Atrius Health's regular business practices. Plaintiffs and Class Members accepted Atrius Health's offers and provided their PII/PHI, which included personally identifiable information such as their names, telephone numbers, IP addresses, Facebook IDs, browser fingerprints, and device identifiers to Atrius Health as part of acquiring Atrius Health's medical services and using its websites and patient portal

[94] https://www.atriushealth.org/patient-information/privacy-practices. Defendant's current Privacy Notice went into effect on September 30, 2022. Defendant's prior "Notice of Privacy Practices" may be found at https://web.archive.org/web/20220713190254/https://www.atriushealth.org/patient-information/privacy-practices. That Privacy Notice informed patients that "Access" to patients' medical records and other information maintained by Atrius Health "is restricted to clinicians and staff who need the information for treatment, payment, or health care operations purposes." Defendant's prior Privacy Notice further promised patients that "We will not use or share your information other than as described here unless you tell us we can in writing." Defendant's prior Privacy Notice also promised that Defendant would "never share your information" for "Marketing Purposes" or "Sale of your information" unless "you give written permission."

[95] https://www.atriushealth.org/patient-information/privacy-practices

mobile app. Per its contractual, legal, ethical, and fiduciary duties, Atrius Health was obligated to take adequate measures to protect Plaintiffs' and Class Members' PII/PHI from unauthorized disclosure to Third Parties such as Facebook and Google. These facts give rise to the inference that Atrius Health took on obligations outside the plain terms of any express contracts that they may have had with Plaintiffs and Class Members.

341. Plaintiffs and the Class Members entered into valid and enforceable implied contracts with Atrius Health when they sought medical treatment from Atrius Health. Specifically, through their course of conduct, Atrius Health, Plaintiffs, and Class Members entered into implied contracts for the provision of medical care and treatment, which included an implied agreement for Atrius Health to retain and protect the privacy of Plaintiffs' and Class Members' PII/PHI.

342. Atrius Health required and obtained Plaintiffs' and Class Members' PII/PHI as part of the physician-patient relationship, evincing an implicit promise by Atrius Health to act reasonably to protect the confidentiality of Plaintiffs' and Class Members' PII/PHI. Atrius Health, through its privacy policies, codes of conduct, company security practices, and other conduct, implicitly promised that it would safeguard Plaintiffs' and Class Members' PII/PHI in exchange for access to that information and the opportunity to treat Plaintiffs and Class Members.

343. Implied in the exchange was a promise by Atrius Health to ensure that the PII/PHI of Plaintiffs and Class Members in its possession would only be used for medical treatment purposes and would not be shared with Third Parties such as Facebook without the knowledge or consent of Plaintiffs and Class Members. By asking for and obtaining Plaintiffs' and Class Members' PII/PHI, Atrius Health assented to protecting the confidentiality of that information. Atrius Health's implicit agreement to safeguard the confidentiality of Plaintiffs' and Class Members' PII/PHI was necessary to effectuate the contract between the parties.

344. Plaintiffs and Class Members provided their PII/PHI in reliance on Atrius Health's implied promise that this information would be safeguarded and not be shared with Third Parties without their consent.

345. These exchanges constituted an agreement and meeting of the minds between the parties: Plaintiffs and Class Members would provide their PII/PHI in exchange for the medical treatment and other benefits provided by Atrius Health (including the protection of their confidential personal and medical information). A portion of the price of each payment that Plaintiffs and the Class Members made to Atrius Health for medical services was intended to ensure the confidentiality of their PII/PHI.

346. In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Atrius Health would comply with its promises to protect the confidentiality of their PII/PHI as well as applicable laws and regulations governing the disclosure of such information and that Atrius Health would not allow Third Parties to collect or exploit their communications with Atrius Health without their consent.

347. It is clear by these exchanges that the parties intended to enter into an agreement, and mutual assent occurred. Plaintiffs and Class Members would not have disclosed their PII/PHI to Atrius Health but for the prospect of Atrius Health's promise of medical treatment and other benefits. Conversely, Atrius Health presumably would not have taken Plaintiffs and Class Members' PII/PHI if it did not intend to provide them with medical treatment and other benefits.

348. Atrius Health was therefore required to reasonably safeguard and protect the PII/PHI of Plaintiffs and Class Members from unauthorized disclosure and/or use by Third Parties.

349. Plaintiffs and Class Members accepted Atrius Health's medical services offer and fully performed their obligations under the implied contract with Atrius Health by providing their

PII/PHI to Atrius Health among other obligations. Plaintiffs and Class Members would not have provided and entrusted their PII/PHI to Atrius Health in the absence of their implied contracts with Atrius Health and would have instead retained the opportunity to control their PII/PHI for uses other than the benefits offered by Atrius Health.

350. Plaintiffs and Class Members relied on Atrius Health's implied promises to safeguard their PII/PHI to their detriment. Atrius Health breached the implied contracts with Plaintiffs and Class Members by failing to reasonably safeguard and protect Plaintiffs' and Class Members' PII/PHI from disclosure to Google, Facebook, and other Third Parties.

351. Atrius Health's failure to implement adequate measures to protect the PII/PHI of Plaintiffs and Class Members and Atrius Health's intentional disclosure of the same to Facebook, Google, and other Third Parties violated the purpose of the agreement between the parties: Plaintiffs' and Class Members' provision of money and PII/PHI in exchange for medical services and other benefits.

352. Instead of safeguarding Plaintiffs' and Class Members' PII/PHI, Atrius Health intentionally shared that information with Google, Facebook, and other Third Parties, thereby breaching the implied contracts it had with Plaintiffs and Class Members.

353. Plaintiffs and Class Members who paid money to Atrius Health reasonably believed and expected Atrius Health would use part of those funds to operate its websites free of surreptitious collection and exploitation of communications between the parties. Atrius Health failed to do so. Plaintiffs and Class Members would not have purchased medical services from Atrius Health if they knew Atrius Health would share their PII/PHI with Google, Facebook, and other Third Parties, or then later use the disclosed PII/PHI for commercial purposes (including targeted advertising), all without their knowledge or written consent.

354. Plaintiffs and Class Members who paid money to Atrius Health reasonably believed and expected that Atrius Health would use part of those funds to operate its websites free of surreptitious collection and exploitation of communications between the parties. Atrius Health failed to do so.

355. Under the implied contracts, Atrius Health and/or its affiliated healthcare providers promised and were obligated to: (a) provide healthcare to Plaintiffs and Class Members; and (b) protect Plaintiffs and the Class Members' PII/PHI provided to obtain such healthcare. In exchange, Plaintiffs and Class Members agreed to pay money for these services, and to turn over their PII/PHI through the use of Atrius Health's websites.

356. Both the provision of medical services and healthcare and the protection of Plaintiffs and Class Members' PII/PHI were material aspects of these implied contracts.

357. The implied contracts for the provision of medical services—contracts that include the contractual obligations to maintain the privacy of Plaintiffs and Class Members' PII/PHI unless they consent—are also acknowledged, memorialized, and embodied in multiple documents, including (among other documents) Atrius Health's published Notice of Privacy Practices.

358. Atrius Health's express representations, including, but not limited to the express representations found in its Notice of Privacy Practices, memorialize and embody an implied contractual obligation requiring Atrius Health to refrain from using or monetizing, or allowing Third Parties to collect, use, and monetize, Plaintiffs' and Class Members' PII/PHI without consent. By soliciting and acquiring Plaintiffs' and Class Members' PII/PHI, Atrius Health assumed an independent duty to handle Plaintiffs' and Class Members' PII/PHI with due care and consistent with industry standards to prevent the foreseeable harm that arises from a breach of that duty.

359. Consumers of healthcare value their privacy, the privacy of their dependents, and the ability to keep their PII/PHI associated with obtaining healthcare private. To customers such as Plaintiffs and the Class Members, healthcare businesses that secretly disclose to Third Parties their PII/PHI for marketing purposes without consent is fundamentally less useful and less valuable than healthcare that refrains from such practices. Plaintiffs and Class Members would not have entrusted their PII/PHI to Atrius Health and entered into these implied contracts with Atrius Health without an understanding that their PII/PHI would be safeguarded and protected or entrusted their PII/PHI to Atrius Health in the absence of its implied promise to do so.

360. A meeting of the minds occurred when Plaintiffs and the Class Members agreed to, and did, provide their PII/PHI to Atrius Health and/or its affiliated healthcare providers, and paid for the provided healthcare in exchange for, amongst other things, (a) the provision of healthcare and medical services and (b) the protection of their PII/PHI.

361. Plaintiffs and the Class Members performed their obligations under the contract when they paid for their healthcare services and provided their PII/PHI.

362. Atrius Health materially breached its contractual obligations to protect the nonpublic PII/PHI that Atrius Health gathered when it disclosed to Third Parties and later commercially exploited that information without Plaintiffs' and Class Members' consent.

363. Atrius Health also materially breached its contractual obligation to protect Plaintiffs' and Class Members' non-public PII/PHI when it failed to implement adequate security measures and policies to protect the confidentiality of that information. For example, on information and belief, Atrius Health (1) failed to implement internal policies and procedures prohibiting the disclosure of patients' PII/PHI without consent to Third Party advertising companies like Google and Facebook, (2) failed to implement adequate reviews of the software

code and JavaScript installed on its websites to ensure that patients' PII/PHI was not being automatically routed without consent to Third Party advertising companies like Google and Facebook, (3) failed to provide adequate notice to the public that visitors to its websites risked having their PII/PHI shared with Third Party advertising companies like Google and Facebook, (4) failed to take other industry standard privacy protection measures such as providing a "cookie" acceptance button on its website homepages or patient portal mobile app, (5) failed to provide visitors to its websites and users of its patient portal mobile app with a means to opt out of the automatic transfer of data regarding their website and patient portal mobile app interactions to Third Party advertising companies like Google and Facebook, (6) failed to implement internal policies and educational programs to ensure Atrius Health's website and patient portal mobile app managers and coders were familiar with the legal regulations governing the disclosure of patient PII/PHI to Third Parties, and (7) failed to install adequate firewalls or take similar measures to prevent the automatic routing of patients' PII/PHI to Third Party advertising companies like Facebook and Google.

364. As a result of Atrius Health's failure to fulfill the data privacy protections promised in these contracts, Plaintiffs and Class Members did not receive the full benefit of their bargains, and instead received healthcare and other services that were of diminished value compared to those described in the contracts. Plaintiffs and Class Members were therefore damaged in an amount at least equal to the difference in the value of the healthcare services with data privacy they paid for and the healthcare services they received.

365. As a result of Atrius Health's material breaches, Plaintiffs and Class Members were deprived of the benefit of their bargain with Atrius Health because they spent more on medical services with Atrius Health than they would have if they had known that Atrius Health was not

providing the reasonable data security and confidentiality of patient communications that Atrius Health represented that it was providing in its privacy policies. Atrius Health's failure to honor its promises that it would protect the confidentiality of patient communications thus resulted in Plaintiffs and Class Members overpaying Atrius Health for the services they received.

366. The services that Plaintiffs and Class Members ultimately received in exchange for the monies paid to Atrius Health were worth quantifiably less than the services that Atrius Health promised to provide, which included Atrius Health's promise that any patient communications with Atrius Health would be treated as confidential and would never be disclosed to Third Parties for marketing purposes without the express consent of patients.

367. The medical services that Atrius Health offers are available from many other health care systems that protect the confidentiality of patient communications. Had Atrius Health disclosed that it would allow Third Parties to secretly collect Plaintiffs' and Class Members' PII/PHI without consent, neither the Plaintiffs, the Class Members, nor any reasonable person would have purchased healthcare from Atrius Health and/or its affiliated healthcare providers.

368. Atrius Health's conduct in sharing Plaintiffs' and Class Members' PII/PHI with Third Parties also diminished the sales value of that information. There is a robust market for the type of information that Plaintiffs and Class Members shared with Atrius Health (which Atrius Health then disclosed to Third Parties). For example, Facebook itself has offered to pay the public to acquire similar information in the past so that Facebook could use such information for marketing purposes. Plaintiffs and Class Members were harmed both by the dissemination of their PII/PHI and by losing the sales value of that information.

369. As a direct and proximate result of these failures, Plaintiffs and Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries,

including, without limitation, the release and disclosure of their PII/PHI, the loss of control of their PII/PHI, the diminution in value of their PII/PHI, and the loss of the benefit of the bargain they had struck with Atrius Health.

370. Plaintiffs and the Class Members are entitled to compensatory and consequential damages suffered as a result.

371. Plaintiffs and Class Members also face a real and immediate threat of future injury to the confidentiality of their PII/PHI both because such information remains within Atrius Health's control and because anytime that Plaintiffs and/or Class Members interact with Atrius Health's websites to make appointments, such information about their medical conditions, search for a doctor, or otherwise seek assistance with their medical conditions they risk further disclosure of their PII/PHI. Plaintiffs and Class Members are therefore also entitled to injunctive relief requiring Atrius Health to cease all website operations that allow for the third-party capture of PII/PHI.

**COUNT V**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Massachusetts Class)**

372. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

373. Plaintiffs hereby plead this Count in the alternative to Count IV.

374. Plaintiffs bring this claim on behalf of themselves and all members of the Massachusetts Class.

375. Plaintiffs and Class Members conferred a benefit on Atrius Health in the form of valuable sensitive medical information that Atrius Health collected from Plaintiffs and Class Members under the guise of keeping this information private. Atrius Health collected, used, and disclosed this information for its own gain, including for advertisement purposes, sale, or trade for

valuable services from Third Parties. Additionally, Plaintiffs and the Class Members conferred a benefit on Atrius Health in the form of monetary compensation.

376. Plaintiffs and the Class Members would not have used Atrius Health's services, or would have paid less for those services, if they had known that Atrius Health would collect, use, and disclose their communications and PII/PHI to Third Parties.

377. Atrius Health unjustly retained those benefits at the expense of Plaintiffs and Class Members because Atrius Health's conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

378. The benefits that Atrius Health derived from Plaintiffs and Class Members rightly belong to Plaintiffs and Class Members. It would be inequitable under unjust enrichment principles for Atrius Health to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

379. Atrius Health should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that Atrius Health received, and such other relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, ask for judgment in their favor, and that the Court enter an order as follows:

a. Certifying the Classes and appointing Plaintiffs as the Classes' representatives;

b. Appoint the law firms of Sweeny Merrigan Law, Keller Postman LLC, Ahmad, Zavitsanos, & Mensing P.C., and Shapiro Haber & Urmy LLP as class counsel;

c. Finding that Atrius Health's conduct as alleged herein was unlawful;

d. Awarding such injunctive and other equitable relief as the Court deems just and proper, including enjoining Atrius Health from making any further disclosure of Plaintiffs or Class Members' communications to Third Parties without the Plaintiffs' or Class Members' express, informed, and written consent;

e. Awarding statutory damages of $10,000 per Plaintiff and Class Members pursuant to 18 U.S.C. § 2520;

f. Imposing a constructive trust against Atrius Health through which Plaintiffs and Class Members can be compensated for any unjust enrichment gained by Atrius Health;

g. Awarding damages for violations of Plaintiffs and Class Members' right to privacy;

h. Awarding Plaintiffs and Class Members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

i. Awarding Plaintiffs and Class Members pre-judgment and post-judgment interest as provided by law;

j. Awarding Plaintiffs and Class Members reasonable attorney's fees, costs, and expenses;

k. Awarding costs of suit; and

l. Such other and further relief to which Plaintiffs and Class Members may be entitled.

Dated: November 28, 2025

Respectfully Submitted,

*/s/ Patrick J. Vallely*

Edward F. Haber (BBO# 215620)
Michelle H. Blauner (BBO# 549049)
Patrick J. Vallely (BBO# 663866)
**Shapiro Haber & Urmy LLP**
One Boston Place, Suite 2600
Boston, MA 02108
Tel: (617) 439-3939
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Attorneys for Jane Doe #1 and the Putative Classes*

J. Tucker Merrigan, BBO# 681627
Thomas T. Merrigan, BBO# 343480
Ryan Hawkins, BBO# 686289
Erin E. McHugh, BBO# 703701
**Sweeney Merrigan Law**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
tom@sweeneymerrigan.com
rmh@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*pro hac vice forthcoming*)
David Warden (*pro hac vice forthcoming*)
Justin C. Kenney *(pro hac vice forthcoming)*
Nathan Campbell (*pro hac vice forthcoming*)
**Ahmad, Zavitsanos, & Mensing, PLLC**
1221 McKinney Street, Suite 2500
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
jkenney@azalaw.com
ncampbell@azalaw.com

Warren Postman (*pro hac vice forthcoming*)
Alex Dravillas (*pro hac vice forthcoming*)
**Keller Postman LLC**
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
wpd@kellerpostman.com
adj@kellerpostman.com

*Attorneys for John Doe, Jane Doe #2, and the Putative Classes*

**CERTIFICATE OF SERVICE**

I hereby certify that, on November 28, 2025, copies of the foregoing were filed using the Court's CM/ECF service, which will provide service copies to all counsel of record.

*/s/ Patrick J. Vallely*
Patrick J. Vallely