**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JANE DOE,<br><br>For herself and the Class,<br><br>v.<br><br>ATRIUS HEALTH, INC.,<br><br>Defendant. | **Case No. 1:25-cv-10020-FDS** |

**<u>PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS</u>**

# Table of Contents


I. Introduction....................1

II. The Facts....................3

III. Argument....................5

A. Plaintiffs State a Claim Under the ECPA....................5

1. Atrius Is Civilly Liable for Intercepting Communications....................5

2. Plaintiffs Adequately Plead the Crime-Exception to One-Party Consent....................6

a. Atrius Intercepted Communications for the Purpose of Committing Acts Which Violated HIPAA....................8

b. Atrius Intercepted Communications for the Purpose of Committing Acts that are Tortious under Massachusetts Law....................11

c. Financial Motivations Are Consistent With a Purpose to Engage in an Act Which Violates HIPAA or Massachusetts Tort Law....................11

d. Atrius Engaged in Criminal and Tortious Acts Separate from the ECPA Violation....................14

3. There is Nothing Absurd About Requiring Hospitals to Refrain from Using PHI for Financial Gain Without Patient Consent....................16

B. Plaintiffs Adequately Allege Their State Law Claims....................18

1. Plaintiffs State a Claim under the MRPA....................18

2. Plaintiffs State a Claim for Breach of Fiduciary Duty....................21

3. Plaintiffs State a Claim for Breach of Contract....................23

4. Plaintiffs Allege Cognizable Injuries and Damages....................24

5. Plaintiffs State a Claim for Unjust Enrichment....................25

IV. Conclusion....................25

# **Table of Authorities**

Cases

*A.D. v. Aspen Dental Mgmt., Inc.*,
2024 WL 4119153 (N.D. Ill. Sept. 9, 2024) .... 2

*A.J. v. LMND Med. Grp., Inc.*,
2024 WL 4579143 (N.D. Cal. Oct. 25, 2024) .... 9, 21, 22, 25

*Alberts v. Devine*,
395 Mass. 59 (1985) .... 17, 21

*Allen v. Midwest Express Care, Inc.,*
2025 WL 2240253 (N.D. Ill. Aug. 6, 2025) .... 10

*Alves v. BJ's Wholesale Club, Inc.*,
2023 WL 4456956 (Super. Ct. June 21, 2023) .... 19, 21

*Am. Hosp. Ass'n v. Becerra*,
738 F. Supp. 3d 780 (N.D. Tex. 2024) .... 10

*Borden v. United States*,
593 U.S. 420 (2021) .... 7

*Boudreau v. Lussier*,
901 F.3d 65 (1st Cir. 2018) .... 15

*Brahm v. Hosp. Sisters Health Sys.*,
2024 WL 3226135 (W.D. Wis. June 28, 2024) .... 8, 21, 25

*Bratt v. Int'l Bus. Machines Corp.*,
392 Mass. 508 (1984) .... 19

*Braun v. Philadelphia Inquirer, LLC*,
2023 WL 7544160 (E.D. Pa. Nov. 13, 2023) .... 3

*Brown v. Google LLC*,
525 F. Supp. 3d 1049 (N.D. Cal. 2021) .... 20

*Byrd v. Aaron's*,
14 F. Supp. 3d 667 (W.D. Pa. 2014) .... 6

*C. M. v. MarinHealth Med. Grp., Inc.*,
2024 WL 217841 (N.D. Cal. Jan. 19, 2024) .... 2

*Carmack v. Amtrak*,
486 F. Supp. 2d 58 (D. Mass. 2007) .... 21

*Castillo v. Costco Wholesale Corp.*,
2024 WL 4785136 (W.D. Wash. Nov. 14, 2024) ........ 3, 10, 13

*Conformis, Inc. v. Aetna, Inc.*,
58 F.4th 517 (1st Cir. 2023) ........ 7

*Cooper v. Mount Sinai Health Sys., Inc.*,
742 F. Supp. 3d 369 (S.D.N.Y. 2024) ........ 2, 11, 12, 15

*Cousin v. Sharp Healthcare*,
681 F. Supp. 3d 1117 (S.D. Cal. 2023) ........ 10

*Cousin v. Sharp Healthcare*,
2023 WL 8007350 (S.D. Cal. Nov. 17, 2023) ........ 3

*Dawson v. Univ. of Phx. Inc.*,
2026 WL 92248 (N.D. Ill. Jan. 13, 2026) ........ 5

*Doe v. Bayhealth Med. Ctr., Inc.*,
2025 WL 1010403 (Del. Super. Ct. Apr. 4, 2025) ........ 3, 11

*Doe v. Bon Secours Mercy Health*,
2021 WL 9939010 (Ohio Com. Pl. Nov. 22, 2021) ........ 3, 23

*Doe v. Boone Health, Inc.*,
2023 WL 4996117 (Mo. Cir. July 20, 2023) ........ 3

*Doe v. Boston Medical Center Corp.*,
2023 WL 7105628 (Mass. Super. Sep. 14, 2023) ........ 3, 19

*Doe v. Emerson Hosp.*,
2023 WL 8869624 (Super. Ct. Nov. 22, 2023) ........ 19, 21, 22, 23, 24, 25

*Doe v. FullStory, Inc.*,
712 F. Supp. 3d 1244 (N.D. Cal. 2024) ........ 3

*Doe v. Hoag Memorial Presbyterian Hosp.*,
2024 WL 1190907 (Cal. Super. Feb. 16, 2024) ........ 3

*Doe v. Lawrence General Hosp.*,
2025 WL 2808055 (D. Mass. Aug. 29, 2025) ........ 12

*Doe v. Medstar Health, Inc.*,
2020 WL 14005240 (Cir. Ct. Aug. 5, 2020) ........ 21

*Doe v. Meta Platforms, Inc.*,
2023 WL 5837443 (N.D. Cal. Sept. 7, 2023) ........ 3

*Doe v. Post Acute Med., LLC*,
2025 WL 511069 (M.D. Pa. Feb. 14, 2025) ....................2

*Doe v. Regents of Univ. of California*,
2023 WL 3316766 (N.D. Cal. May 8, 2023) ....................3

*Doe v. Tenet Healthcare Corp.*,
731 F. Supp. 3d 142 (D. Mass. 2024)....................passim

*Doe v. Tenet Healthcare Corp.*,
789 F. Supp. 3d 814 (E. D. Cal. June 9, 2025) ....................14

*Doe v. The Children's Hosp. Corp.*,
2023 WL 6462578 (Mass. Super. Sep. 14, 2023) ....................3

*E.H. v. Meta Platforms, Inc.*,
2024 WL 557728 (N.D. Cal. Feb. 12, 2024) ....................3

*Elkins v. Bartholomew Cnty. Pub. Hosp.*,
2024 WL 5471834 (Super. Ct. Dec. 16, 2024).................... 23, 25

*Fregosa v. Mashable, Inc.*,
2025 WL 2886399 (N.D. Cal. Oct. 9, 2025) ....................6

*Gaige v. Exer Holdings Co., LLC*,
2025 WL 559719 (C.D. Cal. Jan. 30, 2025)....................11

*Garrity v. John Hancock Mut. Life Ins. Co.*,
2002 WL 974676 (D. Mass. May 2, 2002)....................21

*Gay v. Garnet Health*,
2024 WL 4203263 (S.D.N.Y. Sept. 16, 2024)....................3, 16, 24

*Good v. Uber Techs., Inc.*,
494 Mass. 116 (2024)....................24

*Goulart v Cape Cod Healthcare, Inc.*,
2025 WL 1745732 (D. Mass. June 24, 2025) ....................12

*Hartley v. Univ. of Chicago Med. Ctr.*,
2024 WL 1886909 (N.D. Ill. Apr. 30, 2024) ....................3

*Hartley v. University of Chicago Medical Ctr.*,
2025 WL 2802317 (N.D. Ill. Oct. 1, 2025) .................... 3, 6, 9, 10, 14

*Heerde v. Learfield Commc'ns, LLC*,
741 F. Supp. 3d 849 (C.D. Cal. 2024)....................20

*Hubbard v. Google*,
2024 WL 3302066 (N.D. Cal. July 1, 2024) ....................21

*I.T. v. Choicepoint LLC*,
2025 WL 2495079 (W.D. Wash. Aug. 29, 2025) .................... 10, 14

*In re DoubleClick Inc. Priv. Litig.*,
154 F. Supp. 2d 497 (S.D.N.Y. 2001) ....................12

*In re Facebook Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) ....................20

*In re Google, Inc.*,
806 F.3d 125 (3d Cir. 2015)....................20

*In re Meta Pixel Healthcare Litig.*,
647 F. Supp. 3d 778 (N.D. Cal. 2022) ....................passim

*In re Meta Pixel Tax Filing Cases*,
724 F. Supp. 3d 987 (N.D. Cal. 2024) .................... 7, 24

*In re Pharmatrak, Inc. Privacy Litig.*,
329 F.3d 9 (1st Cir. 2003) ....................17

*In re Shields Health Care Grp., Inc. Data Breach Litig.*,
721 F. Supp. 3d 152 (D. Mass. 2024)....................22

*Jarrell v. Adena Health Sys.*,
2025 WL 81305 (S.D. Ohio Jan. 13, 2015) ....................12, 16, 25

*Jarrett v. Upperline Health, Inc.*,
2025 WL 3067545 (S.D Ind. Aug. 8, 2025)....................10

*Joiner v. NHL Enters., Inc.*,
2025 WL 2846431 (S.D.N.Y. Aug. 2025)....................6

*Kane v. Univ. of Rochester*,
2024 WL 1178340 (W.D.N.Y. Mar. 19, 2024).................... 2, 3, 10

*Korper v. Weinstein*,
57 Mass. App. Ct 433 (App. Ct. 2003)....................22

*Krzyzek v. Openx Techs., Inc.*,
2026 WL 206855 (N.D. Cal. Jan. 27, 2026) ....................11

*Kurowski v. Rush Sys. for Health*,
2023 WL 8544084 (N.D. Ill. Dec. 11, 2023)....................16

*Kurowski v. Rush Sys. for Health*,
2024 WL 3455020 (N.D. Ill. July 18, 2024) ........ 3, 7, 13

*Lamarr v. Goshen Health Sys., Inc.*,
2023 WL 6690582 (Super. Ct. Oct. 3, 2024) ........ 21, 23, 24, 25

*Lugo v. Inova Health Care Servs.*,
2025 WL 905191 (E.D. Va. Mar. 25, 2025) ........ 2, 8, 10, 16

*Luiz v. Zang*,
833 F.3d 619 (6th Cir. 2016) ........ 5, 6

*M.R. v. Salem Health Hosps. & Clinics*,
2024 WL 3970796 (D. Or. Aug. 28, 2024) ........ 2, 10

*McManus v. Tufts Med. Ctr., Inc.,*
2025 WL 2778025 (D. Mass. Sep. 29, 2025) ........ 6, 13

*Mekhail v. N. Mem'l Health Care*,
726 F. Supp. 3d 916 (D. Minn. 2024) ........ 2, 13, 15

*Murphy v. Thomas Jefferson Univ. Hosps., Inc.*,
No. 22-CV-4674, 2024 WL 4350328 (E.D. Pa. Sept. 30, 2024) ........ 2

*Noel v. Hall*,
568 F.3d 743 (9th Cir. 2009) ........ 5

*Polay v. McMahon*,
468 Mass. 379 (2014) ........ 18, 19

*Popa v. Harriet Carter Gifts, Inc.*,
52 F.4th 121 (3d Cir. 2022) ........ 5, 17

*R.C. v. Walgreen Co.*,
733 F. Supp. 3d 876 (C.D. Cal. , 2024) ........ 11, 13, 21

*R.S. v. Prime Healthcare Servs., Inc.*,
2025 WL 103488 (C.D. Cal. Jan. 13, 2025) ........ 2, 9, 14

*Rackemann v. LISNR, Inc.*,
2017 WL 4340349 (S.D. Ind. Sept. 29, 2017) ........ 6

*re BetterHelp, Inc. Data Disclosures Cases*,
2024 WL 3416511 (N.D. Cal. July 15, 2024) ........ 14

*Riganian v. LiveRamp Holdings, Inc.*,
791 F. Supp. 3d 1075 (N.D. Cal. 2025) ........ 13

*Rodriguez v. Google, LLC*,
2026 WL 252570 (C.D. Cal. Jan. 30, 2026) ............................................................................20

*Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
409 Mass. 514 (1991) ...........................................................................................................18

*SEC v. Lipson*,
278 F.3d 656 (7th Cir. 2002) ................................................................................................13

*SEC v. Willis*,
787 F. Supp. 58 (S.D.N.Y. 1992) ..........................................................................................23

*Semien v. Pubmatic Inc.,*
2026 WL 216333 (N.D. Cal. Jan. 27, 2026) ..........................................................................13

*Smith v. Loyola Univ. Med. Ctr.*,
2024 WL 3338941 (N.D. Ill. July 9, 2024) ...................................................................2, 6, 16

*Smith v. Rack Room Shoes, Inc.*,
2025 WL 2210002 (N.D. Cal. Aug. 4, 2025) .........................................................................16

*Stake v. Knox Community Hosp.*,
2023 WL 5719594 (Ohio Com.Pl. Aug. 24, 2023) ....................................................................3

*Stein v. Edward-Elmhurst Health*,
2025 WL 580556 (N.D. Ill. Feb. 21, 2025) ...................................................2, 6, 7, 9, 13, 14

*Strong v. LifeStance Health Grp. Inc.*,
2025 WL 317552 (D. Ariz. Jan. 28, 2025) ...............................................................................2

*Sussman v. Am. Broad. Companies, Inc.*,
186 F.3d 1200 (9th Cir. 1999) ..........................................................................................11, 13

*United States v. Councilman*,
418 F.3d 67 (1st Cir. 2005) ...................................................................................................16

*United States v. O'Hagan*,
521 U.S. 642 (1997) .............................................................................................................23

*United States v. Rodriguez,*
968 F.2d 130 (2d Cir. 1991) ....................................................................................................5

*United States v. Szymuszkiewicz,*
622 F.3d 701 (7th Cir. 2010) ..................................................................................................5

*Vriezen v. Infinite Health Collaborative, P.A.*,
2025 WL 2992204 (D. Minn. Sep. 30, 2025) ...........................................................................8

*Walsh v. Dollar Tree Stores, Inc.*,
2025 WL 2939229 (N.D. Cal. Oct. 16, 2025) .......... 21

*Wiley v. Universal Music Grp., Inc.*,
2025 WL 3654085 (N.D. Cal. Dec. 17, 2025) .......... 21

*Yockey v. Salesforce, Inc.*,
2023 WL 5519323 (N.D. Cal. Aug. 25, 2023) .......... 3

*Zelby Holdings, Inc. v. VideogeniX, Inc.*,
92 Mass. App. Ct. 86 (App. Ct. 2017) .......... 25

Statutes

18 U.S.C. § 2510(4) .......... 5
18 U.S.C. § 2511 .......... 5
18 U.S.C. § 2511(2)(d) .......... 6
42 U.S.C. §1320d-6(b)(3) .......... 9, 17
G.L. c. 111, § 70E .......... 17
M.G.L. c. 214 § 1B .......... 18

Regulations

45 C.F.R. § 160.103 .......... 8, 17
45 C.F.R. § 164.508(a)(3)(i) .......... 9, 16

Other Authorities

Model Penal Code 2.02(2)(a) .......... 7

# I. INTRODUCTION

Atrius engaged in a concerted, years-long scheme to barter its patients' confidential protected health information ("PHI") to Facebook and Google—without its patients' knowledge or consent. Plaintiffs are patients of Atrius who trusted their healthcare provider to keep their PHI private. Atrius betrayed that trust.

Using tracking pixels embedded on its website, patient portal, and physician search functions, Atrius captured PHI that its patients communicated through its website, which it then disclosed to tech companies like Google and Facebook to advance its own advertising. The information Atrius shared included treatments patients searched for, doctors with whom they scheduled appointments, and the appointments they made. Atrius deployed tracking technology on all facets of its website, including its online appointment-making features, the mobile patient portal, and the log-in page to the web-based patient portal. Consolidated Amended Complaint ("CAC") [Dkt. 24] ¶ 18 (hereinafter cited as "¶ "). The information Atrius disclosed about its patients to Facebook, Google, and other third parties without its patients' knowledge, authorization, or consent included their status as patients, their physicians, their medical treatments, the hospitals they visited, and their personal identities.

In its Motion to Dismiss, Atrius ignores Plaintiffs' well-pleaded complaint and attempts to paint its own actions as just the "routine use of website technologies" and Plaintiffs' activities as just interactions with "public parts of the Atrius Website." But Atrius ignores the gravamen—and gravity—of Plaintiffs' allegations. Plaintiffs are Atrius' patients, not members of the public writ large. Atrius is required by law to protect the confidentiality of its patients' PHI. Atrius broke the law when it hid tracking technology on its website and mobile platforms that disclosed sensitive PHI about Plaintiffs and other patients, including their patient status, diagnosis, treatment, and physicians.

1. <u>On the Pages Used to Navigate to Atrius' Website Patient Portal.</u> ¶ 18(i) ("Atrius Health deployed tracking technologies to intercept patients' navigation to the patient portal for marketing and commercial purposes, and … those intercepted communications were disclosed to and subsequently used by Google, Facebook, Atrius Health, and other companies").

2. In Atrius' Patient Portal Mobile App. ¶ 113 ("In addition to employing the Meta Pixel to track patients, Defendant's websites and patient portal mobile app used Google Analytics to track and disclose patient activity—including Plaintiffs' and Class Members'—without their consent. Unbeknownst to patients, the installation of this code inside the patient portal mobile app resulted in disclosures of patients' PII/PHI, including their patient status, whenever they logged in to the patient portal mobile app for routine purposes such as reviewing medical records, checking lab results, and communicating with their doctors. The tracking technology deployed in the patient portal mobile app also disclosed when patients viewed specific pages, including prescription information and test results.").

3. In Atrius' searchable "Find-a-Doctor" database. ¶ 18(ii) ("Atrius Health deployed tracking technologies on its searchable database of doctors for marketing and commercial purposes, and how the intercepted communications were disclosed to and subsequently used by Google, Facebook, Atrius Health, and other companies").

Plaintiffs used Atrius' website and patient portal to communicate with physicians treating them for conditions such as shoulder injuries, degenerative disc disease, and gynecological care, as well as to view test results and schedule appointments. In connection with each communication, Atrius shared sensitive PHI that identifies or could be used to identify Plaintiffs, or that disclosed their medical conditions, treatment, or bill payment status.

Contrary to Atrius' assertions, courts around the country have made clear that it is illegal for healthcare providers to use online tracking software to disclose their patients' PHI to digital advertising companies like Facebook and Google without consent. Following revelations that hospitals were used tracking pixels, such as Facebook's Meta Pixel, on their websites and patient portals, numerous lawsuits have been filed against the hospitals, Facebook, and Google. Courts across the country have denied motions to dismiss in dozens of well-reasoned opinions.[1] Outliers to this reasoning exist, but they are

[1] *E.g.*, *Cooper v. Mount Sinai Health Sys., Inc.*, 742 F. Supp. 3d 369, 381 (S.D.N.Y. 2024); *Kane v. Univ. of Rochester*, 2024 WL 1178340, at *4 (W.D.N.Y. Mar. 19, 2024); *Stein v. Edward-Elmhurst Health*, 2025 WL 580556, at *3–*6 (N.D. Ill. Feb. 21, 2025); *R.S. v. Prime Healthcare Servs., Inc.*, 2025 WL 103488, at *1 (C.D. Cal. Jan. 13, 2025); *C. M. v. MarinHealth Med. Grp., Inc.*, 2024 WL 217841, at *6 (N.D. Cal. Jan. 19, 2024); *A.D. v. Aspen Dental Mgmt., Inc.*, 2024 WL 4119153, at *1 (N.D. Ill. Sept. 9, 2024); *Doe v. Post Acute Med., LLC*, 2025 WL 511069, at *1 (M.D. Pa. Feb. 14, 2025); *M.R. v. Salem Health Hosps. & Clinics*, 2024 WL 3970796, at *8 (D. Or. Aug. 28, 2024); *Strong v. LifeStance Health Grp. Inc.*, 2025 WL 317552, at *1 (D. Ariz. Jan. 28, 2025); *Doe v. Tenet Healthcare Corp.*, 731 F. Supp. 3d 142, 148 (D. Mass. 2024); *Smith v. Loyola Univ. Med. Ctr.*, 2024 WL 3338941, at *1 (N.D. Ill. July 9, 2024); *Murphy v. Thomas Jefferson Univ. Hosps., Inc.*, 2024 WL 4350328, at *1 (E.D. Pa. Sept. 30, 2024); *Mekhail v. N. Mem'l Health Care*, 726 F. Supp. 3d 916, 925 (D. Minn. 2024); *Lugo v. Inova Health Care Servs.*, 2025 WL 905191, at *7 (E.D. Va. Mar.

just that, "outlier[s]." *Hartley v. University of Chicago Medical Ctr.*, 2025 WL 2802317, at *9 (N.D. Ill. Oct. 1, 2025) (holding that "Hartley alleges that UCMC's disclosure of her health information violated HIPAA, so she has alleged a criminal or tortious purpose independent of the interception of her information").

For the reasons set forth below, this Court should follow suit and deny Atrius' Motion to Dismiss.

## II. THE FACTS.

Atrius is a Massachusetts healthcare system that encourages patients to use its website to search for treatments, book appointments, contact providers, and otherwise facilitate their care. ¶¶ 11, 29-33. Atrius also hosts a "Patient Portal" and a mobile app for that Portal, which allow patients to access medical records, view lab results, and communicate with their doctors. ¶ 32.

Plaintiffs are Atrius patients who communicated through the Atrius website about their treatments with Atrius for a variety of medical issues, including shoulder injuries, spine issues, degenerative disk disease, pain care, high blood pressure, yearly skin checks, primary care, and routine gynecological care. ¶¶ 17-20. Plaintiffs communicated with Atrius through its website and patient portal to schedule appointments, obtain information about doctors, their specific medical conditions and procedures, and treatment options, pay bills, and review test results. *Id.*

During their interactions with Atrius' website and patient portal, Plaintiffs communicated sensitive information, including their status as Atrius patients, specific doctors, their specific conditions

25, 2025); *Kurowski v. Rush Sys. for Health*, 2024 WL 3455020, at *1 (N.D. Ill. July 18, 2024); *Kane v. Univ. of Rochester*, 2024 WL 1178340, at *5 (W.D.N.Y. Mar. 19, 2024); *Castillo v. Costco Wholesale Corp.*, 2024 WL 4785136, at *1 (W.D. Wash. Nov. 14, 2024); *Hartley v. Univ. of Chicago Med. Ctr.*, 2024 WL 1886909, at *3 (N.D. Ill. Apr. 30, 2024); *Gay v. Garnet Health*, 2024 WL 4203263, at *1 (S.D.N.Y. Sept. 16, 2024); *E.H. v. Meta Platforms, Inc.*, 2024 WL 557728, at *1 (N.D. Cal. Feb. 12, 2024); *Doe v. FullStory, Inc.*, 712 F. Supp. 3d 1244, 1255 (N.D. Cal. 2024); *Doe v. Bayhealth Med. Ctr., Inc.*, 2025 WL 1010403, at *1 (Del. Super. Ct. Apr. 4, 2025); *Doe v. Hoag Memorial Presbyterian Hosp.*, 2024 WL 1190907, at *2 (Cal. Super. Feb. 16, 2024); *Braun v. Philadelphia Inquirer, LLC*, 2023 WL 7544160, at *5 (E.D. Pa. Nov. 13, 2023); *Yockey v. Salesforce, Inc.*, 2023 WL 5519323, at *7 (N.D. Cal. Aug. 25, 2023); *Cousin v. Sharp Healthcare*, 2023 WL 8007350, at *1 (S.D. Cal. Nov. 17, 2023); *Doe v. Regents of Univ. of California*, 2023 WL 3316766, at *4 (N.D. Cal. May 8, 2023); *Doe v. Boston Medical Center Corp.*, 2023 WL 7105628, at *2 (Mass. Super. Sep. 14, 2023); *Doe v. Boone Health, Inc.*, 2023 WL 4996117, at *3 (Mo. Cir. July 20, 2023); *Doe v. Bon Secours Mercy Health*, 2021 WL 9939010, at *1 (Ohio Com. Pl. Nov. 22, 2021); *Doe v. Meta Platforms, Inc.*, 2023 WL 5837443, at *4 (N.D. Cal. Sept. 7, 2023); *Doe v. The Children's Hosp. Corp.*, 2023 WL 6462578, at *4 (Mass. Super. Sep. 14, 2023); *Stake v. Knox Community Hosp.*, 2023 WL 5719594, at *4 (Ohio Com.Pl. Aug. 24, 2023); *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 793 (N.D. Cal. 2022); *Doe v. Hoag Memorial Presbyterian Hosp.*, 2024 WL 1190907, at *12 (Cal. Super. Ct. Feb. 16, 2024).

and treatments, the searches that they ran using the Atrius website search function, the appointments they made, and logins in to the Atrius patient portal, all of which Atrius then transmitted to Facebook and Google without Plaintiffs' knowledge or consent. ¶¶ 17-20, 28-34, 79, 82, 95-96, 99, 100, 109-10, 113, 166-67, 169-99, 205, 208-09, 282, 288, 294. Along with Plaintiffs' health information, Atrius shared personally identifying information such as their Facebook IDs, IP addresses, device IDs, browser fingerprints, and other information Facebook and Google used to associate intercepted communications with patients' real-world identities. ¶¶ 21, 51, 59, 71, 77, 101, 114, 120-62

Plaintiffs provided their PHI to Atrius with the expectation that Atrius would safeguard it from unauthorized disclosures. *E.g.*, ¶¶ 22, 210-22, 227, 320. Atrius, through its privacy policies, codes of conduct, company security practices, and other conduct, explicitly promised that it would safeguard Plaintiffs' and Class Members' PHI in exchange for access to that information and the opportunity to treat Plaintiffs and Class Members. ¶¶ 2 & nn.2-3, 213-18, 342. It promised specifically to "never share" patient communications for "marketing purposes" without "written permission." ¶¶ 214-15. Atrius pervasively broke those promises by intercepting and then disclosing patients' every action on its website and patient portal, including their search queries, data input into forms, appointment bookings, and communications with doctors, to third-party digital advertisers, such as Facebook and Google. *E.g.*, ¶¶ 17-21, 34. By deploying tracking pixels on its website and patient portal, Atrius captured all this information "automatically," without patients' knowledge or consent. ¶ 22, 34. The tracking pixels Atrius deployed on its website and patient portal then transferred patient data in "real time" to digital advertisers, giving them the information they need to identify patients, learn about their medical conditions, and target them with advertising. ¶¶ 79, 174, 193, 281. Atrius subsequently exploited the healthcare communications that it intercepted and disclosed to Google, Facebook, and other digital marketing companies, for purposes of targeted advertising and "re-targeting" Google's and Facebook's ad platforms. ¶¶ 4-5, 7-8, 54-56, 58, 69-73, 103, 162-64, 179, 185-87, 189, 191, 193, 203, 206-07, 209.

Atrius never told Plaintiffs or any of its patients that it would systematically collect their

communications and share their PHI and instead lied to patients, telling them instead (falsely) that such information and communications would not be shared with advertising companies like Facebook and Google. *E.g.*, ¶¶ 21, 211-18, 320. Plaintiffs never consented to Atrius' surreptitious disclosures of their PHI to Facebook and Google. ¶¶ 21-22, 223, 320.

## III. ARGUMENT

### A. *Plaintiffs State a Claim Under the ECPA*

#### 1. Atrius Is Civilly Liable for Intercepting Communications.

The Electronic Communications Privacy Act ("ECPA"), prohibits the unauthorized interception, access, or disclosure of wire, oral, and electronic communications. 18 U.S.C. § 2511. Atrius argues that because the ECPA confers no private right of action against those who "procure or aid and abet" an interception, "Plaintiffs' claim should be dismissed." Mem. 7-8. As an initial matter, there is civil liability for parties who procure an interception by a third party.[2] Whether the ECPA provides for civil liability for "procurement" is beside the point, however, because Plaintiffs allege Atrius itself intercepted communications and is liable as a principal. ¶¶ 4, 6-7, 81, 282-83, 286, 293-94, 305.

The ECPA defines "intercept" as an "acquisition of the contents of any…electronic communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). An acquisition occurs where "the contents of a…communication are captured or redirected in any way." *United States v. Rodriguez*, 968 F.2d 130, 136 (2d Cir. 1991). Any party that plays an "active role in the use of the relevant device to intercept, disclose, or intentionally use a plaintiff's electronic communications" is liable as a principal for intercepting communications. *Luiz v. Zang*, 833 F.3d 619, 623-24 (6th Cir. 2016).[3]

[2] *See, e.g., Dawson v. University of Phoenix, Inc.,* 2026 WL 92248, at *12-17 (N.D. Ill. Jan. 13, 2026) (finding such civil liability given ECPA's plain term imposing civil liability on those "engaged in [a] violation," and recognizing procurement of an interception is such a "violation"; collecting authorities).

[3] *See also Noel v. Hall*, 568 F.3d 743, 749 (9th Cir. 2009) (interception occurs when communication "redirected in any way"); *Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121, 131 (3d Cir. 2022) (in case involving tracking technologies, holding that "[a]s with tapped phones," a defendant "acquire[s] the communication by rerouting them"); *United States v. Szymuszkiewicz*, 622 F.3d 701, 706 (7th Cir. 2010) (interception occurs by "programming a computer to copy the contents" of an electronic communication); *Byrd v. Aaron's*, 14 F. Supp. 3d 667, 690 (W.D. Pa. 2014) (affirming allegations where defendant was "an integral link in the process" that resulted in interceptions of

Because it configured its website and the tracking technologies to duplicate and redirect communications to Google and Facebook (¶¶ 6, 9, 61-62, 64, 74-75, 77, 80, 82, 115, 118, 144, 225, 245-47, 249), Atrius is liable as a principal for intercepting communications. That Google and Facebook may also have "intercepted" communications, or that Atrius assisted Google and Facebook, does not negate Atrius's liability as a principal. Indeed, multiple parties may "intercept" the same communication if each played an active role.[4] Atrius cites **no** contrary authority involving tracking technologies.

2. Plaintiffs Adequately Plead the Crime-Exception to One-Party Consent.

Under the crime-tort exception to one-party consent, it is unlawful to intercept a communication "for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d). Courts across the country have rejected the challenge Atrius poses here, finding the "purpose" element met whenever a defendant commits a wrongful act in addition to the wiretap violation, centering their reasoning on asserted HIPAA or state tort law violations. *E.g.*, *Hartley*, 2025 WL 2802317, at *9.

The crime-tort exception does not require a conscious objective to break the law. Indeed, Judge Burroughs adopted the prevailing rule in a decision addressing the same conduct as here. In *McManus v. Tufts Med. Ctr., Inc.*, she endorsed *Stein,* 2025 WL 580556, at *4, holding:

> The text [of § 2511(2)(d)] points to the 'purpose of committing any criminal or tortious act.' Separating the adjectives from the noun might shed a little light. The purpose must be to commit an act, and that act must be criminal or tortious. **If the purpose is to do X, and if X is a crime or a tort, then the crime-tort exception to the one-party consent**

electronic communications through tracking software); *Smith*, 2024 WL 3338941, at *5 (hospital's deployment of "pixels" that "operate by contemporaneously duplicating and redirecting [website] communications" satisfies the definition of "interception").

[4] *Luiz*, 833 F.3d at 623-24 (holding that both surveillance software provider and party that installed such software "intercept" communications); *Fregosa v. Mashable, Inc.,* 2025 WL 2886399, at *7-8 (N.D. Cal. Oct. 9, 2025) ("[complaint] pleads direct, not secondary liability. It alleges that [a website owner] embedded third-party trackers in its own website, thereby causing users' browsers to install and run them, and that [the website owner] used the resulting data flows. On those facts, [the website owner] itself" intercepted communications); *Rackemann v. LISNR, Inc.,* 2017 WL 4340349 (S.D. Ind. Sept. 29, 2017) (both provider of third-party surveillance code and the business that installed the code ""intercepted" communications). Atrius's own authority in a case involving Meta Pixel holds that "both the NHL, which installed the pixel, and Meta, which furnished it, were interceptors." *Joiner v. NHL Enterprises, Inc.,* 2025 WL 2846431, at *7 (S.D.N.Y. Aug. 2025).

> **<u>rule applies. A desire to commit a crime qua crime, or a tort qua tort, isn't necessary</u>.**

2025 WL 2778025, at *3 (D. Mass. Sep. 29, 2025) (emphasis added) (quoting *Stein*). The court in *Stein* explained further:

> The placement of "criminal or tortious" is telling. That phrase modifies "act," not "purpose." The statute does not require a "criminal or tortious purpose." It requires a purpose of committing an act—an act that is criminal or tortious. A person can have a purpose of committing an act that is criminal or tortious, without having a criminal or tortious purpose…. Congress could have required a showing that the person acted with a criminal or tortious purpose…. But that's not what the text says. **<u>The "act" must be criminal or tortious, but the "purpose" does not need to be criminal or tortious</u>**.

*Id.* at *14-16 (emphasis added). When the word "purpose" is construed in connection with the object the ECPA describes—an "act" that is "criminal or tortious"—the statute cannot be read to require "[a] party…to say, in effect, 'I want to commit a crime,' or 'today is a great day to commit a tort." *Id.* at *14; *Kurowski*, 2024 WL 3455020, at *4 ("no persuasive reason to read a heightened willfulness requirement into the crime-or-tort exception").[5]

In another recent decision, Judge Burroughs again rejected the argument that "Plaintiffs must allege that Defendants had a specific intent to commit a crime or tort, or to harm or injure Plaintiffs," and instead reiterated her endorsement of *Stein*'s holding that "[a] desire to commit a crime *qua* crime is not required." *Progin v. UMass Memorial Health Care, Inc.*, 2026 U.S. Dist. LEXIS 46522 at *12 (D. Mass. Mar. 6, 2026). Although Judge Burroughs dismissed the ECPA claim without prejudice and with leave to amend because the plaintiffs there had not adequately alleged that the defendants had "purposefully disclosed Plaintiffs' individually identifiable health information" or "breached the confidentiality of their private communications," *id.* at 9, Plaintiffs have so alleged here.

Atrius knew the privacy implications of deploying the tracking technologies that disclosed confidential communications and PHI to Facebook and Google in violation of HIPAA, the MRPA, and

---

[5] Atrius's "purpose" is a question of its state of mind to which Rule 8 applies. *In re Meta Pixel Tax Filing Cases*, 724 F. Supp. 3d 987, 1005 (N.D. Cal. 2024) (applying Rule 8 to ECPA). Rule 8 "does not demand a plentitude of factual content" and "[f]or pleading purposes, circumstantial evidence often suffices to clarify a protean issue such as an actor's motive or intent," given "[d]irect evidence" on state of mind is "rare." *Conformis, Inc. v. Aetna, Inc.*, 58 F.4th 517, 528, 535-36 (1st Cir. 2023).

its own promises, ¶¶ 5, 7, 9, 44-46, 48-50, 54-56, 59-64, 68-74[6]; (ii) Atrius used the intercepted communications for targeted internet ads; indeed, that was Atrius's primary purpose in deploying the tracking technologies, creating an incentive to disclose the substance of sensitive communications to advance advertising, ¶¶ 35-76, 163-65, 179, 183, 185-87, 189, 191, 193, 197, 203, 206, 209, 249-51, 292-97, (iii) Atrius did so even though Google and Facebook warned it not to use the tracking technologies without informed consent or on webpages with health information, ¶¶ 59-61, 74-75, 211-18; and (iv) Atrius had complete control over what information was shared with Facebook and Google through Atrius' configuration of the tracking technologies on its website, and disclosed PHI to Facebook and Google in a manner that allowed them to link the PHI to individual Atrius patients (¶¶ 6, 9, 61-62, 64, 74-75, 77, 80, 82, 115, 118, 144, 225, 245-47, 249). These allegations support the inference that Atrius intercepted communications for the purpose of engaging in acts which were criminal and tortious: namely, the purposeful disclosure of private communications and PHI to third parties and the subsequent exploitation of those communications for financial gain without authorization.

a. Atrius Intercepted Communications for the Purpose of Committing Acts Which Violated HIPAA.

The ECPA's crime-tort exception is satisfied when a hospital uses tracking technologies to intercept patient communications for the purpose of disclosing information protected by HIPAA.[7] "A disclosure that violates HIPAA is a violation of law that is independent of a violation of the ECPA."

---

[6] Indeed, in *McManus*, Judge Burroughs pointed to *Williams v. TMC Health*, No. 23- cv-00434, Dkt. No. 56 (D. Ariz. Aug. 19, 2025), as an example of sufficient facts, including facts showing how "Defendant was not notice regarding how data containing health information may be disclosed or used" and "how the technology served" that purpose. 2025 U.S. Dist. LEXIS 191546, at *8 (quotations omitted). The allegations cited in the accompanying text align with the allegations the plaintiffs added in *Williams*.

[7] *See Vriezen v. Infinite Health Collaborative, P.A.,* 2025 WL 2992204, at *8 (D. Minn. Sep. 30, 2025) ("plaintiffs plausibly alleged the crime-tort exception based on HIPAA violations"); *Wellstar*, 799 F.Supp.3d at 1279 ("Plaintiffs allege that Defendant captured and transmitted their PII and PHI to third parties without their consent and in violation of Defendant's own privacy policies and HIPAA… Plaintiffs sufficiently allege that Defendant intercepted the communications for a criminal or tortious purpose"); *Brahm v. Hospital Sisters Health System*, 2024 WL 3226135, at *5-6 (W.D. Wis. June 28, 2024) ("defendants intercepted patients' electronic communications for the purposes of making disclosures that violated HIPAA"); *Lugo*, 2025 WL 905191, at *2-4 (following "[c]ourts around the country [that permit] invocation of the ECPA's crime-tort exception when plaintiffs allege violations of HIPAA"); *R.S.,* 2025 WL 103488, at *4-5 ("intent to disclose [HIPAA-protected] information" sufficient); *A.J. v. LMND Medical Group, Inc.,* 2024 WL 4579143, at *1 (N.D. Cal. Oct. 25, 2024) (same).

*Hartley,* 2025 WL 2802317, at *9 (citing and quoting *Stein*, 2025 WL 580556, at *4-*5 (collecting cases)).

Atrius argues that Plaintiffs "do not demonstrate that Atrius violated HIPAA in the first place." Mem. 10. But HIPAA protects "information…[that] relates to…the provision of health care to [the] individual [and for] which there is a reasonable basis to believe can be used to identify the individual." 45 C.F.R. § 160.103. "Information which connects an individual with a healthcare provider 'is indicative that an individual has received or will receive medical services,'" is PHI, as it "'relates to the individual's past, present, or future health or health care.'" *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 792 (N.D. Cal. 2022) (quoting Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates, U.S. Dep't of Health and Human Services (Dec. 1, 2022)). HIPAA prohibits healthcare providers from "knowingly 'disclos[ing] individually identifiable health information" and imposes "penalties when a covered entity discloses the information with the intent to use it 'for commercial advantage….'" *Doe v. Wellstar Health System, Inc.*, 799 F.Supp.3d 1268, 1279 (N.D. Ga. Aug. 21, 2025); 42 U.S.C. §1320d-6(b)(3). In addition to prohibiting disclosure of PHI, HIPAA also prohibits "any use…of [PHI] for marketing." 45 C.F.R. § 164.508(a)(3)(i).

Atrius argues that "[b]ecause anyone could visit the Atrius Website for any number of reasons, browsing activity may be 'indicative' of a user's patient status, but is not categorically PHI." Mem. 11. That is not true because Atrius deployed tracking technologies on its patient portals and other pages that, although publicly accessible, are designed for patients and reveal patient status. In a landmark decision against Facebook, the court held that "patient status is protected health information under HIPAA," and therefore, website communications that "show[] patient-status constitute[] protected health information" under HIPAA. *Meta Pixel Healthcare*, 647 F. Supp. 3d at 792-93. Critically, pages that reveal patient status include "public" pages, such as pages showing "a user is about to log in to a healthcare provider's website," *id.*, and other public pages designed for patients. *M.R. v. Salem Health Hospitals and Clinics,* 2024 WL 3970796, at *2, 7-8 (D. Or. Aug. 28, 2024) (interceptions disclosing "status as a patient" through "financial assistance form" supported HIPAA violation). "[W]hether…PHI was provided through a

public webpage or patient portal is 'immaterial.'" *I.T. v. ChoicePoint LLC,* 2025 WL 2495079, at *6 (W.D. Wash. Aug. 29, 2025). An avalanche of authority confirms that interceptions on public webpages can give rise to HIPAA violations.[8]

Atrius's interception of communications on various pages that reveal patient status, including its patient portals, appointment request pages, prescription refill pages, bill payment pages, and contact pages for its physicians (¶¶ 28-33, 180-84, 190-93, 206), together with identifying information (¶¶ 51, 59, 71, 77, 101, 114, 120-62), and the subsequent commercial exploitation of those communications for marketing (e.g., ¶¶ 35-76), is, without more, a HIPAA violation. Even if communications about doctors, conditions, and search terms (¶¶ 170-79, 185-89, 194-99) were not, on their own, HIPAA-protected, Atrius did not disclose those communications in isolation; rather, it disclosed them together with communications revealing patient status and other information linking the searches to their real-world identity. ¶¶ 120-62. These allegations, considered together, palpably demonstrate a HIPAA violation.

Atrius relies principally on *Am. Hosp. Ass'n v. Becerra*, 738 F. Supp. 3d 780 (N.D. Tex. 2024), to argue no HIPAA violation can occur in connection with "public websites," but *Becerra* contains no such holding. *Becerra* instead vacated part of a bulletin issued by the Department of Health and Human Services relating to a "Proscribed Combination" of an "IP address" and a public page "addressing specific health

---

[8] *Hartley*, 2025 WL 2802317, at *2-4 ("act of logging into a healthcare provider's patient portal when combined with individual identifiers such as an IP address or a Facebook ID, can reveal patient status," and "patient status…constitutes individually identifiable health information," even in absence of allegations regarding the use of AdTech "within" a patient portal); *Jarrett v. Upperline Health, Inc.,* 2025 WL 3067545, at *2, 4 (S.D Ind. Aug. 8, 2025) (information transmitted when plaintiff scheduled appointment on public website revealed HIPAA-protected patient status ); *Allen v. Midwest Express Care, Inc.,* 2025 WL 2240253, at *2-4 (N.D. Ill. Aug. 6, 2025) (patient status and information on health conditions and treatments are HIPAA-protected ); *Lugo v. Inova Health Care Services,* 2025 WL 905191, at *6-8 (E.D. Va. Mar. 25, 2025) (crime-tort exception applied where plaintiffs allege "status as medical patients" revealed); *Castillo v. Costco Wholesale Corp.*, 2024 WL 4785136, at *7 (W.D. Wash. Nov. 14, 2024) (Costco collected HIPAA-protected "information about when [they] click[ed] a 'Refill Prescription' button that prompts a "Sign In" page,' which 'relate[d] to' [their] individualized health conditions even though they d[id] not allege that their data were collected while they were logged into their patient portals"); *Cousin v. Sharp Healthcare*, 681 F. Supp. 3d 1117, 1124 (S.D. Cal. 2023) ("navigating to…a healthcare provider's patient portal differs from…general internet browsing…because it conveys a user's patient status"); *M.R.*, 2024 U.S. Dist. WL 3970796, at *2, 4, 7-8 (interceptions disclosing "status as a patient" through "financial assistance form" violated HIPAA); *Kane*, 2024 WL 1178340, at *5-7, 9-10 (patient status captured, and crime-tort exception applies, where interceptions showed individuals had clicked "the 'Schedule an Appointment' button or click[ed] the physician's phone number to schedule an appointment").

conditions or healthcare providers," holding disclosure of those two facts alone is insufficient for a HIPAA violation. *Id.* at 789. None of Plaintiffs' claims, however, depends on the HHS bulletin at issue in *Becerra*, ¶¶ 274-379, or the "Proscribed Combination." Atrius deployed tracking technologies on pages through which patients accessed Atrius' patient portal and patient portal mobile app, and other pages designed for patients. Those pages are not merely "informational," but are designed specifically for patient interaction. *Becerra* did not consider interceptions that reveal patient status as alleged here.[9]

b. Atrius Intercepted Communications for the Purpose of Committing Acts that are Tortious under Massachusetts Law.

Atrius also intercepted communications for the purpose of committing tortious acts. ¶¶ 7, 286, 296, 304. Those torts include invasion of privacy (a tort codified by the MRPA), breach of fiduciary duty, and breach of confidence. *Id.* Although the precise elements of those torts vary, the improper purpose for each is the same—the intentional disclosure to third parties and subsequent commercial exploitation of intercepted patient communications, contrary to Atrius' promises to patients and patients' reasonable expectations of privacy. ¶¶ 317-19, 321, 334-35. Massachusetts courts that have considered those claims in connection with the same conduct have consistently affirmed them. *See* § III-B, *infra*. Plaintiffs' allegations that Atrius' purpose was to engage in acts that were tortious under Massachusetts law, independent of any HIPAA violation, satisfy the ECPA's crime-tort exception.[10]

c. Financial Motivations Are Consistent with a Purpose to Engage in an Act Which Violates HIPAA or Massachusetts Tort Law.

Under the ECPA, "[t]he crime or tort must have been the [1] 'primary motivation' or [2] 'a determinative factor' for the defendant's conduct." *Cooper*, 742 F. Supp. 3d at 378. Contrary to its

---

[9] *Gaige v. Exer Holding Company, LLC,* 2025 WL 559719, at *3 (C.D. Cal. Jan. 30, 2025) (*Becerra* does not preclude invoking HIPAA under the ECPA's crime-tort exception where "Plaintiff's claims are not premised on a violation of HHS guidance, but rather…on violations of various statutes and common law"); *Doe v. Bayhealth Medical Center, Inc.,* 2025 WL 1011508, at *6 (Super. Ct. Apr. 2, 2025) ("[T]he HHS guidance vacated by *Becerra* has no impact on a plaintiff's disclosure allegations when the plaintiff's claims are based on statutory and common law violations").

[10] *See Meta Pixel Healthcare*, 647 F. Supp. 3d at 797 ("tort claims may lie against health care providers over their use of the Pixel," and "the crime-tort exception [may] appl[y]" based on such torts); *Krzyzek v. OpenX Technologies, Inc.,* 2026 WL 206855, at *6 (N.D. Cal. Jan. 27, 2026) (invasion of privacy claim may satisfy ECPA's crime-tort exception); *Jarrell v. Adena Health System*, 2025 WL 81305, at *3-5 (S.D. Ohio Jan. 13, 2015) (state law privacy claim satisfies crime-tort exception); *R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 901-02 (C.D. Cal. , 2024) (same).

argument, Mem. 9-11, that test in no way supports a ruling for Atrius. The suggestion that a pecuniary motive for committing the relevant tort or crime somehow negates liability is not consistent with the test, which requires simply that the interception was done with "the purpose of facilitating some further impropriety"—*i.e.*, the purpose of committing the relevant crime or tort. *See Sussman v. Am. Broad. Companies, Inc.*, 186 F.3d 1200, 1202 (9th Cir. 1999). That pecuniary motives may have existed for committing the crime or tort does not make them any less a crime or tort:

> Take blackmail, which the Ninth Circuit gave as an example of an ECPA violation. … Under Prime Healthcare's reading, the ECPA would not prohibit a person from intercepting a communication with the intent to use that communication to blackmail so long as the ultimate reason for the blackmail was to make money. There, the interceptor's primary purpose would be to make money. And blackmail would merely be a means by which to make money. Of course, this is often the end goal for blackmail. *Cf. Blackmail*, 'BLACK'S LAW DICTIONARY (12th ed. 2024) (providing historical definition as a "tax consisting of money, cattle, crops, or other consideration" and providing as an example "threaten[ing] to expose a criminal act unless I am paid money"). Under Prime Healthcare's reading, blackmail would rarely, if ever, violate the ECPA. This cannot be the case.

*Prime*, 2025 WL 103488, at *7; *see also Cooper*, 742 F. Supp. 3d at 378 ("mere existence of [a] lawful purpose alone does not 'sanitize a[n interception] that was also made for an illegitimate purpose'") (quoting *In re DoubleClick Inc. Priv. Litig.*, 154 F. Supp. 2d 497, 514 (S.D.N.Y. 2001)).

Atrius points to *Goulart v. Cape Cod Healthcare, Inc.,* 2025 WL 1745732 (D. Mass. June 24, 2025), to argue that if its motive was commercial, it was not criminal or tortious. That Atrius violated the law with intent to make money does not alter the analysis. Magistrate Judge Levenson and Judge Burroughs squarely rejected that view. In *Doe v. Lawrence General Hospital,* 2025 WL 2808055 (D. Mass. Aug. 29, 2025), the court held that "[a] purpose to make money, while at times a valid distinction" from a criminal or tortious purpose, "doesn't hold up to pressure testing" because "[t]he underlying motivation for many crimes and torts is to make money." *Id.* at *24 (collecting authorities). Thus, the "'broad theory that the presence of a primary financial motive inoculates a defendant from liability under the ECPA is wrong.'" *Id. McManus* likewise held that allegations of a financial motive do not contradict a purpose of committing a criminal or tortious act because a "'financial motivation…and a criminal or tortious motivation…are

not mutually exclusive.'" 2025 WL 2778025, at *4 (quoting *Stein*, 2025 WL 580556, at *2).

Additionally, "nothing in section 2511(2)(d) requires that a party act with the *sole* purpose of committing the underlying crime or tort. Thus, even if the Court views [Atrius'] 'purpose' in employing the tracking technologies as, for example, improving [their] advertising outcomes and [their] profit margins, that does not mean that [they] didn't also 'consciously desire' to make unauthorized disclosures of [Plaintiffs'] IIHI to achieve that goal." *Kurowski*, 2024 WL 3455020, at *5.[11] In the context of the ECPA and beyond, courts have held that "[t]he existence of [a] legitimate purpose [does] not sanitize the illegitimate one." *SEC v. Lipson*, 278 F.3d 656, 661 (7th Cir. 2002) (citing *Sussman*, 186 F.3d at 1202 (9th Cir. 1999)); *Castillo*, 2024 WL 4785136, at *4 (no "bright-line rule insulating financial motives from the crime-tort exception").

Indeed, "many crimes and torts are motivated by a desire to make money, and 'it defies common sense that a clearly harmful act could escape liability as long as it was done for profit.'" *Kurowski*, 2024 WL 3455020, at *5 (quoting *Mekhail v. N. Mem'l Health Care*, 2024 WL 1332260, at *5 n. 4 (D. Minn. Mar. 28, 2024)). ""A tort and seeking a profit are not mutually exclusive (if anything, the latter is often the reason for the former)…. That's like saying that a bank robber's purpose was not to commit a crime—it was to make money." *Riganian v. LiveRamp Holdings, Inc.*, 791 F. Supp. 3d 1075, 1091 (N.D. Cal. 2025).[12]

---

[11] "It is also worth noting that, by its plain language, the relevant HIPAA provision simply proscribes knowing disclosure of IHII; it doesn't require (or exclude) any particular motive. Courts don't generally add words to the language Congress chose, not even under the guise of interpretation." *Id.*

[12] *See Semien v. PubMatic Inc.,* 2026 WL 216333, at *10 (N.D. Cal. Jan. 27, 2026) ("not persuaded by the authorities PubMatic cites to argue financial motives cannot constitute tortious motive"); *Deaconess*, 2025 WL 2771415, at *11 ("fact that Deaconess only sought to use the information for marketing purposes does not remove the case from the purview of the crime-tort exception."); *R.S.*, 2025 WL 103488, at *4-5 ("Court joins those courts that have held a monetary purpose does not insulate a party from liability under the ECPA."); *R.S. v. Prime Healthcare Servs., Inc.*, 2025 WL 103488, at *7 (C.D. Cal. Jan. 13, 2025) ("Take blackmail, which the Ninth Circuit gave as an example of an ECPA violation. … Under Prime Healthcare's reading, the ECPA would not prohibit a person from intercepting a communication with the intent to use that communication to blackmail so long as the ultimate reason for the blackmail was to make money. There, the interceptor's primary purpose would be to make money. And blackmail would merely be a means by which to make money): *In re BetterHelp, Inc. Data Disclosure Cases,* 2024 WL 3416511, at *4 (N.D. Cal. July 15, 2024) ("trying to make money" consistent with criminal purpose); *Castillo*, 2024 WL 4785136, at *4 (same); *R.C.,* 733 F. Supp. 3d at 901 ("[E]ven where a defendant is…motivated by monetary gain, the crime-tort exception may…apply").

d. Atrius Engaged in Criminal and Tortious Acts Separate from the ECPA Violation.

Atrius argues that Plaintiffs pleaded no crime or tort separate from an interception. Mem. 11-13. Not so. The CAC explains how the tortious and criminal disclosures were separate and independent of the interceptions and identifies an additional separate act—the subsequent commercial exploitation of intercepted communications.

First, the "separate and independent" requirement is met where the defendant "not only intercepted their communications…by using data tracking tools but also transmitted the information to third parties such as Meta and Google." *Wellstar*, 799 F.Supp.3d at 1278 (citing cases).[13] In arguing that there was no separate or independent act, Atrius misunderstands Plaintiffs' pleadings and how the tracking technologies work. These technologies separately intercept and then disclose communications as part of a multi-step process (*see* ¶ 79):

- Step 1: When a user visits a website, the tracking code is deposited onto the user's browser.

- Step 2: When a user sends a communication to that website, the tracking code is triggered. The code acquires the outgoing communication and associated data while still on the user's browser. At that moment, the interception is complete and the communication can be rerouted or otherwise manipulated by the tracking technology.

- Step 3: The tracking technologies force the user's browser to send a separate transmission to third parties, including the previously intercepted communication and related data.

Plaintiffs consistently pleaded how this multi-step process resulted in separate interceptions and disclosures when patients used Atrius' web properties. Tracking technologies Atrius used, such as the

[13] *See also I.T.,* 2025 WL 2495079, at *8 ("Multiple courts have rejected this argument, concluding that an intent to disclose or use private information in violation of HIPAA is distinct from the interception of the private information."); *Deaconess*, 2025 WL 2771415, at *8 ("The disclosure, not the intercept itself, is the secondary act that supports the crime-tort exception."); *Hartley*, 2025 WL 2802317, at *9 ("'[a] disclosure that violates HIPAA is a violation of law that is independent of a violation of the ECPA'"); *Juenger*, 2025 WL 2780221, at *9 ("disclosure that violates HIPAA is a violation of law…independent of a violation of the ECPA…. The disclosure, not the interception itself, is the secondary act that supports the crime-tort exception"); *Doe v. Tenet Healthcare Corp.*, 789 F. Supp. 3d 814, 849-50 (E. D. Cal. June 9, 2025) ("'intentional disclosure' of private information constituted a '"further impropriety" independent and separate from [the] interception' of private information"); *Stein*, 2025 WL 580556, at *4 ("disclosure that violates HIPAA [is] independent of a violation of the ECPA."); *R.S.*, 2025 WL 103488, at *4 (intentional disclosure of the collected Private Information "constitutes a 'further impropriety' independent and separate from … interception").

Meta Pixel, both "capture[] *and* disclose[]" information to third parties. ¶ 197. First, the "capture" occurs when the pixels that "lie in wait … are triggered by an event." ¶ 107. At that instant, the tracking code first harvests the user's communications by "replicat[ing]" the "user data" that was shared with Atrius' web properties. ¶ 91. This interception occurs "through scripts running in a user's internet browser." ¶ 154. Then, once the code in the browser completes the acquisition, the tracking code "takes the information it harvests and sends it to [the third party] with personally identifiable information." ¶ 156. Through this three-step process, Atrius "acquired ... and forwarded to Facebook" and other third parties their patients' sensitive communications and PHI. ¶¶ 79, 133, 177.

Atrius misreads the pleadings when it asserts that "the supposed illegal conduct is the same as that which underlies Plaintiffs' claims: the purported use of the Website Technologies and their 'instantaneous[]' and 'simultaneous[]' transmission of 'patients' communications with Defendant.'" Mem. 12. Plaintiffs allege that interception and disclosure occur while the *communication* is ongoing, not that interception and disclosure occur simultaneously with each other. The interception must occur while the communication is ongoing for the ECPA to apply at all. *Boudreau v. Lussier*, 901 F.3d 65, 78 (1st Cir. 2018) (ECPA does not apply to the "acquisition of no-longer-in-transit communications"). This allegation confirms the viability of Plaintiffs' claims; it does not undermine them.

Second, Plaintiff alleges that Atrius' criminal and tortious use of intercepted communications for marketing purposes, including targeted advertising, occurred subsequent to the interception. ¶¶ 4-5, 7-8, 54-56, 58, 69-73, 103, 162-64, 179, 185-87, 189, 191, 193, 203, 206-07, 209. The subsequent commercial exploitation of intercepted communications is a separate and independent act that supports the crime-tort exception, apart from the earlier disclosure.[14] Neither *Lawrence General, Cape Cod* nor *McManus*

[14] *See* *Castillo*, 2024 WL 4785136, at *5-6 (crime-tort exception met where "Plaintiffs allege that Costco not only intercepted their data, but also used their data to generate targeted advertisements for financial gain"); *Lugo*, 2025 WL 905191, at *8 (hospital disclosed patient's personal health information to increase the success of hospital's INOVA's marketing are sufficient to invoke the crime-tort exception)*; Kurowski v. Rush System for Health,* 2023 WL 8544084, at *3 (N.D. Ill. Dec. 11, 2023) (crime-tort exception satisfied after plaintiff amended to add allegations that intercepted "information was, in turn, used…to target her with particular advertising" based on intercepted communications); *Gay*, 2024 WL 4203263, at *2-4 ("Complaint sufficiently alleges an independent action

considered whether the commercial exploitation of patient communications for marketing constitutes a separate act. Indeed, no decision in this District has considered this question.

As shown above (§ III-A-2-a, *supra*), HIPAA criminalizes not only the "disclosure" of protected information but also its "use" without consent "for marketing." 45 C.F.R. § 164.508(a)(3)(i). Similarly, a fiduciary's exploitation of information entrusted to it breaches its duty owed to the principal. *See* § III-B-2, *infra*. Thus, even if this Court adopts the minority position that disclosure is not separate from the interception, Plaintiff still pleads a separate act: Atrius's subsequent commercial exploitation of the intercepted communications. Finally, a separate act is apparent for Plaintiffs' state-law claims, which do not hinge solely on disclosure but also on Atrius' deception regarding its handling of website communications. The CAC alleges the requisite facts for those torts. *See* §§ III-B-1, 2, *infra*. Atrius' misuse of patient communications, in contradiction of its promises to patients, is not merely a reiteration of its ECPA claim but involves distinct intentional acts that contribute to Atrius's liability.[15]

3. <u>There is Nothing Absurd About Requiring Hospitals to Refrain from Using PHI for Financial Gain Without Patient Consent.</u>

Atrius' rule of lenity and absurdity arguments must be rejected. The rule of lenity applies only when there is "grievous ambiguity" in a statute. *United States v. Councilman*, 418 F.3d 67, 83 (1st Cir. 2005). However, scores of cases have applied the ECPA to the same conduct alleged here. No such ambiguity exists. *See* § III-A, *supra*. And there is nothing absurd about expecting a hospital to refrain from disclosing patients' PHI to third parties without patient consent. HIPAA codifies that requirement. Indeed, this is a bedrock tenet of the ethical and legal obligations that apply to healthcare providers in this country. The

secondary to the interception," the "use[]" of "the content of [the] communications" for "targeted ads on Facebook keyed to…confidential health conditions"); *Mekhail v. N. Mem'l Health Care*, 726 F. Supp. 3d 916 (D. Minn. 2024) (subsequent acts to "monetize" intercepted communications sufficient to support crime tort exception); *Cooper*, 742 F. Supp. 3d at 383 (crime-tort exception met where hospital intercepted communications to later "profit commercially from exploiting Private Information, in violation of HIPAA"); *Smith*, 2024 WL 3338941, at *7 (communications used for "targeted marketing campaigns").

[15] *See Smith v. Rack Room Shoes, Inc.*, 2025 WL 2210002, at *4-5 (N.D. Cal. Aug. 4, 2025) (disclosure of personally identifiable information "in contradiction [to] the commitments it made in its privacy policy…plausibly constitute[s] a further invasion of privacy beyond the act of intercepting"); *Jarrell*, 2025 WL 81305, at *2-4 (common law privacy claim "constitutes an independent tort…that…arises not from the mere *interception* of [communications] but from *disclosure* of that…material to third parties").

modern Hippocratic Oath provides, "I will respect the privacy of my patients, for their problems are not disclosed to me that the world may know." ¶ 229. The American Medical Association's ("AMA's") Code of Medical Ethics also contains many rules protecting the privacy of patient data and communications. *Id.* Massachusetts law likewise acknowledges the importance of patient confidentiality in myriad ways. *See, e.g.*, G.L. c. 111, § 70E (Patients' and Residents' Rights); 105 C.M.R. 300.120; *Alberts v. Devine*, 395 Mass. 59, 65 (1985) (patient confidentiality "is a cardinal rule of the medical profession, faithfully adhered to in most instances, and thus has come to be justifiably relied upon by patients").

The conduct was done secretly, in violation of Atrius' ethical and legal obligations, for its financial gain. ¶¶ 26, 111, 210-22, 297. Requiring regulated entities to follow the law will not lead to the parade of horribles about which Atrius warns. Atrius cites to zero real-world examples of "bankruptc[ies]" or "prison time," *see* Dkt. 36-2 (Amicus Brief of American Hospital Assn., *et al.*, attached to and cited with approval in the Motion) at 2; Dkt. 36-4 (Amicus Brief of United States Chamber of Commerce, *et al.*, attached to and cited with approval in the Motion) at 16, despite decades of courts around the country holding wrongdoers (including non-profit hospitals) accountable for their misconduct in accordance with the plain text of wiretapping statutes. *E.g.*, *In re Pharmatrak, Inc. Privacy Litig.*, 329 F.3d 9, 3 (1st Cir. 2003).

Atrius glosses over a critical distinction: not all website operators are HIPAA-covered entities obliged to protect patient health information. *See* 45 C.F.R. § 160.103 (defining "covered entity"). And not all websites entice patients to share PHI, as Atrius did here. Atrius, as a healthcare provider, is subject to heightened duties under federal law, and its knowing disclosure of PHI for commercial advantage is a crime under 42 U.S.C. § 1320d-6(b)(3). There is nothing absurd about holding Atrius, a HIPAA-regulated entity, accountable for misconduct that Congress saw fit to criminalize.

Finally, Atrius overlooks that it would not have faced liability had it disclosed its use of tracking technologies and patient communications for targeted ads, as Google and Facebook directed it to do (directions it ignored). ¶¶ 61-62, 74-75, 297; *see also Popa*, 52 F.4th at 132 (rejecting defendants' effort "to convince us about the certainty of any number of 'parade of horribles'" because there no liability "when

the person being recorded knew…that the conversation was being recorded [such as by a] privacy policy [that] sufficiently alert[s] [website users] that [website] communications [are] being sent to a third-party company"). Only those like Atrius, who inexplicably fail to disclose, or worse, deceive patients about the use of tracking technologies face liability.

B. *Plaintiffs Adequately Allege Their State Law Claims.*

In *Vita v. New England Baptist Hosp.*, a case involving the same conduct as here, the Massachusetts Supreme Judicial Court ("SJC") observed that the Massachusetts Legislature has provided "statutory and common-law causes of action to address allegedly false, misleading, or deceptive activity on the Internet, including statutory and common-law protections more directly applicable to misrepresentations or misuse of private medical information." 494 Mass. 824, 849-50 (2024) (fiduciary duty, MRPA, implied contract, and unjust enrichment). Massachusetts courts applying these claims to tracking technologies consistently affirm them. Atrius offers no reason for this Court to depart from such established authority.

1. Plaintiffs State a Claim under the MRPA

The MRPA, M.G.L. c. 214 § 1B, codifies and broadens the common law tort of invasion of privacy. *Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 409 Mass. 514, 519 (1991). This statutory tort includes claims for intrusion upon seclusion **and** disclosure of private facts, two distinct torts well-known at common law, included within the MRPA's "broad" terms. *Polay v. McMahon*, 468 Mass. 379, 382-84 (2014). Atrius conflates the two torts, implying Plaintiffs must prove the elements of **both**. Mem. 13-14. This is wrong; Plaintiffs may state a claim under either theory. More significantly, Atrius ignores the elephant in the room—or perhaps five elephants: the five judges who each independently affirmed MRPA claims for the same conduct as alleged here—the surreptitious use of tracking technologies.[16]

***Disclosure of Private Facts.*** Most of Atrius's authorities concern the tort of intrusion upon

[16] *Doe v. Emerson Hospital*, 2023 WL 8869624, at *4-5 (Super. Ct. Nov. 22, 2023); *Doe v. Boston Medical Center Corp.*, 2023 WL 7105628, at *2 (Super. Ct. Sep. 14, 2023); *Alves v. BJ's Wholesale Club, Inc,* 2023 WL 4456956, at *4-6 (Super. Ct. June 21, 2023); *Tenet Healthcare*, 731 F. Supp. 3d at 151-52; *Doe v. Partners Healthcare Sys.*, No. 1984CV01651-BLS1 (Mass. Super. Ct. Nov. 20, 2020) at 44 (attached as Exhibit 1); *see also Vita*, 494 Mass. at 849-50 (MRPA claim "cognizable").

seclusion. Atrius argues Plaintiffs had no reasonable expectation of privacy because "people expect data about their web browsing to be collected" and there were no "highly personal" facts disclosed. Mem. 13-14. Atrius ignores Plaintiffs' well-pled allegations of disclosure of private facts.[17] ¶¶ 312-14, 316-23. Plaintiffs allege that patients' communications with their healthcare provider, for which they had a reasonable expectation of privacy, were secretly shared with third parties. The nature of those facts disclosed—including Plaintiffs' status as patients (¶¶ 18-20, 28-34, 79, 180-84, 190-93, 206, 282, 288, 294), and detail regarding their doctors and medical conditions, among other things (¶¶ 17-20, 79, 82, 95-96, 99-100, 109-10, 113, 166-67, 169-74, 176-80, 184-86, 188-89, 194-95, 197-99, 205, 208-09) reflects sensitive information for which Plaintiffs had a reasonable expectation of privacy. Such facts fit comfortably within the MRPA's scope. *Emerson,* 2023 WL 8869624, at *3 (affirming MRPA claim based on tracking technologies' disclosure of private facts); *Tenet Healthcare,* 731 F. Supp. at 151-52 (same).

***Intrusion upon Seclusion.*** Allegations of "electronic surveillance" state a claim for intrusion upon seclusion under the MRPA. *Polay*, 468 Mass. at 382-84 (2014). Every court that has applied *Polay* to the same conduct as here affirms the intrusion claim. *Boston Medical Center Corp.*, 2023 WL 7105628, at *2; *Emerson,* 2023 WL 8869624, at *3; *Alves,* 2023 WL 4456956, at *6-7.

Ignoring on-point Massachusetts authority, Atrius relies on out-of-state cases construing common law to argue that there is no "invasion" because Plaintiffs voluntarily used Atrius's website. Mem. 13.[18] Although Plaintiffs voluntarily communicated **with Atrius**, they did not agree to have Facebook and Google eavesdrop on those communications. Atrius intruded upon Plaintiffs' seclusion by planting a digital bug that allowed Facebook and Google to eavesdrop, a theory affirmed by the

[17] The MRPA is broader than the common law claim for disclosure of private facts because under the MRPA, broad publication of such private facts is not required. The SJC has held that "publication" even among a limited group of employees within a firm is enough, and the MRPA "depart[s]…from the Restatement's concept of the tort" in this respect. *Bratt v. Int'l Bus. Machines Corp.*, 392 Mass. 508, 519 & n.15 (1984).

[18] Atrius's principal authority for this argument, *Webb v. Injured Workers Pharmacy, LLC*, 2023 WL 5938606, at *5 (D. Mass. Sept. 2023), involved a data breach involving medical information, but the court's dismissal of the MRPA claim was not because there was "no affirmative invasion" but because the defendant (the company whose systems were breached) did not act intentionally. Here, of course, Plaintiff alleges that Atrius's conduct in deploying tracking technologies that disclosed to third parties and commercially exploited patient communications was intentional.

Massachusetts decisions cited in the paragraph above.

Atrius's contentions about whether any disclosures were "personal," even though misguided given Plaintiffs' allegations, are not relevant to the intrusion upon seclusion claim. Indeed, a federal court recently affirmed a jury verdict and class certification against Google regarding tracking technologies in cell phone apps, rejecting arguments that the claim depended on the content or degree of sensitivity of the intercepted information. *Rodriguez v. Google LLC*, 2026 WL 252570, at *11 (C.D. Cal. Jan. 30, 2026). The court credited Plaintiffs' theory that Google "collect[ed] certain data *after it said it would not*," and that the "nature of the data collected played [only] a supporting role." *Id.*

***Atrius's False Promises Support Plaintiffs' MRPA Claim.*** Atrius's "expectation of privacy" and "serious" invasion arguments disregard a critical fact—Atrius's false promises to patients that it would not "use [or] disclosure [patient] health information" without "a written authorization" (¶ 214) and "never share your information" for "marketing purposes" without "written permission" (¶ 215), which is precisely what Atrius did by deploying tracking technologies. Such false promises support invasion-of-privacy claims and provide ample basis for a reasonable expectation of privacy. *In re Facebook Inc. Internet Tracking Litig.*, 956 F.3d 589, 602 (9th Cir. 2020) (affirming intrusion upon seclusion claim where "tracking" contradicted "privacy disclosures"); *In re Google, Inc.*, 806 F.3d 125, 150-52 (3d Cir. 2015) (reversing dismissal of intrusion upon seclusion claim where Google's practices contradicted its own disclosures); *Alves,* 2023 WL 4456956, at *6-7 (affirming MRPA claim based on retailer's breaches of its own promises).[19] The fact that Atrius also disregarded Google and Facebook's directions requiring Atrius to obtain consent and not to use tracking technologies on healthcare websites (¶¶ 61, 74-75) only further

[19] *See also Wiley v. Universal Music Group, Inc.,* 2025 WL 3654085, at *5-6 (N.D. Cal. Dec. 17, 2025) (affirming privacy claim where defendant "promise[d] that users would not be tracked"; *Walsh v. Dollar Tree Stores, Inc.,* 2025 WL 2939229, at *14 (N.D. Cal. Oct. 16, 2025) (although "the internet is not a place where users have a reasonable expectation of privacy," such expectations may arise where business "***itself*** creates a reasonable expectation of privacy" by deceptive statements to consumers); *Heerde v. Learfield Commc'ns, LLC*, 741 F. Supp. 3d 849, 864-65 (C.D. Cal. 2024) (allegations that tracking technologies implemented "surreptitiously" support invasion of privacy); *Meta Pixel Healthcare*, 647 F. Supp. 3d at 799-800 (defendant's violation of its own "policies…tend[s] to support" a "fairly strong" intrusion claim); *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1076 (N.D. Cal. 2021) (intrusion claim appropriate where company's "privacy disclosures at the time allegedly failed to acknowledge [the] tracking …[and] suggest[ed] that users' information would not be tracked"); *Medstar Health, Inc.,* 2020 WL 14005240, at *3 (similar).

shows a reasonable expectation of privacy and that the intrusions were "serious."[20]

Atrius's deception and its violation of its own, Google's, and Facebook's policies also rebuts its argument (Mem. 15-16) of a "legitimate business purpose." Whatever "legitimate" reasons a business may have to "use" tracking technologies, there is no legitimate reason to lie to patients about them or to disregard Google and Facebook's directions to obtain consent and not use them on healthcare sites.[21]

2. Plaintiffs State a Claim for Breach of Fiduciary Duty

Massachusetts courts have routinely affirmed fiduciary duty claims under Massachusetts law for hospitals' surreptitious use of tracking technologies. *Tenet*, 731 F. Supp. 3d at 149-51 (holding plaintiff "states a viable claim of breach of fiduciary duty against her healthcare provider for disclosing her Private Information"); *Emerson,* 2023 WL 8869624, at *3; *A.J.,* 2024 WL 4579143, at *3-4; *Partners Healthcare* (margin order and transcript, attached hereto as **Exhibit 1**); *Vita*, 494 Mass. at 849-50 (fiduciary duty claim "cognizable" for secret use of tracking technologies). These decisions are consistent with controlling Massachusetts law, which provides that "a duty of confidentiality arises from the physician-patient relationship, and that a violation of that duty resulting in damages, gives rise to a cause of action sounding in tort." *Alberts v. Devine*, 395 Mass. 59, 68-69 (1985).

Notwithstanding Atrius's musing (without legal analysis) about whether Atrius owed any fiduciary duty as a medical "provider" (Mem. 16), Massachusetts law is clear that both individual physicians **and** healthcare businesses owe fiduciary duties to patients. *Emerson,* 2023 WL 8869624, at *3; *A.J.,* 2024 WL

[20] Indeed, in one of Atrius's cases finding no MRPA violation, the court emphasized that the employer complied with "policies [it had] in place to limit the dissemination of that information." *Carmack v. Amtrak*, 486 F. Supp. 2d 58, 81 (D. Mass. 2007). In contrast, here, Atrius violated its own policies, and rather than limiting dissemination, it handed over patient communications to Google and Facebook, permitting them to use the intercepted content without limitation. Likewise, in *Garrity v. John Hancock Mut. Life Ins. Co.*, 2002 WL 974676, at *2-3 (D. Mass. May 2, 2002), an employer disclosed through written policies that it may review employee emails (the basis for the plaintiff's claim), much different than Atrius's breaches its own written policies. *See also Hubbard v. Google LLC,* 2024 WL 3302066, at *7 (N.D. Cal. July 1, 2024) (yet another case Atrius cites; emphasizing: "This is not a case involving secret or deceptive data collection.").

[21] Atrius's out-of-state decisions are outliers. Courts construing other states' law (with standards more stringent than the MRPA) affirm such claims for the same conduct. *See, e.g.*, *Brahm*, 2024 WL 3226135, at *3-4; *Doe v. Medstar Health, Inc.,* 2020 WL 14005240, at *2-3 (Cir. Ct. Aug. 5, 2020); *Lamarr v. Goshen Health System, Inc.*, 2023 WL 6690582, at *3 (Super. Ct. Oct. 12, 2024); *R.C.*, 733 F. Supp. 3d at 888-95.

4579143, at *3-4 (affirming duty against healthcare company); *Tenet*, 731 F. Supp. 3d at 151 ("fiduciary relationship exists between healthcare providers and patients"); *In re Shields Health Care Grp., Inc. Data Breach Litig.*, 721 F. Supp. 3d 152, 165 (D. Mass. 2024) ("Plaintiffs have adequately pleaded that as their healthcare provider, Shields [Healthcare Group] was their fiduciary.").

Atrius argues that Plaintiffs' communications were not sufficiently related to Atrius's duty. Mem. 11-13. Atrius's primary authority for this point—*Korper v. Weinstein*, 57 Mass. App. Ct 433 (App. Ct. 2003), is distant from the facts here; the conduct giving rise to purported liability—a patient-physician affair—had no logical connection to the fiduciary relationship. Here, Plaintiffs present detailed allegations regarding their communications that reveal their status as Atrius patients (¶¶ 18-20, 28-34, 79, 180-84, 190-93, 206, 282, 288, 294) connected to personal medical information, including their doctors, medical conditions, information about their appointments, and medical searches (¶¶ 17-20, 79, 82, 95-96, 99, 100, 109-10, 113, 166-67, 169-74, 176-80, 184-86, 188-89, 194-95, 197-99, 205, 208-09, 279, 282). Atrius's insistence that *Alberts* protects only disclosure of "medical facts" (Mem. 17) ignores that Plaintiffs allege such facts.

Atrius's similar argument that communications through the Atrius website "could have been done by anyone" (Mem. 16) ignores that **<u>Plaintiffs are patients</u>**, and their communications with Atrius, including their use of the patient portal and their communications on various pages that revealed specific information about them (including their specific medication conditions and the identities of their doctors), are indisputably related to their physician-patient relationship. That Atrius "disclaimed any 'doctor-patient' relationship based on…website activity" (Mem. 17) is beside the point because Plaintiffs do not allege they were patients **<u>because</u>** they visited the website; their patient relationship arose from the medical services they received, and their communications related to those services. ¶¶ 17-20.

Finally, Plaintiffs' claims arise not only from the disclosure of patient communications but also Atrius's subsequent commercial exploitation of those communications. ¶¶ 4-5, 7-8, 54-56, 58, 69-73, 103, 162-64, 179, 185-87, 189, 191, 193, 203, 206-07, 209. Atrius ignores those allegations, but they are

significant: a fiduciary's commercial exploitation of information entrusted to it breaches the fiduciary duty it owes to patients, separate from any disclosure.[22]

3. Plaintiffs State a Claim for Breach of Contract.

Atrius's arguments on breach of contract (Mem. 18-19) disregard Plaintiffs' detailed allegations and established Massachusetts law affirming contract claims under substantively the same facts. *Emerson,* 2023 WL 8869624, at *3; *Tenet Healthcare*, 731 F. Supp. 3d at 149-50; *see also Vita*, 494 Mass. at 849-50 (implied contract claim "cognizable" based on undisclosed use of tracking technologies).[23]

Atrius's argument that a claim arises only if Plaintiffs' "names and addresses or test results" were disclosed (Mem. 18) ignores that tracking technologies connect intercepted communications to patients' real-world identities. ¶¶ 3, 4, 38-39, 50-51, 59, 71, 77, 100-01, 114, 120-53, 155-62. That association—which facilitates individualized ads—is the whole point of the tracking technologies. *Id.* & ¶¶ 50, 54-59, 69-73. Atrius's refrain that "browsing data…could have been associated with any [website] visitor" (Mem. 18) ignores that the tracking technologies were designed to identify individuals. In any event, Atrius cites no authority that disclosure of "names and addresses or test results" is required; Massachusetts law instead affirms claims based on facts like those here. *Emerson,* 2023 WL 8869624, at *3 (affirming claim based on disclosure of "IP address," "Find-A-Doctor" searches, and appointment requests); *Tenet*, 731 F. Supp. 3d at 147-48, 150 ("patient status" and "health conditions and treatments").

Atrius's argument that it did not "assent" to any contract ignores the policies it drafted. ¶¶ 2, 213-18, 339, 358. Atrius argues "nothing shows there was a meeting of minds" (Mem. 18), but *Emerson* squarely rejected that argument, finding an "implied promise [may be] evidenced by [a hospital's] privacy

[22] Restat. 3d of Agency, § 8.05 (fiduciary owes duty "not to use…confidential information of the principal for the [fiduciary's] own purposes"); *United States v. O'Hagan*, 521 U.S. 642, 652 (1997) ("[A] fiduciary's undisclosed, self-serving use of a principal's information" for the fiduciary's financial interests is a "breach of a duty of loyalty and confidentiality"); *SEC v. Willis*, 787 F. Supp. 58, 61-62 (S.D.N.Y. 1992) (when "patient…entrusts [a fiduciary] with information," fiduciary "becomes duty-bound not to appropriate the [information] for his own use").

[23] Other jurisdictions are in accord, particularly where a privacy policy falsely promises non-disclosure. *Lamarr*, 2023 WL 6690582, at *3 (implied contract claim based on "failure [of hospital] to comply with [its] privacy policy"); *Bon Secours*, 2021 WL 9939010, at *1; *Elkins v. Bartholomew County Public Hosp.,* 2024 WL 5471834, at *4 (Super. Ct. Dec. 16, 2024).

policies" and "statement[s] on its website." *Emerson,* 2023 WL 8869624, at *4-6.

Atrius's argument that a visit to its website on its own does not create a patient relationship (Mem. 19) again ignores that **Plaintiffs were patients**, not because they visited the website, but because they obtained medical care from Atrius, and their communications on the Atrius website related to that care.

Finally, Atrius's argument that Plaintiffs did not "read" Atrius's privacy policy (Mem. 19) ignores that contract claims do not require proof of reliance, *Good v. Uber Techs., Inc.*, 494 Mass. 116, 141 (2024), and, the policies reflect reasonable, objective expectations of the parties that can be implied at contract terms, regardless of whether Plaintiffs read them. *Emerson,* 2023 WL 8869624, at *4-6.

4. Plaintiffs Allege Cognizable Injuries and Damages.

Atrius's arguments on injuries and damages, made only for Plaintiffs' fiduciary duty and contract claims (Mem. 17-19), ignore Plaintiffs' detailed allegations that describe an established, mature market for the intercepted communications. ¶¶ 237-51. Plaintiffs' allegations are sufficient under Massachusetts law. *Emerson,* 2023 WL 8869624, at *3 (allegations, far less detailed than those here, that "private medical information was disclosed to Facebook" and defendant "and Facebook monetized [plaintiff's] personal health information without compensating him," sufficient at the pleading stage).[24] Each of Atrius's arguments on injury and damages lacks merit.

First, the better-reasoned authority rejects Atrius's argument (Mem. 17), that Plaintiffs must themselves have attempted to monetize their own data to sustain damages in the form of loss of value. *See, K.L. v. Legacy Health,* 2024 WL 4794657, at *11 (D. Or. Nov. 14, 2024) (rejecting requirement that plaintiff "herself would have participated in a market to sell her own confidential data").

Second, Atrius's argument that Plaintiffs suffered no loss in "privacy" because she had no expectation of privacy to begin with fails for the reasons previously discussed. *See* § III-A, *supra.*

[24] *See also Meta Healthcare Pixel Litigation*, 713 F.Supp.3d 650, at *4 (allegation that "Meta unjustly profited from the data taken" is sufficient); *Meta Pixel Tax Filing*, 724 F. Supp. 3d at 1019-21 (allegations of "loss of privacy," "diminution in value," and "loss of the benefit of [the] bargain" sufficient even if not quantified; "[i]f a user shares information with the expectation that it will be protected but the recipient does not actually protect it, then the user has surrendered in that transaction more than she otherwise would have"); *Gay v. Garnet Health*, 2024 WL 4203263, at *2-4 (similar); *Lamarr*, 2023 WL 6690582, at *3 (similar).

Third, Massachusetts law credits allegations, like those here (¶¶ 237-244, 306), that as "part of the payment for…medical services was intended to compensate for [a healthcare provider's] protection of [the plaintiff's] health information." *Emerson,* 2023 WL 8869624, at *3; *A.J.,* 2024 WL 4579143, at *3-4 (crediting similar allegations).

Fourth, Atrius's citation-free argument that Plaintiffs cannot measure damages "based on purported benefits Atrius received" is wrong. The benefit Atrius received provides a legitimate approach to valuing Plaintiffs' harm. *Aspinall v. Philip Morris Cos.*, 32 Mass. L. Rep. 75 (Super. Ct. Feb. 7, 2014) ("defendant's profits is unquestionably a means of calculating actual damages").

5. <u>Plaintiffs State a Claim for Unjust Enrichment</u>

Massachusetts courts affirm unjust enrichment claim under the same substantive facts here, rejecting the same arguments Atrius makes. *Tenet*, 731 F. Supp. 3d at 150-51; *A.J.,* 2024 WL 4579143, at *3-4; *Emerson,* 2023 WL 8869624, at *3 (same); *see also Vita*, 494 Mass. at 849-50 (unjust enrichment claim "cognizable" based on hidden tracking technologies).[25] Each of Atrius's specific arguments lacks merit. The fact that Plaintiffs assert both legal claims and an unjust enrichment claim is permissible; Plaintiffs "may plead" unjust enrichment and legal remedies "in the alternative." *Tenet*, 731 F. Supp. 3d at 150-51. Massachusetts law also rejects Atrius's argument that an unjust enrichment claim arises only if Plaintiffs expected to receive a benefit. *Id.* at 151 (a plaintiff need not plead "an expectation of payment" where the plaintiff "paid for medical services…with the expectation that her health information would remain confidential").

## IV. CONCLUSION

For the reasons stated, Plaintiffs request that the Court deny Atrius' Motion in its entirety.

[25] *See also Zelby Holdings, Inc. v. VideogeniX, Inc.*, 92 Mass. App. Ct. 86, 92-93 (App. Ct. 2017) ("Zelby properly pleaded alternative bases for relief, and dismissal of its unjust enrichment claim would be inappropriate as it presupposes the existence of a valid underlying contract."). Other states are in accord. *Brahm*, 2024 WL 3226135, at *3-4; *Jarrell*, 2025 WL 81305, at *2-4; *Lamarr*, 2023 WL 6690582, at *3 (same); *Elkins,* 2024 WL 5471834, at *4.

March 9, 2026

Respectfully submitted,

*/s/ Patrick J. Vallely*

Edward F. Haber (BBO# 215620)
Michelle H. Blauner (BBO# 549049)
Patrick J. Vallely (BBO# 663866)
**Shapiro Haber & Urmy LLP**
One Boston Place, Suite 2600
Boston, MA 02108
Tel: (617) 439-3939
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

***Attorneys for Jane Doe #1 and the Putative Class***

J. Tucker Merrigan, BBO# 681627
Thomas T. Merrigan, BBO# 343480
Ryan Hawkins, BBO# 686289
Erin E. McHugh, BBO# 703701
**Sweeney Merrigan Law**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
tom@sweeneymerrigan.com
rmh@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*pro hac vice forthcoming*)
David Warden (*pro hac vice forthcoming*)
Justin C. Kenney *(pro hac vice forthcoming)*
Nathan Campbell (*pro hac vice forthcoming*)
**Ahmad, Zavitsanos & Mensing, PLLC**
1221 McKinney Street, Suite 2500
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
jkenney@azalaw.com
ncampbell@azalaw.com

Warren Postman (*pro hac vice forthcoming*)
Alex Dravillas (*pro hac vice forthcoming*)
**Keller Postman LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, Illinois 60606
(312) 741-5220
wpd@kellerpostman.com
adj@kellerpostman.com

***Attorneys for John Doe, Jane Doe #2, and the Putative Class***

**CERTIFICATE OF SERVICE**

I hereby certify that, on March 9, 2026, the foregoing document was filed using the Court's CM/ECF service, which will provide service copies to all counsel of record.

*/s/ Patrick J. Vallely*
Patrick J. Vallely